# Exhibit 5

Dockets.Justia.com

**Apple Computer, Inc. v. Burst.com, Inc.**

**Claim Construction Expert Report of Dr. Sheila S. Hemami**

**October 20, 2006**

# 1. Introduction and Preliminaries

I have been retained by Susman Godfrey L.L.P. to offer expert opinions and testimony regarding digital audio and video compression and transmission. In this report, I am offering opinions based on the following subjects relating to Burst's four patents 4,963,995 ('995), 5,057,932 ('932), 5,164,839 ('839), and 5,995,705 ('705): (1) the underlying technology as understood by a person of ordinary skill in the art; (2) the level of ordinary skill in the art; and (3) what certain of the identified claim terms would mean to a person of ordinary skill in the art. My opinions and testimony on those subjects are based on my review of the patents being asserted by Burst, including the language of the asserted claims, the drawings and specifications, the prosecution history, and the dictionary definitions being offered by the parties.[1] This report and my opinions may be supplemented in light of any further information.

Below in this section, I discuss my qualifications, my previous experience as an expert witness, my compensation, and an outline of the remainder of this report.

## 1.1. Qualifications

Appendix A is my curriculum vitae, documenting the details of my professional experience in the areas of digital signal processing and compression. It also lists all of my publications.

In summary, I have performed research on the general topics of digital signal processing and compression as a graduate student at Stanford University, as a Member of Technical Staff at Hewlett-Packard Laboratories, and as an Assistant, Associate, and Full (effective November 2006) Professor of Electrical and Computer Engineering at Cornell University in Ithaca, New York. I have published over 100 refereed journal and conference papers, and I have supervised nine Ph.D. theses, two M.S. theses, and twenty Masters of Engineering projects on topics in digital signal processing and compression. I have taught graduate classes on digital signal processing, digital image processing, and Wiener and Kalman filtering. I also teach in my classes and have a high level of familiarity with image, video, and audio coding standards, including JPEG and JPEG-2000 (standards for still image compression) and MPEG-1/MPEG-2/MPEG-4 (standards for video and wideband audio compression).

---

1  Materials considered in forming the opinions set forth in this report are included in the accompanying list of references.

I am a Senior Member of the Institute for Electrical and Electronics Engineers (IEEE) and a member of the Signal Processing Society (SPS) therein. *Signal processing* broadly deals with the manipulation or processing of an *information representation* (i.e., a signal) to achieve some end goal, such as compression or transmission. Within the IEEE, I have served as Associate Editor for signal representation, coding and compression for the *IEEE Transactions on Signal Processing* journal. In this position, I coordinated reviews and made editorial decisions on papers addressing both theoretical and practical aspects of data compression applied to a multitude of signals, including audio and video. I am currently the elected Chair of the Image & Multidimensional Signal Processing Technical Committee (IMDSP TC) of the IEEE for 2006-8. *Image and multidimensional signal processing* includes not only processing of conventional images and video signals, but also hyperspectral images, data from grids of sensors, and medical images, to name several examples. The purpose of the IMDSP TC is to promote and guide the advancement of the field of image and multidimensional signal processing, through activities such as coordinating reviews for and sessions within the two major yearly IEEE signal processing conferences (the *International Conference on Acoustics, Speech, and Signal Processing* (ICASSP) and the *International Conference on Image Processing* (ICIP)), nominating community members for technical achievement and service awards, assisting in the selection of SPS Distinguished Lecturers, recruiting associate editors for SPS publications, participating in the development of IEEE standards, and organizing the IEEE's flagship image and multidimensional signal processing conference ICIP. I regularly serve as a reviewer for many IEEE journals and conferences.

I have also served on various review panels for the National Science Foundation, to evaluate research proposals for funding; on the program committees of the *Data Compression Conference*, the *Asilomar Conference on Signals, Systems, and Computers*, and *Video Processing and Quality Metrics*; and on the program committees for several conferences organized by the International Society for Optical Engineering (SPIE): *Human Vision and Electronic Imaging* and *Visual Communications and Image Processing*.

## *1.2.* **Previous Experience as an Expert Witness**

I have served as an expert in the case of National Rural Telecommunications Cooperative, Plaintiff, v. Directv, Inc., Hughes Communication Galaxy, Inc., and Does 1-10, Defendants, in

3

which I testified in a deposition (2002-3).

### 1.3. Compensation

I am being compensated at my standard billing rate of $500/hour plus expenses. My compensation is not contingent on the testimony that I intend to offer in this case.

### 1.4. Outline of this Report

In this report, I am offering opinions based on the following subjects relating to Burst's four patents — '995, '932, '839, and '705, which I will collectively refer to as the *Burst patents* — the underlying technology of the patents as understood by a person of ordinary skill in the art (Section 2), the level of ordinary skill in the art (Section 3), and what certain of the identified claim terms would mean to a person of ordinary skill in the art (Section 4). Section 5 includes a listing of materials considered in forming the opinions set forth in this report.

## 2. The Underlying Technology of the Burst Patents

The Burst patents can be broadly characterized as describing operations upon audio/video source information: reception/transmission (i.e., communication), manipulation of the information (i.e., compression and editing), and storage and recording. Below, I describe the technology available and known to one of ordinary skill in these areas in 1988.

### 2.1. Basic Terminology

In order to discuss the Burst patents, some basic technical definitions are required.

**analog/analog signal** — Information in the form of continuously varying physical quantities.

**digital/digital signal** — Information in the form of digits or discrete quantities.

**bits and bytes** — A bit is the smallest unit of digital information and can take on either of two values: 0 or 1. A byte is a unit of information which contains 8 bits. Bits and bytes are related by the equation

$$\text{number of bytes} = \text{number of bits} \times 8$$

**Kilobits, Megabits, and Gigabits (Kilobytes, Megabytes, and Gigabytes)** — A Kilobit is 1000 bits. Similarly, a Megabit is 1,000,000 bits (a million bits), and a Gigabit is $10^9$ bits (a thousand

million bits). The same prefixes when used with "byte" have equivalent meanings but are counting bytes (i.e., units of 8 bits). Therefore, 1 Kilobyte contains 8 Kilobits, or 8,000 bits. Four Megabits are equivalent to (4/8=) 0.5 Megabytes.

**transmission bandwidth, bits/second, bytes/second** — When digital information is transmitted, the speed of transmission (or transmission bandwidth) is measured in bits/second. For example, if 120 bits are received in 60 seconds, the transmission speed is 120 bits/60 seconds = 2 bits/second. Speed can also be measured in bytes/second by simply converting bits to bytes. In our previous example, 120 bits are 120/8 = 15 bytes, so the transmission speed is 15 bytes/60 seconds = 0.25 bytes/second.

**transmission time —** When digital information is transmitted, the time required to transmit the file can be computed from the file size and the transmission bandwidth as

transmission time (in seconds) = file size (in bits)/transmission bandwidth (in bits/second)

When only an approximation of the transmission bandwidth is known, a corresponding approximate transmission time can be computed.

**compression** — reducing the number of bits necessary to represent the digital signal

## 2.2. Digital Communication Technology and Networks

The Burst patents involve both the reception and transmission of audio/video source information. (Whether this information refers to an entire program or a portion thereof is a claim construction issue; in this section, I will simply use it colloquially to refer to generic audio/video content.) Reception of this source information occurs with the intention of subsequent operations including compression, editing, and storage, and reception of either analog or digital source information can occur.

### 2.2.1 Analog and Digital Communication Basics

*Analog communication* employs communication signals of continuously varying frequency and/or amplitude, in which information is carried in the variations themselves. The information signal is converted to a signal suitable for transmission by a process called *modulation*, and the information signal is recovered from the received signal by a process called *demodulation*. For example, "FM" radio broadcasts employ frequency modulation, while "AM" radio broadcasts

employ amplitude modulation. In analog over-the-air television broadcasts in the United States, as referred to in the Burst patents, the video portion of the signal is transmitted using AM, while the audio portion of the signal is transmitted using FM; these signals are transmitted over regions of the spectrum from 54 MHz to 806 MHz (MHz means *millions of cycles/second*, and is a measure of frequency). In analog cable television in the United States, as referred to in the Burst patents, the same modulation and frequency bands are used for the audio/video signals, but they are transmitted over a coaxial cable rather than over-the-air.

*Digital communication* essentially involves the transmission and reception of bits representing information. Perhaps the most commonplace example of the use of digital communication is by computers (which are inherently digital devices), for transmitting information to and/or receiving information from other devices which use digital communication. For example, the RS-449 and ethernet connections on a computer employ digital communication to communicate with external devices such as other computers on a network. However, digital communication encompasses far more than just computer communication. Digital communication can be described at many levels of abstraction, but here we focus on two aspects — digital communication between a sender and a receiver occurs over one or more *channels* (some of which may be shared), and the system can be described or represented simply by its transmission bandwidth.

Digital communication occurs over a *channel*, which is the physical medium for propagation of an electromagnetic path connecting a transmitter and a receiver. Copper wires, coaxial cable, and fiber optic cable are examples of physical media, while the atmosphere is an example of an electromagnetic path for over-the-air transmission. A channel can also be a composite of multiple transmission systems, in which case it is a *composite channel*.

Connections between users who are communicating digitally can be either point-to-point, in which two users communicate over a channel of which they are the only users, or in a network, in which multiple users simultaneously communicate with each other over shared media. Examples of networks in 1988 included the telephone network (for both digital and analog communications), the NSFNET computer network (the precursor of the internet), and local-area computer networks. The Burst patents mention a network of devices for communicating audio/video source information. *Multiple-access techniques* allow many users to simultaneously communicate over a network and therefore share the communications media. Common techniques for sharing include (but are not limited to) time-division multiplexing, frequency-division

multiplexing, and wavelength-division multiplexing, and several techniques for sharing could be used at the same time. Such sharing is transparent or invisible to users.

One way to allow users to share a channel is to allocate each connection a fixed portion of the total bandwidth, which essentially establishes a fixed connection between two users. This fixed portion is dedicated to the two users, even when they are not communicating anything, until the connection is broken by the users or the network itself. This is called "circuit switching" and has this name based on the history of the analog telephone network: originally, a connection between two telephones engaged in a call would be established as a series of copper wires which were connected by switches in the appropriate positions. In such a connection, the channel formed by the wires and switches was dedicated to the particular telephone call for which it was created. (Eventually, telephone systems evolved to more sophisticated ways of creating a connection between two callers.) By 1988, the term "circuit switched" had evolved to simply refer to dedicated bandwidth providing a dedicated connection in any network and was not limited to the telephone network.

In contrast, "packet switching" in digital communications refers to only allocating bandwidth for communication between two users *when it is needed*. This is accomplished by grouping the bits to be communicated into "packets," labelling each packet with its destination, and including a sequence number. Each packet then travels through the network, taking one of many possible paths, eventually ending up at the destination specified by the address. The receiver then reassembles the received packets into the information signal, using the sequence numbers from the packets to ensure the information is assembled in the correct order. Circuit switching and packet switching provide two techniques for multiple-access to communication networks; however, they both provide the same end-to-end communication of the digital signal and the use of one or the other is transparent to the user.

As an example of a composite channel using the sharing of media over some channels, consider an email message in 1988. Even in 1988, many computer-to-computer communications typically used composite channels (and this is still true today, to an even greater extent with the use of wireless routers to provide home networks, and cable modems and ADSL modems to enable users to access the internet via the cable television coaxial cable system and copper wire local telephone loops, respectively). When I sent my friend at Stanford an email from the University of Michigan in 1988, bits representing my message travelled from my email server

over category-10 (ethernet) cable within the campus. This within-campus transmission was over a shared media (the campus network) governed by a sharing protocol called IP. The ethernet connection was packet-switched. The message was then multiplexed (using time-division multiplexing) onto a digital T1 line with other computer messages as well as digitized voice telephone calls, and it was routed to a digital switch at the Stanford University. The digital T1 line was a circuit-switched connection. The T1 signal itself was then transmitted over a fiber optic link to travel cross-country. At Stanford, the received multiplexed T1 signal was demultiplexed (i.e., extracted from the shared media) and routed again via ethernet cable (on the shared Stanford campus network, which was packet-switched) to my friend's email server. Note that as far as the users (I and my friend) and the email application were concerned, the fact that the digital message travelled over various physical media with different signalling strategies (electrical signalling over the ethernet cable and light pulses over the fiber optic cable) and different sharing strategies is irrelevant. The digital communication technology available enabled the output bits from my email program to appear as input bits to my friend's email program, thereby transmitting the message.

The previous example demonstrates that digital communications can occur over many different types of channels and even over many different types of media in a composite channel, using various multiple-access techniques. Regardless of media, channel, or sharing, digital communication essentially involves the transmission of bits representing information over a *digital communications link*, or simply a *communications link*. A communications link is simply a connection between one device and another provided by one or more media over which information can be transmitted and received. A communications link can be characterized by its bandwidth, representing the effective transmission speed between the sender and receiver. This level of abstraction is sufficient for many digital system design applications, in which the system has a specific task or application. Such a designer (i.e., the Burst inventor) is not concerned with the details of transmission media, physical signalling over that media, or sharing protocols for media, but rather that he can count on reception and transmission of sequences of (possibly many) bits representing of information which is used by or is relevant to his application.

Below, the digital communications techniques mentioned in the Burst patents are discussed. ISDN and B-ISDN, both near-future technologies that were under development and widely anticipated in 1988, are also discussed.

### 2.2.2  Analog and Digital Reception and Transmission in the Burst Patents

*Analog reception* is the receiving or input of an analog signal into a device, and is described in the Burst patents as occurring over a video line/camera input line (receiving signals transmitted over a coaxial cable) or through a radio-frequency (RF) tuner which allows reception of either over-the-air (analog) broadcasts or cable TV transmission over coaxial cable. *Analog transmission* in the Burst patents is described as delivery of analog output signals over either an analog video output line (which could then be displayed on a television with a "video in" jack) or over an RF modulator which allows subsequent reception and playback of the signal by a conventional television set or VCR, and converts signals to a format such that a television can receive and display it by tuning to a particular channel. The analog signals representing audio/video source information described by the patents include a standard television composite signal such as NTSC (i.e., the analog television format in use in North America and Japan) as well as other broadcast television formats (PAL, used in Europe except for France, and SECAM, used in France, as well as high-definition TV (HDTV)).

Digital *reception* in the Burst patents is described as occurring over an audio/video transmitter/receiver such as a modem (e.g., connected to a telephone line), a fiber optic input/output port (connected to a fiber optic cable called a "signal line"), an auxiliary digital input port which generically receives any acceptable digital signal, or a microwave transceiver (which receives either point-to-point terrestrial microwave transmissions or satellite transmissions). Digital *transmission* is described as occurring over the same modem, fiber optic port, or microwave transceiver. In addition, as I describe below, the auxiliary digital port would be understood to support bidirectional communication. Below, I describe each of these digital communications media in terms of the physical link, the bandwidth/bit rate characteristics, and the availability at the time of the Burst patents.

### 2.2.3  Digital communication via fiber optic cables available in 1988

The late 1980's saw explosive growth in the installation of fiber optic cabling in the United States. As a physical media, fiber optic cables signal using light, and a single fiber optic cable can carry many individual communication signals through multiple access techniques suitable for fiber optic transmission. In the mid 1980's, trial fiber optic systems with data rates of 565 Megabits/second and 1.7 Gigabits/second were being tested, with commercial installation

9

underway in 1986-1987. By mid-1988, 2.5 million kilometers of long and short-haul fiber had been installed worldwide and by 1987 MCI had installed a coast-to-coast fiber optic network in the United States.

While fiber existed for long-haul transmission in the 1988 time frame, it was not yet a commodity for digital communications. In the 1988 time frame, users wishing to employ fiber optic communications for their communication needs had several options. Two examples are given below (this list is not exhaustive, but representative).

- Users could install their own fiber and then employ a *Fiber Distributed Data Interface* (FDDI) local area network (LAN). The FDDI interface is a specification for a 100-Megabits/second LAN using fiber-optic cable, and provides data transmission rates of 100 Megabits/seconds.

- *Datakit* was an AT&T proprietary fiber optic network which was deployed by the regional Bell operating companies; it was designed at Bell Labs and sold by AT&T. This system was a single network that could be used to connect equipment between 10 meters and 100 kilometers apart.

### 2.2.4  Digital communication via microwave transmission in 1988

The two microwave communication applications to which the Burst patents refer are *point-to-point terrestrial digital radio* and *digital satellite communication* (the microwave frequency range starts at frequencies of 1 Gigahertz). Point-to-point terrestrial digital radio refers to transmission via radio waves between two antenna which have a direct line-of-sight between them, and is often used as an alternative to coaxial cable in locations where running cables is impractical. Satellite communication refers to communication between two locations on the earth in which the signal is relayed by communication satellites in geosynchronous orbits at an altitude of 22,300 miles. Satellite communication only requires line-of-sight to the satellite and therefore anyone on Earth with line-of-sight to the satellite can use the communications link.

The raw signalling rate of a single terrestrial microwave link is approximately 1 Gigabit/second. The antennas use highly directional beams to maximize the received energy and are a common sight atop buildings in urban areas and in rural areas.

A typical communications satellite in 1988 had approximately a dozen transponders, each of which could provide a single data stream of 50 Megabits/second.

10

### 2.2.5  Digital communication via dial-up modem technology in 1988

While twisted-pair copper wires, such as those that were in place in telephone local subscriber loops (i.e., the wires that went to residences and to the central telephone office), can provide a digital bandwidth of 1.5 to 6 Megabits/second, the equipment in place to allow analog voice calls to occur constrains the signalling that can be used on these wires. As a result, local loops could not be used for digital communications in 1988 without the use of a *modem*. A modem, which stands for modulator/demodulator, communicates digital signals over analog channels through strategic signalling and thus allows a computer to communicate digitally over the (analog components of the) telephone network. In 1988, the fastest generally available commercially available modems operated at 9.6 Kilobits/second.

### 2.2.6  Digital communication for computers in 1988

Computers are inherently digital devices and they communicate with other computers and other external devices using digital communication. In 1988, many standardized techniques for digital communication involving computers existed. These techniques were bidirectional — they allowed both digital transmission and digital reception over the same cable and using the same port on the computer or device itself. As examples, RS-232 digital communication provided a data rate of up to 20 Kilobits/second. RS-449 provided 2 Megabits/second over distances up to 60 meters, and higher speeds over shorter distances. Ethernet (also called IEEE 802.3) provided data rates of approximately 1-10 Megabits/second.

### 2.2.7  Near-future digital communication in 1988: ISDN and B-ISDN

In 1988, planning of the *Integrated Services Digital Network* (ISDN) was well underway and the network was highly anticipated in the communications community. ISDN was to be a telephone network in which the internal network and the local loops (i.e., the lines going to residences) were entirely digital, thereby allowing voice traffic and data to be carried in an integrated fashion. In 1988, two basic rates were envisioned: 144 Kilobits/second for home users and 1.544/2.048 Megabits/second to businesses and users with higher bandwidth needs. ISDN was envisioned to operate over existing copper wires using an ISDN modem.

The explosive growth of fiber optic installation, however, suggested that eventually fiber would be used in the local loops, and *Broadband ISDN* (B-ISDN) was in its early stages of standardization in 1988, with an expectation of full implementation in the mid 1990's. B-ISDN

11

would provide data rates from 64 Kilobits/second to multiple Gigabits/second, with the standard user access rate being 155 Megabits/second.

## *2.3.*  **Video and Audio Sources and Compression**

The Burst patents utilize *compression* to reduce the number of bits (i.e., the size of the file) required to represent the audio/video source information. In order to compress this information, it must first be converted to digital form — to a sequence of 1's and 0's. Following digitization, the information is compressed using audio-specific and video-specific compression algorithms. (In this section, the term video will be used to refer solely to the visual portion of the information.)

Below, I first discuss general characteristics of the original analog audio and video sources and I then discuss digitization of these signals. I provide a general overview of compression as applied to audio and video source information, and then discuss specific examples of audio compression and video compression.

### *2.3.1*  **Video and Audio Sources**

Video and audio are inherently time-varying analog signals that convey visual and auditory information, respectively. Any video or audio signal has a "length" — the length of the song, or the video clip, or generally the work — which is the time required to view or listen to the signal at its intended playback speed.

Audio can be either one-channel (monophonic) or two-channel (stereophonic). The time-varying analog waveform represents pressure variations, which are sensed by the eardrum and interpreted by the brain as sounds. An audio signal in its entirety has an associated "length" representing the time required to play the signal from a recording or to listen to it. If the analog signal is played back at the incorrect rate (e.g., if a record player turns a 33 rpm LP record at 45 rpm instead of 33 rpm, or if a cassette tape is sped up during playback), the audio frequencies are shifted, resulting in a distorted sound and a misrepresentation of the actual signal. A similar distortion occurs when the playback speed of digital audio is increased.

Video is a sequence of images called *frames* intended for display at a regular time interval representing a scene or scenes in space and time and providing the illusion of motion when viewed sequentially. The inverse of the time interval is called the frame rate; this time interval is 1/30 second for television in the United States with a corresponding frame rate of 30 frames/ second. Provided that the frame rate is sufficiently high (generally thought to be 24 frames/

second), the motion appears smooth and nonjerky; such video is generally called "full motion video." A video signal in its entirety also has a time associated with it: the time required to play or view the entire signal at its normal frame rate, which again is commonly called the "length" of the video and is measured in seconds, minutes, or hours. If this time interval is reduced, i.e., if the video is played back at a faster rate than intended, all motion in the video will appear faster than intended, as if it occurred in "fast forward" mode. An increase in the time interval, or slowing down of the display rate, will make all motion appear slower than intended, as if it occurred in "slow motion."

### 2.3.2  Digitization of Audio and Video Source Information to form Digital Audio and Video

Digital audio is obtained by first *sampling* the analog audio signal at a sampling rate which is fast enough to capture the variations in the signal, and then representing the resulting samples in digital form so that they can be stored in a computer. A sample is simply the value of the audio (i.e., a number) at a time instant, and the samples are equally spaced in time. The audio can be filtered prior to digitization to lower the required sampling rate. General audio content such as music and television and movie sound tracks is sometimes called *wideband audio* to emphasize its rich harmonic nature and to delineate it from speech (sometimes called *narrowband audio*). Because wideband audio typically has a much greater range of harmonic content and also exhibits different statistical signal characteristics, compression techniques for audio were developed separately from those for speech.

The Burst patents refer to audio sampled at a rate of 88,000 samples/second and represented by 8 bits/sample. This combination produces bits at a rate of 704 Kilobits/second, suggesting that digitized audio files can be quite large. For example, digitizing a song with a 2 minute duration would produce 84.5 Megabits, or 10.6 megabytes (88,000 samples/second x 8 bits/sample x 120 seconds = 84.48 Megabits).

While digital audio is obtained by simply sampling and quantizing an analog audio signal, digital video is *not* obtained in an analogous manner. Digital video refers to a sequence of digital images (frames) with a temporal spacing associated with them, suggested to be 1/30 second in the Burst patents. Each digital frame is a a two-dimensional (2-D) array of numbers called *pixels* (short for *picture elements*). Each pixel in a color image is represented by three numbers, each of which represents the amount of red light, green light, and blue light, respectively, which will combine to create the correct pixel color. This method of describing colors is known as "RGB."

13

With 7 bits for each red, green, and blue value as given in the Burst patents and each value ranging from 0 (indicating none of a particular color) to 127 (indicating the maximum amount of that color), 21 bits are required to store all the information required to create the color pixel.

The Burst patents refer to video with a frame size of $300 \times 300$ pixels, 21 bits of color information for each pixel, and 30 frames/second. This combination produces bits at a rate of 56.7 Megabits/second, suggesting that digitized video files can be extremely large. Digitization of the video for a 2-hour movie would therefore produce 408 Gigabits, or 51.03 Gigabytes.

Clearly, the file sizes produced by digitization of audio and video are extremely large. In 1988, a CD-ROM could hold 682 Megabytes or approximately 80 minutes of audio. No single storage media existed which could hold a digitized 2-hour movie (or even a 30 minute television program). Transmission of these files over a digital communication link required transmission time which increased in direct proportional to the size of the file (see *transmission time* in Section 2.1). A processing technique for the source information that would result in smaller files would allow for more efficient use of both storage media and transmission media. Such a processing operation is called *compression*.

### 2.3.3  An Overview of Data Compression and its application to Audio/Video Source Information

Compression reduces the number of bits (i.e., the size of the file) required to represent the audio/video source information. *Compression* is a common shorthand term for *data compression*. Compression can be performed in one of two regimes: *lossless compression* and *lossy compression*. Lossless compression permits an exact recovery of the original signal on a bit-for-bit basis. Lossy compression provides greater compression (smaller file sizes), but the original signal cannot be recovered in its original bit-for-bit form from the compressed representation. In the case of audio and video information, lossy compression can be quite effective because a perfect bit-for-bit representation of the original is not necessary. Rather, the information can be represented in a manner such that it sounds to the human ear (in the case of audio) or looks to the human eye (in the case of video) equivalent to the original. If the listener or viewer is willing to accept some degradation in the audio or video quality, even further compression (i.e., smaller file sizes) is possible.

A general compression system model for both audio and video information consists of three operations illustrated in Figure 1: *data pre-processing*, *data retention/discarding*, and *entropy*

14

*coding*. *Data pre-processing* performs operations on the input signal to facilitate selection and retention of only the most important data required to represent the signal. As an audio example, consider that humans have a lower sensitivity to distortions in heavy metal music than to distortions in symphonic music (i.e., it is easier to hear distortions in the symphonic music). The data pre-processing stage locates sections in the input signal where some information could be discarded without causing a significant impact on the perceived quality of the audio, and then represents the signal in a manner that facilitates retaining only the important information in the second stage. The *data retention/discarding* stage retains only the salient information while strategically discarding other information. This is generally performed by an operation called *quantization*. Because of the close relationship between the processing and selection/discarding, these two stages are often implemented as a single super-stage. Finally, the *noiseless coding* stage compacts the bitstream which is output from the data retention/discarding stage and represents it using as few bits as possible. Many *noiseless coding* techniques were well known in 1988 and examples include Huffman coding, Lempel-Ziv coding, and Elias coding.

For audio/video source information, two general approaches for compression were known in 1988, and both approaches appear in the Burst patents. These approaches are applied in different manners to audio and video because of the nature of the difference between audio, which only varies in time (i.e., an audio signal can be written as a function of time only), and video, which varies in both time and space (i.e., frames vary over time). However, the general concepts are the same and are as follow.

- Approach 1: data is treated *independently*. Information at each time instant is treated independently of all other information at all other time instants. Using the nomenclature from Section 2.3.2, each *sample* is treated independently. The benefit of this approach is its simplicity.



**Figure 1**  Three components of a compression system model for audio and video information.

- Approach 2: data is treated *dependently*. Information in a number of sequential time instants is treated together. Again using the nomenclature from Section 2.3.2, multiple samples are treated simultaneously. This approach is particularly appropriate for audio and video signals, in which samples which occur close together in time are likely to be very similar to each other (consider that adjacent frames in video occur 1/30 second apart, and therefore not much has changed between two time instants). The benefit of this approach is that for signals which exhibit a similarity between adjacent samples, treating data dependently provides more efficient compression than treating data independently.

For audio, the information at a time instant is simply a single sample of the audio information — a single number. Approach 1 is called *pulse-coded modulation* (PCM) or PCM coding and Approach 2 is called *differential pulse coded modulation* (DPCM) or DPCM coding. These techniques are described in greater detail in the next section.

For video, information at a single time instant is a frame — a two-dimensional array of pixels. Approach 1 is called *intraframe coding*, and approach 2 is called *interframe coding*. These techniques are described in greater detail in the following sections.

Any compression procedure is described by an *algorithm*, which is broadly defined as a procedure for solving a problem or accomplishing some end. An algorithm can be implemented in a variety of different ways. It can be implemented in software, in which it is written as a computer program in a programming language such as Basic, Fortran, or C. The program can then be stored in memory on a general purpose computer such as a Macintosh or a PC and run by a user by typing on the computer keyboard or by using a mouse to click on an icon on the computer monitor. The program can also be run by being started by another program. An algorithm can also be implemented in hardware. For example, a computer chip could be designed specifically to perform a particular algorithm, by selecting and interconnecting circuits on the chip to provide exactly the operations required by the algorithm in the required order. A hardware implementation can also be created by selecting individual specialized chips to perform each operation required by the algorithm, and then interconnecting those chips with wires. Finally, an algorithm can be implemented using a combination of both software and hardware by using a programmable chip such as a microprocessor that would normally be used in a personal computer, in conjunction with several specialized chips, all of which are connected with wires. This combination would include

memory to store the computer program, along with an interface which allowed a user to control the operation.

### 2.3.4  PCM and DPCM Digital Audio Compression in 1988

In the 1988 time frame, both approaches described in the previous section were known for compression of wideband audio signals. Again, I draw a distinction between speech and more general audio content which includes music. Because music typically has a much greater range of harmonic content and also exhibits different statistical signal characteristics, compression techniques for audio were developed separately from those for speech. Here, I focus on the compression of audio and not speech because general audio content is what appears in the Burst patents.

Both approaches described in the previous section — treating samples independently (PCM) and treating samples dependently (DPCM) — were known for audio compression in 1988. In the simplest PCM technique, the number of bits used to represent each sample is simply reduced. For example, the Burst patents describe audio represented with one byte/sample (i.e., 8 bits/sample). Simply reducing the number of bits for each sample to 6 bits/sample reduces the file size of our two minute song by a factor of 1.3, from 84.5 Megabits to 63.7 Megabits. More sophisticated PCM techniques provided compression which would represent our 2-minute song in 23-38.4 Megabits, reducing the file size by a factor of 2.2 to 3.7 relative to its original size of 84.4 Megabits.

In DPCM coding, samples are treated dependently by computing the differences between adjacent samples. These differences are then subject to data selection/discarding and noiseless coding, rather than the actual samples themselves. Differential pulse code modulation is sometimes shortened to simply *differential coding* or *differential compression*. DPCM is also called *predictive coding* because the difference operation represents forming the difference between a sample and a prediction of that sample. If the prediction is accurate, the difference is small and can be represented using fewer bits than representation of the sample itself. Variations on DPCM coding that were applied to audio also included *adaptive DPCM* (ADPCM), in which differences (or predictions) were determined in a manner that depended on the properties of the particular audio signal being compressed. Most generally, DPCM need not be applied to the samples themselves, but can be applied to processed samples. For example, the samples could be filtered or otherwise processed prior to compression using DPCM coding. DPCM coding and its

17

variants generally require fewer bits than PCM coding to provide the same audio quality.

The Burst patents refer to "conventional algorithms" for digital audio compression, which would include any of the techniques described here, and identify as an example Fibonacci delta compression, which is a form of DPCM coding.

It was during this same time period that the MP3 standard for audio compression was developed. In 1987 the EUREKA project began at Fraunhofer Labs in Germany, and that project eventually produced the MP3 audio compression standard which was adopted in 1989. The MP3 standard is very sophisticated but employs versions of DPCM.

### 2.3.5  Intraframe Video Compression

In the 1988 time frame, both approaches described in Section 2.3.3 were known for compression of video signals. In this section, I discuss the first approach, in which data is treated *independently*. Recall that in this approach, information at each time instant is treated independently of all other information at all other time instants.

For video, information at a single time instant is a frame, and Approach 1 is called *intraframe coding*. Intraframe coding simply compresses each frame independently, treating each frame as an individual image. In 1988, there were many techniques known for the compression of individual images which could simply be applied to each frame.

Images could be compressed by simply allowing a fewer number of colors. For example, in the Burst patents, each color is represented by 21 bits, allowing a total of $2^{21}$ different combinations of bits and hence different colors. Representing each color by 15 bits, allowing a total of $2^{15} = 32,768$ colors, reduces the file size by a factor of 21/15=1.4.

Greater compression could be achieved by using *transform coding* on individual frames. In 1988, transform coding was well known for images and was nearing adoption in a standard which we now know as JPEG. In transform coding, an image is mathematically decomposed into components which can be mapped to the way in which the human visual system processes images. This facilitates data selection/discarding, which can be tuned to retain components which are easier to see and to discard components which are more difficult to see. The data selection/discarding step is followed by a noiseless coding technique. Such transform coding techniques can reduce file size by typical factors greater than 4.

The Burst patents suggest intraframe video coding in mentioning the example of CCITT Group IV algorithm, which is a compression algorithm for bilevel images.

18

### 2.3.6  Interframe Video Compression

In this section, I discuss the second approach, in which data is treated *dependently*. Recall that in this approach, information in a number of sequential time instants is treated together, and one way that this was achieved in audio coding was by using DPCM coding. The idea in video is similar, in that differences between successive frames or portions thereof are coded rather than the frames themselves. In video, such coding is called *interframe coding*.

The Burst patents refer to interframe video compression in column 5. Interframe video compression typically achieves greater compression than intraframe compression. Intraframe video compression may be inefficient when frame content is considered. Frames occur at a regular interval (e.g., every 1/30 second), and there is rarely a large difference between one frame and the next; large differences tend to occur at scene changes or when extremely fast motion occurs. Therefore, when coding video, it is more efficient to code changes between adjacent frames than to only code each frame individually.

The application of DPCM to video is the simplest form of interframe coding and was well known in 1988. In DPCM coding of video, the current frame is coded by subtracting the previous frame from it to form a difference image. It is likely that most of the pixels in the difference image will be very small or zero, because very few things have changed in the 1/30 second between frames. This difference image is a 2-D array of numbers which can take on both positive and negative values, and the difference image is coded as a still image and transmitted to the receiver. At the decoder/receiver, the current frame is reconstructed by adding the decoded difference image to the previous frame. DPCM coding is initiated by coding the first frame as a still image. This process is illustrated in Figure 2.

Note that the process shown in Figure 2 continues *ad infinitum*, and illustrates a challenge with practical use of interframe coding. In order to decompress (decode) the third frame, all previous frames must be decoded. This poses problems when a user wishes to skip ahead in viewing a video. Rather than simply beginning the decoding at the desired location, all intermediate frames must be decoded, which is an inefficient use of resources and a waste of time. In practical implementation of interframe video coding, "reset" frames are included which are coded as still images (i.e., as Frame 0 in Figure 2). If a user wishes to begin viewing a video at an arbitrary location, the decoder must only begin decoding from the nearest reset frame occurring before the desired location. A collections of frames between reset frames (and including the first one) are



Generating DPCM Coded Frames

1.  Frame 0 (still image)

2.  Difference frame 1 = Frame 1 - Frame 0.

3.  Difference frame 2 = Frame 2 - Frame 1.

Decoding DPCM Coded Frames

1.  Decode Frame 0 (still image)

2.  Decode Difference frame 1 and add it to Frame 0 to produce Frame 1

3.  Decode Difference frame 2 and add it to Frame 1 to produce Frame 2

Video Frames

**Figure 2**     DPCM interframe video coding. The difference frames generated in steps 2 and 3 are difference images and are compressed using an image compression algorithm.

often called a "group-of-pictures," and such a group-of-pictures can be independently decoded, without decoding other portions of the video. (I note here that a similar argument can be applied to DPCM coding of audio, and the problem is dealt with in a similar manner: portions of the audio signal are coded using DPCM while allowing for a "reset" between portions, to allow independent decoding of the portions.)

More sophisticated interframe video compression techniques do not subtract entire frames, but instead segment frames into regions or blocks of pixels and process each block separately. In order to take possible motion which has occurred in the frame interval into account, for each block the difference image is formed by subtracting not necessarily the block in the identical location in the previous frame, but instead by subtracting a block in the previous frame which is most similar to the current block (this "best-matching" block could be at a different location). This process is called "motion compensation" and is illustrated in Figure 3. The original block is then represented by copying the best-match block from the previous frame and then adding in the difference block. Again, the difference block is simply a 2-D array of numbers and is then compressed by an image compression algorithm. Such video compression is called *motion compensated predictive* (MCP)

video coding, and was beginning to be seen in video coding algorithms in 1988.

Motion compensation combined with coding the resulting difference images (i.e., MCP coding) can represent video frames very efficiently when adjacent frames are very similar. This is the most common occurrence, but is not true at events such as scene changes when adjacent frames have no content in common. The most general type of interframe video compression algorithm therefore allows blocks (and hence entire frames) to be coded entirely as still images. An efficient video coder will allow both intraframe and interframe coding of blocks or more general portions of frames, and will select the appropriate strategy for each block or portion depending on the content.



To encode a block in the current frame, (1) a best-match block in a *reference* frame is first found. (2) This best-match block is then subtracted from the current block to form a difference block, which is then compressed using an image compression strategy.

Transmitted information is an offset describing the location of the best-match block (described by a vector, as shown by the arrow) and the compressed difference block.

**Figure 3**    Motion compensated predictive interframe coding

21

### 2.4. Memory

The Burst patents describe various forms of memory that enable the invention.

#### 2.4.1 The Appearances of "Memory" in the Patents

Four items/labelled units in Figure 2 (common to all patents) which fall in the general category of memory are described in the patents: RAM 29, Media 23, ROM 32, and Memory 13. Additionally, the later 3 patents include Memory 74 in Figure 4.

RAM 29 is used in conjunction with the digital-to-analog and analog-to-digital conversion processes and is described as having "sufficient capacity to store at least two full uncompressed frames (e.g., about 472 KB (kilobytes))." RAM stands for "random access memory." The DRAM (dynamic random access memory) chip referred to in the specification is a 1 Megabit DRAM from Texas Instruments. The SRAM (static random access) chip referred to in the specification is a 4 Kilobit SRAM from INMOS.

Media 23 represents removable media, such as the VCR tape in a conventional VCR, but is described as also including magnetic tapes of various formats, CD-ROM, or optical discs of either write-once-read-many (WORM) type or of the erasable type. In this description, all media mentioned are digital with the exception of the reference to the VCR tape.

ROM 32 is used to store the programs used for editing functions. ROM stands for "read-only memory" and is a memory which is non-volatile. The chip referred to in the specification holds 32,000 8-bit words.

Memory 13 stores the digital audio/video source information, for editing, transmission, or local playback. In '995, it is described as being implemented as a semiconductor memory, an optical disc memory (which is of the erasable variety), or as using emerging memory technology. In the three later patents magnetic disks are also mentioned.

Memory 74 is simply referred to generically as "memory."

#### 2.4.2 Technology available to implement memory and storage functions

As outlined in the previous section, several types of digital memories are mentioned in the specifications, including random access memory (DRAM and SRAM), ROM, magnetic disks, and optical disks (CD-ROM, WORM and erasable). These are each described in detail below. The costs of the storage media for Memory 13 are also mentioned, since Memory 13 is of sufficient size to store the audio/video source information in its entirety.

**Semiconductor random-access memory (RAM)**

Semiconductor random-access memory RAM falls into categories — dynamic (DRAM), in which the data must be "refreshed" regularly (i.e., dynamically) to ensure it is not corrupted, and static (SRAM), in which the circuitry within each bit storage location will hold the saved 1 or 0 until it is specifically overwritten. DRAM has the benefit of density (i.e., more bits can be stored on a single chip) but requires more power due to the constant refreshing of data. SRAM uses less power because it does not require the constant refreshing of DRAM, but it is less dense because each memory location contains more circuitry than in DRAM. As such, a memory type can be selected for a particular application or implementation of an application based on engineering trade-offs between space on a PC board and power consumption of the unit or device.

In 1988, the cost of the 472 kilobytes of DRAM described in the patent specification was approximately $200. The cost of the same amount of memory as SRAM was approximately $250.

**Read-only memory (ROM)**

The term ROM refers to non-volatile memory that is either permanent or that can only be erased through a specific application of energy (e.g., UV light, electricity). In contrast to the RAM discussed above, contents in ROM memory could not be changed in the course of normal operation of the device using the ROM, but only accessed or read (hence the name read-only memory). Various forms of ROM existed in 1988: electrically programmable ROM (EPROM) which could only be erased in its entirety (i.e., erase the entire chip at once) using UV light; electrically erasable programmable ROM ($E^2$PROM) (which can be erased using electronics, but in a time-intensive manner and only byte-by-byte rather than the entire chip at once). "Flash" $E^2$PROMs of size 512Kbits began to be available in 1988, which combined the conveniences of electrical erasure with the ability to do full-chip erasure. While erasable, these ROMs were not designed to be constantly overwritten as they had a limited number of write cycles (typically 100-1000).

**Magnetic disks**

Magnetic disk technology substantially predated the patent, and as early as 1959, IBM marketed systems with magnetic disks as "random access." In 1988, magnetic disks commonly known in the industry as Winchester disks (and to the average consumer as the "hard disks" in their computers) were available in capacities from 10-350 Megabytes at a price range of $500-

4000. The specification cites an example in which Memory 13 can be of size 250 Megabytes in order to store an entire video program. At the end of 1988, large capacity disks ranging in size from 332 Megabytes to 380 Megabytes were available for $2389 to $2495.

### CD-ROM

A CD-ROM can hold approximately 680 Megabytes of user data (data stored on the disc contains some error-correction bits which provide robustness to scratches, dust, and mishandling). Since the CD-ROM is read-only, it could function only as a source of audio/video source information in the Burst patents.

### Optical disks

Write-once read-many (WORM) optical disks were read-only disks which had very high capacity but could only be written to once, as the name suggests. In November 1988, Maxtor offered a 400 Megabyte WORM for $2799 and an 800 Megabyte WORM for $3799.

Erasable optical disks appeared commercially at the end of the 1980's and were used in the NeXT computer. The disk in the NeXT machine was manufactured by Canon and cost approximately $1400 for a 256 Megabyte drive. This was a large amount of storage given that PCs at the time typically shipped with a 20 Megabyte hard drive. Even larger disks were available; in November a 650 Megabyte erasable optical disk system was marketed for $4995.

## 2.5. The Burst Concept

A confluence of technological developments enabled the concepts disclosed in the Burst patents: very high speed networks, reasonably priced large-scale memory, and improvements in compression efficiency. By 1988, projects had been undertaken at research laboratories and at universities both within and outside of the United States to develop high-speed digital communication and networking technologies, and to develop audio and video compression algorithms which would reduce the size of the digital representations to be transmitted. Better communication strategies would provide higher bandwidths, and better compression algorithms would reduce the generally high bandwidth requirements. However, *these efforts focused on continuous delivery of the digital material* — the material was viewed or listened to *as it was received*. The Burst patents look beyond this point on which other researchers and practitioners were fixated.

Long before high-speed digital communication became feasible, audio and video information

was communicated by broadcasting — radio and television stations would continuously transmit programming as analog signals, and listeners and viewers could "tune in" at any time and listen to/view the programs instantaneously, while they were being transmitted. The only delay between transmission and reception was the propagation delay of the signal itself, either over-the-air or through the cable television distribution system. A program's transmission time was exactly the length or duration of the program itself. If a listener or viewer wished to listen to or watch a program at a later time than its transmission time, a tape recorder or VCR could be used to record the program during its transmission.

As computer capabilities increased, audio and video were seen as signals which could be digitized. As digital communication began to be adopted into widespread use and available transmission bandwidths increased, the first attempts were simply to communicate audio and video to listeners and viewers in *digital* rather than analog form. As discussed in Section 2.3.2, the digitization of audio and video produced digital data at very high data rates — in our example, digitizing video produced bits at a rate of 56.7 Megabits/second. To continue with this example, digital communication of this video would be expected to require a transmission bandwidth of 56.7 Megabits/second to mimic the analog communication scenario, i.e., to transmit the video such that it would be immediately viewed upon reception and such that the transmission time was equal to the length of the program. Furthermore, viewing during reception was taken for granted, since the storage of an entire program in digital form was not practical due to the extremely large file sizes. So while digital transmission of digitized audio and video became feasible, the listener or viewer did not have a different experience than in the analog communication scenario which allowed only viewing and/or listening while the program was being transmitted and received.

The development of compression technology at the same time was seen as useful to reduce the transmission bandwidth requirements for the instantaneous viewing/listening experience. Instead of requiring a channel with 56.7 Megabits/second bandwidth, video could be transmitted over channels with much lower bandwidths. For example, a substantial standardization effort in the 1980's named $p \times 64$ addressed compressing video such that it could be transmitted continuously over the telecommunication network over links with bandwidths which were multiples of 64 Kilobits/second.

These efforts focused on instantaneous listening or viewing, which required continuous delivery of the digital material for the entire duration of the program. The network had to provide

25

connectivity for the entire duration of the audio/video signal. All bandwidth requirements were discussed in the context of the currently available average bit rates provided by compression algorithms. The idea of a "burst transmission" — one in which an entire program or portion thereof was quickly delivered to a user — was a significant departure from continuous delivery. One reason for this was that the large amount of memory required to store the entire digital audio/video program at the receiver appeared to be impractical. The Burst patents were the first to realize that the increasing availability of large memories could be used to enable a new paradigm in transmission of audio/video source information, i.e., "burst" transmission.

## 3.  The Level of Ordinary Skill in the Art

Based upon my knowledge of the development of digital communications and networking and my personal involvement in the development of compression technology, a person of ordinary skill in the art at the time that the patent application leading to the '995 patent was filed would have had an understanding of: (1) digital communication technologies and their available bandwidths, and (2) audio and/or video compression techniques.

In general, a person of ordinary skill in the art would work in the area of digital communication of audio/video source information. A person in this area could be specialized in digital communications having a familiarity with compression technology, or such a person could be specialized in compression technology having a familiarity with digital communications.

Such a person of ordinary skill in the art would have had at least a bachelor's degree in electrical engineering with a at least two to three years of experience working on digital communication of audio/video source information.

Alternatively, such a person of ordinary skill in the art would have had a master's degree in electrical engineering with one year of experience working on digital communication of audio/video source information. As another alternative, such a person of ordinary skill in the art would have had a Ph.D. degree in electrical engineering in the area of digital communication of audio/video information.

# 4. The Meaning of Specific Claim Terms

### *4.1.* **"audio/visual source information" and "audio/video source information"**

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "audio/visual source information" and "audio/video source information" '995: 1, 2, 3, 8, 9, 15, 16, 17, 19, 20, 21, 22; 23, 24, 25, 26, 27, 28, 44, 47, 51, 52, 80; '839: 1, 2, 3, 7, 8, 9, 15, 16, 17, 19, 20, 22, 23, 26, 27, 28, 44, 45, 46, 47, 48, 49, 50, 51, 52, 58, 59, 73, 76, 77; '705: 1, 2, 3, 12, 13, 21; '932: 4. | "an audio and/or video work that can be received from one or more sources and that has a temporal dimension" | "audio/video" — agreed construction  "source information" —"the entirety of the data intended to be transmitted, not segments of that data" |

"Source information" does not appear in the Burst patent specifications, but only in the claims and in the title of the '839 patent. The term "source information" would be well understood to one of ordinary skill as a well known term in the art of compression (compression was and is also called "source coding") to mean the original signal (whether uncompressed or previously modified) in the context of compression or processing. In the Burst patents, this raw material is repeatedly described as being audio and video in the context of movies or television programs ('995, 1:6-18, 1:40-62, 2:1-7, 2:18-22, 5:28-32, 7:1-8:2), video only ('995, 9:48-49), or audio only ('995, 10:37-41). It would be apparent to one of ordinary skill that this material is capable of being played and naturally has some "length" or duration (i.e., temporal dimension) as I discussed in Section 2.3.1. The fact that it has such a temporal dimension is also indicated in the prosecution histories ('705 5/28/90 OAR at 15-16).

According to the specification, the audio/video source information can be received from a variety of sources. Figure 2 in the '995 patent indicates, for example, a video line or input camera, a TV RF tuner, an auxiliary digital input port, and a fiber optic input/output port, and these sources are discussed in detail in the specification ('995, 7:1-66). The '995 prosecution history also clarifies that the audio/video source information can be received from a variety of sources ('995 3/12/90 OAR at 18, 20).

Furthermore, this material and the operations performed on it as described in the patents indicate that the information has creative meaning; for example, the video is described as movies

or television programs, rather than video from a security system camera. Webster's dictionary definition of "work" is "something produced by the exercise of creative talent or expenditure of creative effort" which is an appropriate description for the audio/video source information in these patents.

Apple construes audio/video source information to include "the entirety of the data intended to be transmitted, not segments of that data" while Burst refers to a "work." Apple includes many citations in the specifications to support their construction, but the specifications never refer to an "entirety." Rather, Apple's cited intrinsic evidence points to repeated use of the word "program" in the specification. However, all of the four Burst patents clarify the use of the term "program" in the Background of the Invention section in a parenthetical sentence: "(As used in the remainder of this specification, the term "program" encompasses movies and other types of video and/or audio materials, whether broadcast from a TV station or another source.)" ('839: 1:20-24). Nowhere do the patents provide a definition for program that implies "entirety of the data intended to be transmitted, not segments of that data."

Burst's use of "received" as the appropriate verb is informed by both the claim language and the functionality of the invention as described in the specifications. Claim 1 in all patents begins with the "receiving" of the audio/video source information, because the information must have some origin. To the contrary, Apple describes the audio/video source information in terms of its transmission. While transmission is an option for the information, it is not a requirement. For example, the description of operating modes given at ('995, 8:58-9:54) does not involve transmission of the audio/video source information; however, it does require that the information is present and it must therefore have been received in one of several manners that are described in the specifications. Therefore, construing the information as information "that can be received from one or more sources" is preferable to "intended to be transmitted."

### 4.2. "input means" or "input means for receiving audio/video source information"

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "input means" or "input means for receiving audio/video source information" '995: 1, 15, 16; '932: 4; '705: 1.<br><br>"input means" or "input means for receiving audio/video source information as a time compressed representation thereof…" '995: 17. | "input means" — Not subject to §112 ¶6: "an input port or terminal capable of receiving information" | "input means for receiving audio/video source information" — Limited to structures disclosed under §112 ¶6: video line or camera input line 15, TV RF tuner 16, auxiliary digital input port 17, or fiber optic port 18. ('995)<br><br>"input means for receiving audio/video source information" — Limited to structures disclosed under §112 ¶6: point-to-point microwave transceiver, or satellite transceiver ('932 chart)<br><br>"input means for receiving audio/video source information" — Limited to structures disclosed under §112 ¶6: video line or camera input line 15, TV RF tuner 16, auxiliary digital input port 17, fiber optic port 18, auxiliary analog audio and digital input ports, point-to-point microwave transceiver, or satellite transceiver. ('705 chart)<br><br>"input means for receiving audio/video source information as a time compressed representation thereof…" — Limited to structures disclosed under §112 ¶6: fiber optic port 18. |

The claim language "input means for receiving audio/video source information" is self-explanatory and adequately describes the structure that receives the source information. One of ordinary skill in the art would understand that "input" itself connotes a physical port or terminal on a device through which information is received. Audio/video source information is a very specific type of data and this information can be in either analog or digital form at the input in the Burst patents, depending on the context of the particular claim. As such, the "input means" describes any port or terminal capable of receiving such information, and limiting it to the structures disclosed in the specification is incorrect.

I have been informed by counsel that the use of the term "means" in a claim limitation creates a presumption that the term is claimed in a functional manner. I have also been informed that the

29

presumption created by the use of "means" is overcome if the claim language itself describes the structure that performs that function. I believe this to be the case with "input means." As I stated above, the term "input" connotes (to one of ordinary skill) a physical port or terminal on the receiving device. This understanding is consistent with definitions of the term as commonly found in dictionaries. For example, the *Modern Dictionary of Electronics* (6th ed. 1984, pg. 495) defines an "input" as "The terminals, jack, or receptacle provided for the introduction of an electrical signal or electric power into a device or system." The *IEEE Standard Dictionary of Electrical and Electronic Terms* (4th ed. 1988, pg. 474) defines "input" as "The device or collection of devices used for bringing data into another device." Consistent with the understanding of one of ordinary skill in the art, these dictionaries demonstrate that an "input" is a physical structure when used in this context.

The Burst patents give many different examples of inputs in both the figures and the written description. These inputs include video line or camera input line 15, TV RF tuner 16, auxiliary digital input port 17, fiber optic input/output port 18, audio/video transmitter/receiver 22, microwave transceiver 78, many of which are shown in Figure 2 of the '995 patent. Each of these inputs receives audio/video source information in different formats depending on the requirements of the particular input. Video line or camera input 15 receives signals from "a television camera, a conventional VCR, a television tuner, or another VCR, etc." in the form of "a standard television composite signal" ('995, 7:3-7). TV RF tuner input port 16 also receives a standard television composite signal, but from "an antenna or cable TV coaxial cable" ('995 7:23-26). Auxiliary digital input port 17 receives "a computer-generated video signal," "any acceptable digital signal or as may be supplied by another VCR-ET" or "a digitized audio signal" ('995, 7:32-37). Fiber optic port 18 receives digital signals such as those received by auxiliary digital input port 17, but in the form of light instead of electricity. Audio/video transmitter/receiver 22 is said to be typically a modem, which transmits and receives digital signals over analog channels, as described in Section 2.2.5. The input may also be a microwave transceiver, which receives microwave signals such as those used in point-to-point terrestrial microwave transmissions or satellite transmissions ('839 11:56-59; 12:40-42).

Although I believe that the term "input means" describes adequate structure and is not a means-plus-function term as discussed above, I have been instructed to address the term in the alternative as though it were a means-plus-function claim.

Two different functions appear in the claims of the Burst patents for the "input means." Claim 1 of the '995 patent requires an "input means for receiving audio/visual source information," while claim 17 of the '995 patent requires an "input means for receiving audio/video source information as a time compressed representation thereof." I have been informed that the scope of a claim term written in means-plus-function format is defined by the structures described in the patent specification that are necessary to perform the claimed function and the equivalents to those structures. I will address the different "input means" functions and their corresponding structures separately.

Beginning with the language in claim 1 of the '995 patent, the function of the "input means" is "receiving audio/visual source information." As I described above, the specifications of the Burst patents describe many different structures for performing the function of "receiving audio/visual source information." Figure 2 of the '995 patent shows some of these structures, which include video line or camera input line 15, TV RF tuner 16, auxiliary digital input port 17, fiber optic input/output port 18, audio/video transmitter/receiver 22, and microwave transceiver 78. All of these structures perform the function of "receiving audio/visual source information."

Claim 17 of the '995 patent is slightly different than claim 1 in that the function is "receiving audio/video source information as a time compressed representation thereof." The difference between the two is that claim 17 restricts the audio/video source information to a time compressed format. As I explained above, the formats of the signals received at video line or camera input 15 and TV RF tuner input port 16 are standard television composite signals. These signal formats do not carry time compressed information, so the inputs receiving the signals do not perform the function in claim 17. Auxiliary digital input port 17, fiber optic port 18, and microwave transceiver 78 all receive signals in a digital format that can include time compressed information. These inputs can perform the function of receiving time compressed representations of audio/video source information and would be the corresponding structures if "input" alone did not already sufficiently provide it.

31

### 4.3. "compressing said audio/video source information," "compression means," "decompression means"

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "compressing the received audio/video source information" '839: 1; '705: 12.<br><br>"compressing said audio/video source information" '995: 1; '932: 4; '705: 1. | "compressing said audio/video source information" — "reducing the number of bits necessary to represent the audio/video source information" | |
| "compression means" and "compression means … for compressing said audio/video source information into a time compressed representation … having an associated time period that is shorter than a time period associated with a real time representation" '995:1, 8, 9, 21<br><br>Both parties agree term is subject to § 112, ¶ 6. | "compression means" ('995) — "A compressor/decompressor executing an intraframe compression algorithm (reducing the number of bits by coding each frame independently, i.e., treating each frame as an individual image), and/or an interframe compression algorithm (reducing the number of bits by comparing two or more frames and coding certain differences between those frames) for video, plus equivalents; or for audio, executing a differential compression algorithm (reducing the number of bits by comparing two or more samples and coding certain differences between those samples), plus equivalents." | No structures disclosed under § 112, ¶ 6. |
| "compression means … for compressing said audio/video source information into a time compressed representation … having an associated time period that is shorter than a time period associated with a real time representation" '932:4<br><br>Both parties agree term is subject to § 112, ¶ 6. | "compression means" ('932) — "A compressor/decompressor executing an intraframe compression algorithm (reducing the number of bits by coding each frame independently, i.e., treating each frame as an individual image), and/or an interframe compression algorithm (reducing the number of bits by comparing two or more frames and coding certain differences between those frames) for video, plus equivalents." | No structures disclosed under § 112, ¶ 6. |

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "compression means … for compressing said audio/video source information into a digital time compressed representation … capable of being transmitted in a burst time transmission period that is substantially shorter than a time period associated with real time viewing" '705:1<br><br>Both parties agree term is subject to § 112, ¶ 6. | "compression means" ('705) — "A compressor/decompressor executing an intraframe compression algorithm (reducing the number of bits by coding each frame independently, i.e., treating each frame as an individual image), and an interframe compression algorithm (reducing the number of bits by comparing two or more frames and coding certain differences between those frames) for video, plus equivalents." | No structures disclosed under § 112, ¶ 6. |
| "decompression means" or "decompression means … for selectively decompressing said time compressed representation"<br><br>Both parties agree term is subject to § 112, ¶ 6. | "a compressor/decompressor executing a decompression algorithm consistent with the compression algorithm used" | No structures disclosed under § 112, ¶ 6. |

The Burst patents provide a definition for compressing at '995, 4:66-68: "Various algorithms may be employed in the compression process which enable the representation of a series of numbers by a reduced number of bits." The "series of numbers" in this passage refers to the digitized audio/video source information. The patents also specifically mention "data compression" as an objective for achieving "efficient storage, transmission, and reception of a digitized audio/video program." ('995, 2:46-51). The Burst patents indicate that a "compressor/decompressor" 26 within a video control unit (VCU) ('995, 4:19-21) performs the compression and decompression ('995, 4:63-65). The patents mention a variety of compression techniques that can be implemented by the compressor/decompressor. Specifically, the patents give examples of intraframe video compression ('995, 4:68-5:8), interframe video compression ('995, 5:9-18), and differential audio compression ('995, 5:28-33), all of which were known compression techniques in 1988 as discussed in Section 2.3.

Each class of compression algorithms suggested in the Burst patents reduces the number of bits representing the audio/visual source information. Thus, fundamentally, compression in the Burst patents requires a reduction in the number of bits, or data compression, as one skilled in the

33

art would understand. Therefore, "compressing said audio/video source information" is correctly construed as "reducing the number of bits necessary to represent the audio/video source information."

Decompression is described as the reverse process of compression. In the compression operation, the input to the compressor/decompressor is digitized audio/video source information and the output is the time compressed representation; in the decompression operation, the input to the compressor/decompressor is the time compressed representation and the output is uncompressed digital audio/video source information. One of skill in the art would know that the compression algorithm used to compress the source information dictates a specific decompression algorithm which must be used to decompress the time compressed representation. In the event that the compression algorithm is a "lossy" algorithm, the decompression process will not be able to exactly reproduce the original signals, but as noted above, the human eye or ear may not be able to perceive any difference.

Apple's Quicktime 7.1 User's Guide supports the understanding of one of ordinary skill in the art with a definition of compression: "the process of reducing the data size of a file." An Apple representative also testified that this was an accurate description. Apple's publication "Demystifying Multimedia" describes both intraframe compression ("Spatial compression is used to remove information from within a single frame of picture or video. The frame is analyzed and compressed independently of the other frames.") and interframe compression ("Temporal compression...analyzes the changes from one frame to the next and only records the changes.").

The term "compression means" provides only a description of the function to be performed: "compressing said audio/video source information." I have been informed that the use of the term "means" combined with a description of only the function to be performed by that "means" results in a "means-plus-function" term, and that the scope of the claim is limited to the structures described in the patent that are necessary to perform that function and their equivalents.

The Burst patents are very clear that the structure performing the function of the "compression means" is compressor/decompressor 26, which implements a compression algorithm to reduce the number of bits ('995, 4:63-68). As I explained above when discussing the "compressing" terms, the Burst patents describe several different compression algorithms that could be implemented in compressor/decompressor 26, many of which I have mentioned in Section 2.3.

When describing compression of the audio/video source information, the Burst patents

separately discuss compression of video and compression of audio ('995, 4:68-5:24 (video) and '995, 5:28-35 (audio)). Given the differences between video and audio compression and the separate treatment of those compression techniques in the Burst patents, it is appropriate to separately identify the classes of algorithms for video and audio.

The first video compression algorithm discussed in the patents treats the video frames independently by performing intraframe compression. Intraframe compression reduces the number of bits required to represent a single video frame by efficiently representing redundant information within the frame. For example, if many adjacent pixels have the same value, a reduced number of bits may be used to represent this redundancy. Several other examples of well-known intraframe compression techniques are mentioned in Section 2.3.5.

The second video compression technique described in the Burst patents treats video frames dependently by performing interframe compression. Interframe compression reduces the number of bits by comparing two or more frames and coding certain differences between those frames. The Burst patents suggest that an interframe compression algorithm may be used that only represents pixel differences between frames. Thus, if certain pixels do not change from one frame to the next, a reduced number of bits may be used to represent the unchanged pixels in the second, dependent frame.

While the Burst patents suggest that these video compression techniques may be used in conjunction for greater data reduction, the patent itself does not specify that both must be used. One skilled in the art would recognize that implementing both intraframe and interframe video compression would be desirable as a way to maximize compression and thus minimize the size of the video representation, as described at the end of Section 2.3.6, and therefore reduce the time necessary to transmit the video representation to another device.

With respect to audio compression, the Burst patents indicate that conventional audio compression algorithms may be used. The '995 patent refers to a differential compression algorithm that identifies and uses the differences between audio samples to represent the samples with a reduced number of bits.

Given this disclosure in the Burst patents, it is appropriate to identify the structure of the "compression means" as including the compressor/decompressor executing the classes of video or audio algorithms described above. To the extent that certain Burst claims limit the audio/video source information to video (such as '932 claim 4), then it is appropriate to identify the structure

of the "compression means" as the compressor/decompressor executing at least one of the video algorithms described above without also requiring audio compression. Certain claims, such as '705, claim 1, require that the compression means compress the audio/video source information into a digital time compressed representation capable of being transmitted in a burst transmission time period that is "substantially shorter" than real time viewing. In this instance, it is appropriate to interpret this functional claim language to require a greater degree of compression than in other claims, and thus both intraframe and interframe video compression are required.

The structure for the decompression means also is the compressor/decompressor. One skilled in the art would recognize that the algorithm implemented by the compressor/decompressor should be consistent with the compression algorithm used. Thus, for example, if a particular interframe compression algorithm was implemented by the compressor/decompressor to compress video source information, a decompression algorithm would be implemented by the compressor/decompressor to reverse that process to provide an approximation of the original video source information.

### 4.4. "in said burst time period"

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "in said burst time period" '839: 1, 17, 73,76, 77; '705: 1, 3, 12, 21. | "in said burst time period" – "in a time period that is shorter than the time required for normal playback" | "in said burst time period" – in the burst transmission time of definite duration that is known at the time of compression to be shorter than the time required to play the source information in real time. |

Claim 1 in the '995 and '839 patents clearly define a burst time period as an "associated time period that is shorter than a time period associated with a real time representation of said audio/video source information." A person of ordinary skill in the art would clearly understand a "time period associated with a real time representation of said audio/video source information" to be colloquially the "length" of the work, or more formally the time required for normal playback. (Also see discussion below in Section 4.5 regarding "a time period associated with a real time representation of said audio/video source information.") This is also spelled out in the '705 prosecution history ('705 5/26/98 OAR at 11). The specifications make clear that transmission occurs at a high speed, which is different than a traditional transmission, and that the burst time

period is shorter than the program viewing time ('995, 1:34-37, 1:50-57, 7:55-8:2).

Apple's construction requires that the burst transmission time be "of definite duration that is known at the time of compression to be shorter than the time required to play the source information in real time." The language used in the patents does not support "definite duration" and in fact at most supports no more than an approximation of transmission duration. Transmission duration is computed as

duration (in seconds) = file size (in bits) /transmission speed (in bits/second)

Therefore, in order for the duration to be known definitively at the time of compression, the transmission speed must be known at the time of compression. However, the patents refer to bandwidth using imprecise approximation language. The bandwidth of fiber optic cables is referred to as "*about* 200 Megabytes/second" ('995, 7:58) and the bandwidth of microwave transmission links is referred to as "*at least as fast as* the transmission and reception of programs over optical fibers" ('839, 12:6-8). Neither of these wordings suggest a definite and fixed transmission speed, and therefore the definite duration need not be known at the time of compression.

An alternative interpretation of "definite duration" is to suggest that the transmission duration is known *a priori*. However, the language in the patents does not suggest that a "fixed transmission duration" is known ahead of time. For example, "accelerated rate" ('995, 7:59 and '839, 12:27), "less time than it would take to view the program" ('995, 7:63-64), and "transmission and reception of programs in a few minutes or seconds" ('839, 12:8-9) do not quantify the exact transmission time. Neither does "5-30 seconds" ('995 prosecution history, 3/12/90 OAR at 20). The transmission duration is never precisely quantified.

Apple also suggests that the burst time period is known at the time of compression; however, the specification never relates a known burst time period with the compression operation ('995, 4:19-27, 4:63-5:35, 5:59-60, 9:12-15, 9:25-26).

### 4.5. "time compressed representation," "digital time compressed representation"

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "time compressed representation. . . having an associated time period that is shorter than a time period associated with a real time representation" '995: 1, 8, 9; '932: 4.<br><br>"time compressed representation . . . having an associated burst time period that is shorter than a time period associated with a real time representation" '839: 1, 8, 9, 73, 76;<br><br>"digital time compressed representation . . . having an associated burst transmission time period that is substantially shorter than a time period associated with real time viewing" '705: 12. | "time compressed representation . . . having an associated time period that is shorter than a time period associated with a real time representation" and "time compressed representation . . . having an associated burst time period that is shorter than a time period associated with a real time representation" —"a version of audio/video source information having a reduced number of bits that allows data transfer over an external communications link in a time period that is shorter than the time required for normal playback"<br><br>"digital time compressed representation . . . having an associated burst transmission time period that is substantially shorter than a time period associated with real time viewing" – "a digital version of audio/video source information having a reduced number of bits that allows data transfer over an external communications link in a time period that is substantially shorter than the time required for normal playback" | "time compressed representation" - "a representation of the audio/video source information that is compressed in time without using data compression"<br><br>"having an associated time period that is shorter than a time period associated with a real time representation" and "having an associated burst time period that is shorter than a time period associated with a real time representation"— "the time compressed representation has a burst transmission time of definite duration that is known at the time of compression to be shorter than the time required to play the source information in real time" |
| "digital time compressed representation . . . capable of being transmitted in a burst transmission time period that is substantially shorter than a time period associated with real time viewing" '705: 1.<br><br>"is capable of being transmitted in a burst transmission time period that is substantially shorter than a time period associated with real time viewing" '705: 1. | "digital time compressed representation . . . capable of being transmitted in a burst transmission time period that is substantially shorter than a time period associated with real time viewing" – "a digital version of audio/video source information having a reduced number of bits that allows data transfer over an external communications link in a time period that is substantially shorter than the time required for normal playback" | "is capable of being transmitted in a burst transmission time period that is substantially shorter than a time period associated with real time viewing" — the time compressed representation is such that it is known at the time of compression that it is capable of being transmitted in a burst time period of definite duration that is substantially shorter than the time required to play the representation in real time |

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "digital time compressed representation" '995: 8, 9, 23, 24, 25, 26, 27, 28; '839: 8, 9, 23, 24, 25, 26, 27, 28; '705: 1, 2, 3, 12, 21. | "digital time compressed representation" —"a digital version of audio/ video source information having a reduced number of bits." | |
| "time compressed representation . . . being received over an associated burst time period that is shorter than a real time period associated with real time playback" '839: 17; | "time compressed representation . . . being received over an associated burst time period that is shorter than real time playback" - "a digital version of audio/video source information having a reduced number of bits that is received over an external communications link in a time period that is shorter than the time required for normal playback" | |
| "time compressed digital representation . . . being received in an associated burst time period that is shorter than a time period with a real time representation" '839: 77. | "time compressed digital representation . . . being received in an associated burst time period that is shorter than a time period with a real time representation" —"a version of audio/ video source information having a reduced number of bits that is received over an external communications link in a time period that is shorter than the time required for normal playback" | |
| "being received . . . in a burst transmission time period that is substantially shorter than a time period associated with real-time viewing" '705: 21. | "being received . . . in a burst transmission time period that is substantially shorter than a time period associated with real-time viewing" — "being received . . . over an external communications link in a time period that is substantially shorter than the time required for normal playback." | "being received in an associated burst time period that is shorter than a time period with a real time representation" and "being received over an associated burst time period that is shorter than a real time period associated with real time playback" — the time compressed representation is received in a time of definite duration that is shorter than the time required to play the source information in real time. |

Based on the claims and specifications, one of ordinary skill in the art would understand the use of "time compressed representation" in the patents to refer to the result of the process of applying data compression to a signal that has a temporal dimension (i.e., audio/video source information, as described in Section 4.1). Support is found in the claims and in the specification. As discussed in Section 4.3, "compression" would have been understood by one of ordinary skill in the art to mean "reducing the number of bits necessary to represent the audio/video source information." With this understanding, one of ordinary skill in the art would understand "time compressed representation" as it appears, for example, in Claim 1 of the '995 patent: "for compressing said audio/video source information into a time compressed representation" to correspond to applying data compression to the digitized audio/video source information to form the compressed audio/video source information. Note that the time compressed audio/video source information is inherently digital. It is clear that the "time compressed representation" has experienced compression ('995, 2:42-51, 4:19-27, 4:63-5:35, 5:59-60, 9:12-15, 9:25-26, 10:28-31; '839, 2:52-58, 11:28-32, 12:38-45; '705 5/26/98 OAR at 15-16). Furthermore, the prosecution history explicitly states that "the audio/video information is time compressed to thereby allow transmission in a burst transmission time period" ('705 5/26/98 OAR at 11).

The clause "a time period associated with a real time representation" would be understood by one of ordinary skill in the art as corresponding to the length or time required for normal playback of the work. This is supported in the '705 prosecution history which refers to the "time associated with real-time viewing of the video program by a receiver of the program," which is clearly the normal playback time ('705 5/28/90 OAR at 11).

Throughout the specifications and the prosecution histories, the Burst patents distinguish between the playback time of the audio/video source information and the time required to transmit or receive this audio/video source information when it has been compressed, and they make it clear that the playback time is greater than the transmission time. Communication of the time compressed audio/video source information is described as high-speed, efficient, and at an accelerated rate ('995, 1:34-37, 1:50-57, 2:42-51, 7:55-8:2; '839, 2:52-58, 8:18-20, 10:6-9, 11:28-32, 11:51-12:11, 12:25-27). The relationship between duration and the associated time period is explained in the sentence "a video program may be communicated at an accelerated rate from the first VCR-ET to a second VCR-ET in less time than it would take to view the program" ('995, 7:61-64). This explanation also appears in the prosecution history ('705 5/28/90 OAR at 11, 13).

Clearly, if digital information in the form of the time compressed audio/video source information is to be transmitted or received, a communication link is required. The agreed construction of a communication link is "a connection between one device and another provided by one or more media over which information can be transmitted and received." The examples of communication in the specifications and prosecution histories illustrate either transmission to a separate device, or reception from a separate device ('995, 7:45-8:2, '839, 8:18-20, 11:51-12:11). Clearly, if two devices are separate entities, the communication link between the two devices must be external to the two devices.

Summarizing the previous paragraphs, one of ordinary skill would understand a "time compressed representation" or a "digital time compressed representation" to be a version of the audio/video source information having a reduced number of bits. This representation can be communicated over an external communications link, and the transmission time will be shorter than the normal playback time of the audio/video source information.

Apple's constructions have two fundamental flaws. First, Apple asserts that the time compressed representation has not undergone data compression. Secondly, Apple asserts that the burst transmission time is of definite duration known at the time of compression. I have addressed the problems with the second assertion in Section 4.4 ("in said burst time period"). I will only remind the reader that it is completely unsupported in the patents and prosecution histories. Here, I discuss why Apple's first assertion is incorrect.

Apple's construction as "a representation of the audio/video source information that is compressed in time without using data compression" is not supported in the patents and is clearly contrary to the specifications (see my discussion in Section 4.3 regarding "compressing"). Rather, the term "data compression" explicitly appears in the specifications and the prosecution history referring to the audio/video source information ('995, 2:42-51, 4:48-5:24) and example compression algorithms are described ('995, 4:48-5:24, 5:28-35). Compression units are shown in the Figures ('995, Figure 2; '839 Figures 2, 3, 4). Apple's construction is directly contrary to what is taught in the specifications.

Apple has provided two extrinsic references to support their construction of time-compressed representation. The material covered in these references is clearly irrelevant to the material in the Burst patents.

The chapter provided from *Data Communication Principles* (Gitlin et al.) is entitled "Echo

Cancellation" and the Introduction (Section 9.1) discusses *full-duplex data communication*, which is simply communication on a single medium in both directions at the same time. An everyday example of full-duplex communication is a telephone call — both callers can talk and be heard at the same time. Full-duplex data communication can be achieved with both analog and digital communication. For example, a telephone call is generally transmitted in both analog form (on the local loop) and in digital form (on high-speed digital telephony circuits). It is in the context of full-duplex digital data communication that "time compression multiplexing" is discussed in Section 9.1 on page 609. The text refers to it as a "time-domain sharing technique...each direction of transmission uses the same large spectrum." The Burst patents do not discuss full-duplex data communication because no digital "conversation" between devices is ever described; rather, audio/video source information is simply received or transmitted away, in a single direction.

The chapter provided from *Video Scrambling & Descrambling for Satellite and Cable TV* (Graf et al.) is entitled "Commercial Satellite Encryption Systems." Satellite and cable TV transmission systems provide real-time delivery. The system described on pp. 103-104 is entitled "B-MAC" where MAC stands for multiplexed analog luminance and chrominance components. This section describes an encryption system for real-time transmission of analog television signals via satellite. Time compression is described as an operation on analog signals which increases their constituent frequencies and decreases the amount of time that the (now distorted) signals require for playback. An example is given: "if we play a record twice as fast, all audio is doubled in frequency and the record takes half the time to play." The audio/video source information which is time compressed in the Burst patents has been digitized and has also been compressed, is not analog, and it is clearly not delivered in real-time.

Finally, it is worth noting that the proper construction and meaning of "time compressed representation" can only be gleaned from the Burst patents themselves, because that term did not have a single accepted use or meaning in 1988. Apple ignores the entire claim phrase "time compressed representation" and improperly focuses on the words "time compression." In 1988, "time compression" was used variously to describe different operations such as the following:

1. Reducing the duration of an analog signal relative to its original duration [14, 15, and the Graf reference cited by Apple].

2. Processing of speech in which it was made to sound as if the speaker had spoken more quickly than he or she actually had spoken [27].

3. Processing digital signals in which longer signals were represented by repeating copies of shorter signals, in the context of speech [16]

4. Increasing the digital signalling rate (i.e., the rate that 0's and 1's are switched on the channel) of a digital signal transmitted over a digital communications link to reduce the transmission time. This technique was used to allow sharing of a single communication medium [1, 17, and the Gitlin reference cited by Apple]. This technique increased the transmission bandwidth. In this definition, the origin or meaning of the digital signal is irrelevant; it is simply viewed as a sequence of 1's and 0's.

None of these definitions is applicable to the Burst patents. The information being compressed in the Burst patents is digital (eliminating 1); the patents are not in the area of speech processing (eliminating 2 and 3); and the patents emphasize efficient use of existing bandwidth rather than increasing the transmission bandwidth to allow sharing of a communication medium (eliminating 4).

### *4.6.* **"random access storage means"**

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "random access storage means" '995: 1, 2, 3, 7, 8, 9, 17, 20, 21, 22, 23, 25, 26, 28, 44, 47, 80; '932: 4. | "random access storage means" - Not subject to §112 ¶6: "storage that provides for random access to any given segment of stored audio/video source information" | "random access storage means" - Limited to structures disclosed under §112 ¶6: DRAM, SRAM, CMOS memory, or optical disc memory. ('995 Chart) |
| "random access storage means...for storing the time compressed representation... said random access storage means comprising one or magnetic disks" '932: 4. | | "random access storage means...for storing the time compressed representation... said random access storage means comprising one or magnetic disks" - magnetic disk. ('932 Chart) |
| "random access storage means…for storing the recompressed…" '995: 21. | | "random access storage means…for storing the recompressed…" - Limited to structures disclosed under §112 ¶6: DRAM, SRAM, CMOS memory, or optical disc memory. |

Random access storage was a term known to one of ordinary skill in the art in 1988 to mean storage that provides for random access to any given segment of stored information and would be

self-descriptive to such an individual. The Burst patents explain that an object of the invention is to provide for "random access to any given segment of a self-stored audio/video program so that the desired segment may be accessed and viewed without the time consuming delays normally involved in fast-forward or fast-reverse searching procedures employed in present state-of-the-art VCR's." ('995, 2:60-66) It would be clear that random access storage could be provided by many types of media and that any such media would be acceptable as long as it provided this random access subject to the system design constraints. The prosecution history describes random access storage means in the same manner; for example, in '995 OAR 3/12/90, pp. 18-20, storage is always generically referred to as "stored in the random access storage."

The Burst patents give a number of examples of different types of random access storage. These include DRAM and SRAM semiconductor memories, CMOS memory, optical disk memories ('995, 6:8-19), and magnetic disk memory ('839, 6:37-40). Any of these devices would provide the type of random access to the segments of the stored program described by the patent.

I have been asked to address the term "random access storage means" in the context of a means-plus-function claim term even though I believe that the term "random access storage" provides more than adequate structure for performing the function. In this term, the function to be performed would be "storing the time compressed representation."

As I have already explained above the different types of random access storage described in the Burst patents, my discussion of the corresponding structure will be largely redundant. The corresponding structures for performing the function of "storing the time compressed representation" are DRAM and SRAM semiconductor memories, CMOS semiconductor memory, magnetic disks memories, and optical disk memories. The Burst patents describe each of these as possible memory types for memory 13, which receives the time compressed representation of the audio/video source information from the digital control unit or from one of the digital inputs ('995 Fig. 2; 5:20-24; 6:53-54; 9:14-15; 9:55-59; '839, 6:37-40). While "random access storage" alone describes sufficient structure to a person of ordinary skill in the art for "storing the time compressed representation," the specific structures corresponding to the function in the Burst patent are those corresponding to memory 13.

*4.7.* **"storage means"**

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "storage means" or "storage means…for storing said digital time compressed representation…" '705: 1, 2. | "storage means" – Not subject to §112 ¶6, and no construction necessary. Alternatively, "a medium in which data is retained for subsequent retrieval" | "storage means…for storing said digital time compressed representation…" - Limited to structures disclosed under §112 ¶6: DRAM, SRAM, CMOS memory, optical disc memory, bubble memory, magnetic disk, or digital paper. |

Similarly to the previous term, storage for digitally represented information was a term known to one of ordinary skill in the art in 1988 to mean a medium in which data is retained for subsequent retrieval and would be self-descriptive to such an individual. The Burst patents refer to storage and storing of digital information throughout the specifications ('995, Abstract, Figure 2, 1:29-33, 2:13-17, 2:59-62, 5:27, 9:12-26, 9:33-43, 9:55-61, 10:1-5, 10:9-21; '839 Abstract, Figures 3 & 4, 9:65-10:11, 11:29-35, 11:66-12:4, 12:23-25, 12:38-40).

It would be clear to one skilled in the art that storage could be provided by many types of media, and examples of different types of storage are given in the Burst patents. These include DRAM and SRAM semiconductor memories, CMOS memory, optical disk memory, and magnetic disk memory ('995, 4:13-16, 4:22-23, 5:36-45, 6:8-17, 6:20-22; '839, 6:37-42, 8:30-33). Any of these memory devices would provide the storage for said time compressed digital representation described by the patent.

Both dictionary definitions provided by Burst support the common meaning of the term storage. The *IEEE Standard Dictionary of Electrical and Electronic Terms* (4th ed. 1988) defines storage as "any device in which information can be stored, sometimes called a memory device." The *Modern Dictionary of Electronics* (6th ed. 1984) defines storage as "the retention of data so that data can be obtained at a later time."

I have been asked to address the term "storage means" in the context of a means-plus-function claim term even though I believe that the term "storage" provides more than adequate structure for performing the function. In this term, the function to be performed would be "storing the time compressed representation."

As I have already explained, the different types of storage described in the Burst patents, my discussion of the corresponding structure is again largely redundant. The corresponding structures

for performing the function of "storing the time compressed representation" are DRAM and SRAM semiconductor memories, CMOS semiconductor memory, optical disk memory, and magnetic disk memory. The Burst patents describe each of these as possible memory types for memory 13, which receives the time compressed representation of the audio/video source information from the digital control unit or from one of the digital inputs ('995 Fig. 2; 5:20-24; 6:53-54; 9:14-15; 9:55-59). While "storage" alone describes sufficient structure to a person of ordinary skill in the art for "storing the time compressed representation," the specific structures corresponding to the function in the Burst patent are those corresponding to memory 13.

### 4.8. "output means"

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "output means"<br>'995: 1, 2, 17;<br>'932: 4.<br><br>"output means…for receiving…for transmission away from said audio/video transceiver apparatus"<br>'995: 1, 2, 17.<br><br>"output means…for receiving… [and] for transmission away from said audio/video transceiver apparatus"<br>'932: 4 | "output means" - Not subject to §112 ¶6: "an output port or terminal capable of transmitting information" | output means…for receiving…for transmission away from said audio/video transceiver apparatus" - Limited to structures disclosed under §112 ¶6: fiber optic port 18 that delivers audio/video signals to a fiber optic telephone line. ('995)<br><br>"output means…for receiving… [and] for transmission away from said audio/video transceiver apparatus" - Limited to structures disclosed under §112 ¶6: point-to-point microwave transceiver, or satellite transceiver. ('932) |

Similar to "input means," the claim language "output means" is self-explanatory and one of ordinary skill in the art would understand that "output" is a physical port or terminal on the claimed transceiver that receives information to be transmitted away from the device. In each claim, the term "output means" is described as transmitting the time compressed representation away from the device, which would indicate to one of ordinary skill in the art that the output signal is digital. As such, the term "output means" would be understood by one of ordinary skill in the art to be "an output port or terminal capable of transmitting information."

I have been informed by counsel that the use of the term "means" in a claim limitation creates a presumption that the term is claimed in a functional manner. I have also been informed that the presumption created by the use of "means" is overcome if the claim language itself describes the

structure that performs that function. I believe this to be the case with "output means." As I stated above, the term "output" connotes (to one of ordinary skill) a physical port or terminal on the claimed transceiver described in the Burst patents. This understanding is consistent with the definition of the term as commonly found in dictionaries. For example, the *IEEE Standard Dictionary of Electrical and Electronic Terms* (4th ed. 1988, pg. 655) defines "output" as "the device or collective set of devices used for taking data out of a device." The *Modern Dictionary of Electronics* (6th ed. 1984, pg. 698) defines "output" as "the terminals or other places where the circuit or device may deliver the current, voltage, power, or driving force."

The Burst patents give many examples of outputs, including fiber optic input/output port 18, and microwave transceiver 78. Each of these outputs is shown in Figure 2 of the '995 as receiving a time compressed representation of audio/video source information from memory 13 for transmission away from the device. Fiber optic input/output port 18 "has a capability for two-way communication between high speed data bus 34 and a fiber optic signal line" ('995, 7:46-48). The microwave transceiver 78 provides "the capability for microwave transmission of stored video programs in compressed digital format" ('839, 12:2-4). A person of ordinary skill in the art would recognize that based on the description given in the specification, the auxiliary digital input port 17 could be a general communications port providing bidirectional communication such as an RS-449 connection or an Ethernet connection ('995, 7:32-42).

Although I believe that the term "output means" describes adequate structure and is not a means-plus-function term, I have been instructed to address the term as though it were. "Output means" is associated with two different functions in the Burst patents. In the '995, the "output means" performs the function of "receiving the time compressed audio/video source information... for transmission away from said audio/video transceiver apparatus." The '932 slightly changes this function to "receiving the time compressed digital representation of the audio/video source information... for transmission away from said audio/video transceiver apparatus." I do not believe that the differences between the terms results in any difference in related structure, so I will address the claims together.

I have already identified the components of the Burst device that correspond to the "output means" above. These same components are the relevant structure for performing the functions required by the claims. Fiber optic input/output port 18, auxiliary digital port 17, and microwave transceiver 78 each receive a time compressed representation and transmit that representation

away from the transceiver apparatus. The same passages quoted above also demonstrate the functions performed by these components

### 4.9. "transmitting," "transmitting . . . to a selected destination," "transmitting ... away"

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "transmitting"<br>'839: 1, 17, 73, 76, 77.<br><br>"transmitting... to a selected destination"<br>'839: 1, 17, 73, 76, 77.<br><br><br>"transmitting... away"<br>'705: 1.<br><br><br>"the time compressed audio/video source information…for transmission away from said audio/video transceiver apparatus"<br>'995: 1.<br><br><br>"the time compressed representation of said audio/video source information…for transmission away from said audio/video transceiver apparatus"<br>'995: 2, 17. | "transmitting" – No construction required. Alternatively, "sending"<br><br>"transmitting . . . to a selected destination" – "sending to an external device that is capable of playback and is selected by a user"<br><br>"transmitting . . . away" – "sending to an external device capable of playback"<br><br>"the time compressed audio/video source information…for transmission away from said audio/video transceiver apparatus" and "the time compressed representation of said audio/video source information…for transmission away from said audio/video transceiver apparatus" – "sending the time compressed representation to an external device capable of playback, where the representation is sent in a time period that is shorter than the time required for normal playback" | "transmitting" - sending to a remote location; excludes transferring through an interface to a storage device. |

"Transmitting" for the above referenced claims would be understood by one of ordinary skill in the art to mean sending and transmission. Transmitting in this sense appears throughout the specifications ('995, 1:34-37, 1:50-57, 7:45-66; '839, 11:28-32, 11:48-12:45).

The prosecution history indicates that the inventor intended the transmission to be to a device which can play the time compressed representations of audio/video source information, i.e., which has playback capabilities. Transmission from one VCR-ET to another is described in the specification ('995, 7:45-66; '839, 11:28-32). Transmission between similar devices is described in the prosecution history ('995 3/12/90 OAR at 19; also '705 5/26/98 OAR at 11), which goes on to describe the same devices providing playback as an operation. The prosecution history also indicates that the device at the selected destination need not be identical to the preferred

48

implementation by describing that the time compressed representation can be transmitted to "any of various types of destination devices via any number of transmission mediums." The context in which this statement is made demonstrates that such destination devices are expected to be able to play back the information ('995 OAR 3/12/90 pp. 18-20). Clearly these devices are external to the transmitting device.

The prosecution history also describes that audio/video information is transmitted away from the apparatus to one or more receivers ('705 OAR 5/26/98 pg. 15).

Lastly, "to a selected destination" would be understood by one of ordinary skill in the art to mean that the user selects the destination or external device.

Apple's construction requires that the transmission be to a "remote location." Demanding that the receiving location is remote is inconsistent with the patent specifications and therefore incorrect. Webster's dictionary defines remote as "separated by an interval or space greater than usual" or "far removed in space, time, or relation." Both of these definitions, as well as colloquial understanding, suggest a *large* distance. The patents, however, do not *require* that the transmitting and receiving devices be separated by a large distance. An example is given of two VCR-ETs communicating with each other ('995, 7:60-65; '839, 11:28-32). In 1988 it would not be unexpected for a single household to have 2 televisions and two VCRs, and these two units would not be considered to be far removed from each other if they were in the same home.

Apple's construction includes the language "excludes transferring through an interface to a storage device" and a citation to the '705 prosecution history. The citation does not support Apple's construction. The prosecution history states "The 'output means' (80) of Izeki et al. simply comprises an interface for transferring edited files to a master tape (see column 6, lines 61-65); it is not analogous to the transmission means or transmission step of the claimed invention" ('705 5/26/98 OAR at 15). The Izeki patent discloses an editing apparatus for audio and video information, which is a unit which has the capability to produce master tapes (from which copies are made). The premastering device 54 is the unit which "produces a master tape" (Izeki, 5:63-65). Figure 1 in the Izeki patent clearly indicates that the premastering device is integrated with the system and is internally connected to the system bus 42 via an interface 80, and that the premastering device is not an external device which is receiving information which has been transmitted away from the apparatus.

49

*4.10.* **"transmission means"**

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "transmission means" or "transmission means...for transmitting...away from said audio/video transceiver apparatus in said burst transmission time period" '705: 1, 3.<br><br>"transmission means...configured to receive the edited digital time compressed representation..." '705: 3. | "transmission means" - Subject to §112 ¶6: "an auxiliary digital port, fiber optic transceiver, microwave transceiver, satellite transceiver, plus equivalents" | "transmission means...for transmitting...away from said audio/video transceiver apparatus in said burst transmission time period" - Limited to structures disclosed under §112 ¶6: fiber optic port 18, point-to-point microwave transceiver, or satellite transceiver.<br><br>"transmission means...configured to receive the edited digital time compressed representation..." - Limited to structures disclosed under §112 ¶6: fiber optic port 18, point-to-point microwave transceiver, or satellite transceiver. |

The patents clearly list transmission as an objective of the invention ('995, 2:46-51), then indicate the existence of a "fiber optic input/output port" block 18 ('995 Figure 2) and satellite transmission ('995, 2:46-51), a "microwave transceiver" block 78, and a "fiber optic transceiver" block 76 ('839 Figure 4). Throughout the specifications, it is made clear that transmission occurs using these structures ('995, 1:34-37, 2:46-51, 7:45-8:6, 8:20-23; '839, 2:38, 2:52-58, 8:18-20, 11:48-12:11, 12:25-27, 12:38-45). A person of ordinary skill in the art would also recognize that based on the description given in the specification, the auxiliary digital input port 17 could be a general communications port providing bidirectional communication such as an Ethernet connection ('995, 7:32-42).

The term "transmission means" provides only a description of the function to be performed: "for transmitting...away from said audio/video transceiver apparatus in said burst transmission time period" and "configured to receive the edited digital time compressed representation." I have been informed that the use of the term "means" combined with a description of only the function to be performed by that "means" results in a "means-plus-function" term, and that the scope of the claim is limited to the structures described in the patent that are necessary to perform that function and equivalents.

The structures performing the function of the "transmission means" are the fiber optic transceiver, microwave transceiver, and satellite transceiver. Additionally, the Burst patents

describe an auxiliary digital input port which can provide video signals as provided by another VCR-ET, RGB-formatted video signals, or digitized audio ('995, 7:32-42). The objectives also list a computer as a signal source for inputs to the VCR-ET ('995, 2:27-32; '839, 2:33-38). Based on this description, it would be clear to one of ordinary skill in the art that the auxiliary digital input port could consist of a generic computer communication interface for bidirectional communication, such as an RS-449 or an ethernet connection. Such a connection could provide bidirectional communication, and would have appropriate transmitter and receiver circuitry and therefore also provide appropriate structure for transmitting.

### 4.11. "editing"

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "editing"<br>'995: 2, 3, 20, 21, 23, 24, 26, 27, 80;<br>'839: 2, 3, 20, 21, 23, 26, 27;.<br>'705: 2, 13. | No construction required. Alternatively, "modifying" | "Modifying the representation of the audio/video source information (does not include the function of creating a playlist)" |

"Editing" audio/video source information would be understood to one of ordinary skill in the art as modifying. Editing appears in the '995 Abstract with this generally understood meaning. Examples of editing are given as "video segments may be edited and rearranged" and "alter[ation of] the movie soundtrack" ('995, 6:27-29). Specific examples of editing audio source information include "rearranging the order of portions of the audio program, increasing or decreasing the volume of portions (or different frequency components) of the audio program, or enhancing the audio program through filtering techniques (e.g., to remove static and noise.)" ('839, 12:46-52). Specific examples of editing video source information are "changing the contrast, brightness, sharpness, colors, etc....Images could be rotated, scaled, ..., etc." on a frame-by-frame basis; "in a manner similar to the PC paint program" on a pixel-by-pixel basis; and insertion or deletion of frames or groups of frames ('995, 6:23-48). Other examples of editing operations are the addition of captions to a video, the addition of audio commentary to a silent video, and deleting commercials (9:31-54). These operations can all be broadly described as modifying the information.

Apple attempts to limit editing to exclude creation of a playlist. Nothing in the specifications or the prosecution histories indicates editing excludes creation of a playlist.

### 4.12. "editing means"

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "editing means" or "editing means…for editing the time compressed representation…and for restoring the time compressed representation" '995:2, 20, 21, 23, 26, 80; '705: 2<br><br>"editing means…for editing the digital time compressed representation…and for storing …" '705: 2.<br><br>"editing means…for editing said selectively decompressed time compressed representation… and for storing…" '995: 20, 21. | "editing means" — Subject to §112 ¶6: "a processor executing stored editing software and a controller, plus equivalents" | "editing means…for editing the time compressed representation…and for restoring the time compressed representation" - Limited to structures disclosed under §112 ¶6: (1) Digital control unit 14 which includes (a) CPU (Intel 80286 or 80386 or Motorola 68020 or 68030), (b) ROM (TI TMS47256) and (c) integrated circuit controller; and (2) user interface control panel, light pen or mouse.<br><br>"editing means…for editing said selectively decompressed time compressed representation… and for storing…" - Limited to structures disclosed under §112 ¶6: (1) Digital control unit 14 which includes (a) CPU (Intel 80286 or 80386 or Motorola 68020 or 68030), (b) ROM (TI TMS47256) and (c) integrated circuit controller; (2) user interface control panel, light pen or mouse; and (3) VME bus, Intel's Multibus, or Optobuss. |

The term "editing means" appears in the claims of the Burst patents in connection with several functions. Claim 2 of the '995 recites two functions performed by the editing means: "editing the time compressed representation of said audio video source information" and "restoring the edited time compressed representation of said audio/video source information in said random access storage means." Claim 20 of the '995 recites "editing said selectively decompressed time compressed representation of said audio video source information" and "storing said edited selectively decompressed time compressed representation." Claim 21 of the '995 recites only "editing said selectively decompressed time compressed representation of said audio video source information." Finally, Claim 2 of the '705 recites "editing the digital time compressed representation of said audio/video source information" and "storing the edited digital time compressed representation of said audio/video source information in said storage means."

The functions described above can be broken into two groups: those that involve "editing" the compressed or selectively decompressed audio/video source information; and those that involve

"storing" or "restoring" the same. I will address these functions together because they implicate the same components of the Burst device.

The "editing" and "storing" functions for audio/video source information described in the patents are performed within the Digital Control Unit (DCU) 14 as described in ('995, 6:23-25). "Digital control unit (DCU) 14 comprises a CPU (Central Processor Unit) 31, a ROM (Read Only Memory) 32, and a controller 32." Although the DCU includes a ROM for storing the software, it is not required for performing the claimed function. CPU 31 is described generically as a microprocessor commercially available at the time. Controller 33 handles the timing and aids in data communication. The patent explains that CPU 31 and controller 33 "control the editing process as they execute the programs stored in ROM 32" ('995, 6:60-62). Controller 33 is involved in performing the "storing" and "restoring" functions.

None of the audio and video editing operations described in the specification (and cited in the immediately preceding discussion of the claim term "editing") rely on any particular features of the example chips given. Limiting the description to the semiconductor chips listed as examples in the patent as Apple has done in its construction is overly limiting. It would be clear to one of ordinary skill in the art that the particular chips were not important as long as the CPU and controller provided the desired editing capabilities. Apple has also included a user interface control panel, light pen, or mouse in its construction. Each of these is a tool that may be used while editing, but none of them perform the "editing" or "storing" functions recited in the claims and are not part of the related structure.

### 4.13. "monitor means"

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "monitor means" or "monitor means for enabling the user to selectively identify the time compressed representation…" '995: 3, 22, 24, 25, 27, 28. | ""monitor means" – Not subject to §112 ¶6, and no construction necessary. Alternatively, "a display" | monitor means for enabling the user to selectively identify the time compressed representation…" - Limited to structures disclosed under §112 ¶6: flat panel video display built into the VCR-ET, television coupled to an RF modulator, or a computer monitor. |
| "monitor means…for enabling the user to selectively view…" '995: 24, 25, 27, 28. | | "monitor means…for enabling the user to selectively view…" - Limited to structures disclosed under §112 ¶6: (1) flat panel video display built into the VCR-ET, television coupled to an RF modulator, or a computer monitor and (2) user interface control panel, light pen or mouse. |
| "selectively view … during editing" '995: 24, 27. | "selectively view. . . during editing" – No construction necessary. Alternatively, "view selection(s) of . . . during editing" | "selectively view … during editing" – viewing the portion of the representation selected by a user on during editing. |

The claims containing "monitor means" all contain language which clearly indicates to one of ordinary skill that the monitor means is simply a "monitor" or display. The language "to selectively view" ('995 claims 22 and 24) clearly indicates that the "monitor means" allows display (and is therefore a display). The common understanding of the term "monitor," along with the language "monitor means to selectively identify the time compressed representation of said audio/video source information stored in said random access storage means during editing" in claim 3 is also clearly indicative of a display device to one of ordinary skill in the art. The modifying language in claims 22 and 24 of the '995 is similar to claim 3, and would also indicate to one of ordinary skill in the art that the "monitor means" is any type of monitor or display.

The Burst patents describe various types of monitors, all of which support the understanding that the "monitor means" is a monitor or display. For example, the patents explain that one output of the Burst device provides "an RGB signal as required by computer monitors and similar display devices" ('995, 8:24-26). The patents also describe an editing process in which "a program may be edited, one frame at a time," while being viewed on "a display such as a flat-panel video display" or "television" ('995, 6:30-52). The specific examples provided in the specification show

54

that the "monitor means" is simply a "monitor" or display. Although I believe the term "monitor" connotes sufficient structure for performing the stated functions, I have been instructed to address this term in the alternative as though it were a means-plus-function claim. The Burst patents recite several different functions in connection with the "monitor means." Claim 3 of the '995 recites "enabling the user to selectively identify the time compressed representation of said audio/video source information . . . during editing." Claim 22 of the '995 recites "enabling the user to view the selectively decompressed representation of said audio/video source information." Claim 24 of the '995 recites "enabling the user to selectively view the decompressed digital time compressed representation of said corresponding digital audio/video source information." Although each of these functions are slightly different, each one is performed by the same structure.

For example, in the passage cited above, the program is edited while being viewed on "a display such as a flat panel video display" or a "television" ('995, 6:39-52). The patents also describe "RGB converter 21," which outputs "an RGB signal as required by computer monitors and similar display devices" ('995, 8:24-26). Although a person of ordinary skill in the art would understand the term "monitor" alone to be the structure in the claim, that person would also recognize any of the display devices described above as easily fulfilling any of the functions associated with the "monitor means."

Apple has also included a user interface control panel, light pen, or mouse in its construction. None of them perform the claimed functions recited in the claims and are not part of the related structure.

The meaning of "selectively view . . . during editing" is sufficiently descriptive to not need construction and would be clear to one of ordinary skill in the art to correspond to viewing selection(s) of a work during editing. For example, the patents explain that a user can "select a desired frame number" and then the device "displays a strip of frames (including several frames before and after the selected frame)" for editing ('995, 6:40-45). If construction is required, Apple's construction is not correct. Apple's construction provides for viewing "the portion . . . selected." This is not correct because, as explained above, the patents indicate that during editing, frames both before and after a selected frame are also displayed ('995, 6:43-44). Therefore, limiting what is viewed to "the portion . . . selected" is inconsistent with the specification. As such, Burst's construction is correct and preferable.

### 4.14. "monitoring … during editing"

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "monitoring … during editing" '839: 3. | No construction required. Alternatively, "observing and/or listening during editing" | "watching (for video) and/or listening (for audio)… during editing." |

The meaning of "monitoring ... during editing" is sufficiently descriptive to not need construction and would be clear to one of ordinary skill in the art to correspond to observing and/or listening during editing. The specifications describe user interaction during the editing procedures ('995 6:23-48, 9:31-54; '839 8:30-33, 12:46-52).

If a construction is required, Burst's construction is preferable. It is consistent with the definition of "monitor" as a verb in *Webster's New Collegiate Dictionary* (1981). Apple attempts to limit the action of "monitoring" to watching for video and listening for audio. However, some type of visual display would be needed for audio editing such as a display of the audio waveform; relying solely on listening for audio would require that the user remember exactly what portions of the audio were being edited. A user could not indicate what portion of the audio information he or she wished to edit without a visual display (for example, "speaking" to the VCR-ET is not suggested as an editing interface).

### 4.15. "visually displaying … for selective viewing by a user during editing"

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "visually displaying … for selective viewing by a user during editing" '839: 27. | No construction required. Alternatively, "displaying at least the representation selected by a user" | "Showing the portion of the representation selected by a user on a screen or other visual display during editing." |

The meaning of "visually displaying...for selective viewing by a user during editing" is sufficiently descriptive to not need construction and would be clear to one of ordinary skill in the art to correspond to displaying at least the representation selected by a user. References to viewing during editing appear throughout the specifications ('995, 6:23-52, 9:31-54, 9:64-10:9).

If construction is required, Burst's construction is correct. The substantive difference between the two proffered constructions is in how much material is displayed. Apple's construction

displays "the portion" selected while Burst's construction displays "at least the representation selected." Burst's construction is correct because the patents indicate that during editing, frames both before and after a selected frame are also displayed ('995, 6:23-52).

### 4.16. "analog to digital converter means"

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "analog to digital converter means" or "analog to digital converter means for converting said analog audio/video source information to corresponding digital audio/video source information" '995: 8. | "analog to digital converter means" — Not subject to §112 ¶6, and no construction necessary. Alternatively, "a circuit that changes analog information into digital information" | "analog to digital converter means for converting said analog audio/video source information to corresponding digital audio/video source information"— Limited to structures disclosed under §112 ¶6: Burr-Brown ADC 600. |

To one of ordinary skill in the art, the claim term "analog to digital converter means" is completely described in the claims themselves – an analog to digital (A/D) converter is a device or unit which converts analog signals to digital signals, as described in the claim in the context of audio/video source information. The term "analog to digital converter" connotes a physical device. A/D conversion and A/D converters would have been well-known in 1988 to one of ordinary skill in the art, partially by virtue of the fact that use of A/D converters was a requirement for any system with analog inputs that performed digital processing. This understanding is reflected in technical dictionaries that would be used by one of skill in the art, which define an analog to digital converter as a "device" or "circuit" that performs analog to digital conversion. *IEEE Standard Dictionary of Electrical and Electronic Terms* 38 (48th ed. 1988); *Modern Dictionary of Electronics* 40 (6th ed. 1984). While the claim does contain the word "means," the word is modified by the "analog to digital converter" that fully performs the function of "converting said analog audio/video source information to corresponding digital audio/video source information."

The patents clearly describe an analog to digital converter as a physical device. For example, the specification describes the video control unit (VCU) 12, which "comprises an analog to digital converter (ADC) 24" and "a digital to analog converter (DAC) 25" ('995, 4:19-21). The ADC and the DAC are shown in Figure 2. The patents also explain that the ADC is a high speed, high accuracy digital to analog converter and provides the examples of some converters manufactured

by a company named Burr-Brown ('995, 4:57-60). However, it would be clear to one of ordinary skill in the art that the particular brand of A/D converter was not important as long as it met the requirements of the particular application.

Although I believe the term "analog to digital converter" connotes all of the structure needed to perform the function of "converting said analog audio/video source information to corresponding digital audio/video source information," I have been instructed to address this term in the alternative as though it were in means-plus-function format. I have already stated the function performed by the analog to digital converter means and described the structure in the preceding paragraphs. As I explained, one of ordinary skill in the art would not believe that the structure associated with the "analog to digital converter means" was limited to analog to digital conversion circuits manufactured by Burr-Brown. Instead, one of ordinary skill in the art would recognize that any analog to digital converter could be used as long as it could satisfy the high-speed, high-accuracy requirements of the application.

### *4.17.* **"selectively decompressing"**

| **Claim Term** | **Burst's Proposed Construction** | **Apple's Proposed Construction** |
|---|---|---|
| "selectively decompressing" '995: 20, 21, 22, 23, 25, 26, 28; '839: 20, 21, 22, 23, 26, 28. | "selectively decompressing" – No construction required. Alternatively, "decompressing some or all of the stored time compressed representation selected by a user" | "selectively decompressing" – decompressing the portion of the stored time compressed representation selected by a user. |

The meaning of "selectively decompressing" is sufficiently descriptive to not need construction and would be clear to one of ordinary skill in the art in the context of the patents to correspond to decompressing some or all of the stored time compressed representation selected by a user.

If construction is required, the meaning of "selectively decompressing" is apparent from reading the term in the context of the claim and specification. This term appears in claims pertaining to decompression and editing. With respect to editing, either some or all of the time compressed representation can be selected by a user ('995, 1:57-59; 2:59-64, 9:18-30). As discussed in regard to the other claim terms using the word "selectively" in the context of editing, the patent indicates that additional information can be displayed to the user beyond what has been

58

selected during editing ('995, 6:23-48). With respect to decompression, "selectively decompressing" is performed on all of a time compressed representation when a user selects a program stored on media 23 to view ('995, 9:1-3).

Apple's construction decompresses only "the portion" selected while Burst's construction decompresses "some or all" of the material selected. Clearly limiting the material decompressed to "the portion" is incorrect. "Some or all" is correct because in some types of compression algorithms, decompression of exactly specified material is not possible or is not easily accomplished. Interframe compression of video and DPCM compression of audio are examples in which decompression of exactly specified material may not be possible, as discussed in Section 2.3.6; it may be necessary to decompress beginning at the "reset" frame, which may be prior to the start of the portion selected by a user.

### 4.18. "recording means"

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "recording means" or "recording means, including a removable recording medium … for storing … " '995: 44, 47. | "recording means" — Subject to §112 ¶6: "an audio/video recording unit such as a magnetic tape drive, WORM drive, or erasable optical disk drive, plus equivalents" | "recording means, including a removable recording medium … for storing … " - Limited to structures disclosed under §112 ¶6: recording unit that uses removable magnetic tape, removable WORM optical disk, or removable erasable optical disk, and shunt switch. |

The patents clearly list recording as an objective of the invention ('995, 2:37-41), and then indicate that recording occurs in the audio/video recording unit (AVRU) ('995, 3:38-4:16). The patents provide a variety of recording media that can be used in connection with the recording means. Specifically, the patents give the examples of magnetic tape, WORM optical disk, or erasable optical disk ('995, 3:38-4:16).

The term "recording means" provides only a description of the function to be performed: "for storing the time compressed representation of said audio/video source information...onto said removable recording medium." I have been informed that the use of the term "means" combined with a description of only the function to be performed by that "means" results in a "means-plus-function" term, and that the scope of the claim is limited to the structures described in the patent that are necessary to perform that function and equivalents.

The structures performing the function of the "recording means" are those that correspond to the recording media, namely a magnetic tape drive, WORM drive, or erasable optical disk drive, plus equivalents. These are all used in conjunction with a removable recording medium.

Apple includes a shunt switch in the list of recording means. This unit, as indicated in Figure 2 in the '995 patent, is simply a switch which can be in the "closed" or "open" position. The shunt switch exists to avoid the addition of time base information when recording compressed or decompressed signals, which are inherently digital (time base information is only required for analog recording) ('995, 5:67-6:2). Clearly the shunt switch does not perform any recording, does not have any recording media associated with it, and does not store the time compressed representation, which is digital, onto a removable recording media.

### 4.19. "recording … onto a removable recording medium"

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "recording … onto a removable recording medium" '839: 44, 45, 47, 48, 49, 50. | "recording … onto a removable recording medium" — Not subject to §112 ¶6, and no construction required. Alternatively, "copying on a storage medium that can be removed" | "recording … onto a removable recording medium" — Limited to structures disclosed under §112 ¶6: removable magnetic tape, removable magnetic disk, removable WORM optical disk, or removable erasable optical disk. |

Claim 44 in '839 is a dependent claim on claim 1, in which the time compressed representation has been stored. With respect to the information which is in storage, "recording" would be understood by one of ordinary skill in the art to mean copying onto some type of media. The claim further specifies the media as a "removable recording media," which one of ordinary skill in the art would understand to refer to a self contained medium which could be inserted into and ejected from the recording device. This construction is supported throughout the specifications ('995, Fig. 2, 1:29-33, 1:51-53, 2:4-7, 2:13-17, 2:37-41, 3:38-4:16, 8:60-63, 9:4-30, 10:1-5, 10:29-36; '839, Fig. 3, 6:37-42, 8:30-33, 9:64-10:9, 10:60-61). Furthermore, the *Modern Dictionary of Electronics* provides a definition of "the process of putting data into a computer storage device" which supports Burst's construction.

### 4.20. "multiplicity"

| Claim Term | Burst's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| "multiplicity"<br>'839: 19, 73, 76, 77;<br>'932: 4;<br>'705: 1, 12, 21.<br>'995 19 | "multiplicity" – No construction necessary. Alternatively, "a large number" | "multiplicity" — two or more; usually a fairly large number. |

"Multiplicity" in the '839, '932, and '705 claim terms is used to describe a "multiplicity of video frames" representing one or more full motion video programs. It is also used in the '839 claim terms to describe the number of programs stored in a video library and in the '995 claim terms to describe the number of items of audio/video source information stored in a video library. In all of these contexts, "multiplicity" refers to a large number.

As I described in Section 2.3.1, video is a sequence of frames intended for display at a regular time interval which provides the illusion of motion. Providing that the frame rate is sufficiently high, the motion appears smooth and nonjerky. To provide even 5 seconds of video at the US television frame rate of 30 frames/second requires 150 frames. To provide full motion video, multiplicity clearly refers to its ordinary meaning of "many" or "a large number."

The extrinsic evidence also supports Burst's construction. *Webster's New Collegiate Dictionary* (1981) defines "multiplicity" as "a great number" and the *American Heritage Dictionary* (1982) defines it as "a large number."

Apple's construction of "two or more" for multiplicity is not consistent with providing full motion video. Two frames would only represent 1/15 second of video for NTSC (or 2/25 second for PAL/SECAM and 1/12 second for film), which is not sufficient time for a viewer to experience that he/she is viewing video and to understand the scene content and the motion. Rather, video shown for these short time periods would only appear as a short flash of movement.

In the '839 patent, "multiplicity" also describes the number of programs stored in a video library. In the '995 patent, the claims use "multiplicity" to describe the number of items of audio/ video source information stored in a video library, and these items are referred to as programs in the specification ('995, 7:67-8:2). The concept of video-on-demand was known at the time of the Burst patents, and video libraries were known to be the repositories that held the videos available to VOD customers. Similar to a brick-and-mortar library for books, a video library was

understood to contain enough material that a customer could make a selection from many choices. Therefore, multiplicity clearly referred to its ordinary meaning of "many" or "a large number." Additionally, the '705 prosecution history refers to video-on-demand systems while discussing the video library, and described the library contents as "a collection of multiple programs" ('705 5/26/98 OAR at 11-12). This phrase suggests a large number.

Providing only two choices in a video library is not consistent with the understanding of video library to one of ordinary skill in the art in 1988.

### *4.21.* **"multiplicity of video frames in the form of one or more full motion video programs"**

| **Claim Term** | **Burst's Proposed Construction** | **Apple's Proposed Construction** |
|---|---|---|
| "multiplicity of video frames in the form of one or more full motion video programs" '839: 73, 76, 77; '932: 4;<br><br>"multiplicity of video frames collectively [representing/constituting] at least one full motion video program" '705: 1, 12, 21. | "multiplicity of video frames in the form of one or more full motion video programs" — No construction necessary. Alternatively, "movies and other video materials represented by multiple images in a temporal sequence and providing the sense of motion when viewed sequentially" | |
| "video frames" '839: 73, 76, 77. | | "video frames" — individual images intended to be displayed in sequence. |
| "[at least one] full motion video program" '839: 73, 76, 77. | | "[at least one] full motion video program"— an entire audio/video program made of video frames that are displayed in sequence to make a moving picture. |

Following my explanation in the previous section of "multiplicity," I believe there is no construction required for "multiplicity of video frames in the form of one or more full motion video programs." To one of ordinary skill in the art, this is self-explanatory. An alternative construction is "movies and other video materials represented by multiple images in a temporal sequence and providing the sense of motion when viewed sequentially." Support for this construction is in both the '995 and '839 specifications ('995, 1:14-18, 4:28-54, 5:9-18, 6:30-48; '839, 1:21-24) and the '705 prosecution history ('705, 5/26/98 OAR at 15-16). Additionally, the definition of "frame" in the *Modern Dictionary of Electronics* (6th ed. 1984) confirms that frames

are images in a temporal sequence.

As I discussed in Section 2.3.1, "full motion video" would be understood by one of ordinary skill in the art to be video with motion which appears smooth and nonjerky, as is typically seen in movies and on television. This appearance is achieved by using a sufficiently high frame rate as discussed in Section 2.3.1.

Apple's construction of video frames combined with its construction of multiplicity yields a construction of "two or more (usually a fairly large number) of individual images intended to be displayed in sequence." As described in the previous section, two video frames are insufficient to provide the illusion of motion even when displayed in sequence. Furthermore, images "intended to be displayed in sequence" is not sufficient to describe video; such a description could equally apply to a PowerPoint presentation, or to an image "slide show" of someone's vacation.

Apple's construction of "full motion video program" as "an entire audio/video program made of video frames that are displayed in sequence to make a moving picture" misrepresents the meaning of "full" in "full motion video program." They attempt to use "entire" as a synonym for full; however, the term "full motion video" was well known to one of ordinary skill in the art to refer to a video captured and displayed at a sufficiently high frame rate to display smooth and nonjerky motion. "Entire" is not a synonym for "full" in this context, and Apple's construction is therefore incorrect.

# 5. Materials Considered in Preparing this Report

[1]   E. A. Lee and D. G. Messerschmitt, *Digital Communication*, Kluwer Academic Publishers, 1988.

[2]   A. S. Tanenbaum, *Computer Networks*, Prentice Hall, 1989.

[3]   D. Bertsekas, R. Gallagher, *Data Networks*, Prentice Hall, 1987.

[4]   B. Sklar, *Digital Communications: Fundamentals and Applications*, Prentice Hall, 1988.

[5]   P. Cochrane, M. Brain., "Future optical fiber transmission technology and networks," *IEEE Communications Magazine*, November 1988.

[6]   D. R. Spears, "Broadband ISDN switching capabilities from a services perspective," *IEEE Journal on Selected Areas in Communications*, October 1987.

[7]   N. S. Jayant, P. Noll, *Digital Coding of Waveforms*, Prentice Hall, 1984.

[8]   J. D. Johnston, "Transform coding of audio signals using perceptual noise criteria, *IEEE Journal on Selected Areas in Communications*, Feb. 1988.

[9]   J. Soumagne, P. Mabilleau, S. Morissette, G. Chouinard, D. Bennett, "A comparative study of the proposed high quality coding schemes for digital music," *IEEE ICASSP*, 1986.

[10]  P. J. Bloom, "High quality digital audio in the entertainment industry: an overview of achievements and challenges," *IEEE Acoustics Speech and Signal Processing Magazine*, October 1985.

[11]  Byte Magazine, January — December 1988.

[12]  Tim Dietrich, "The Next Computer," *ACM SIGSMALL/PC Notes*, Aug. 1989.

[13]  Webster's on-line dictionary (`http://www.m-w.com`).

[14]  D. Morgen, E. Protonotarios, "Time Compression Multiplexing for Loop Transmission of Speech Signals," *IEEE Transactions on Communications*, 22:12, December 1974.

[15]  United States Patent 4,300,161, Time compression multiplexing of video signals.

[16]  K. Okazaki, A. Sasama, S. Unagami, "A 4.8 kbps voice coding using pitch synchronous DFT," *Military Communications Conference*, October 1988.

[17]  P. N. Gardiner, "The UK D-MAC/packet standard for DBS," *IEEE Transactions on Consumer Electronics*, 34:1, February 1988.

[18]  United States Patent 4,963,995 ("'995 patent"), Audio/video transceiver apparatus including compression means.

[19]  United States Patent 5,164,839 ("'839 patent"), Method for handling audio/video source information.

[20]  United States Patent 5,057,932 ("'932 patent"), Audio/video transceiver apparatus including compression means, random access storage means, and microwave transceiver means

[21]  United States Patent 5,995,705 ("'705 patent"), Burst transmission apparatus and method for audio/video information

[22]  Prosecution history for the '995 patent.

[23]  Prosecution history for the '839 patent.

[24]  Prosecution history for the '705 patent.

[25]  Prosecution history for the '932 patent.

[26]  The claim construction disclosures of Burst and those of Apple as well as the references cited in each.

[27]  Burst vs. Microsoft Markman materials including parties' briefs, exhibits to briefs, orders, and Markman hearing transcripts.

[28]  Casanova deposition transcript at 51-52.

[29]  Quicktime 7.1 User's Guide (exhibit 44 to Casanova deposition).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that, based on my knowledge, qualifications, and experience, I am prepared to testify on the subjects addressed herein.

EXECUTED on October 20, 2006 at Ithaca, New York.

_____

Sheila S. Hemami, Ph.D.

Appendix A

# Curriculum Vitae of Sheila S. Hemami

School of Electrical & Computer Engineering, Cornell University
332 Frank H. T. Rhodes Hall, Ithaca, NY   14853
(607) 254-5128   hemami@ece.cornell.edu     http://foulard.ee.cornell.edu

## Education

Stanford University                                                      Stanford, CA
Ph.D. in Electrical Engineering, December 1994.

Stanford University                                                      Stanford, CA
M.S. in Electrical Engineering, April 1992.

University of Michigan                                                  Ann Arbor, MI
B.S. in Electrical Engineering, Summa Cum Laude, May 1990.

## Professional Experience

Cornell University                                                        Ithaca, NY
Associate Professor, School of Electrical & Computer Engineering, November 2000-present.
Assistant Professor, School of Electrical Engineering, January 1995 - October 2000.

Hewlett Packard Laboratories                                            Palo Alto, CA
Member of Technical Staff, February-December 1994, Interactive Video Initiative: Multimedia Systems & Community Networking Group.

Visiting Positions: Visiting Fellow, Princeton University Dept. of Electrical Engineering, Fall 2001; Texas Instruments Associate Professor of Electrical Engineering, Rice University, Spring 2002.

## External Research Funding

### Sponsored Research

National Science Foundation, "ACCEL: Advancing Cornell's Commitment to Excellence and Leadership (Cornell University ADVANCE Proposal)," $3,300,000, November 2006-October 2011 (1 of 5 Co-PIs).

National Science Foundation, "A Signal Processing. Approach to Modeling Visual Masking," $255,873, July 2005-June 2008 (sole PI)

National Science Foundation, "A Framework for Encoding American Sign Language and Other Structured Video," joint with University of Washington, $269,584 for Cornell, July 2005-June 2008 (1 of 3 Co-PIs)

National Science Foundation, "Workshop Series on Starting Successful Faculty Careers," $20,000, September 2004-December 2005 (1 of 2 Co-PIs)

National Science Foundation, "Nomination of Professor Robert M. Gray for a Presidential Award for Excellence in Science, Mathematics, and Engineering Mentoring," $10,000 (to Stanford, matched by Stanford to fund a mentoring workshop) (1 of 4 Co-PIs)

Department of the Navy, "Channel and QOS Adaptive Wireless Multimedia Ad-hoc Networks," $4,500,000, 1999-2004 (1 of 7 Co-PIs)

Department of Energy, "Visually Optimized Scalable Image Compression," May 1999-April 2002, $309,000 (sole PI)

National Science Foundation, "Visually Optimized Supra-threshold Image Compression," May 1999-April 2002, $205,000 (sole PI)

National Science Foundation Career Award, "Robust Visual Communications for Packet Networks," May 1997 - April 2001, $209,000 (sole PI)

Department of Energy, "Visual Communications for Heterogeneous Networks," September 1995 - August 1998, $375,000 (sole PI)

National Science Foundation, "A Next Generation Computing and Communication Substrate," July 1997 - June 2002, $1,000,000 (1 of 16 Co-PIs)

**Corporate Sponsors**

Lockheed-Martin, Tektronix Corporation, Eastman Kodak Company, AT&T, GTE, Intel, Center for Electronic Imaging & Science (New York State)

## Memberships

IEEE (Senior Member), Tau Beta Pi, Eta Kappa Nu

Graduate fields of electrical engineering, computer science, and applied math at Cornell

## Professional Service Activities

Chair, Image & Multidimensional Signal Processing Technical Committee (IMDSP TC) of the IEEE, 2006-7; general member, October 2001-present (includes program committee duties for ICASSP & ICIP); Awards Subcommittee Chair, 2005

Technical Co-Chair, IMDSP Workshop on Image and Video Quality, June 2007

Program Committee Member: Human Vision and Electronic Imaging, 2007; Video Processing and Quality Metrics, 2006-present; Visual Communications and Image Processing, 2006; Asilomar Conference on Signals, Systems, and Computers, 2005; Data Compression Conference, 2003-present

Organizing/Program Committee, PAESMEM/Stanford School of Engineering Workshop on Mentoring in Engineering, June 2004

Associate Editor, *IEEE Transactions on Signal Processing*, August 2000-April 2006

IEEE International Conference on Image Processing — 2002 Publicity Chair

Reviewer: *National Science Foundation, IEEE Transactions on Signal Processing*, *IEEE Transactions on Image Processing*, *IEEE Transactions on Circuits & Systems for Video Technology, IEEE Transactions on Communications, IEEE Proceedings, Journal of Visual Communication and Image Representation*, *SPIE Journal of Electronic Imaging.*

## Awards and Honors

Constance E. Cook and Alice H. Cook Recognition Award, 2005 (from the Cornell University Advisory Council on the Status of Women)

Cornell University College of Engineering Faculty Diversity Award, 2005

Joel & Ruth Spira Excellence in Teaching Award (Cornell), 2004

Elected Senior Member of the IEEE, 2003

Eta Kappa Nu Outstanding Young Electrical Engineer Finalist, 2002

Fulbright Distinguished Lecturer, Morocco, 2001

HKN C. Holmes MacDonald Outstanding Teaching Award, 2000

National Science Foundation CAREER Award, 1997

Kodak Term Professor of Electrical Engineering, 1997, 1998, 1999

Lilly Teaching Fellowship, 1996-7

Cornell College of Engineering Michael Tien '72 Teaching Award, 1996-7, 1999-2000.

## Graduate Students

### Ph.D. Students Graduated

Matt Gaubatz, Ph.D., May 2006, "Practical Rate-Control Tools for Wavelet-Based Image Compression" (Hewlett-Packard)

Chao Tian, Ph.D., August 2005, "Multiple Description Quantization: Improvement and New Approach" (Ecole Polytechnic Federale de Lausanne, Switzerland)

Yegnaswamy Sermadevi, Ph.D., August 2005, "Optimal bit allocation for efficient encoding and transmission of video" (Microsoft)

Damon M. Chandler, Ph.D., May 2005, "Visual Detection and Perception of Distortion in Wavelet-Compressed Images" (Psychology Department, Cornell)

Mark A. Masry, Ph.D., January 2004, "Perceptual Metrics for Video Quality Evaluation and Image Watermarking" (Mechanical and Aerospace Engineering Department, Cornell)

Aaron Deever, Ph.D. (Applied Math), November 2000, "Projection-based Techniques for Lossy and Lossless Wavelet Image Compression," (Eastman Kodak Research Labs, Rochester, NY)

Marcia Ramos, Ph.D., May 2000, "Perceptually-Based Image Coding" (Fish & Neave, Palo Alto, CA)

Yan Yang, Ph.D., January 2000, "Rate Control for Video Coding and Transmission" (previously of Aware, Inc., Boston, MA)

Knox Carey, Ph.D., August 1999, "Applications of Wavelet Coefficient Decay" (previously of InterTrust, San Jose, CA)

20 Masters of Engineering graduates, 2 Masters of Science graduates

### Current Ph.D. students

Frank Ciaramello, David Rouse

## Teaching

Image & Video Coding Standards Seminar — senior/1st-year-graduate JPEG/MPEG course.
Visual Motion Seminar — 1st-year-graduate "short course."
Digital Signal Processing — senior-level Oppenheim & Schafer-style course.
Introduction to Digital Signal Processing — junior-level Oppenheim & Schafer-style course.
Signals & Information: Multimedia Signal Processing — sophomore-level DSP course.
Statistical Signal Processing — senior/1st-year-graduate course.
Digital Image Processing — graduate course.
Wiener & Kalman Filtering — advanced graduate course.

## Other Expert Witness Consulting in the past 4 years

Expert witness for Pegasus (Plaintiff) in National Rural Telecommunications Cooperative (Plaintiff) vs. Directv, Inc., Hughes Communications Galaxy, Inc., and Does 1-10 (Defendants), 2002-3

## Publications

### Refereed Journal Publications

1. J. Chen, C. Tian, T. Berger, S. S. Hemami, "Multiple description quantization via Gram-Schmidt Orthogonalization," to appear in *IEEE Transactions on Information Theory*.

2. M. D. Gaubatz, S. S. Hemami, "Scalable image embeddings from arbirary wavelet-based perceptual models," to appear in *IEEE Transactions on Image Processing*.

3. M. D. Gaubatz, S. S. Hemami, "Robust rate-control for wavelet-based image coding via Bootstrapping with Probability Models," to appear in *IEEE Transactions on Image Processing*.

4. M. D. Gaubatz, S. S. Hemami, "Efficient entropy estimation with double stochastic models for quantized wavelet image data," to appear in *IEEE Transactions on Image Processing*.

5. Y. Sermadevi, "Convex programming formulations for rate allocation in video coding," *IEEE Transactions on Circuits and Systems for Video Technology*, August 2006

6. M. A. Masry, S. S. Hemami, "A wavelet-based scalable video quality metric and applications," *IEEE Transactions on Circuits and Systems for Video Technology*, February 2006.

7. C. Tian, S. S. Hemami, "A new class of multiple description scalar quantizer and its application to image coding," *IEEE Signal Processing Letters*, Vol. 12, No. 4, pp. 329-332, April 2005.

8. D. M. Chandler, S. S. Hemami, "Dynamic contrast-based quantization for lossy wavelet image compression," *IEEE Transactions on Image Processing*, Vol. 14, No. 4, pp. 397-410, April 2005.

9. C. Tian, S. S. Hemami, "On the analysis of multiple description lattice vector quantization," *IEEE Transactions on Information Theory*, Vol. 50, No. 10, pp. 2458-70, October 2004.

10. C. Tian, S. S. Hemami, "Universal multiple description scalar quantization: analysis and design," *IEEE Transactions on Information Theory*, Vol. 50, No. 9, pp. 2089-2102, September 2004.

11. M. A. Masry, S. S. Hemami, "A metric for continuous quality evaluation of compressed video with severe distortions," *Signal Processing: Image Communication*, Vol. 19, No. 2, pp. 133-46, February 2004.

12. W. Xu, S. S. Hemami, "Robust adaptive transmission of images and video over multiple channels," *Signal Processing: Image Communication*, Vol. 18, No. 10, pp. 981-1000, November 2003.

13. D. M. Chandler, S. S. Hemami, "Effects of natural images on the detectability of simple and compound wavelet subband quantization distortions," *Journal of the Optical Society of America:A.*, July 2003.

14. A. T. Deever, S. S. Hemami, "Efficient sign coding and estimation of zero-quantized coefficients in embedded wavelet image codecs," *IEEE Transactions on Image Processing,* Vol. 12, No. 4, pp. 420-30, April 2003.

15. A. T. Deever, S. S. Hemami, "Projection-based modelling and context modelling for lossless image compression," *IEEE Transactions on Image Processing,* Vol. 12, No. 5, pp. 489-99, May 2003.

16. M. G. Ramos, S. S. Hemami, "Supra-threshold wavelet coefficient quantization in complex stimuli: psychophysical evaluation and analysis," *Journal of the Optical Society of America:A*, October 2001.

17. Y. Yang, S. S. Hemami, "Rate control for VBR video over ATM networks: simplification and implementation," *IEEE Transactions on Circuits and Systems for Video Technology*, Vol. 11, No. 9, pp. 1045-58, September 2001.

18. Y. Yang, S. S. Hemami, "Generalized rate-distortion optimization for motion-compensated video coding," *IEEE Transactions on Circuits and Systems for Video Technology*, Vol. 10, No. 6, pp. 942-55, September 2000.

19. S. S. Hemami, "Robust image transmission using resynchronizing variable-length codes," *IEEE Journal on Selected Areas in Communications, Special Issue on Error Resilient Image and Video Transmission,* Vol. 18, No. 6, pp. 927-39, August 2000.

20. W. K. Carey, S. S. Hemami, P. N. Heller, "Smoothness-Constrained Wavelet Image Compression," *IEEE Transactions on Image Processing*, Vol. 8, No. 12, pp. 1807-1811, December 1999.

21. G. C. Conklin, S. S. Hemami, "A Comparison of Temporal Scalability Techniques," *IEEE Transactions on Circuits and Systems for Video Technology,* Vol. 9, No. 6, pp. 909-19, September 1999.

22. W. K. Carey, D. B. Chuang, S. S. Hemami, "Regularity-Preserving Image Interpolation," *IEEE Transactions on Image Processing,* Vol. 8, No. 9, pp. 1293-7, September 1999.

23.  M. G. Ramos, S. S. Hemami, "Perceptually-Based Scalable Image Compression for Packet Networks," *Journal of Electronic Imaging, special issue on Image/Video Compression and Processing for Visual Communications,* Vol. 7, No. 3, pp. 453-64, July 1998.

24.  S. S. Hemami, R. M. Gray, "Subband Coded Image Reconstruction for Lossy Packet Networks," *IEEE Transactions on Image Processing,* Vol. 6, No. 4, pp. 523-39, April 1997.

25.  S. S. Hemami, R. M. Gray, "Subband Filters Optimized for Lost Coefficient Reconstruction," *IEEE Transactions on Signal Processing,* Vol. 45, No. 3, pp. 763-7, March 1997.

26.  S. S. Hemami, "Reconstruction-Optimized Lapped Orthogonal Transforms for Robust Image Transmission," *IEEE Trans. Circuits & Systems for Video Technology, special issue on Wireless Visual Communications*, Vol. 6, No. 2, pp. 168-81, April 1996.

27.  S. S. Hemami, T. H.-Y. Meng, "Transform Coded Image Reconstruction Exploiting Interblock Correlation," *IEEE Transactions on Image Processing*, Vol. 4, No. 7, pp. 1023-6, July 1995.


**Currently Under Review**

28.  D. M. Chandler, S. S. Hemami, "VSNR: A visual signal-to-noise ratio for natural images based on near-threshold and supra-threshold vision," submitted to *IEEE Transactions on Image Processing*.

29.  Y. Sermadevi, S. S. Hemami "Optimal bit allocation for predictive video coding via convex modeling," submitted to *IEEE Transactions on Circuits and Systems for Video Technology.*


**Conference Publications/Presentations**

30.  M. D. Gaubatz, S. Kwan, B. Chern, D. M. Chandler, S. S. Hemami, "Spatially adaptive wavelet image compression via structural masking," *to be presented at ICIP 2006*.

31.  C. Tian, S. S. Hemami, "Visually optimized multiple description image coding," *ICASSP 2006*.

32.  M. Gaubatz, A. Vosoughi, A. Scaglione, S. S. Hemami, "Efficient, low complexity encoding of multiple burred noisy downsampled images via distributed source coding principles," *ICASSP 2006*.

33.  D. C. Chandler, K. L. Lim, S. S. Hemami, "Effects of spatial correlations and global precedence on the visual fidelity of distorted images," *Human Vision and Electronic Imaging*, San Jose, CA, January 2006.

34.  S. S. Hemami, D. C. Chandler, B. G. Chern, J. A. Moses, "Suprathreshold visual psychophysics and structure-based visual masking," *Visual Communication and Image Processing*, San Jose, CA, January 2006.

35.  M. D. Gaubatz, S. S. Hemami, "Fast Accurate Rate Control for Low-Rate Wavelet-Based Image Coding via Bootstrapping," *IEEE International Conference on Image Processing*, Genoa, Italy, September 2005.

36. J. Chen, C. Tian, S. Hemami, T. Berger, "A new class of universal multiple description lattice quantizers," *IEEE International Symposium on Information Theory*, Adelaide, Australia, September 2005.

37. M. D. Gaubatz, D. M. Chandler, S. S. Hemami, "Spatially selective quantization and coding for wavelet-based image compression," *IEEE International Conference on Acoustics, Speech, and Signal Processing (ICASSP),* Philadelphia, PA, March 2005.

38. S. S. Hemami, "Robust Video Coding — An Overview," *IEEE International Conference on Acoustics, Speech, and Signal Processing (ICASSP),* Philadelphia, PA, March 2005.

39. Y. Sermadevi, S. S. Hemami, "Bit allocation in video is easy," *Data Compression Conference*, Snowbird, Utah, March 2005.

40. C. Tian, S. S. Hemami, "Staggered Lattices in Multiple Description Quantization," *Data Compression Conference*, Snowbird, Utah, March 2005.

41. C. Tian, J. Chen, S. S. Hemami, "Multiple descriptions with central refinement," *39th Annual Conference on Information, Sciences, and Systems* (CISS), Baltimore, MD, March 2005.

42. D. M. Chandler, N. L. Dykes, S. S. Hemami, "Visually lossless compression of digital radiographs based on contrast sensitivity and visual masking," *SPIE Medical Imaging: Image Perception, Observer, and Technology Assessment*, San Diego, CA, February 2005.

43. M. D. Gaubatz, D. M. Chandler, S. S. Hemami, "Spatial quantization via local texture masking," *SPIE Human Vision and Electronic Imaging 2005,* Santa Clara, CA, January 2005.

44. Y. Sermadevi, S. S. Hemami, "Convexity results for a predictive video coder," *Asilomar Conference on Signals, Systems, and Computers*, Pacific Grove, CA, November 2004.

45. C. Tian, S. S. Hemami, "An embedded image coding system based on tarp filter with classi-fication," *IEEE International Conference on Acoustics, Speech, and Signal Processing (ICASSP),* Montreal, CA, May 2004.

46. M. Gaubatz, S. S. Hemami, "Scalable image embeddings from arbitrary wavelet-based perceptual models," *IEEE International Conference on Acoustics, Speech, and Signal Processing (ICASSP),* Montreal, CA, May 2004.

47. W. Xu, S. S. Hemami, "Distortion optimized multiple channel transmission under delay constraints," *IEEE International Conference on Acoustics, Speech, and Signal Processing (ICASSP),* Montreal, CA, May 2004.

48. C. Tian, S. S. Hemami, "Sequential design of multiple description scalar quantizers," *Data Compression Conference*, Snowbird, Utah, March 2004.

49. Y. Sermadevi, S. S. Hemami, "Efficient bit allocation for dependent video coding," *Data Compression Conference*, Snowbird, Utah, March 2004.

50. M. D. Gaubatz, S. S. Hemami, "Local entropy estimation for low rate wavelet image coding," *38th Annual Conference on Information, Sciences, and Systems* (CISS), Princeton, NJ, March 2004.

51. Y. Sermadevi, M. A. Masry, S. S. Hemami, "Rate control with a perceived quality metric," *Visual Communications and Image Processing*, Santa Clara, CA, January 2004.

52. D. M. Chandler, M. A. Masry, S. S. Hemami, "Quantifying the visual quality of wavelet-compressed images based on local contrast, visual masking, and global precedence," *Asilomar Conference on Signals, Systems, and Computers*, Pacific Grove, CA, November 2003.

53. M. A. Masry, D. M. Chandler, S. S. Hemami, "Digital watermarking using local contrast-based texture masking," *Asilomar Conference on Signals, Systems, and Computers*, Pacific Grove, CA, November 2003.

54. G. Yadavalli, M. A. Masry, S. S. Hemami, "Frame rate preferences in low bit rate video," *IEEE International Conference on Image Processing*, Barcelona, Spain, September 2003.

55. Y. Sermadevi, S. S. Hemami, "Linear approximations and linear programming for video rate control," *IEEE International Conference on Image Processing*, Barcelona, Spain, September 2003.

56. W. Xu, S. S. Hemami, "Delay-optimized robust transmission of images over multiple channels," *International Conference on Multimedia and Exposition*, Baltimore, MD, March 2003.

57. C. Tian, S. S. Hemami, "Universal multiple description scalar quantization: analysis and design," *Data Compression Conference 2003*, Snowbird, Utah, March 2003.

58. Y. Sermadevi, S. S. Hemami, "Linear programming optimizations for video coding under multiple constraints," *Data Compression Conference 2003*, Snowbird, Utah, March 2003.

59. C. Tian, S. S. Hemami, "On the asymptotic analysis of multiple description scalar quantization," *37th Annual Conference on Information, Sciences, and Systems*, Baltimore, MD, March 2003.

60. D. M. Chandler, S. S. Hemami, "Suprathreshold image compression based on contrast allocation and global precedence," *Human Vision and Electronic Imaging 2003.*

61. M. A. Masry, S. S. Hemami, "CVQE: a continuous video quality evaluation model for low bit rates," *SPIE Human Vision and Electronic Imaging 2003.*

62. D. M. Chandler, S. S. Hemami, "Contrast-based quantization and rate control for wavelet-coded images," *Proceedings IEEE Intl. Conf. Image Processing,* Rochester, NY, September 2002. Winner (2nd prize), Best Student Paper Award.

63. M. A. Masry, S. S. Hemami, "Perceived quality metrics for low bit rate compressed video," *Proceedings IEEE Intl. Conf. Image Processing,* Rochester, NY, September 2002.

64. W. Xu, S. S. Hemami, "Efficient partitioning of unequal error protected MPEG video streams for multiple channel transmission," *Proceedings IEEE Intl. Conf. Image Processing,* Rochester, NY, September 2002.

65. D. M. Chandler, S. S. Hemami, "Additivity models for suprathreshold distortion in quantized, wavelet-coded images," *Proceedings SPIE Human Vision and Electronic Imaging*, San Jose, CA, January 2002.

66. M. Masry, S. S. Hemami, "Subjective quality evaluation of low-rate video," *Proceedings IEEE Intl. Conf. Image Processing,* Thessaloniki, Greece, October 2001.

67. S. S. Hemami, M. G. Ramos, "Quantifying Visual Distortion in Low-Rate Wavelet-Coded Images," *Proceedings IEEE Intl. Conf. Image Processing,* Thessaloniki, Greece, October 2001.

68. S. S. Hemami, "Supra-threshold wavelet coefficient quantization in natural images: analysis and application to compression," *Int. Conf. on Image and Signal Processing*, Agadir, Morocco, May 2001.

69. M. Masry, S. S. Hemami, W. Osberger, A. M. Rohaly, "Subjective quality evaluation of low-rate video," *Proceedings SPIE Human Vision and Electronic Imaging*, San Jose, CA, January 2001.

70. Y. Yang, S. S. Hemami, "Rate-distortion optimization for region- and object-based wavelet video coding," *Proceedings Thirty-fourth Asilomar Conference on Signals, Systems, and Computers*, Pacific Grove, CA, October 2000.

71. A. T. Deever, S. S. Hemami, "Scalable Image Coding with Projection-Based Context Modelling," *Proceedings IEEE Intl. Conf. Image Processing,* Vancouver, BC, September 2000.

72. M. Masry, S. S. Hemami, "Data Hiding in Images with Psychovisual Thresholding," *Proceedings IEEE Intl. Conf. Image Processing,* Vancouver, BC, September 2000.

73. M. Eoin Buckley, M. G. Ramos, S. S. Hemami, S. B. Wicker, "Perceptually-based Robust Image Transmission over Wireless Channels," *Proceedings IEEE Intl. Conf. Image Processing,* Vancouver, BC, September 2000.

74. M. G. Ramos, S. S. Hemami, "Perceptual Quantization for Wavelet-Based Image Coding," *Proceedings IEEE Intl. Conf. Image Processing,* Vancouver, BC, September 2000.

75. A. T. Deever, S. S. Hemami, "What's Your Sign? Efficient Sign Coding in an Embedded Wavelet Image Coder," *Proceedings Data Compression Conference , Snowbird, UT, March 2000*.

76. Y. Yang, S. S. Hemami, "Separate Source and Channel Rate Selection for Video over ATM," *Proceedings Data Compression Conference, Snowbird, UT, March 2000*.

77. S. S. Hemami, M. G. Ramos, "Wavelet coefficient quantization to produce equivalent visual distortion in complex stimuli," *Proceedings of SPIE Human Vision & Electronic Imaging*, San Jose, CA, Jan. 2000.

78. Y. Yang, S. S. Hemami, "Minmax Frame Rate Control using a Rate-Distortion-Optimized Wavelet Coder," *Proceedings of IEEE Int. Conf. on Image Processing,* Kobe, Japan, Oct. 1999.

79. S. S. Hemami, "Distortion Analyses for Temporal Scalability Coding Techniques," *Proceedings of IEEE Int. Conf. on Image Processing,* Kobe, Japan, Oct. 1999.

80. Y. Yang, S. S. Hemami, "VBR Rate-distortion optimization for a motion compensated video coder," *Proceedings of IEEE Int. Conf. on Image Processing,* Kobe, Japan, Oct. 1999.

81. Y. Yang, S. S. Hemami, "A rate-distortion optimized wavelet video coder," *Proceedings of Picture Coding Symposium*, Portland, OR, April 1999, pp. 61-4.

82.  S. S. Hemami, T. Chang, R. Lau, "Resynchronizing Variable-Length Codes for Robust Image Transmission," *Data Compression Conference*, Snowbird Utah, April 1999, pp. 529.

83.  M. G. Ramos, S. S. Hemami, "Activity-Selective SPIHT Coding," *Proceedings SPIE Visual Communications & Image Processing*, Vol. 3653, Pt. 1, San Jose, CA, Jan. 1999, pp. 315-26.

84.  A. T. Deever, S. S. Hemami, "Dense Motion Field Reduction for Motion Estimation," *Thirty-second Asilomar Conference on Signals, Systems, and Computers*, Pacific Grove, CA, Nov. 1998, Vol. 2, pp. 944-8.

85.  Y. Yang, S. S. Hemami, "Rate-distortion-based Combined Motion Estimation and Segmentation," *IEEE Int. Conference on Image Processing*, Chicago, IL, Oct. 1998, Vol. 3, pp. 920-4.

86.  W. K. Carey, L. A. Von Pischke, S. S. Hemami, "Rate-distortion Based Scalable Progressive Image Coding," *SPIE Conf. on Mathematics of Data and Image Coding, Compression, and Encryption*, San Diego, CA, July 1998, Vol. 3456, pp. 197-208.

87.  S. S. Hemami, "Visual Sensitivity Considerations for Subband Coding," *Proceedings of Thirty-first Asilomar Conference on Signals, Systems, and Computers*, Pacific Grove, CA, Nov. 1997, Vol. 1, pp. 652-6.

88.  Y. Yang, S. S. Hemami, "Rate-Constrained Motion Estimation and Perceptual Coding," *Proceedings of IEEE Int. Conference on Image Processing*, Santa Barbara, CA, Oct. 1997, Vol. 1, pp. 81-4.

89.  M. G. Ramos, S. S. Hemami, "Psychovisually-Based Multiresolution Image Segmentation," *Proceedings of IEEE Int. Conference on Image Processing*, Santa Barbara, CA, Oct. 1997, Vol. 3, pp. 66-9.

90.  G. J. Conklin, S. S. Hemami, "Evaluation of Temporally Scalable Video Coding Techniques," *Proceedings of IEEE Int. Conference on Image Processing*, Santa Barbara, CA, Oct. 1997, Vol. 2, pp. 61-4.

91.  W. K. Carey, D. B. Chuang, S. S. Hemami, "Regularity-Preserving Image Interpolation," *Proceedings of IEEE Int. Conference on Image Processing*, Santa Barbara, CA, Oct. 1997, Vol. 1, pp. 901-4.

92.  G. Conklin, S. S. Hemami, "Multiresolution Motion Estimation," *Proceedings of IEEE International Conference on Acoustics, Speech, and Signal Processing (ICASSP),* Munich, Germany, April 1997, pp. 2873-6.

93.  M. G. Ramos, S. S. Hemami, "Robust Image Coding with Perceptual-Based Scalability," *Proceedings Data Compression Conference '97*, Snowbird, Utah, March 1997, p. 466.

94.  W. K. Carey, S. S. Hemami, P. Heller, "Smoothness-Constrained Wavelet Image Compression," *Proceedings IEEE International Conference on Image Processing*, Lausanne, Switzerland, September 1996, pp. 569-72.

95.  S. S. Hemami, "Reconstruction-Optimized Lapped Orthogonal Transforms," *Proceedings of IEEE ICASSP '96*, Atlanta, Georgia, May 1996, pp. 1542-5.

96.  M. Ramos, S. S. Hemami, "Edge-Adaptive JPEG Image Compression," *Proceedings of SPIE Conference on Visual Communications and Image Processing*, Orlando, Florida, March 1996, pp. 1082-93.

97.  M. Ramos, S. S. Hemami, "Eigenfeatures Coding of Videoconferencing Sequences," *Proceedings of SPIE Conference on Visual Communications and Image Processing*, Orlando, Florida, March 1996, pp. 100-10.

98.  S. S. Hemami, "Digital Image Coding for Robust Multimedia Transmission," *Proceedings of Symposium on Multimedia Communications and Video Coding*, New York, October 1995, pp. 491-98.

99.  S. S. Hemami, R. M. Gray, "Subband Filters Designed for Lost Coefficient Reconstruction," *Proceedings of IEEE ICASSP '95,* Detroit, Michigan, April 1995, pp. 1520-3.

100.  S. S. Hemami, R. M. Gray, "Subband Coded Image Reconstruction for Lossy Packet Networks," *Proceedings of The Twenty Eighth Asilomar Conference on Signals, Systems, and Computer*s, October 1994. pp. 497-91.

101.  S. S. Hemami, R. M. Gray, "Image Reconstruction Using Vector Quantized Linear Interpolation," *Proceedings of IEEE ICASSP '94*, Adelaide, Australia, April 1994, pp. 629-32.

102.  T.-H. Meng, E. K. Tsern, A. C. Hung, S. S. Hemami, B. M. Gordon, "Video Compression for Wireless Communications," *Proceedings of Virginia Tech's Third Symposium on Wireless Personal Communications,* Blacksburg, VA, June 1993, pp. 1-17.

103.  S. S. Hemami, T. H.-Y. Meng, "Reconstruction of Lost Transform Coefficients Using a Smoothing Criterion," *Proceedings of 1993 Picture Coding Symposium,* Lausanne, Switzerland, March 1993.


## Book Chapters & Other

104.  E. Riskin, M. Ostendorf, P. Cosman, M. Effros, J. Li, S. Hemami, R. M. Gray, ed., "Mentoring for Academic Careers in Engineering: Proceedings of the PAESMEM/Stanford School of Engineering Workshop," Graphics Publishing, 2005.

105.  S. S. Hemami, "Robust image communication over wireless channels," *IEEE Communications Magazine*, November 2001.

106.  S. S. Hemami, "Image Compression," *Image Databases: Search and Retrieval of Digital Imagery*, L. Bergman and V. Castelli, ed., John Wiley & Sons, 2001.

107.  S. S. Hemami, R. M. Gray, "Subband Coding for Lossy Packet Networks," in *Recovery Techniques for Image and Video Compression and Transmission*, A. Katsaggelos and N. Galatsanos, ed., Kluwer Academic Publishers, October 1998.


## Workshop Presentations

108.  D. M. Rouse, S. S. Hemami, "Quantifying the Use of Structure in Cognition," *Western New York Image Processing Workshop*, Rochester, NY, September 2006, Winner, best student presentation.

109. F. Ciaramello, S. S. Hemami, "'Can you see me now?' An Objective Metric for Predicting the Intelligibility of Compressed American Sign Language Video," *Western New York Image Processing Workshop*, Rochester, NY, September 2006.

110. S. S. Hemami, "A Signal Processor's Approach to Modeling the Human Visual System, and Applications," *Mathematics and Multimedia Workshop*, Banff, Alberta, Canada, July 2005.

111. S. S. Hemami, M. A. Masry, "A scalable video quality metric and applications," *Video Processing and Quality Monitoring Workshop*, Scottsdale, AZ, January 2005.

112. C. Tian, S. S. Hemami, "A special class of multiple description scalar quantizers," *IEEE Information Theory Workshop*, Austin, TX, October 2004.

113. M. D. Gaubatz, S. S. Hemami, "Embedding from arbitrary perceptual models," *Western New York Image Processing Workshop*, Rochester, NY, September 2004.

114. Y. Sermadevi, S. S. Hemami, "Convexity results for predictive video coding," *Western New York Image Processing Workshop*, Rochester, NY, September 2004, Winner, best student presentation.

115. D. M. Chandler, S. S. Hemami, "Quantifying the visual quality of wavelet-compressed images based on contrast signal-to-noise ratios and global precedence," *Western New York Image Processing Workshop*, Rochester, NY, October 2003.

116. M. D. Gaubatz, S. S. Hemami, "Perceptual embedded coding," *Western New York Image Processing Workshop*, Rochester, NY, October 2003, Best Student Poster Presentation.

117. W. Xu, S. S. Hemami, "Rate control for video transmission over multiple channels in ATM networks," *Western New York Image Processing Workshop*, Rochester, NY, October 2003.

118. C. Tian, S. S. Hemami, "An embedded image coding system based on Tarp filtering with classification," *Western New York Image Processing Workshop*, Rochester, NY, October 2003.

119. Y. Sermadevi, S. S. Hemami, "Optimal bit allocation for video coding under multiple rate constraints," *Western New York Image Processing Workshop*, Rochester, NY, October 2003, Best Student Oral Presentation.

120. S. S. Hemami, "Robust Visual Communications: Possibilities for Sensor Networks," *Upstate New York Workshop on Sensor Networks*, Syracuse, NY, October 2002.

121. W. Xu, S. S. Hemami, "Spectrally efficient partitioning of MPEG video streams for efficient transmission over multiple channels," *Proceedings of the International Packet Video Workshop*, Pittsburgh, PA, April 2002.

122. M. Masry, S. S. Hemami, "Modeling the subjective quality of low bitrate coded video," *Western New York Image Processing Workshop*, Rochester, NY, Sept. 2001.

123. D. Chandler, S. S. Hemami, "Additivity models for suprathreshold distortion in quantized, wavelet-coded images," *Western New York Image Processing Workshop*, Rochester, NY, Sept. 2001.

124. A. Deever, S. S. Hemami, "What's Your Sign? Efficient Sign Coding in an Embedded Wavelet Image Coder," *Western New York Image Processing Workshop*, Rochester, NY, Sept. 1999.

125. Y. Yang, S. S. Hemami, "Rate control for region-based coding using a wavelet video coder," *Western New York Image Processing Workshop*, Rochester, NY, Sept. 1999.

126. M. Ramos, S. S. Hemami, "Towards a perceptual model for supra-threshold subband image coding," *Western New York Image Processing Workshop*, Rochester, NY, Sept. 1999.

127. S. S. Hemami, *IBM Interactive TV Workshop*, Yorktown Heights, NY, August 1999, "Rate-Distortion Optimizations for Content-based Coding"

128. Y. Yang, S. S. Hemami, "Rate-distortion-based Combined Motion Estimation and Segmentation," *Western New York Image Processing Workshop*, Rochester, NY, Sept. 1998.

129. M. G. Ramos, S. S. Hemami, "Activity-Selective SPIHT Coding," *Western New York Image Processing Workshop*, Rochester, NY, Sept. 1998.

130. S. S. Hemami, "Human Sensitivity to Quantization Noise in Image Subbands," *Western New York Image Processing Workshop*, Rochester, NY, Sept. 1997.

131. M. G. Ramos, S. S. Hemami, "Activity-Selective JPEG Coding," *Western New York Image Processing Workshop*, Rochester, NY, Sept. 1997.

132. M. G. Ramos, S. S. Hemami, "Robust Image Coding with Perceptual-Based Scalability," *Data Compression Conference Industry Workshop*, Snowbird, Utah, March 1997.

133. S. S. Hemami, T. H.-Y. Meng, "Spatial and Temporal Video Reconstruction for Non-layered Transmission," *Proceedings of the Fifth International Workshop on Packet Video,* Berlin, Germany, March 1993.