# Exhibit 6

Dockets.Justia.com

1  MATTHEW D. POWERS (Bar No. 104795)
   matthew.powers@weil.com
2  GARLAND STEPHENS (admitted N.D.C.A.,
   Texas Bar No. 24053910)
3  garland.stephens@weil.com
   NICHOLAS A. BROWN (Bar No. 198210)
4  nicholas.brown@weil.com
   WEIL, GOTSHAL & MANGES LLP
5  Silicon Valley Office
   201 Redwood Shores Parkway
6  Redwood Shores, CA 94065
   Telephone: (650) 802-3000
7  Facsimile: (650) 802-3100

8  Attorneys for Plaintiff
   APPLE COMPUTER, INC.

9

               UNITED STATES DISTRICT COURT
10
             NORTHERN DISTRICT OF CALIFORNIA
11

12
   APPLE COMPUTER, INC.,            | Case No. C-06-00019 (MHP)
13
             Plaintiff,
14
        v.
15
   BURST.COM, INC.,
16
             Defendant.
17

18

19
             **EXPERT REPORT OF JOEL HALPERN RE:**
20          **CLAIM CONSTRUCTION OF U.S. PATENT NOS.**
            **4,963,995, 5,057,932, 5,164,839, AND 5,995,705**
21

22

23

24

25

26

27

28

1  that is stored and then transmitted faster than real-time (i.e. in a time period that is shorter than

2  the time it would take to view the source information in real time).

3  Given this, relevant background areas include (1) the general area of compression,

4  and (2) the area of communication networks, including the relationship of communication

5  networks to transmission time.

### 1.    Compression

7  The Burst patents claim the transmission of the audio/video program in less than

8  real time as part of the invention.  According to the claims, this faster-than-real-time transmission

9  is achieved with "time compression."  Time compression is a specific kind of compression.  In

10  computer science and data communication there are many kinds of compression that are

11  recognized and utilized.

12  *Data Compression*.  Data compression is the representation of a series of numbers

13  by a reduced number of digits.  Most compression is a form of data compression.  There are many

14  different techniques for doing data compression.  Some techniques are optimized for specific

15  kinds of data, for example, audio or video data.

16  The best known techniques date back to the late-1970's work of Abraham Lempel

17  and Jacob Ziv and the 1950s work of David Huffman.  In these techniques, common patterns of

18  bits in the data are replaced with short abbreviations.  Such techniques are perfectly reversible

19  and are commonly used for data files.  They are referred to as lossless compression techniques.

20  Such techniques can be used to encode digital audio and video data.

21  However, the eyes and ears of human beings can often compensate for slight

22  inaccuracies in images or sounds.  Hence, one can often compress image or sound data more

23  effectively by allowing a bit of loss to creep in.  Techniques such as the one described in the

24  widely known "Scene Adaptive Coder" paper,[2] or the later MPEG and MPEG2 standards provide

25  techniques for highly efficient compression.  There were many such techniques known at the time

26  of the invention.  For example, the H.120 video standard was adopted in 1984.

27

---

28  [2] Exh. F [Chen et al., "Scene Adaptive Coder," *IEEE Transactions on Communications*, COM-32(3): 225-232 (1984)].

# IV.

## CLAIM TERMS TO BE CONSTRUED

**A.    "audio/video source information"**

### 1.    Opinion

One of ordinary skill in the art in the 1988-1989 timeframe would have understood "audio/video source information," as used in the Burst patents, to mean the entirety of the data intended to be transmitted, not segments of that data.

One of ordinary skill in the art would also have understood that Burst's proposed construction – "an audio and/or video work that can be received from a variety of sources and that has a temporal dimension" – is incorrect.

### 2.    Bases and Reasons

**SUMMARY**

The phrase "audio/video source information" refers to the audio/video material acted upon by the claims, which is ultimately "transmitted" in the final step of the claims. One of ordinary skill in the art would have understood this "source information" to be the entirety of the information, and not segments of it, because (1) the claim language requires the source information to pass from step to step as a whole, and (2) the specification consistently treats the "source information" as an unsegmented block of data.

**CLAIM LANGUAGE**

The claim language shows that "source information" must refer to the entirety of the information that is ultimately transmitted and not to segments of it. There are two types of claims. The first type of asserted claim, ('995 patent claim 1, '839 patent claims 1, 73, and 76, '705 patent claims 1, and 12), has four basic steps:

(1) receiving audio/video source information;

(2) compressing the audio/video source information;

(3) storing the compressed audio/video source information;

(4) transmitting the stored compressed audio/video source information.

EXPERT REPORT OF JOEL HALPERN RE: CLAIM
CONSTRUCTION                                    5                      Civ. Case No. 3:06-CV-00019 (MHP)

1    The second type of claim, ('995 patent claim 17, '839 patent claims 17, and 77, '705 patent claim

2    21), has three basic steps:

3                    (1) receiving compressed audio/video source information;

4                    (2) storing the compressed audio/video source information;

5                    (3) transmitting the stored compressed audio/video source information.

6                In both types of claims, each step performs a different action on the "source

7    information" that is received in the first step.  Since each successive step operates on the result of

8    the previous step, the claim steps must be performed in order.  Also, because each step operates

9    on the result of the previous step, the source information must pass from step to step as a whole.

10   The source information cannot be stored in compressed form before it is all compressed.  The

11   stored compressed information cannot be transmitted before it is all stored.  Thus, the claim

12   language is inconsistent with information being segmented during processing so that different

13   actions are occurring to different pieces of the source information.  Likewise, the source

14   information is not itself a piece of a larger whole – the claim shows that it is the source

15   information that is ultimately transmitted (as a "time compressed representation").

16   **SPECIFICATION**

17               The Burst patents consistently refer to the information processed as the complete

18   "program" and not as segments of that program.  For example, a goal of the invention is to

19   provide "a capability for transferring a previously recorded *program* from one magnetic tape or

20   other storage medium to another."  Exh. D ['839 patent] at 2:10-13 (emphasis supplied).  Also,

21   "[a] still further object of the invention is to provide an effective and efficient means for

22   intermediate storage of the audio/video *program* in digital memory."  *Id.* at 2:19-21 (emphasis

23   supplied).

24               Similarly, the patent states:

25               The VCR-ET can receive/transmit a video program at an accelerated rate
             via fiber optic port 18 from/to a variety of sources.  For example a video
26           program may be communicated at an accelerated rate from the first VCR-
             ET to a second VCR-ET in less time than it would take to view the
27           program.

28   *Id.* at 8:18-23.  The fact that the patent speaks of a viewing time for the video *program* and

1  transmission of the *program* is consistent with understanding "source information" as being the

2  program, and not segments of the program. The same is true when the patent discusses storing:

3  "if no data compression technique is used, it would take approximately 51.03 gigabytes to store a

4  2 hour video program, but by using the above compression techniques, it is estimated that

5  memory 13 will require only 250 megabytes." *Id.* at 5:35-39.

6          When the patents do refer to "frames" and "video segments," they do so only in

7  the context of video editing, and not in the context of transmission or compression. *See, e.g.*,

8  Exh. D ['839 patent] at 6:46-7:5. The absence of any discussion of audio/video information as

9  segments or frames outside of the editing context confirms that when the patents refer to

10  "audio/video source information," they are referring to the entirety of data being processed and

11  transmitted by the claim.

12          **BURST'S CONSTRUCTION**

13          Burst's proposed construction does not require the source information to be the

14  entirety of the data to be transmitted. However, as I explain above, one of ordinary skill in the art

15  would understand that the "source information" must be the entirety of data to be transmitted.

16  Thus, Burst's construction is incorrect.

17

18

19

20

21

22

23

24

25

26

27

28

**B.** **"time compressed representation"**

**1.** **Opinion**

One of ordinary skill in the 1988-1989 timeframe would have understood that the phrase "time compressed representation" in context of the Burst patents means a representation of the audio/video source information that is compressed in time without using data compression.

One of ordinary skill in the art also would have understood that Burst's proposed construction - "a version of audio/video source information consisting of a reduced number of bits that allows data transfer over an external communications link in a time period that is shorter than the time required for normal playback" - is incorrect.

**2.** **Bases and Reasons**

**SUMMARY**

The phrase "time compressed representation" would have been understood by one of ordinary skill in the art as a signal that has been compressed in time (i.e. by increasing its frequency) without using data compression. "Time compression" would have been understood this way because (1) "time compression" was well understood in the art as referring to compressing a signal for a burst transmission by increasing the signal's frequency and not as "data compression"; (2) Burst told the Patent Office during prosecution that "time compression" was not "data compression."

**ORDINARY MEANING**

"Time compression" is not a widely used term. However, it does have a known meaning in the context of data transmission and particularly in the context of time division multiplexing. In the context of data transmission, "time compression" is understood by those of skill in the art to mean compressing in time, that is, increasing the frequency of the underlying signal and decreasing its duration. Time compression is not the same thing as data compression; the two concepts are orthogonal. Data compression reduces the number of "bits" used to represent a particular signal; time compression does not change the "bits" themselves, only their

1    time signature (i.e. their frequency).[3] This ordinary meaning is reflected in both the prior art cited

2    during the prosecution of the Burst patents and in dictionary definitions.

3            U.S. Patent No. 4,300,161 to Haskell ("Haskell patent") is entitled "Time

4    Compression Multiplexing of Video Signals."    The Haskell patent was cited during the

5    prosecution of the Burst patents. It discloses a system of multiplexing video signals through time

6    compression. The time compression in time division multiplexing allows multiple signals to be

7    sent through a single channel in the same amount of time it would normally take to send one

8    signal over that same channel (though this requires that the channel have sufficient bandwidth to

9    accommodate the increased amount of data being sent). As explained in the Haskell patent, "in

10   time division multiplexing, the signal of each channel occupies the communication path only for a

11   fraction of the time, i.e., during its time slot, but during that fraction of time the whole bandwidth

12   is available to the signal." Exh. G [Haskell patent] at 1:55-59.    "In time compression

13   multiplexing, the signal from each input channel is stored for a short period of time. The signals

14   from all channels are then read from the store, **compressed in time**, and transmitted sequentially,

15   one after the other, over the communication path." *See id.* at 1:62-66 (emphasis supplied).

16           This discussion of time division multiplexing in the Haskell patent shows the

17   ordinary way in which "time compression" is applied – signals, in this case video signals, are

18   stored in real time and then read out much faster than real time so that each can be transmitted in

19   a fraction of the time it would take to play in real time. When the signals are received, the signals

20   are slowed down to real time so that they can be understood.[4]

21           Two other patents cited in the Burst patents are similar. The Abraham patent (U.S.

22   Patent No. 4,521,806) describes a system in which "[a] plurality of recorded audio/video signal

23   sources of a program library sequentially transmit segments of a broadcast signal within a time

24

25   [3] Time compression does not need to operate on digital bits; it can operate on an analog signal.

26   [4] Burst confirmed that the Haskell patent describes time compression by agreeing with the
     Examiner that Haskell taught "time compression" and distinguishing the Haskell patent on
27   different grounds, namely that it did not show faster-than-real-time transmission of audio/video
     programs. Exh. H ['705 File History] at APBU 620 ("Haskell and Hamilton teach a system for
28   time compression multiplexing so that multiple clients can receive audio/video information *in
     real time*.") (emphasis in original).

EXPERT REPORT OF JOEL HALPERN RE: CLAIM                                    Civ. Case No. 3:06-CV-00019 (MHP)
CONSTRUCTION                                   9

1    signal in time without data compression, i.e. by "releasing it [faster than] its normal speed" [5]

2       In short, a person of ordinary skill in the art would know that time compression is

3    different from data compression. The two concepts are orthogonal. Time compression functions

4    by compressing a given signal in time so that it can be transmitted faster. However, the signal

5    itself can be played at the user end completely unchanged by returning its time signature to the

6    normal rate—the number of "bits" in the signal is not changed, the "bits" are simply put closer

7    together in time. By contrast, data compression functions to reduce the number of bits

8    representing a signal – and data is sometimes irretrievably lost in the process.

9       **CLAIM LANGUAGE**

10      A person of ordinary skill in the art would recognize that the claim language is

11   inconsistent with Burst's construction and consistent with my opinion. The claim language

12   specifically allows for both analog ('839 Patent claim 8) and digital ('839 Patent claim 9) source

13   information. Most of the independent claims, including the '839 patent claims 1 and 17,

14   encompass both analog and digital source information. However, one of ordinary skill in the art

15   would recognize that Burst's definition is not compatible with the compression of analog source

16   information. "Reducing the number of bits" only makes sense in the context of digital data;

17   analog source information does not have "bits." In contrast, time compression as it is normally

18   understood by those of skill in the art (compressing in time by increasing the frequency of the

19   underlying signal and decreasing its duration) is applicable to both analog and digital information.

20      Also, as stated above, the fact that the claim language associates transmission in a

21   "burst" with "time compression" tells a person of ordinary skill in the art that time compression

22   refers to compressing a signal in time (as is done in the "bursts" of time compression

23   multiplexing) rather than to data compression.

24      **SPECIFICATION**

25      The phrase "time compressed representation" does not appear in the specifications

26

27   [5] During prosecution Burst also explicitly linked the concepts of "burst transmission" and "time
     compression" when distinguishing the prior art: "The time-compression/burst transmission

28   feature recited in the claims of the present Application is neither disclosed nor suggested by Izeki
     et al. . . . ." *See* Exh. H ['705 File History] at APBU 651.

1    of the Burst patents.  Neither "time compressed representation," nor "time compression," nor

2    "burst" appear in the specification or in the originally-filed claims.  Thus, the specification

3    provides little guidance as to the meaning of "time compression."

4        The specification's only express discussion of compression is a discussion of "data

5    compression."  *See* Exh. D ['839 patent] at 5:16-39;  Data compression, as understood by one of

6    ordinary skill in the art, and as described in the patent, involves "the representation of a series of

7    numbers by a reduced number of digits."  *Id.* at 5:20-21.  Likewise, the original claims also refer

8    only to data compression.  *See, e.g.*, Exh. N ['995 File History] at APBU 38 ("said first means

9    sequentially compresses said first digital data signal into a second digital data signal . . . .").

10   **FILE HISTORY**

11       Burst told the Patent Office expressly that time compression and data compression

12   were "not equivalent," and argued that its invention did not involve data compression.

13       The Patent Office found the Izeki patent (U.S. Patent No. 4,974,178).  The Izeki

14   patent, which is titled  "Editing Apparatus for Audio and Video Information," describes a device

15   for editing audio/video programs, including full motion video,[6] and then creating an edited

16   "master tape" from the audio/video data.  As part of this, the Izeki patent describes using data

17   compression to reduce the number of bits used to represent video data.  Specifically, the Izeki

18   patent describes a "conversion unit" that "compresses the inputted video and/or audio data," and

19   refers to the well-known paper "Scene Adaptive Coder" by Chen and Pratt as an example of a

20   technique that can be used for this.  The "Scene Adaptive Coder" paper describes a compression

21   algorithm for "real-time color television transmission."  Exh. O [Izeki patent] at 2; 47-56; Exh. F

22   ["Scene Adaptive Coder"] at 225.  The compression algorithm of "Scene Adaptive Coder" is a

23   data-compression algorithm that reduces the number of bits necessary to represent full-color

24   television video to 1.5 Mbits/second.

25       The Examiner rejected the claims based on the Izeki patent, and said that Izeki

26

27   [6] One of ordinary skill would have understood that this is full motion video: the Izeki patent
teaches that the video signals received by the video input unit can be generated by a television
camera.  Exh. O [Izeki patent] at 3:37-40.  The Izeki patent further specifies that the video signal

28   can be an "animation."  *Id.* at 3:46-49.

1    time must be known at the time of compression. The claims have four basic steps

2        (1) receiving audio/video source information;

3        (2) compressing the audio/video source information;

4        (3) storing the compressed audio/video source information;

5        (4) transmitting the stored compressed audio/video source information.

6        Since each successive step operates on the result of the previous step, the claim

7    steps must be performed in order. At the compression step of the claims, the audio/video source

8    information is converted into a time compressed form "having an associated burst time period"

9    that is "shorter than a time period associated with a real time representation." Thus, at the

10   compression step, the "burst time period" must exist, and must be shorter than the playback time

11   or "real time" period. Since the claims later require the transmission to be done in "said burst

12   time period," the "burst time period" that exists and is associated with the compressed

13   representation in compression step is the transmission time.

14       Also, the "burst time period" must be something which the time compressed

15   representation has "associated" with it during the compression step, before it is stored or

16   transmitted. That means that each time compressed representation has a burst time period that is

17   known at the compression step, and is a "built-in" characteristic of that time compressed

18   representation. This is what the word "associated" means: "uniting in a relationship" or

19   "connecting or joining together." *See* Exh. P [WEBSTER'S II NEW RIVERSIDE UNIVERSITY

20   DICTIONARY (1984)] ("associate: 1. To unite in a relationship. 2. To connect or join together:

21   LINK.").

22       While it may seem odd today to specify that the time of transmission must be

23   known to the compressor, it was not odd at all at the time the patent was filed in 1988. In fact,

24   that would have been a normal circumstance in 1988. For example, if you obtained a

25   communications link between two locations from a telephone company in 1988, it would have

26   had a defined and fixed bandwidth that you would have specified at purchase time. Similarly,

27   point-to-point and satellite microwave communication links had known, fixed bandwidths.

28   Television channels also had known, fixed bandwidths. It was common in 1988 to design

1  solutions for specific, known bandwidth connections. Thus, it would have made sense to discuss

2  a known and associated transmission time in the context of communications link having a known

3  and fixed bandwidth. This is what the specifications of the Burst patents clearly assume. All

4  examples of transmission media in the specifications were fixed bandwidth: fiber optic telephone

5  lines, point-to-point or satellite microwave transceivers.

6  **BURST'S CONSTRUCTION**

7  Burst's proposed construction – "allowing data transfer over an external

8  communications link in a time period that is shorter than the time required for normal playback" –

9  is incorrect because it ignores the claim language. Specifically, Burst's construction is

10  incomplete because it ignores the fact that the burst time period for transmission must exist and

11  must be "associated" with the time compressed representation at the time of compression.

12  The claim language shows that the burst time period is not just any time that is

13  shorter than the playback time. Rather, it must have a known duration. This is because the burst

14  time period must exist and be associated with the representation at the time of compression. If

15  the burst transmission "period" did not have a definite duration, the transmission period would

16  not exist at the time of compression and it could not be "associated" with the representation as

17  required by the claims.

18  Additionally, the phrase "having an associated burst time period" does not itself

19  say anything about an external communications link. However, as explained below in the context

20  of the term "transmitting," I agree that the transmission of the Burst patents require sending to a

21  remote location, rather than connecting through an interface to a local device.

22

23

24

25

26

27

28

**D.**    **"transmitting"**

**1.**    **Opinion**

One of ordinary skill in the 1988-1989 timeframe would have understood that the claim phrase "transmitting" in the Burst patents means sending to a remote location rather transferring through an interface to a local storage device.[7]

**2.**    **Bases and Reasons**

**SUMMARY**

The word "transmitting" is normally used in the art to refer to sending information over a distance (i.e., to a remote location) rather than moving information around among local devices. Confirming this, (1) the abstracts of the Burst patents refer to "transferring" programs onto local storage devices and "transmitting" them to "remote locations"; (2) the claim language distinguishes between "storing" and "transmitting," and most importantly, (3) Burst argued repeatedly to the Patent Office that the prior art the Izeki patent does not show "transmission" because the Izeki patent describes "nothing more than an interface to a storage device."

**ORDINARY MEANING**

In the late 1980s, the word "transmitting" was normally used in the art to refer to sending information over a distance (i.e., to a remote location) rather than moving information around among local devices. The latter would normally be referred to as "copying" or "transferring" or the like.

**FILE HISTORY**

One of ordinary skill in the art would understand from the file history that "transmission" as used in the patents meant sending to a remote location, not transferring data through an interface to a local device.

---

[7] An "interface" in this context is a connection that enables communication between a computer and another device, or between different parts of a computer. For example, SCSI and IDE/ATA are common hard drive interfaces that were in use in the late 1980s, and PS/2 is a keyboard and mouse interface. In this case, the Burst patents refer specifically to an article (that was sent to the Patent Office) that describes storage interface technology available at the time, including specifically the SCSI interface. *See* Exh. N ['995 File History] at APBU 122-123; *see also* Exh. B ['995 patent] at 4:3-5.

F.    **"input means for receiving audio/visual source information"**

1.    **Opinion**

A person of ordinary skill in the art in the 1988-1989 timeframe would not recognize "input means" as referring to a particular structure or class of structures.

For the '995 patent, the structures that are clearly linked and are necessary to perform the function of receiving audio/visual source information are video line or camera input line 15, TV RF tuner 16, auxiliary digital input port 17, fiber optic port 18, and a modem.

For the '705 patent, the structures that are clearly linked and are necessary to perform the function of receiving audio/visual source information are video line or camera input line 15, TV RF tuner 16 (or 55), auxiliary digital input port 17, and fiber optic port 18, a modem, auxiliary analog audio and digital input ports, point-to-point microwave transceiver, or satellite transceiver.

For the '932 patent, the structures that are clearly linked and are necessary to perform the function of receiving audio/visual source information are point-to-point or satellite microwave transceivers.

2.    **Bases and Reasons**

The phrase "input means for receiving audio/visual source information" does not connote a particular structure. Rather, the term "input" is generic and functional language – it would not identify to one of ordinary skill in the art which structures, for purposes of the claims, perform the "input" function.

The fact that "input" is essentially generic and lacking in definite structure is shown in technical dictionaries. *See, e.g.,* Exh. Q [McGraw-Hill Dictionary of Scientific and Technical Terms, 4th Ed. (1989)] (*input/output device*: "A unit that accepts new data, sends it into the computer for processing . . . ."). A "unit" is even more generic than an "input" – the definition confirms that an input device is a "unit" that performs the function of inputting data.

1
2

**H.    "compression means . . . for compressing said audio/video source information into a time compressed representation thereof"**

3

**1.    Opinion**

4    A person of ordinary skill in the art in the 1988-1989 timeframe would not
5    recognize "compression means" as referring to a particular structure.

6    For the '995 patent, the only structure that is clearly linked and is necessary to
7    perform the function of compressing audio/video source information is the AMD 7971 fax
8    compression chip.  There is no structure that is clearly linked to the function of compressing
9    audio/video source information into a "time compressed representation."

10    For the '705 patent, there is no structure that is clearly linked to the function of
11    compressing audio/video source information, either generally, or into a "time compressed
12    representation."

13    For the '932 patent, there is no structure that is clearly linked to the function of
14    compressing audio/video source information, either generally, or into a "time compressed
15    representation."

16

**2.    Bases and Reasons**

17    The phrase "compression means . . . for compressing said audio/video source
18    information into a time compressed representation thereof" does not connote any particular
19    structure.  The term "compression" is generic and functional language – it would not identify to
20    one of skill in the art which structures, for purposes of the claims, perform the "compression"
21    function.  There are a wide range of very different structures that can perform compression,
22    depending on the type of compression, whether the compression is done in hardware or software,
23    whether it is done in real-time, etc.

24    The fact that "compression" is essentially generic and lacking in definite structure
25    is shown in technical dictionaries.  *See, e.g.,* Exh. Q [MCGRAW-HILL DICTIONARY OF SCIENTIFIC
26    AND TECHNICAL TERMS, 4TH ED. (1989)]  (*data compression*: "The technique of reducing the
27    number of binary digits required to represent data").  "Compression" is a set of techniques; a
28    means for compression is simply any structure that performs those techniques.  Even limited to

I.    **"random access storage means . . . for storing the time compressed representation"**

1.    **Opinion**

A person of ordinary skill in the art in the 1988-1989 timeframe would not recognize "random access storage means" as referring to a particular structure or class of structures.

There is no structure clearly linked to the function of storing a "time compressed representation" because the specifications of the Burst patents do not contain any reference to time compression or storing time compressed representations.

The structures that are clearly linked and are necessary to perform the function of storing the data compressed versions of source information are DRAM, SRAM, CMOS memory, or optical disc memory.

2.    **Bases and Reasons**

One of ordinary skill in the art would have understood that the phrase "random access storage means . . . for storing the time compressed representation" did not connote a particular structure. The phrase "random access storage" is generic and functional language – it would not identify to one of skill in the art which structures, for purposes of the claims, perform the "storage" function. There are a wide variety of very different classes of structures that provide random access storage, including magnetic and optical disks, RAM, and ROM.

The fact that "storage" is essentially generic and lacking in definite structure is shown in technical dictionaries. *See, e.g.,* Exh. Q [MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, 4TH ED. (1989)] (*storage*: "Any device that can accept, retain, and read back one or more times; the means of storing data may be chemical, electrical, magnetic, mechanical, or sonic."). The definition of storage as encompassing any device demonstrates that "storage" is purely functional language. Likewise, one of ordinary skill in the art would have understood "random access storage" as being functional, it is simply a narrower function than any storage that excludes some classes of structures, such as tape drives.

**K.**    **"output means . . . for receiving . . . for transmission away from said audio/video transceiver apparatus"**

**1.**    **Opinion**

A person of ordinary skill in the art in the 1988-1989 timeframe would not recognize "output means" as referring to a particular structure or class of structures.

For the '995 patent, the structure that is clearly linked and is necessary to perform the function of receiving time compressed audio/visual source information and transmitting that information away from the transceiver apparatus is fiber optic port 18 that delivers audio/video signals to a fiber optic telephone line.

For the '932 patent, the structure that is clearly linked and are necessary to perform the function of receiving time compressed audio/video source information and transmitting that information away from the transceiver apparatus is a point-to-point or satellite microwave transceiver.

**2.**    **Bases and Reasons**

One of ordinary skill in the art would have understood that the phrase "output means . . . for receiving . . . for transmission away from said audio/video transceiver apparatus" did not connote a particular structure. The term "output" would have been understood as generic and functional language – it would not identify to one of skill in the art which structures, for purposes of the claims, perform the "output" function.

The fact that "output" is essentially generic and lacking in definite structure is shown in technical dictionaries. *See, e.g.,* Exh. Q  [MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, 4TH ED. (1989)]  (*input/output device*: "A unit that accepts new data, sends it into the computer for processing . . . ."). A "unit" is even more generic than an "output" – the definition confirms that an input device is a "unit" that performs the function of outputting data. Thus, one of ordinary skill in the art would have understood that Burst's proposed construction that "output means" implies sufficient structure on its own to render construction of the phrase unnecessary is incorrect.

1

2  **M.    "editing means"**

3      **1.    Opinion**

4      A person of ordinary skill in the art in the 1988-1989 timeframe would not

5  recognize "editing means" as referring to a particular structure or class of structures.

6      For claim 2 of the '995 patent, where the editing means is "for editing the time

7  compressed representation . . . and for restoring the edited time compressed representation," the

8  structures that are clearly linked and are necessary to perform the function are (1) Digital control

9  unit 14 which includes (a) CPU (Intel 80286 or 80386 or Motorola 68020 or 68030), (b) ROM

10  (TI TMS47256) and (c) integrated circuit controller; and (2) user interface control panel, light pen

11  or mouse.

12      For claim 20 of the '995 patent, where the editing means is "for editing said

13  selectively decompressed time compressed representation . . . and for storing . . . in said random

14  access storage means," the structures that are clearly linked and are necessary to perform the

15  function are (1) Digital control unit 14 which includes (a) CPU (Intel 80286 or 80386 or Motorola

16  68020 or 68030), (b) ROM (TI TMS47256) and (c) integrated circuit controller; and (2) user

17  interface control panel, light pen or mouse.

18      For claim 21 of the '995 patent, where the editing means is "for editing said

19  selectively decompressed time compressed representation," the structures that are clearly linked

20  and are necessary to perform the function are (1) Digital control unit 14 which includes (a) CPU

21  (Intel 80286 or 80386 or Motorola 68020 or 68030), (b) ROM (TI TMS47256) and (c) integrated

22  circuit controller; and (2) user interface control panel, light pen or mouse.

23      **2.    Bases and Reasons**

24      One of ordinary skill in the art would have understood that the phrase "editing

25  means" did not connote a particular structure. The term "editing" is generic and functional

26  language – it would not identify to one of skill in the art which structures, for purposes of the

27  claims, perform the "editing" function.

28      The fact that "editing" is essentially generic and lacking in definite structure is

1  shown in technical dictionaries.  *See, e.g.,* Exh. Q [McGraw-Hill Dictionary of Scientific

2  and Technical Terms, 4th Ed.(1989)]  (*edit*: "To modify the form or format of an output or

3  input by inserting or deleting characters such as page numbers or decimal points.").

4          To determine what structures disclosed in the patents are both clearly linked and

5  are necessary to perform the function performed by the "editing means," I have reviewed each

6  patent individually.

7                              a.      '995 patent, claim 2

8          The specification of the '995 patent discloses that a combination of several

9  structures are necessary to perform the function of "editing the time compressed representation

10  . . . and for restoring the edited time compressed representation."  The primary function of

11  "editing" by manipulating the stored time compressed data is handled by a control unit with

12  several components.  *See* Exh. B ['995 patent] at 6:23-29 ("Digital Control Unit (DCU) 14

13  comprises a CPU (Central Processor Unit) 31, a ROM (Read Only Memory) 32 and a controller

14  32. DCU 14 is responsible for all of the digital editing processes. Through the use of DCU 14,

15  video segments may be edited and rearranged. Thus, one may use DCU 14 to rearrange the scenes

16  in a movie, alter the movie sound track, etc.").  The components of the Digital Control Unit 14

17  are disclosed to be particular structures.  *Id.* at 6:53-62 ("CPU 31 is a microprocessor of the type

18  described in connection with the CPU 28 of VCU 12. ['The Intel 80286, Intel 80386, Motorola

19  68020, and Motorola 68030 are examples. A more complete description of the microprocessors

20  can be found in the Oct. 27, 1988 issue of Electronic Design News (EDN), pages 231 and 242, or

21  in the applicable data sheets.'] Controller 33 is a integrated circuit which handles the timing and

22  aids in communication between DCU 14 and memory 13. ROM 32 holds the necessary step-by-

23  step editing programs which are installed at the factory. A currently available example of a

24  suitable ROM for this application is the Texas Instruments part TMS47256. CPU 31 and

25  controller 33 together control the editing process as they execute the programs stored in ROM

26  32.").  The editing function also requires a user interface.  The structures linked to this part of the

27  editing function are also disclosed.  *Id.* at 6:40-48 ("A user interface control panel of DCU 14

28  allows a user to select a desired frame number from a menu on the display. The VCR-ET then

1    displays a strip of frames (including several frames before and after the selected frame). The user

2    can delete frames in a strip, select a point where other frames are to be inserted into the program,

3    or enhance different frames. A light pen or mouse can be used to select individual frames in a

4    strip."). This combination of structures, which includes (1) Digital control unit 14 which includes

5    (a) CPU (Intel 80286 or 80386 or Motorola 68020 or 68030), (b) ROM (TI TMS47256) and (c)

6    integrated circuit controller; and (2) user interface control panel, light pen or mouse, is the only

7    set that is clearly linked and is necessary to perform the function of receiving audio/visual source

8    information in the '995 patent.

9        Burst's proposed construction, which focuses on a generic "processor for

10   executing stored editing software pursuant to the stated function" is incorrect because it is

11   incomplete – the patent discloses several structures in addition to a CPU that are clearly linked

12   and necessary to perform the editing function. One of these structures, as I mentioned above, is a

13   ROM (i.e. TI TMS47256). The ROM comes preloaded from the factory with editing programs

14   burned in. *Id.* at 6:57-60.

15              **b.      '995 patent, claim 20**

16       The '995 patent discloses the same structures linked and necessary to perform the

17   function in claim 20 of "editing said selectively decompressed time compressed representation . .

18   . and for storing . . . in said random access storage means," as for the function in claim 2.

19              **c.      '995 patent, claim 21**

20       The '995 patent discloses the same structures linked and necessary to perform the

21   function in claim 21 of "editing said selectively decompressed time compressed representation,"

22   as for the function in claim 2.

23

24

25

26

27

28

- Excerpt from the MODERN DICTIONARY OF ELECTRONICS (6th Ed.) (definition of "burst transmission").
- Excerpt from WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY (1984) (definition of "associate").
- Excerpts from the McGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, FOURTH ED. (1989) (definitions of "data compression" "edit" "input/output" "storage").
- LUTHER, "You are there...and in control," *IEEE Spectrum*, pp. 45-50 (September 1988).

Executed October 20, 2006 at Leesburg, Virginia.