1
2

### b. The cited prior art and the other TCM references do not support Apple's position

3    Apple argues that the Arnon, Abraham and Haskell patents all show that "time

4  compression was well understood in the art to involve compressing information in time … by

5  increasing the rate or frequency of the data."  Apple Br. at 14-15. All of these patents involve

6  multiplexing or duplexing.[26]  As stated above, such references have nothing to do with the faster-

7  than-real-time time compressed representation claimed by the Burst patents.  As Judge Motz

8  noted in the *Burst v. Microsoft* lawsuit, "There is no . . . reasonable basis for inferring that Burst

9  was adopting that [Haskell] definition as its own." 1st Payne Decl., Exh. 23 (Letter from Motz,

10  J., dated March 12, 2004), at 1-2.  Judge Motz's point applies equally to Arnon and Abraham.

11
12    All of the extrinsic evidence cited by Apple is of marginal relevance in determining the

13  construction of "time compressed representation."  As noted by *Phillips*, "discrepancies between

14  the patent and treatises are apt to be common because the patent by its nature describes

15  something novel." 415 F.3d at 1322 (citing *Autogiro Co. of Am. v. United States,* 384 F.2d 391,

16  397 (Ct. Cl. 1967)).  Apple's references are all directed to multiplexing or duplexing in real-time

17  for purposes of time-sharing a communications channel, and cannot alter the construction

18
19  afforded by the context of the specification and the literal claim language.

20

21    Furthermore, it is clear that "time compressed" and "time compression" had meanings

22  beyond the meaning advocated by Apple.  For example, articles that were cited in the *Burst v.*

23  *Microsoft* lawsuit use the term "time compression" to mean the dropping of frames or removing

24  redundancies (such as pauses in audio).  *See* "Time Compression:  Systems Concerns, Usage,

25  and Benefits," by Omoigui, et al. at 1-2 (Microsoft Research) (2d Payne Decl., Exh. 28);

26
27
28

"Efficient listening with two ears: Dichotic time compression and spatialization," Proceedings of the 1994 Second International Conference on Auditry Display, at 2 (note that footnotes 1 and 6 which are referenced in the relevant "time compression" section evidence a meaning for "time compressed" that was vastly different than TCM and which existed long before the '995 Patent application filing) (2d Payne Decl., Exh. 31); *see also* 2nd Payne Decl., Exhs. 27, 29 and 30 (documents also considered by Judge Motz, including an Apple book titled *Multimedia Demystified* that reflect the use of the term "temporal compression" to refer to a type of data compression in which changes between video frames are recorded).[27]

To the extent that Apple contends that time compression" or "time compressed" had a single understood meaning, these citations, relied on by Judge Motz, prove otherwise. *See also* 1st Payne Decl., Exh. 23 (Letter from Motz, J., dated March 12, 2004), at 2.

> c.    **The Burst documents clearly show that Burst products implemented data compression**

Apple goes so far as to argue that Burst's marketing and commercial documents show that Burst intended to use something other than data compression. In addition to being entirely irrelevant,[28] Apple's factual conclusion is simply wrong.

The first document, the company profile dated in 1994, focuses on the ability to burst or send video programs using "less-than-real-time delivery." Kalay Decl., Exh. B, at BURSTA 353342. It is true that the document contrasts what it calls "time compression" with "spatial

---

[26] Arnon is a full duplex system used for telephone systems. Haskell is a multiplexing system that delivers video in real-time, as is Abraham.

[27] Apple's more recent documents continue to use that same definition. 2nd Payne Decl., Exh. 34.

compression" but like the patent, the difference is not with respect to the type of compression, but on sending the compressed data faster than real-time. *See id.* Moreover, elsewhere the document makes clear that the data is compressed. *See id.* at BURSTA 353346.

The 1995 Intergraphics memo makes it clear that standard data compression was used in the Athena project. After defining a "Burst Transmission" as "less-than-realtime transmission", the memo states that "Athena will not contribute new methods of spatial compression but will demonstrate the commercial efficiencies available from such existing compression methods." Kalay Decl., Exh. C, at BURSTA 255888. On page 10 of that same document (BURSTA 255891), the memo indicates that "[t]he transmitted source file ... shall be of a file format recognized by the industry as a valid spatially compressed media of video and related audio content...."

The third document, a 1991 interoffice memo, makes clear that the system expects to use "data compression, storage and transmission." *See* Kalay Decl., Exh. D, at BURSTA 0315723. These, of course, are the same three steps in the same sequence claimed in the Burst patents in suit, and as noted above, they exclude TCM-type compression.

The fourth document is Burst's later '334 Patent, which was filed as an original application in February 1993. Brown Decl., Exh. Y. This patent describes in column 3, line 42 – column 4, line 9 a memory capable of storing 16 video programs. The passage notes that if the compressed digital bitstream requires 1.2 Mbits/s for real-time playback, and if the transmission bandwidth supported 114 Mbit/s, then a "time compression factor" of 95:1 was achievable. As used in this passage, it is clear that the "time compression factor" in this patent refers to the

---

[28] Extrinsic evidence after the date of invention is irrelevant. *Kopkake Enterprises, Inc. v. Lucks Co.*, 264 F.3d 1377, 1383 (Fed. Cir. 2001) (determining the meaning of the claims as of

factor by which the data compressed information could be sent faster than real-time playback. Thus, contrary to Apple's argument, the use of "time compression" here is tied directly to the data compression and the transmission speed of the communications channel.

Finally, the VCR-ET Technical Summary from 1989 clearly states that data compression is used in the commercial prototype of the invention. *See* 2d Payne Decl., Exh. 35, at BURSTA 54. The Technical Summary mentions what it calls D2D Compression which uses both intraframe and interframe compression to achieve better compression ratios. *Id.* at BURSTA 58. This document also notes that the compression enables faster-than real-time transmission. *Id.* at BURSTA 56.

The Burst documents establish the desire to use data compression to perform faster-than-real-time transmission n the commercial embodiment of the patented invention.

> **5.    This case is vastly different than *Plastipak* and the other cases on which Apple relies in its attempt to exclude the preferred embodiment**

As demonstrated above, Apple's unusual approach of attempting to exclude the preferred embodiment is not supported by the claims and prosecution history. Apple certainly cannot demonstrate the sort of unambiguous claims, clear prosecution history, and highly persuasive evidentiary support to take the rare path trod in *Plastipak* and the other cases cited by Apple. This is not one of those rare cases.

**C.    "Having an associated time period"**

Apple concedes that the claims are not limited to transmissions over a fixed bandwidth communication medium. Apple Br. at 32. Nonetheless, Apple argues that the time period for transmission (or reception, depending on the claim language) must be of a definite duration. In

the date the patent application was filed.

addition, for the transmission claims, Apple argues that this definite duration must be known at the time of compression because of the inclusion of the word "associated" in the compression limitation.[29] Apple's constructions fail because they do not adequately consider the specific claim language, and they seek limitations inconsistent with the patent specification.

### 1.    Apple has failed to account for the specific claim language

Apple's "definite duration" requirement finds no support in the patents, because nothing in the claims ties the time period to any fixed length. Instead, the claims are explicit that the duration must simply be shorter than real-time playback. Thus, Apple's definite duration requirement is not based on the claim language.

Apple argues that the duration must be known at the time of compression, yet Apple concedes that the claims do not require a fixed bandwidth for the communication medium. If the bandwidth of the communication channel varies, it is not feasible to place a definite quantity on the duration period until the transmission or reception has been completed. As an example, if the speed of a motorist varies from 25 mph to 75 mph on a trip, it is not possible to identify a definite duration for the trip prior to departure. While approximations can be made regarding the travel time, until the motorist travels the route, the various dynamic parameters (such as traffic, different speed limits for different portions of the route, closed roads, etc.) cannot be accurately predicted to quantify the travel time with any precision. The duration is known when the trip is concluded. The same is true for a variable bandwidth communications medium. Because Apple

---

[29] Specifically, Apple contends that claims '995:1; '839:1, 73, and 76; '932:4; and '705:1, 12 require that the time compressed representation has a transmission period of definite duration, that is known at the time of compression to be shorter (or substantially shorter) than the time required to play the source information in real time. With respect to claims '995:17; '839:17, 77 and '705:21, Apple contends these claims require that the time compressed representation be

now concedes that the claims can cover variable bandwidth communication channels, it necessarily follows that the duration cannot be definitively known until the transmission (or reception) is completed.

Despite admitting that bandwidth may vary, Apple contends that the period of transmission must be known during compression because the word "associated" appears in some, though not all of the independent transmission claims. For example, claim 1 of the '705 Patent does not include the "associated" requirement. As a result, this claim cannot be subject to the "known" requirement that Apple seeks to impose based on the word "associated." Apple Br. at 30-32. Further, '705 claim 1 explicitly ties the burst time period to the transmission period of the time compressed representation, not the compressing act ("wherein said digital time compressed representation of said audio/video information is <u>capable of being transmitted in a burst transmission time period</u> that is substantially shorter than a time period associated with real time viewing...").[30] It is improper to limit this claim to require knowledge at the time of compression when the term is linked to transmission.

Moreover, other claims that use the term "associated" also tie the associated time period to transmission or reception. Claim 12 of the '705 Patent, for example, states that "the digital time compressed representation of said audio/video source information [has] an associated burst <u>transmission</u> time period that is substantially shorter than a time period associated with real time viewing...." Because the "associated" period is the transmission period, it logically follows that

---

received in a burst time period of definite duration that is shorter than the time required to play the source information in real time.

[30] The same is true on the receipt side with regard to '705 claim 21 ("<u>being received</u> by a receiver in a <u>burst transmission time period</u> that is substantially shorter that a time period associated with real time viewing...").

the period is not known until that event occurs.[31]  Merely because the association is mentioned in the "compressing" limitation does not mean that the association must occur or be known at the compressing stage.  Thus, with respect to these claims that explicitly tie the period to transmission, it is illogical to require that the duration be known at the time of compression.

At most Apple's argument applies to '995 claim 1, '932 claim 4, and '839 claims 1, 73 and 76.  While these claims require the formation of the time compressed representation during the compressing act, they do not indicate when the burst time period must be determined.  In the '839 claims, such as '839 claim 1, the association must take place at or prior to the transmitting act because that step requires transmitting "in said burst time period."  Thus, the window of associating the time compressed representation with a time period may occur any time between compressing and transmitting – but the claim is not specific on when during that period the association must occur.

Because the claims do not explicitly require a definitive duration to be known at the time of compression, the claims cover an association at any time consistent with the context of the claim language, as long as the duration is less than the real-time playback period.  *See, e.g.*, *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1316 (Fed. Cir. 2003) ("The claims simply do not require a specific temporal limitation associated with the term 'holding'"); *Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002) ("[C]onsidering the language of the claim as a whole and the use of the term in other claims, the term 'mobility' is not ambiguous, but rather encompasses both release and migration.").

---

[31]  Other claims, such as '839 claims 17 and 77 and '995 claim 17, similarly tie the "associated burst time period" to reception ("being received over an associated burst time

## 2.    The specification does not support Apple's construction

The patent specification never identifies a definite duration for the transmission or reception period. Instead, the specification uniformly uses terms of approximation when discussing the bandwidth of the communication medium. *See* '839 Patent at 8:15-18; 12:6-8. The duration of transmission or reception is determined by dividing the file size by the transmission speed of the communications channel. 1st Payne Decl., Exh. 5 (Hemami Report) at 37. Duration can only be known if both the file size and the transmission speed are known. While the size of a file is readily determinable, the transmission speed may not be known beforehand, especially if the communication medium exhibits a variable bandwidth, which Apple concedes is within the scope of the claims. Given that bandwidth is only approximated in the specification, it logically follows that the duration can only be approximated.

Similarly, there is nothing in the patent specification that requires association of the burst time period at any particular time. In fact, Apple never explains the basis for its "known" construction. Instead, it appears to raise an invalidity argument, contending that there is no explanation of what this term means in the specification. Apple Br. at 33. Given that the specification does not fix knowledge at compression, it follows that the association may occur at any time through transmission.

## 3.    Burst time period

The term "burst time period" is defined by the context of the claim language. Specifically, the "burst time period" "is shorter than a time period associated with a real time representation of the received audio/video information." *See, e.g.*, '995 Patent claim 1. In

---

period") and not to compression. Apple does not seek a "known" requirement for these claims.

each instance where "burst time period" is used, this or a similar definition is explicitly provided in the claims.[32]

### D.    Compression Means

Apple's "compression means" arguments misstate the issue before the Court, fail to address the relevant legal standard, and ignore the heightened evidentiary burden that Apple faces. First, Apple incorrectly states that "the parties' dispute turns on the question of whether the disclosure of 'compressor/decompressor 26,' which is represented by an empty box in Figure 2 of the Burst, can constitute corresponding structure." Apple Br. at 57. Apple fails to mention that whether a specification's disclosure is sufficiently definite for purposes of section 112 must be analyzed from the viewpoint of a person of ordinary skill in the art. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376-77 (Fed. Cir. 2001); *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1380 (Fed. Cir. 1999). Under this standard, the real issue is whether compressor/decompressor 26, along with the Burst Patents' detailed disclosure of compression algorithms, would apprise a person of ordinary skill in the art of the corresponding structure for implementing the claimed "compression means." Apple ignores that detailed disclosure and what one of ordinary skill would glean from the disclosure. As shown below and at pages 60-67 of Burst's principal brief, the description of compressor/decompressor 26 and the compression algorithms in the Burst Patents is more than adequate when viewed by one of ordinary skill.

Apple also blissfully ignores the significant evidentiary burden it faces. Apple's primary argument is rooted in the definiteness requirement of 35 U.S.C. §112, Paragraph 2, not the

---

[32] *See also* 2[d] Payne Decl, Exh. at 35, at BURSTA 56; Kalay Decl., Exh. C at BUR5011061; and Kalay Decl., Exh. B at BURSTA 353342 (showing Burst's consistent usage of the term "burst" to mean less than real-time).

requirements of Paragraph 6. The essence of Apple's argument is that the structure associated with compressor/decompressor 26 in the Burst Patents is not sufficiently definite. The law is clear that a claim construction argument that would result in indefiniteness, if accepted, must be carried by clear and convincing evidence. *Budde*, 250 F.3d at 1376-77 ("a challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function") (emphasis added). Apple cannot carry this heavy, self-imposed burden.

### 1.    The Specification, When Viewed by One of Skill, is Adequate

In focusing on the so-called "empty box" 26, Apple ignores a significant part of the disclosure provided in the Burst Patents (as well as how one of skill would interpret that disclosure). The patents explain that "[c]ompression of the digital data defining a video frame and the reverse process (decompression) are accomplished by compressor/decompressor 26." '995 Patent, 4:63-65. The patents then describe specific algorithms that are used in the compressor/decompressor, such as interframe or intraframe algorithms for video, or algorithms such as Fibonacci delta for audio. *Id.* at 4:65-5:24. Although not necessary to satisfy § 112, the '995 Patent also mentions the AMD 7971 chip as an "example of an appropriate compression/decompression circuit" that can execute the disclosed compression algorithms. *Id.* at 5:4-6.

Importantly, both parties' experts have acknowledged the significance of disclosing the algorithms in the Burst Patents. There is no dispute that the patents sufficiently describe compression algorithms to a person of ordinary skill in the art – even Apple's expert agrees that the patents disclose audio/video compression algorithms. *See* '995 Patent, 4:64-5:35; 1st Payne

Decl., Exh. 5 (Hemami Report), at 14-21, 34-35; 1st Payne Decl., Exh. 8 (Halpern Depo. Tr.) at

55-68; 2d Payne Decl., Exh. 32 (Halpern Depo. Tr.), at 235-238.   Furthermore, as Dr. Hemami

explained in her report and deposition, one of skill in the art would understand that the disclosed

compression algorithms could be implemented by the compressor/decompressor 26 in either

software, hardware, or a combination of both.  *See* Brown Decl., Exh. C (Hemami Depo. Tr.), at

72-82; 103-113; 119-126; 131-140; 1st Payne Decl., Exh. 5 (Hemami Report), at 16-17, 33-36.

For example, Dr. Hemami testified:

> It is unquestionable that there is hardware in the box [26].  Now, we can delineate
> whether the hardware is general purpose hardware such as a CPU or a DSP chip
> or whether it is custom-designed hardware or a combination of both stock and
> custom-designed hardware.

Brown Decl., Exh. C, at 138-39.

Apple's expert, Mr. Halpern, also testified that one of ordinary skill would understand

that the disclosed algorithms could be implemented in a chip (such as the AMD 7971 chip) or a

microprocessor.   2d Payne Decl., Exh. 32 (Halpern Depo. Tr.), at 235-238; 246-248.   The

following admissions of Mr. Halpern are particularly relevant:

> Q    The means for compression that could perform the data
>      compression could be, for example, the A.M.D. chip, right?
> A    That would perform data compression, yes.
> Q    Other chips could perform data compression, right?
> A    Yes.
> Q    A CPU running a software algorithm could perform data
>      compression in 1988, correct?
> A    Depending on the constraints of the data compression algorithm. Some
>      algorithms could be performed by CPUs.
> Q    In 1988?
> A    In 1988.

*Id.* at 237:6-20.

The parties' experts therefore agree that, in 1988, one of ordinary skill knew that both

custom-designed chips and microprocessors could be used to execute the disclosed data

compression algorithms and were represented by compressor/decompressor 26.   This was no

secret, and Burst was not required to disclose anything more than it did.  The above disclosure in

the Burst patents and expert analysis are especially important in light of Apple's admission that

"algorithms become structure when they are implemented in hardware." Apple Br. at 60.[33]

### 2.    The Law Supports Burst's Constructions

The disclosure described above is more than enough under controlling law.    On

remarkably similar facts, the Federal Circuit found adequate disclosure in *S3 Inc. v. NVIDIA

Corp.*, 259 F.3d 1364 (Fed. Cir. 2001).  At issue in *S3* was the meaning of the term "means . . .

for selectively receiving." *Id.* at 1370.  The patent in that case contained only a figure depicting

the means (item 24, labeled "SEL," in the figure below) and the following terse description of

structure:

> In certain modes of operation, it may be desirable for the VGA controller 11 to
> bypass the RAM portion of the RAMDAC 23 and instead provide video display
> information directly to the DAC portion of the RAMDAC 23 <u>through a selector
> 24.</u>

U.S. Pat. No. 5,581,279, 4:1-5 (emphasis added).



Fig. 2

---

[33] Apple's argument that "[a]lgorithms without hardware are not structure" can simply be
ignored.  *See* Apple's Br. at 60.  Burst has not "suggested" that algorithms alone constitute the
corresponding structure.  Instead, the algorithms are only part of the corresponding structure as
would be understood by one of ordinary skill in the art.  *See Tehrani v. Hamilton Med., Inc.*, 331
F.3d 1355, 1362 (Fed. Cir. 2003) (remanding case to district court "to determine what algorithm
<u>forms part of the structure</u>") (emphasis added).

1

2

3

4

     The Federal Circuit found that Selector 24 – which Apple would characterize as an "empty box" – was adequate corresponding structure. *Id.* at 1371. Central to the court's conclusion was that:

> S3 presented evidence that a selector is a standard electronic component whose structure is well known in this art, and that such standard components are usually represented in the manner shown in the . . . patent. The inventor of the . . . patent and the expert witnesses testified that persons of skill in this field would readily recognize that the selector as shown in the specification is an electronic device such as a simple multiplexer, whose structure is well known.

5

6

7

8

9

*Id.* at 1370. Thus, the "empty box" in the figure, combined with testimony regarding the view of those skilled in the art, was sufficiently definite structure for section 112.

10

11

     In the face of *S3*, Apple's reliance on *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291 (Fed. Cir. 2005), is unavailing. In *Default Proof*, the term before the court was "means for dispensing." The court noted that "[t]he only structure in the '182 patent associated with the function of distributing debit cards is the 'dispenser' shown in Figure 1." Other than stating that the dispenser was "loaded with three or more stacks of debit cards," the court explained, "[n]o other structural aspects of the 'dispenser' [were] disclosed." The court concluded that the claim term was indefinite.

12

13

14

15

16

17

18

19

     Critical to understanding the holding in *Default Proof* – and to reconciling the holding with the court's decision in *S3* – is the following statement:

20

21

> Default Proof does not appear to argue that the term "dispenser" constitutes the corresponding structure. Instead, Default Proof asserts that "certain specific parts" of the POS terminal correspond to the distributing function. This argument fails for two reasons....

22

23

24

25

*Id.* at 1299. Unlike the patentee in *S3*, Default Proof did not argue that the "dispenser" shown in the patent was the corresponding structure or that one of ordinary skilled in the art would understand the structure of the dispenser. Instead, Default Proof erroneously argued that one of

26

27

28

skill in the art would have identified "certain specific parts" of the POS terminal disclosed in the patent as the corresponding structure. The Federal Circuit rejected Default Proof's argument that these parts were the corresponding structure – not that the "dispenser" was insufficient structure as Apple suggests. The sufficiency of the dispenser disclosure was simply never addressed.

The distinction identified above cannot be chalked up as an anomaly in the Federal Circuit's precedent. It consistently appears in the decisions of that court. For example, in *Atmel Corp. v. Information Storage Devices, Inc.* 198 F.3d 1374 (Fed. Cir. 1999) (cited in Apple's Brief at page 58 n.243), the Federal Circuit carefully noted that "Atmel does not assert on appeal that [specific blocks in a figure] are a sufficient disclosure of structure corresponding to the high-voltage generating means to satisfy §112, ¶ 2." *Id.* at 1377 n.3. In other words, just like *Default Proof*, the patentee in *Atmel* failed to identify *any* structure in the specification that could perform the claimed function. These cases are easily distinguishable from the present case because Burst has identified ample corresponding structure.

Additionally, the Federal Circuit has proclaimed that "[i]n past cases, we have been generous in finding something to be a corresponding structure when the specification contained a generic reference to structure that would be known to those in the art...." *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1213 (Fed. Cir. 2003). As these cases reflect, any identification of structure in the specification can satisfy the definiteness requirements of section 112 if one of ordinary skill in the art would find that structure adequate to perform the recited function. Even an "empty box" can suffice, as shown by *S3*, if one of skill would understand the structure associated with the box, and the Burst Patents provide far greater detail regarding the operation of the box than existed in the *S3* patent.

1    Furthermore, while the Burst Patents do not describe the specific circuitry of the

2    compressor/decompressor 26, such specificity is not required when it would be unnecessary to

3    one of skill in the art.  *See Intel Corp. v. VIA Tech., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003)

4

5    ("VIA contends that a generic core logic is an inadequate disclosure of structure because no

6    circuitry is disclosed in the patent to show how the core logic is modified.  We hold that the . . .

7    patent is not indefinite merely because no specific circuitry is disclosed in the patent to show the

8    modification."); *In re Dossel*, 115 F.3d 942, 946-47 (Fed. Cir. 1997).  The reason section 112

9

10    doesn't require specific circuitry in many cases is simple:  there is no need to disclose what one

11    of ordinary skill the art would understand, and a contrary rule would result in patents that are

12    hundreds or thousands of pages long.  *Atmel*, 198 F.3d at 1382.

13    It is also improper under the law for Apple to argue that the '995 compression means is

14    limited to the specific model (the AMD 7971 chip) mentioned in the specification.  Specifics

15

16    such as the manufacturer name or part numbers should not be part of a claim construction.  *See*

17    *Odetics, Inc. v. Storage Tech. Corp.,* 185 F.3d 1259, 1268 (Fed. Cir. 1999) (claim limitation is

18    the overall structure corresponding to the claimed function, not the individual components of the

19    overall structure); *TM Patents, L.P. v. Int'l Bus. Mach. Corp.*, 72 F. Supp. 2d 370, 383-84

20

21    (S.D.N.Y. 1999) ("IBM's insistence that such details as Hamming code and Texas Instrument

22    chips are literally part of what the inventor under the '342 patent is claiming, while

23    understandable, is unwarranted.") (relying on *Odetics*).

24    **3.    Apple's Own Patents Support Burst**

25    That a person of ordinary skill in the art would understand the Burst Patents to disclose

26    sufficient structure for the compression means is further demonstrated by Apple's own patents.

27

28    U.S. 5,724,450, for example, contains the claim limitation "means for compressing."  *See* 2d

Payne Dec., Exh. 36.   Figure 5 of the patent, reproduced below, includes "empty box" 102, which is labeled "Color Transformation and Compression/De-Compression" and which is the "means for compressing."  The Apple patent specification describes this box as "a color utility which can include a set of routines and data structures," *i.e.*, computer code.  Just like the Burst Patents, Apple's patent provides no description of the implementing structure or circuitry. Rather, what is true for Burst's patents is true for Apple's – one of skill in the art would recognize that the "routines and data structures" of the "compression/de-compression" unit are executed in a processor or a chip represented by box 102.



FIG_5

Burst has shown the Court the corresponding structure in the Burst patents and established the understanding that would be attributed to that structure by one of skill in the art. Accordingly, Burst respectfully requests that its construction be adopted.

### E.     Apple Purposefully Avoids The Decompression Terms

Apple ignores the decompression claim terms because those terms expose the nonsensical nature of Apple's "time compression" arguments.  Many of the apparatus claims in the patent

include a "decompression means, coupled to said random access storage means, for selectively decompressing" the time compressed representation that is stored in random access storage. *See, e.g.,* '995 claims 20-23, 25, 26, 28; *see also* '705 claims 4, 10 and '839 method claims 20-23, 25, 26, 28 (claiming a method variation).  These claims provide that the stored time compressed representation is decompressed so that it can be edited or displayed for viewing by the user.

Decompression is the reverse process of the disclosed data compression and takes place in the compressor/decompressor 26.  '995 Patent, 4:63-65, 5:57-59.  This reverse process takes the compressed version of the audio/video source information – which has a reduced number of bits relative to the original source information – from storage and restores some or all of the original bits.  The requirement that the decompression starts with the stored time compressed representation is explicit in the claims themselves.

Apple's constructions make no sense in the context of the decompression/decompressing claim terms because the product of Apple's time compression is composed of the same bits as the source information.  Apple's expert, Mr. Halpern, readily admitted this one-to-one bit correspondence in both his report and deposition.  *See, e.g.,* 1st Payne Decl., Exh. 6 (Halpern Report), at 8-9 ("[t]ime compression does not change the 'bits' themselves...."); 1st Payne Decl., Exh. 8 (Halpern Depo Tr.), at 73:4-74:10, 126:12-20, 134:22-136:25, 153:24-154:5, 167:5-10, 281:14-19.  Even more critically, during storage, the effect of Apple's type of compression (the increase in frequency or signaling rate) is completely lost because the frequency or signaling rate is not maintained during the storage process.  The only item saved in the memory is the data itself – the 1's and 0's. There is not, therefore, any "stored time compressed representation" to decompress in Apple's hypothetical system.

1       Another likely explanation for Apple's decision not to address the decompression terms

2 is that not a single time compression reference cited by Apple uses the words decompression or

3 decompressing (or any of their variants).  The reason for Apple's decision is simple:  the claimed

4 concepts of decompression have no applicability to Apple's time compression world.  Against

5 this backdrop, all of Apple's time compression arguments must fail since they effectively ignore

6

7 the decompression/decompressing claim terms.

8 **III.    THE TRANSMISSION TERMS**

9

10     **A.    Transmitting Away and Transmitting to a Selected Destination**

11       Apple's argument misapprehends the '705 prosecution history.  Apple argues that, in

12 distinguishing the Izeki patent (Brown Decl., Ex. M), Burst disclaimed "transfers to any local

13 storage device, whether external or internal."  Apple's Br. at 36.  While Burst distinguished

14 Izeki, Apple's argument expands Burst's distinction to create a faulty non-infringement

15

16 argument.

17       Izeki describes an apparatus for editing audio and video information and then storing it

18 either on a (potentially removable) recording medium or in a storage unit in the device.  Brown

19 Decl., Ex. M at 1:10-15, 3:8-25.  Accordingly,

20 unless somebody physically carries that recording

21 medium away, the audio and video information

22

23 never leaves the Izeki apparatus.   As Burst

24 explained to the patent examiner, "Izeki et al. is

25 simply    not    concerned    with    transmitting

26

27 audio/video information away from the apparatus

28



the apparatus to one or more receivers," as claimed.  Brown Dec., Ex. L at APBU 652.

Apple's argument rests solely on the dotted lines shown in Figure 1 of Izeki.  Apple claims the dotted lines indicate devices that are *external* to the Izeki apparatus. Apple's assertion is pure conjecture because nowhere

does Izeki state that the dotted lines distinguish between internal and external components. Conjecture does not constitute a clear disavowal as required by the law.  *See Sandisk*, 415 F.3d at 1287 ("There is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term.").  Furthermore, as Dr. Hemami explained, the dotted lines do not indicate external, or "physically separate," components, but rather functional groupings of the multi-part components ("composite components") of the Izeki apparatus.  Brown Decl., Exh. C (Hemami Depo. Tr.), at 315:9-316:12.  In other words, only components of the Izeki apparatus that include multiple sub-components are surrounded with a dotted line (i.e., items 48 and 55 in Fig. 1 above).[34]  Moreover, Apple's argument is inconsistent with the absence of a dotted line around the printer 51 in Figure 1, because a printer is a quintessential peripheral device that is typically separate and thus external.

Burst properly told the PTO that Izeki is "nothing more than an interface to a storage device such as a magnetic tape."  That is, after all, what Izeki describes – transfers through an interface *within the apparatus* to a variety of different storage and editing components.  Each of those components, however, is an internal part.  The "reproduction device 55" in Izeki on which Apple relies so heavily is no different.  The reproduction device "operates as the simulation

---

[34] While Dr. Hemami did explain that a "console," as used in connection with "console 48" suggested a common housing, Dr. Hemami disagreed that a common housing meant that the console was "physically separate from the remainder of

means to check whether the contents of the edited and/or processed information files were converted correctly and thus confirms whether the information files can be accurately reproduced in the predetermined reproduction sequence." Brown Decl., Ex. M (Izeki), 5:24-29. Transferring information files to the reproduction device is a transfer *within* the Izeki apparatus for simulation and, possibly, further editing of those files. After simulation, the files are either returned to storage or transferred to a recording medium. *Id.* at 6:6-7:3. In either event, because audio/video information never leaves the Izeki apparatus, there is no "transmission" away as required by the claims.

In addition to misperceiving the meaning of the dotted lines in Figure 1, Apple also fails to satisfy the legal requirement that disclaimers in the prosecution history must be clear. *See, e.g., Sandisk*, 415 F.3d at 1287; *Aquatex*, 419 F.3d at 1382-83. The nondescript dotted lines in Figure 1 do not rise to level of clarity required by the law. Apple's argument suffers from the further legal shortcoming that Apple is construing the term "transmission" with an eye toward its iPod device. Apple characterizes the iPod as an "external storage device."[35] Apple's Brief at 36 & n.138. Apple's construction is designed to exclude this iPod device. As the Court knows, claims are to be construed based on the intrinsic record – not the accused device. *NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002).

Apple's non-infringement angle also shows in its employment of an ambiguous distinction between "remote" and "local." The goal of claim construction is to clarify the meaning of claims for the jury. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Regardless of whether it was used in the specification, the term "remote" does not

---

the device." Brown Decl., Exh. C, at 310:6-14. Apple's suggestion to the contrary is a mischaracterization of Dr. Hemami's testimony. *See* Apple's Br. at 36 n.140 and accompanying text.

clarify the meaning of "transmission." Furthermore, Apple's insistence on injecting "remote" into the claim construction seems to contradict Apple's argument that Burst disclaimed both internal and external storage devices when distinguishing Izeki. The term "remote," in common usage such as a "remote control," refers simply to an external control. The remote control for a television, for example, does not cease to be remote simply because it is used by someone standing right in front of the screen. Rather, it is a "remote" control because it is external to the television, much as a "remote" location in the Burst Patents is simply a location that is external to the transmitting device. That the term "remote" can also mean distant, however, injects ambiguity and lack of clarity into the meaning of the claims.

### B.    Transmission Means

As explained by both parties, the only dispute over "transmission means" is whether the corresponding structure should include the auxiliary digital port. The auxiliary digital port is corresponding structure to the "transmission means" for the same reasons explained below in connection with "output means" and in Burst's Opening Brief. *See id.* at 76-77.

## IV.    DISPUTED MEANS PLUS FUNCTION TERMS

### A.    The "Means Plus Function" Presumption is Rebutted for the Remaining Means Terms

The parties disagree on whether 35 U.S.C. §112, ¶6 ("Paragraph 6") applies to "input means," "output means," "storage means," and "random access storage means." Burst maintains that the drafter did not intend to invoke Paragraph 6. As both parties agree, "[t]he use of the term 'means' generally (but not always) shows that the patent applicant has chosen the option of means-plus-function format invoking §112, ¶6 construction." *Unidynamics Corp. v. Automatic*

---

[35] The iPod is much more than a mere storage device.

*Prod. Int'l Ltd.*, 157 F.3d 1311, 1319 (Fed. Cir. 1998) (emphasis added). The qualifying phrase – "generally, but not always" – is critical. This is illustrated by Apple's concession that the terms "monitor means" and "analog to digital converter means" – even though they contain the word "means" – are not subject to Paragraph 6.[36]

Both parties acknowledge that each of the disputed "means" terms is modified by a "structural noun." Apple's Br. at 43. This acknowledgement alone contradicts Apple's assertion that the claims are in "classic 'means-plus-function' format." *Id.* at 45. Classic means-plus-function claims do not recite structure. Burst's claims do.

The core dispute is whether the "structural noun" that modifies the "means" language describes sufficient structure. Apple contrasts the *Greenberg* case (detent mechanism) and *Unidynamics* case (spring means), which found terms subject to Paragraph 6, with the decisions cited by Burst (*Allen Engineering* – pivot steering box means, cable means crank means; friction disk means; torque rod means and *Cole v. Kimberley-Clark* – perforation means), in which the terms were held *not* to be subject to Paragraph 6, and invites the Court to make a decision based solely on a comparison of nouns. This improper invitation is summed up in the following sentence from its brief: "An 'input' is not a 'precise structure' in the same way as a 'pivot steering box' or 'torque rod.'" This type of comparison falls short under the law.

Instead, whether a drafter intended to invoke Paragraph 6 is determined from the view of one skilled in the art. Even if a structural noun "does not call to mind a single well-defined structure," it may still represent sufficient structure if it "has a reasonably well understood

_____

[36] In its Brief, Apple withdrew its proposed constructions for these terms, agreeing with Burst that "no construction is needed for these terms." In light of Rules 4-1(a) and 4-2(a) of the Court's Patent Local Rules, which require a party to identify any claim elements that it contends

meaning in the art." *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir.

1996). Dr. Hemami explained in her expert report that one of ordinary skill would understand

that the terms "input," "output," "storage," and "random access storage" describe sufficient

structure. 1st Payne Decl., Exh.5 (Hemami Report) at 29, 43, 45, 47. Mr. Halpern, while

conceding that these terms are structural, complained only of their specificity. *Id.* at Exh. 6

(Halpern Report) at 23, 34, 38. *Greenberg* shows, however, a term need not "call to mind a

single well-defined structure."

The controlling law also provides that the repeated generic use of the word "means" can

dilute the presumption. In *Greenberg*, the Federal Circuit noted that the drafter used the term

"means" "simply as a shorthand way of referring to each of the key structural elements of the

invention." 91 F.3d at 1583. The same and more can be said regarding the Burst Patents. As in

*Greenberg*, the drafter of the Burst Patents used "means" in the specification in a colloquial

manner:

> A still further object of the invention is to provide an effective and efficient <u>means</u>
> for intermediate storage of the audio/video program in digital memory as a <u>means</u>
> for achieving the transfer of the audio/video program from one tape or storage
> medium to another.
>                                    * * *
> The destination phone number ma[y] be entered <u>by means of</u> an optional
> keyboard/keypad 45 incorporated into the video recorder 10 of the invention.

'995 Patent, 2: 13-17 and 8:46-48 (emphasis added); *see also id.* at 9:36 ("by means of an audio

monitor"); 9:40 ("by means of a control panel"). As each of the above examples demonstrate,

the drafter was clearly "enamored of the word 'means.'" *Greenberg*, 91 F.3d at 1583-84. And,

---

should be governed by ¶6 and the corresponding structure for any such claim elements, Apple's
position is tantamount to a concession that ¶6 does not apply.

as Apple has essentially conceded, the drafter used the word means in connection with "monitor means" and "analog to digital converter means" in a non-Paragraph 6 manner.

Further demonstrating the inapplicability of Paragraph 6 are the locations of the structural components recited in the claims themselves. *See Cole v. Kimberley-Clark Corp.*, 102 F.3d 524, 531 (Fed. Cir. 1997) ("The claim describes not only the structure that supports the tearing function, but also its location … and extent …."). For the "means" still in dispute, each describes not only the structure that performs the function but also the location of that structure. *See, e.g.,* '995 Patent, claim 1 ("compression means, <u>coupled to said input means</u>"; "random access storage means, <u>coupled to said compression means</u>"; output means, <u>coupled to said random access storage means</u>").

Apple repeatedly argues that "a claim cannot be construed so broadly as to cover every conceivable way or means to perform the function." Apple Br. at 46 (quoting *Mas-Hamilton Group v. LaGard*, 156 F.3d 1206, 1214 (Fed. Cir. 1998)). *Mas-Hamilton* is inapposite. In *Mas-Hamilton*, the term at issue was "lever moving means." As noted by the Federal Circuit, "there is no structure recited in the limitation that would save it from application of §112, ¶ 6." *Id.* at 1214. A "moving element" alone connoted no structure that performed the function. *Id.* In contrast, the claimed input, output, storage, and random access storage are all structure. Broad or general terms do not pose a problem if "the term, as the name for structure, has a reasonably well understood meaning in the art." *Greenberg*, 91 F.3d at 1583.

**B.    Input Means**

Burst contends that this term is not subject to Paragraph 6. See Burst Opening Brief at 29-32. If Paragraph 6 were to apply, Apple has correctly identified the two functions: (1) "receiving audio/video source information"; and (2) "receiving audio/video source information

as a time compressed representation thereof." Burst further agrees with many of the structures that Apple identifies, but believes that Apple's identification is underinclusive. Because the '995 Patent is slightly different from the '932 and '705 Patents, the '995 is discussed first.

### 1.    '995 Patent

#### a.    "input means for receiving audio/video source information"

In addition to Apple's cited structure, an audio/video transmitter/receiver and a microwave satellite transceiver should be included. Apple incorrectly argues that these two input means do not appear in the '995 specification. Apple Br. at 48. With respect to the audio/video transmitter/receiver, Figure 2 of the '995 Patent plainly shows box 22 – an "Audio/Video Trans/Rec." The specification of the '995 Patent explains that "[d]igital output signals from VCR-ET 10 may be dispatched from high speed data bus 34 via line 43 to input leads of RGB converter 21 and audio-video transmitter/receiver 22." '995 Patent, 8:20-23 (emphasis added). Even Apple's expert acknowledged that the audio/video transmitter/receiver is present in the '995 Patent.[37] The '995 Patent also discloses a microwave satellite transceiver, stating that an object of the invention is the "transmission, and reception of a digitized audio/video program over telephone lines or by other external digital means such as satellite transmission or reception." '995 Patent, 2:48:51 (emphasis added).

#### b.    "input means for receiving audio/video source information as a time compressed representation thereof"

Apple identifies only the fiber optic port as corresponding structure for receiving compressed audio/video source information, and improperly omits an auxiliary digital input port

---

[37] *See* 2d Payne Decl., Exh. 32 (Halpern Depo. Tr.), at 214:23-216:20. Mr. Halpern believes the term "modem," rather than "audio/video transmitter/receiver," should be added as

and microwave satellite transceiver. The auxiliary digital port can receive "any acceptable digital signal such as a computer-generated video signal or as may be supplied by another VCR-ET." '995 Patent, 7:32-35. Any acceptable digital signal would include the compressed audio/video information. The microwave satellite transceiver, described in the '995 patent, also can receive the compressed audio/video information.

### 2.    '932 and '705 Patents

#### a.    "input means for receiving audio/video source information"

With regard to the '705 Patent, Apple once again omits the audio/video transmitter/receiver from its identification of corresponding structure. This omission is inappropriate for the reasons set forth above. With respect to claim 4 of the '932 Patent, even though the '932 Patent has a disclosure identical to the '705 Patent, Apple argues that the corresponding '932 structure is limited to microwave transceivers due to a purported disclaimer that Apple has pieced together with excerpts from the '932 file history presented out of order and out of context. Apple's argument rests essentially on a single, ambiguous statement in the prosecution history. The manner in which Apple interprets that statement contradicts the express claim language in the '932 patent and is inconsistent with the remainder of the dialogue reflected in the prosecution history.

The '932 patent includes five independent claims. The relevant portion of claim 1 is as follows: "said input and output means comprising microwave transceiver means, coupled to a microwave link, for receiving said audio/video source information over said microwave link and for transmitting said time compressed audio/video source information stored in said random

---

corresponding structure because the specification states that the transmitter/receiver is "typically" a modem.

access storage means over said <u>microwave link</u>." (emphasis added). Claim 5, while slightly different from claim 1, also contains a "microwave transceiver" limitation. Claims 2 through 4 of the '932 Patent, in sharp contrast, do not contain a microwave transceiver limitation.

The five allowed claims were added in an amendment dated May 7, 1990, and identified as claims 26-30. Burst explained in the amendment that the new claims "are directed to an audio/video transceiver <u>having the ability</u> to receive audio/video source information over a microwave link…." Brown Decl., Exh. O, at APBU 216 (emphasis added). Importantly, all of the claimed transceivers did have the ability to receive audio/video source information over a microwave link. Claims 26 and 30 (issued claims 1 and 5), however, were expressly limited to that ability. Claims 27-29 (issued claims 2 through 4) were not. The statement above about the abilities of the claimed devices does not change that fact, nor does it even suggest that all the claims should be limited to microwave transceivers as Apple argues.

Following the amendment, the Patent Office rejected claims 26 and 30 (which were grouped together for discussion purposes) as obvious in light of Southworth et al. The examiner found it necessary to combine Southworth with Lambert to reach the "microwave transceiver" limitation in claims 26 and 30. *Id.* at APBU 223-24. Next, the examiner rejected claims 27-29 (which he also grouped together) in light of Southworth and the knowledge of one of skill in the art. *Id.* at APBU 224. Importantly, the examiner <u>did not cite Lambert against claims 27-29 and made no mention of a "microwave transceiver" limitation in these claims</u>.

In the next response (dated January 4, 1991), Burst recited all of the elements of claim 26 (issued claim 1), including the microwave transceiver. Regarding claims 27-29 (issued claims 2-4), Burst said only that "[c]laims 27-29, as amended, call for <u>substantially</u> the same structure

recited above . . . ." *Id.* at APBU 232. Based on this ambiguous statement, Apple incorrectly argues that Burst limited claims 27-29 to having a microwave transceiver.

Burst's use of the phrase "substantially the same" plainly indicates that there are differences between the structure in claims 26 and the structure in claims 27-29. This language certainly cannot rise to the level of clarity necessary to limit claims 27-29 to a microwave transceiver when those words are absent from the claims. Furthermore, Apple ignores subsequent paragraphs in the amendment that describe the "important structural features" of claims 26, 27-29, and 30 in great detail. Notably, the discussion of claims 26 and 30 in those paragraphs describes a microwave transceiver requirement, while the discussion of claims 27-29 does not. *Id.* at APBU 232-33.

The last piece of Apple's argument creates the false impression that, after having changed the claims and made the statements above, the examiner required Burst to change the title. While it is true that the examiner required Burst to change the title of the application to reflect the broader disclosure, this happened <u>well before the claims described above were filed</u>. *See id.* at APBU 200. In the claims that prompted the examiner to insist on a title change, the microwave transceiver was present only in dependent claims. *See, e.g., id.* at APBU 166 (dependent claim 6). Consequently, it is clear that the examiner would not have viewed all of those claims as limited to a microwave transceiver.

## C.    Output Means

The "output means" appears in both the '995 Patent and the '932 Patent. With regard to the '932 Patent, Apple makes the same (microwave transceiver) disclaimer argument that it made in connection with "input means." For the same reasons discussed above, Apple's disclaimer argument should be rejected.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

For the '995 Patent, Apple identifies only the fiber optic port as corresponding structure. Apple has again ignored the '995 Patent's teaching of a satellite transceiver. *See* '995 Patent, 2:46-51. The satellite transceiver is structure that performs the claimed function of the output means. The new matter introduced in the '932 Patent adds a point-to-point microwave transceiver to the satellite transceiver described in the '995 Patent. *See, e.g.*, '932 Patent, 12:10-11. While this new matter cannot be used for the output means of the '995 Patent, it should certainly be included in the construction of the output means in the '932 Patent.

Apple also fails to identify the auxiliary digital input port as corresponding structure for the '995 and '932 Patents. The inclusion of that port was discussed in Burst's Opening Brief in connection with "transmission means." *See* Burst's Br. at 77. As explained there, the Burst Patents disclose that the auxiliary digital input port can "receive any acceptable digital signal such as computer-generated video signal or as may be supplied by another VCR-ET." '995 Patent, 7:32-35. As Dr. Hemami explained in her report, because of the auxiliary digital input port's ability to accept diverse digital signals, one of skill in the art would recognize the auxiliary digital input port as a "generic computer communication interface for bidirectional communication, such as an RS-449 or an ethernet connection." 1st Payne Decl., Exh. 5 (Hemami Report), at 51.

**D.     Storage Means**

Apple contends that "storage means" in the '705 Patent is subject to Paragraph 6 and that the patent specification fails to identify any corresponding structure. Apple's brief represents the first time Apple has taken the latter position, as its portion of the Patent Local Rule 4-3 Joint Claim Construction and Prehearing Statement filed with this Court stated simply that the corresponding structure was "DRAM, SRAM, CMOS memory, optical disc memory, bubble

memory, magnetic disk, or digital paper." *See* Court's Docket No. 59, Exhibit E. In any event, Apple is wrong on both of its contentions.

The term "storage means" is not subject to Paragraph 6 because one of ordinary skill in the art in 1988 understood the structures connoted by the term "storage" that could store the digital time compressed representation in memory, and definitions of "storage" from technical dictionaries support that understanding. *See* 1st Payne Decl., Exh. 5 (Hemami Report), at 45; *id.*, Exh. 16 (*IEEE Standard Dictionary of Electrical and Electronic Terms* (4th ed. 1988)).

Apple's reliance on *Mas-Hamilton Group v. LaGard*, 156 F.3d 1206 (Fed. Cir. 1998), and *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533 (Fed. Cir. 1991), is simply wrong. In *Mas-Hamilton*, the Federal Circuit held that the term "lever moving element" invoked Paragraph 6 because it described a function rather than a structure. 156 F.3d at 1214. In contrast, the term "storage means" in the Burst patent is itself a structure, understood by those of ordinary skill to be a memory device and part of a group or family of structures that connotes sufficient structure to preclude the application of Paragraph 6. *See, e.g., Personalized Media Comms., L.L.C. v. Int'l Trade Comm'n*, 161 F.3d 696, 704-05 (Fed. Cir. 1998) (the term "detector" in the phrase "detector means" constitutes sufficiently definite structure to preclude application of Paragraph 6 because "detector" has a well-known meaning to those of skill in the art that encompasses a variety of structures).

Apple's reliance on *Laitram*, 939 F.2d at 1536, is even more puzzling, because the language from that opinion that Apple quotes does not even address the issue of *whether* a claim term should be deemed subject to Paragraph 6. Instead, the quoted language addresses the effect of Paragraph 6 *when* it is found to apply.

1    If the Court concludes that "storage means" is subject to Paragraph 6, it should reject

2    Apple's position that the patent discloses no corresponding structure. That position results only

3    from Apple's tortured construction for "time compressed representation." The correct

4    identification of structure that performs the cited function is "DRAM, SRAM, CMOS, magnetic

5    disk, or optical disk memories, plus equivalents." Indeed, Apple includes all of these structures

6

7    in its alternative identification of corresponding structure.

8    E.    **Random Access Storage Means**

9    Apple's positions regarding "random access storage means" are even weaker than its

10   "storage means" positions. The term "random access storage" was known to one of ordinary

11

12   skill in the art in 1988. *See* 1st Payne Decl., Exh. 5 (Hemami Report), at 43-44. Apple describes

13   Dr. Hemami's definition of the term as "self-definitional," apparently intending that description

14

15   as a disparaging one, but in fact it is the very nature of terms that convey sufficient structure that

16   they define themselves. In Dr. Hemami's words, the term "random access storage" is "self-

17   descriptive" to one of ordinary skill and means "storage that provides for random access to any

18   given segment of stored audio/video source information." *Id.* A term that conveys sufficient

19   structure *is* self-descriptive and self-definitional to one of ordinary skill in the art.

20   As Apple's expert conceded in his deposition, the term "random access storage"

21

22   represents a "general class of structure." 1st Payne Decl., Exh. 8 (Halpern Depo. Tr.), at 258.

23   As such, the term falls squarely within Federal Circuit decisions that recognize sufficient

24   structure when a term refers to a "class of structures [that are] identifiable by a person of

25   ordinary skill in the art." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1322 (Fed.

26

27   Circ. 2004) (although "PWM circuit" did not reference a specific circuit, persons of skill in the

28

art would understand that it referenced a discrete class of structures performing known functions); *see also Personalized Media Comms.,* 161 F.3d at 704-05.

If the Court were to conclude that "random access storage means" as used in the '995 Patent is subject to Paragraph 6, Burst would identify the corresponding structure as "DRAM, SRAM, CMOS, or optical disk memories, plus equivalents." Apple again argues that the patent specification discloses no corresponding structure. This argument must fail together with Apple's unsupported construction of "time compressed representation." Moreover, Apple's alternative identification of corresponding structure includes the same structures that are identified by Burst.

## V.    REMAINING TERMS IN DISPUTE

### A.    Recording Means

For this means-plus-function claim term, Apple persists in its inappropriate addition of a "shunt switch" to the corresponding structure. Apple asserts that the shunt switch 48' couples the random access storage means to the recording means, but that assertion is simply incorrect. The only purpose of the shunt switch is to enable the device to bypass the time base generator 48 when recording compressed or decompressed digital information onto removable media. *See* '995 Patent, 5:63-6:2. It is unnecessary to performance of the recited function. If the shunt switch did not exist – *i.e.,* if it were replaced with a mere wire – the structure identified by Burst and the remaining portion of the structure identified by Apple would still perform the recited function by themselves. Accordingly, the shunt switch does not perform the recited function and does not serve as a claim limitation. *See Asyst Techs., Inc. v. Empak, Inc.,* 268 F.3d 1364, 1370 (Fed. Cir. 2001) (corresponding structure should be limited to that which is necessary to actually

perform the recited function and does not include everything that may be needed to enable the invention).

### B.    Editing Means

Apple adds three extraneous items into the structure that performs the recited function of editing:  read-only memory (ROM), various user interfaces and tools, and specific high-speed data bus models.  Although these structures may be used to enable the invention, they do not belong as part of the corresponding structure for editing means. *Asyst Techs.,* 268 F.3d at 1370.

Apple argues that ROM 32 is part of a "specialized piece of hardware" – the Digital Control Unit (DCU) – and thus cannot be separated from other components of the DCU.  Apple Br. at 66.  The hole in this argument is that the patent specification nowhere identifies the DCU as a specialized, single piece of hardware.  Nothing in the patent describes ROM 32 as a part of a single physical unit with the other structures that are included in the DCU.  The only function performed by ROM 32 is storage of the editing program or instructions.  '995 Patent, 6:57-58.  It is the "CPU 31 and controller 33 [that] together control the editing process as they execute the programs stored in ROM 32." *Id.* at 6:60-62.  ROM is not part of the structure that actually performs the function of editing, as Apple's own expert admitted at deposition. *See* 1st Payne Decl., Exh. 8 (Halpern Depo. Tr.), at 280.

The same is true of the "user interface control panel, light pen or mouse" that Apple seeks to inject into the corresponding structure.  These items do not perform the functions of editing and storing or re-storing that are recited in the claims; they are merely interfaces or tools that may be used in the editing process. *See* 1st Payne Decl., Exh. 5 (Hemami Report), at 53.  Even if they were necessary to enable the invention to work, they are not properly included as

part of the corresponding structure because they do not perform the recited functions. *See Asyst Techs.,* 268 F.3d at 1370.

Finally, Apple's inclusion of "VME bus, Intel's Multibus, or Optobuss" is puzzling. Their own expert, Mr. Halpern, does not include these items within his identification of corresponding structure for editing means. *See* 1st Payne Decl., Exh. 6 (Halpern Report), at 43-45. Apple argues that these particular types of busses perform the recited function of storing or re-storing, but they are merely conduits along which the edited audio/video program travels to memory. It is the CPU 31 and Controller 33 that would cause the storage to occur. Burst's identification of the corresponding structure as "a processor executing stored editing software and a controller, plus equivalents," is correct.[38]

## C.     Editing

The parties agree that "editing" means "modifying." Burst completely disagrees with two further statements made by Apple about editing. First, Burst disagrees that modifying "metadata about a song" is not editing. To the contrary, any action that modifies the representation of the audio/video source information constitutes editing, regardless of whether the precise subject of the modification is the data or the metadata that contributes to that representation.

---

[38]  If the Court were to conclude that a high-speed bus is part of the corresponding structure for editing means, it still would be incorrect to adopt Apple's position that the bus has to be one of the particular models that are listed in the patent specification. The specification states that memory and the DCU "communicate with each other via a high speed data bus," and list the Motorola VME bus, Intel Multibus and the Optobuss as merely "[e]xamples of suitable data bus devices." '995, 6:63-67. See Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1268 (Fed. Cir. 1999); TM Patents, L.P. v. Int'l Bus. Mach. Corp., 72 F. Supp. 2d 370, 383-84 (S.D.N.Y. 1999).

Second, contrary to Apple's statement that Burst raised the argument that playlists should be covered by the construction of editing, it is Apple that has asserted a specific argument about the applicability of editing to playlists as they are used in the accused products. Burst's position is that there is no basis to incorporate a specific exclusion for playlists in the construction of "editing" when there is no mention in the claims or the specification of the term "playlist." The purpose and object of claim construction is to construe the claims as written, not to pack the constructions with language that includes or excludes particular features of the accused products. *See NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc).

Nevertheless, if the Court is inclined to consider this issue as part of claim construction, the term "editing" certainly encompasses the creation of a playlist. That creative function involves modifying the segments (*e.g.*, songs) of an audio/video work or program (*e.g.*, album) by rearranging, inserting or deleting those segments. Those kinds of modifications are clearly disclosed in the patent specifications. '995 Patent, 6:27-29, 6:44-48; 9:49-52; '839, 12:47-52. As noted above, it matters not whether one edits the data or the metadata to modify the representation of the audio/video work or program.

**D.     Audio/video source information**

Apple's brief states that it "does not object to 'work'," which is part of Burst's construction. Apple Br. at 39. "Apple also does not object to Burst's suggestion that the work must be one that 'has a temporal dimension,' though it appears … that this phrase is not necessary." *Id*. Thus, the parties appear to agree that "audio/video information" means "an audio and/or video work that has a temporal dimension."

The entirety issue is still disputed. If Apple is arguing that each claimed step must be completely performed on the entire work before the next step begins, Burst disagrees. It is illogical to require that each step must finish before the next begins, and it is inconsistent with the patent specification. For example, it is clear from the specification that compressed portions of data from the compression operation may be stored in memory before the entire compression process is completed. *See, e.g.*, '995 Patent at 9:17-18 (RAM is used as interim storage during the conversion of the signals to a digital format and during the subsequent compression operation).

Additionally, the patent specifications clearly envision the possibility that certain segments or portions of a work may be manipulated without requiring a transfer of the entire program. For example, the patent specification clearly indicates that "the digitized program" can be viewed or recorded "either in its entirety or in random segments, based on user preference." '995 Patent (Exhibit 1) at 10:1-5.

## VI.    CONCLUSION

For all the foregoing reasons, Burst respectfully requests that the Court adopt its constructions and reject Apple's constructions.

Dated: December 22, 2006                    Respectfully submitted,

                                            /s/Floyd G. Short

                                            PARKER C. FOLSE III (WA Bar No. 24895 -
                                            Admitted Pro Hac Vice)
                                                pfolse@susmangodfrey.com
                                            IAN B. CROSBY (WA Bar No. 28461 - Admitted
                                            Pro Hac Vice)
                                                icrosby@susmangodfrey.com
                                            FLOYD G. SHORT (WA Bar No. 21632- Admitted
                                            Pro Hac Vice)
                                                fshort@susmangodfrey.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUSMAN GODFREY, L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
(206) 516-3880 Tel.
(206) 516-3883 Fax
SPENCER HOSIE (CA Bar No. 101777)
    shosie@hosielaw.com
BRUCE WECKER (CA Bar No. 078530)
    bwecker@hosielaw.com
HOSIE McARTHUR LLP
    One Market, 22nd Floor
    San Francisco, CA 94105
    (415) 247-6000 Tel.
    (415) 247-6001 Fax
MICHAEL F. HEIM (TX Bar No. 9380923 -
    Admitted Pro Hac Vice)
LESLIE V. PAYNE (TX Bar No. 0784736 -
    Admitted Pro Hac Vice)
HEIM, PAYNE & CHORUSH, L.L.P.
    600 Travis Street, Suite 6710
    Houston, TX 77002
    (713) 221-2000 Tel.
    (713) 221.2021 Fax
ROBERT J. YORIO (CA Bar No. 93178)
V. RANDALL GARD (CA Bar No. 151677)
COLBY B. SPRINGER (CA Bar No. 214868)
CARR & FERRELL LLP
    2200 Geng Road
    Palo Alto, CA 94303
    (650) 812-3400 Tel.
    (650) 812-344

1

## CERTIFICATE OF SERVICE

2

3    I hereby certify that a true and correct copy of the above and foregoing DEFENDANT

4    BURST.COM, INC.'S REPLY BRIEF ON CLAIM CONSTRUCTION, was served as follows on

5    the following counsel of record:

6

7    Nicholas A. Brown                        *via Electronic Mail*
     WEIL, GOTSHAL, & MANGES, LLP
8    201 Redwood Shores Parkway
     Redwood Shores, CA  94065
9

10   Matthew D. Powers                        *via Electronic Mail*
     WEIL, GOTSHAL, & MANGES, LLP
11   201 Redwood Shores Parkway
     Redwood Shores, CA  94065
12

13   Garland T. Stephens                      *via Electronic Mail*
     WEIL, GOTSHAL, & MANGES, LLP
14   700 Louisiana, Suite 1600
     Houston, TX 77002
15

16   On this 22nd day of December, 2006.

17

18                                        /s/Floyd G. Short

19

20

21

22

23

24

25

26

27

28