1   MATTHEW D. POWERS (Bar No. 104795)
    matthew.powers@weil.com
2   GARLAND T. STEPHENS (admitted N.D.C.A.,
    Texas Bar No. 24053910)
3   garland.stephens@weil.com
    NICHOLAS A. BROWN (Bar No. 198210)
4   nicholas.brown@weil.com
    WEIL, GOTSHAL & MANGES LLP
5   Silicon Valley Office
    201 Redwood Shores Parkway
6   Redwood Shores, CA  94065
    Telephone: (650) 802-3000
7   Facsimile: (650) 802-3100

8   Attorneys for Plaintiff
    APPLE COMPUTER, INC.
9

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12

13   APPLE COMPUTER, INC.,              Case No. C 06-0019 MHP

14              Plaintiff,              **APPLE COMPUTER, INC.'S SECOND
                                        MOTION FOR SUMMARY
15        v.                            JUDGMENT OF INVALIDITY**

16   BURST.COM, INC.,                   Date:  September 10, 2007
                                        Time:  2:00 p.m.
17              Defendant.              Hon. Marilyn Hall Patel

18                                      Complaint Filed:  January 4, 2006
                                        Trial Date:  February 26, 2008
19

20

21

22

23

24

25

26

27

28

Dockets.Justia.com

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................. 1

II.   THE PRIOR ART ............................................................................................... 4

    A.    Walter – A Faster-Than-Real-Time Video Distribution System ............................ 4

    B.    Gremillet – A Faster-Than-Real-Time Music Distribution System........................ 5

    C.    Tescher – An Intra-Frame and Inter-Frame Video Compression Method.............. 6

    D.    Kramer and Kepley –  Patents From Apple's Audio Anticipation Motion............ 7

    E.    CompuSonics – Editing ................................................................................ 7

III.  LEGAL STANDARDS.......................................................................................... 8

IV.   EACH OF THE ASSERTED BURST CLAIMS IS INVALID ........................................ 9

    A.    The Asserted Claims .................................................................................... 9

    B.    The Independent Claims ............................................................................. 10

        1.    The Audio-Only Claims Are Obvious If They Are Not Anticipated........ 10

            a.    Kramer Makes Obvious Burst's Audio-Only Claims .................. 11

            b.    Kepley Makes Obvious Burst's Audio-Only Claims.................... 12

        2.    The "Compressing" Method Claims ('839 claims 1 and 76, '705 claim 12)............................................................................... 13

            a.    Walter Anticipates '839 Claim 1 And '705 Claim 12, And Renders Obvious '839 Claim 76. ............................................. 14

            b.    Gremillet In Combination With Tescher Makes Obvious The "Compressing" Method Claims ............................................. 15

        3.    The "Compressing" Apparatus Claims ('995 claim 1, '932 claim 4)....... 16

            a.    Walter Anticipates '995 Claim 1 And Renders Obvious '932 Claim 4 ..................................................................................... 17

            b.    Gremillet In Combination With Tescher Renders Obvious '995 Claim 1 and '932 Claim 4..................................................... 18

        4.    The "Receive Compressed" Method Claims ('839 claims 17 and 77, '705 claim 21) Are Made Obvious By Walter and the Combination of Gremillet and Tescher........................................................................ 19

        5.    The "Receive Compressed" Apparatus Claim ('995 claim 17) ............... 21

    C.    The Dependent Claims ............................................................................... 21

        1.    The "Editing" And "Monitor" Limitations ('995 claims 2, 3, 22, 80; '839 claims 2, 3,'705 claim 13) ............................................................ 21

        2.    "Semiconductor Memory" ('995 claim 7) ........................................... 23

        3.    "Analog To Digital Conversion" ('995 claim 8)................................... 23

        4.    "Digital Source Information" ('995 claim 9 and '839 claim 9)............... 23

        5.    "Computer-Generated Information" ('995 claim 15 and '839 claim 15) ........................................................................................... 24

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

6.   "Video Library" ('995 claim 19 and '839 claim 19)................................. 24

4

7.   "Removable Recording Medium" ('995 claims 44, 45, 47; '839
claims 45, 47) and "Optical Disk" ('995 claims 51 and 52; '839

5

claim 51)........................................................................................................ 25

8.   The Decompression Limitations('995 claims 20, 22, and 23, '839

6

claims 20, 28)............................................................................................... 25

7

V.   CONCLUSION ...................................................................................................... 26

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson's Black Rock, Inc. v. Pavement Salvage Co.*,
    396 U.S. 57 ................................................................................................................ 8

*Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*,
    340 U.S. 147, 71 S. Ct. 127 (1950) ....................................................................... 8

*KSR International Co. v. Teleflex Inc.*,
    No. 04-1350, 127 S. Ct. 1727 (April 30, 2007) ........................................ 1, 8, 9
                                                                                            12, 18

*Leapfrog v. Fisher-Price*,
    485 F.3d 1157 (Fed. Cir. 2007) ............................................................................. 4

*Pharmastem Therapeutics Inc. v. Viacell, Inc.*,
    Nos. 05-1490, 05-1551, 2007 WL. 1964863 (Fed. Cir. July 9, 2007) ................. 9

## STATUTES

35 U.S.C. §§  102(a) and (e) .............................................................................................. 4

35 U.S.C. § 102(b) ............................................................................................................ 6,7

1    **I.    INTRODUCTION**

2          Apple Inc.'s Motion for Summary Judgment of Invalidity Based on Kramer and

3    Kepley patents ("Audio Anticipation Motion") established that certain claims asserted by

4    Burst.com, Inc. ("Burst") are invalid because they are anticipated by the Kramer and Kepley

5    patents.[1]    This motion seeks summary judgment of anticipation and/or obviousness of **all** the

6    asserted claims—including those claims requiring the processing of full motion video

7    information—by four additional references, as well as by Kramer and Kepley.[2]

8          To be valid, patent claims must be both novel (i.e., unanticipated by prior art) and

9    nonobvious.  The asserted Burst claims are neither.  Rather, the Burst claims describe systems

10   and methods for compressing, storing, transmitting (and in some cases, editing) digitized

11   audio/video information that were known, described, and used long before Burst's alleged June

12   1987 conception date.[3]    Indeed, as demonstrated in Apple's Audio Anticipation Motion, and

13   below, such systems and methods date back to the 1970s and early 1980s and are based on data

14   compression work that was done beginning in the 1950s.  Burst's asserted patents and claims add

15   nothing to this extensive collection of prior art patents, literature, and products and thus are

16   anticipated.  And even if Burst were able to point to elements in one or more Burst claims as

17   missing in a single prior art reference, the claims would at best be an obvious combination of

18   known elements yielding predictable results, and thus would be invalid under a long line of

19   Supreme Court precedent recently extended just this April in *KSR Int'l Co. v. Teleflex Inc*., No.

20   04-1350, 127 S. Ct. 1727, 1740 (April 30, 2007) ("when a patent 'simply arranges old elements

21   with each performing the same function it had been known to perform' and yields no more than

---

22   [1] Apple's Audio Anticipation Motion was originally directed to claims 1, 9, 15, 16, 17, and 44 of
23   the '995 patent and claims 1, 9, 15, 16, 17, 44, and 47 of the '839 patent.  Burst subsequently
     dropped claim 16 of the '995 patent and claim 16 of the '839 patent from this lawsuit, and
24   accordingly those claims are not at issue in Apple's Audio Anticipation Motion.  That Motion
     was filed in January 2007, but Burst's opposition was deferred until after the Court's May 8, 2007
25   Claim Construction Order.  Briefing was completed on June 21 and a hearing is currently
     scheduled for July 19.

26   [2] As was stated in Apple's Audio Anticipation Motion, the references upon which this motion is
     based do not by any means represent the full extent of the invalidating prior art upon which Apple
27   may rely in this case.  Only a few such references are addressed herein.

28   [3] Apple does not believe that Burst will be able to corroborate its claim to a June 1987 conception
     date, or establish its entitlement to a priority date earlier than its December 27, 1988 filing date.

1    one would expect from such an arrangement, the combination is obvious").

2           According to Burst, the "innovation [that] is at the heart of Burst's patents" is that

3    "Burst's inventions effectively decouple the time required to transmit and receive audio and video

4    works from the time required to play them back."[4]  In other words, Richard Lang, the named

5    inventor of the Burst patents-in-suit, believes he was the first to see that "the delivery of an audio

6    or video work could be accomplished faster than the real-time period required for playback."[5]

7           Mr. Lang admits, however, that he did not invent any of the various components

8    that would allow compressed audio or video to be sent faster than real-time.  Specifically, Mr.

9    Lang admits that he did not invent compression, data compression of audio/video information, or

10    any improved method of data compression.[6]  He did not invent the idea of sending a data-

11    compressed audio or video representation over a transmission medium, or any new or improved

12    transmission medium,[7] including the fiber optic link described in the Burst patents as transmitting

13    digital signals at "about 200 megabytes/second).[8]  Mr. Lang admits that he did not invent any

14    "improved storage system" but rather contemplated using existing storage systems.[9]  He also

15    admits that he did not invent or improve the process of digitizing audio or video data.[10]  In short,

16

17    [4] Burst's Opening Claim Construction Brief at 1.

18    [5] *Id.* at 2. *See* Kalay Decl., Exh A [Lang Depo.] at 18:13-17 ("Q. Are you the first person to ever send digitized audio or video faster than real time?  A. I believe I'm the first person to invent an apparatus and method specifically designed for doing so, as a distribution model.")

19    
20    [6] *Id.* at 74:16-22 ("Q. … You did not invent the idea of using fewer bits to represent data, is that right? A. That's correct.  Q. Now is it also true that you did not invent data compression of audio or video information? A. That's correct."); *Id.* at 82:2-4 ("Q.  Did you in the '995 patent invent an improved method of data compression?  A. No.").

21    
22    [7] *Id.* at 74:23-75:2 ("Q. And you did not invent the idea of sending a data-compressed audio or video representation over a transmission medium, correct?  A.  Correct."); *id.* at 84:17-25 ("Q. … Did you invent any new or improved digital transmission medium? A. Medium?  Q. Yes, like a fiberoptic line, or a telephone line, or a telephone modem.  A.  So you're talking about the transmission, the networking side of it? Q. Yes. A. No.").

23    
24    [8] Docket #110, Crosby Decl., Exh. A ['995 patent] at 7:55-58.

25    [9] Kalay Decl., Exh. A [Lang Depo] at 82:5-15 ("Q. Did you invent an improved storage system? A. Well, what do you mean by "improved storage system"?  Q. A storage system that's improved in any way over what was already known at the time you came up with your idea improved method of data compression?  A. I utilized existing storage systems.  Q. And you didn't come up with a new, improved storage system, is that right?  A.  No.  If I understand your question correctly.")

26    
27    
28    [10] *Id.* at 84:3-5 ("Q. Did you invent any new or improved method or apparatus for digitizing audio or video data?  A. No, we used existing.")

Mr. Lang has admitted that the component parts of his alleged invention were known,[11] and asserts that what he contributed was the idea of sending compressed audio or video data faster than real-time.[12]  Yet, as shown in this motion and Apple's Audio Anticipation Motion, Mr. Lang was unquestionably <u>not</u> the first to have the idea of sending compressed audio or video faster than real-time.  Moreover, Mr. Lang has admitted that it was known that compressing a file would allow it to be sent faster, acknowledging that "persons of skill in the art at the time [he] filed the '995 patent application understood that a digital representation that had fewer bits took less time to send over a given transmission medium than one that had more bits."[13]

Indeed, faster-than-real-time transmission of compressed audio and video data is simply an inevitable result of the advance of technology for compression, storage, and transmission—technology to which Mr. Lang admits he did not contribute.  By 1988, there were a variety of fast data transmission technologies available, including T1 lines with a bandwidth of 1.544 Mbps dating back to at least 1966, Ethernet with a bandwidth of at least 3 Mbps dating back to 1976, and the 200 MB/s fiber optic link described in the Burst patents.[14]  Storage systems described in the 1988 "Peripheral Storage" article Burst referenced in its patent application included external hard drives arrays with 3 gigabytes of capacity and a bandwidth of "3 Mbytes/sec."[15]  Compression and digitization of audio and video data were known, and any digitized and compressed audio file that was copied to one of these external hard drives, or sent over any of these transfer mechanisms, would have transferred faster-than-real-time.[16]

---

[11]  *Id.* at 20:24-21:23 (testifying that a "general summary of key features" of his invention was "data compression," "storage, output ports, and sending audio or video faster than real time" and "creation of a time-compressed representation"; *see also id.* at pp. 14-21 (questions and answers regarding the components of Mr. Lang's alleged invention).

[12]  *Id.* at 76:23-77:5 ("Q. And I think you said you did not invent the concept of sending data-compressed representations of audio/video information, is that correct?  A. Well, what I said I believe is that I invented an apparatus and a method of doing so that departed from the conventional method at that time, which was to play them in real time.")

[13]  *Id.* at 76:9-15 ("Q. Is it your view that persons of ordinary skill in the art at the time you filed the '995 patent application understood that a digital representation that had fewer bits took less time to send over a given transmission medium than one that had more bits?  A.  I think that's a fair statement.")

[14]  Docket #116 [Kalay Decl.], Exh. E (1966 Ronne paper); Docket #93 [Brown Decl.], Exhibit 7 (1976 Metcalfe paper); Kalay Decl., Exh. L ['932 patent] at 8:15-18.

[15]  Kalay Decl., Exh. J [Peripheral Storage]; *See* Kalay Decl., Exh A [Lang Depo.] at 82:5-15.

[16]  This is clear because even uncompressed audio would have transferred faster than real time at

Furthermore, as shown for example by the Tescher reference described below, it was known by 1985 that video could be compressed down to a data rate of 239 kbps, and any video file compressed to that data rate would have transferred faster-than-real-time if copied to one of the above external hard drives or across an Ethernet or T1 communication link.  As this shows, it was both inevitable and unremarkable that digitized audio and video data would be moved from one place to another faster-than-real-time.  Accordingly, to the extent that they are not anticipated, the asserted Burst claims are obvious because they are: a set of known elements performing known functions, whose combination yields a result even Mr. Lang admits was predictable.[17]

## II.    THE PRIOR ART

### A.    Walter – A Faster-Than-Real-Time Video Distribution System

The Walter patent (U.S. Patent No. 4,506,387, Kalay Decl., Exh. B) was filed June 24, 1983, and issued on September 13, 1988.  Thus, Walter is prior art to all of the asserted Burst claims under at least 35 U.S.C. sections 102(a) and (e).[18]

In Walter, a "library of video programs [is] maintained at the central data station."

Walter describes a video-on-demand system where a "central data station" can transmit a "video program at a high non-real-time-rate over a fiber optic line network to a data receiving station at the user's location."  Through the use of compression and multiple parallel fiber optic lines, "a two hour movie can be transmitted in about 31 seconds."  [7:37-47].

In Walter, a "library of video programs [is] maintained at the central data station."  Each video program "is converted to compressed digital form and stored in suitable high density

---

these data rates.  *See* Hemami Decl., ¶ 22 ("digitized uncompressed wideband audio signal has a data rate of 705.6 Kilobits/second"); ¶ 50.

[17] Mr. Lang also admitted that he, the sole named inventor, could not have built what his patents describe, because he was "not an electrical engineer, [so] its not in my field of expertise to build it." Kalay Decl., Exh. A [Lang Depo.] at 234:6-23.  *See Leapfrog v. Fisher-Price*, 485 F.3d 1157 (Fed. Cir. 2007) ("Our conclusion [of obviousness] is further reinforced by testimony from the sole inventor at trial that he did not have a technical background, could not have actually built the prototype himself, and relied on the assistance of an electrical engineer").

[18] Walter was submitted with during the prosecution of the '932 application about two weeks after the claims were allowed.  Burst did not disclose to the Patent Office that Walter describes sending a 2 hour movie in "about 31 seconds."  Kalay Decl., Exh. K [Notice of Allowance and Information Disclosure Statement].  When asked about the Walter reference, Mr. Lang testified that "I can't distinguish my patent from the Walter patent without relying on opinions and information that I have garnered in my discussions with my patent counsel" and was instructed not to answer questions "concerning the extent to which [Walter] does or does not anticipate the patents-in-suit."  Kalay Decl, Exh. A [Lang Depo.] at 373, 368; *see generally id.* at 368-380.

1    memory devices." [2:13-18]. These devices are organized into "memory modules," each of

2    which "contains a specific video program for broadcasting." [4:7-14].[19] Memory modules are

3    included both at the "central data station" and at the "receiving station," and are "arranged

4    identically" in both places. [7:8-11]. Walter describes in some detail the circuitry and devices

5    used for reading data from the memory modules, converting it into optical data, transmitting it

6    through multiple parallel fiber optic lines faster than real-time to the receiving station, where it is

7    stored "for an indefinite period of time for viewing at a later date." [Abstract; 4:3-7:47].

8         The video data is compressed using circuitry that performs an "inter-frame

9    differential pulse code modulation technique [that] is known in the art, [although] additional

10   circuitry may be added to avoid problems caused by rapid motion in the picture." [7:25-34].

11   Walter does not expressly state where the "circuitry" that performs this compression is located,

12   saying only that "the digital data is compressed in memory modules 24-34 [which are in the

13   central data station] by a technique known as inter-frame differential pulse code modulation."

14   [7:26-30]. This suggests that the compression process occurs in the central data station.

15   However, Walter also states that the "video programs are preprogrammed into respective memory

16   modules 24-34." This suggests that the compression occurs elsewhere. [4:10-13]. This

17   ambiguity is significant here because two of Burst's independent apparatus claims ('995 claim 1

18   and '932 claim 4) require a device within a "common housing" to receive, compress, store, and

19   transmit audio/video data – a requirement that is not literally met if the compression occurs

20   outside the central data station. However, as discussed below, Walter renders these claims

21   obvious in any event. Wicker Decl., ¶ 15.

22        **B.    Gremillet – A Faster-Than-Real-Time Music Distribution System**

23        The Gremillet patent (U.S. Patent No. 4,499,568, Kalay Decl., Exh. C) issued in

24   1985 and claims priority to a 1981 French patent application. Thus, Gremillet is prior art to all of

25   the asserted Burst claims under at least 35 U.S.C. section 102(b). Gremillet was not cited during

26   prosecution of any of the asserted Burst patents.

27

28   ───────────────────────

[19] Each memory module is subdivided in the preferred embodiment into 16 memory cells, one for each of the 16 parallel "optical data channels" to be used. [5:29-65; 7:39-44].

1    The music-on-demand system described in Gremillet transmits music from a
2    distribution center to a customer over a television transmission channel much faster than real-
3    time. This is possible because "[t]he information flow rate linked with classical music is
4    approximately 0.5 Mbits/s," while "the information flow rate of picture transmission channels
5    used in television … is well above this value, being about 100 Mbits/s." [2:3-8]. This means that
6    "a musical work lasting one hour can be transmitted in 18 seconds." [2:8-12].

7    To accomplish the transmission, the distribution center has a television transmitter,
8    either a "transmitting antenna" or "a cable or optical fibres." [4:1-7]. At the receiving end, "the
9    user equipment 20 comprises a television receiver" as well as "a video recorder" and a "rate
10    recorder 24 connected to the video recorder and able to restore the normal speed to the
11    information." [3:55-62]. In operation, a "user wishing to listen to a work belonging to the
12    collection recorded in the [distribution] centre supplies the latter with the references of the chosen
13    work by means of the telephone line," and "provides his identity," for example by "a numerical
14    code." [4:8-18]. The user-selected digitized music is sent over a television channel, "preceded
15    by the addressing code of the subscriber." [4:18-20]. When user's device receives the addressing
16    code, it sends a "writing control instruction" to the "video recorder," where "it is recorded at the
17    fast speed … until the work has been completely recorded." [4:20-25]. The transmitted work
18    then can be played using the rate converter that restores it to its normal speed, or the user can
19    keep the transmitted recording "for the purpose of listening to it later." [4:36-37].

20    **C.     Tescher – An Intra-Frame and Inter-Frame Video Compression Method**

21    The Tescher patent (U.S. Patent No. 4,541,012, Kalay Decl., Exh. D) was filed in
22    1982 and issued in 1985. Thus, Tescher is prior art to all of the asserted Burst claims under at
23    least 35 U.S.C. section 102(b). Tescher was not cited during prosecution of the Burst patents.

24    Generally, Tescher describes a system for digitizing analog/video information,
25    compressing that digitized information, storing and/or transmitting that information, and then
26    decompressing, and/or displaying the video information. [2:32-45]. Tescher is significant
27    because it discloses a video compression technique that achieves a data rate of 239 kbps ("2.39 x
28    $10^5$ bits per second") for full motion video information. [Tescher at 11:52-12:1]. Notably, this

1  video data rate (239 kbps, or 0.239 Mbits/s) is lower than the data rate of the music that is

2  distributed faster than real-time in Gremillet ("approximately 0.5 Mbits/s").   Tescher is also

3  significant because it uses both the intraframe and interframe compression mentioned in the

4  Court's claim construction order. [1:40-45; 1:59-66; 2:32-45].

5      **D.    Kramer and Kepley –  Patents From Apple's Audio Anticipation Motion**

6          The Kramer patent (U.S. Patent No. 4,667,088, Kalay Decl., Exh. **E**) and Kepley

7  (AT&T) (U.S. Patent No. 4,790,003, Kalay Decl., Exh. **F**) patents were described in Apple's

8  Audio Anticipation Motion, and those descriptions are not repeated here.  Burst has not denied

9  that these references are prior art to its claims.  Neither Kepley nor Kramer was cited during

10  prosecution of any of the asserted Burst patents.

11      **E.    CompuSonics – Editing**

12          In the 1980s a public company called CompuSonics sold a series of digital audio

13  products, including the "DSP-2000 Series," which was a "multitrack digital audio recorder/editor

14  for professional use."  Kalay Decl, Exh. G [6/15/87 CompuSonics Form 10-K] at 4.  The DSP-

15  2000 is prior art to Burst's patents under at least 35 U.S.C. § 102(b): "As of May 30, 1987, 15

16  DSP-2000 series systems have been sold."  *Id.*  The CompuSonics DSP-2000 digitized and

17  compressed audio data[20] and performed editing of the digital audio files,[21] which it stored on hard

18  disks and high density floppy disks.[22]  It could output the edited audio to a Sony PCM-1610

19  encoder for mastering CDs.  Exh. H at APBU-00016099.  The CompuSonics DSP-2000 product

20  demonstrates that editing digitized and compressed audio information was known prior to Burst's

---

[20] "[T]he analysis stage of the CompuSonics system, which compresses and filters the digital-audio data rate and allows for high speed editing and greater data density."  Kalay Decl., Exh. G [6/15/87 CompuSonics Form 10-K] at APBU 653390.  "Use of CompuSonics proprietary CSX encoding is optional when making recordings on the DSP-2002."  Kalay Decl., Exh H [CompuSonics DSP 2002 brochure, copyright 1985] at APBU-0016100.

[21] "The DSP-2000 is … configured as a single user workstation for the recording and editing of live and recorded music." Exh. G at APBU 653390. "Because you are now dealing wholly within the digital domain, the DSP-2002 lets you take advantage of the following features: … real-time trial edits … razor-sharp edits, butt splices, and cross-fades."  Exh. H at APBU-00016099.

[22] "The standard system comes with a 143 megabyte hard disk capable of holding at least 18 minutes of mono or 9 minutes of stereo." Exh H at APBU-00016099; "Superfloppy disk drive … 3.3 Megabytes (unformatted)."  *Id.* at APBU-0016100.  CompuSonics also sold the DSP-1000, which stored digital audio in compressed or uncompressed form on a WORM (write-once read-many) optical disk.  Exh. G at APBU 653391-392.

1   patent application.[23]

2   **III.    LEGAL STANDARDS**

3           Summary judgment legal standards and the law of anticipation are well-known to

4   the Court and were addressed in Apple's Audio Anticipation Motion.  This law is not repeated

5   here.  However, very recently, the Supreme Court overturned long-standing Federal Circuit law

6   regarding "obviousness," and urged "caution in granting a patent based on the combination of

7   elements found in the prior art."  *KSR Int'l Co. v. Teleflex Inc.*, No. 04-1350, 127 S. Ct. 1727,

8   1731 (April 30, 2007).   The *KSR* decision rejected the rigid application of a "teaching, suggestion

9   or motivation" (or "TSM") requirement for a finding of obviousness, and adopted instead what it

10  called a "common sense" approach, explaining that a patent claim is obvious, and thus invalid,

11  "when it does no more than yield predictable results." *Id.* at 1731.

12          The Supreme Court has repeatedly held that a combination of known elements

13  according to known methods is obvious when it does no more than yield predictable results.

14  *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 152-153, 71

15  S.Ct. 127, 130 (1950) ("a patent for a combination which only unites old elements with no change

16  in their respective functions . . . obviously withdraws what is already known into the field of its

17  monopoly and diminishes the resources available to skillful men."); *Anderson's Black Rock, Inc.*

18  *v. Pavement Salvage Co.*, 396 U.S. 57, 62; 90 S. Ct. 305, 308-309 (1969) (combination of radiant

19  heat burner and paving machine was obvious because each element performed as expected:

20  "while the combination of old elements performed a useful function, it added nothing to the

21  nature and quality of the radiant-heat burner already patented.").

22          The Supreme Court applied these precedents in *KSR*, which involved a claim

23  which combined an adjustable automobile pedal and an electronic pedal position sensor.  The

24  district court had found, on summary judgment, that claim 4 was obvious over the combination of

25  the prior art Asano patent (which disclosed an adjustable automobile pedal) with the prior art

---

26  [23] Apple believes that the CompuSonics products anticipate all of Burst's asserted claims, in part
27  because they could compress and store audio and video information, and could transmit the
    compressed audio and video files between various internal and external disk drives faster-than-
    real-time, but that is beyond the scope of this motion, which relies on the CompuSonics DSP-
28  2000 to show editing.

Smith patent (which disclosed an electronic position sensor on an automobile pedal.)  *Id.* at 1738. The Federal Circuit reversed the district court, and the Supreme Court reversed again, reinstating the district court's finding of obviousness.  As it explained,

> When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

*Id.* at 1740.  Thus, the Supreme Court explained, "when a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious."  *Id.* at 1740.  In sum, the *KSR* Court concluded, the results of "ordinary innovation" are not patentable, because "granting patent protection to advances that would occur in the ordinary course without real innovation retards progress."  *Id.* at 1732, 1746

Notably, the Federal Circuit's reversal of summary judgment had relied in part on an affidavit submitted by the patentee's expert, and the Supreme Court disagreed with the Federal Circuit on this point as well, noting that the ultimate judgment of obviousness is a legal determination.  *Id.* at 1745.  "Where, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate."  *Id.* at 1745-1746.  *See Pharmastem Therapeutics Inc. v. Viacell, Inc.*, Nos. 05-1490, 05-1551, 2007 WL 1964863 (Fed. Cir. July 9, 2007) (applying *KSR* to overturn jury verdict of non-obviousness).

## IV.    EACH OF THE ASSERTED CLAIMS IS INVALID

### A.    The Asserted Claims.

Thirty-six of the sixty claims originally asserted by Burst in this lawsuit remain asserted, of which nine are independent claims (marked in bold below).[24]

---

[24] Burst dropped claims 16, 21 and 24-28 of the '995 patent, claims 7-8, 16, 22-23, 26-27, 46, 48-50, 52, 58-59 and 73 of the '839 patent, and claims 1-3 of the '705 patent in its June 8, 2007 Final Infringement Contentions.

| Patent | Asserted Claims |
|--------|-----------------|
| '995 | **1**, 2, 3, 7, 8, 9, 15, **17**, 19, 20, 22-23, 44, 47, 51, 52, 80 |
| '839 | **1**, 2, 3, 9, 15, **17**, 19, 20, 28, 44, 45, 47, 51, **76**, **77** |
| '705 | **12**,13, **21** |
| '932 | **4** |

As explained in Apple's Audio Anticipation Motion, all of Burst's asserted independent claims can be divided into two groups. The first set of claims—the "compressing" claims—each requires (1) receiving audio/video source information, (2) compressing it, (3) storing it, and (4) transmitting it faster than real-time. The second set of claims—the "receive compressed" claims—shortens this sequence to three steps by requiring that the audio/video source information be compressed before it is received. Of the nine independent claims at issue, five are "compressing" claims,[25] and four are "receive compressed" claims.[26]

The independent claims at issue can be further categorized as either method or apparatus, and as either audio or video.[27] The six asserted independent claims in the '705 and '839 patents are method claims, and the three in the '995 and '932 patent are apparatus claims. Five claims are limited to "full motion video,"[28] and four encompass audio only.[29]

This motion first addresses the independent claims, then turns to the dependent claims. All of the dependent claims at issue, except for claim 13 of the '705 patent, depend from audio-only claims, and can thus be anticipated by either audio or video references.

**B.      The Independent Claims**

**1.      The Audio-Only Claims Are Obvious If They Are Not Anticipated**

Apple's Audio Anticipation Motion did not assert obviousness. This motion asserts obviousness. Even if the court accepts some or all of the arguments that Burst has made in

---

[25] "Compressing" claims:  '995 claim 1; '932 claim 4; '839 claims 1 and 76, '705 claim 12

[26] "Receive Compressed" claims:  '995 claim 17, '839 claims 17 and 77, '705 claim 21

[27] An "audio" claim refers to a claim that can be met with audio-only audio/video source information.  A "video" claim refers to a claim that requires video audio/video source information.

[28] Video claims:  '839 claims 76, 77; '932 claim 4, '705 claims 12, 21.

[29] Audio claims:  '995 claims 1, 17; '839 claims 1, 17.  All but one of the dependent claims—'705 claim 12—depend from these audio-only claims.

1   opposition to Apple's Audio Anticipation Motion, all of Burst's audio-only independent claims

2   ('995-1, '995-17, '839-1, and '839-17) are nonetheless obvious over Kepley and Kramer. Both

3   Kepley and Kramer, which are undisputedly prior art, describe what Burst claims to have

4   invented: faster-than-real-time transmission of compressed audio source information.

### a.    Kramer Makes Obvious Burst's Audio-Only Claims

6           Burst makes four arguments in an effort to distinguish Kramer, none of which

7   could avoid summary judgment of obviousness even if accepted for purposes of anticipation.

8           Burst's first argument is that the DPCM encoding in Kramer is not compression

9   because the disclosed DPCM supposedly encodes audio in an analog circuit and thus does not

10  reduce the number of "bits" as the Court required. Even if the Court were to accept this

11  argument, Burst cannot deny that it would have been obvious to perform DPCM encoding in a

12  digital circuit, and that in a digital circuit, the number of "bits" is reduced. Indeed, a reference

13  text cited by Burst's Dr. Gersho states that "due to the availability of digital signal processing

14  components, digital processing … is generally the most effective means of implementing a

15  DPCM algorithm." Audio Anticipation Reply at 5. Burst also argues that Kramer fails to

16  disclose a "compression means" because it does not mention a "compressor/decompressor." But

17  Burst cannot dispute that use of a "compressor/decompressor" would have been obvious in light

18  of Kramer's disclosure of an "encoding system" and a "coder." Dr. Gersho's reference text

19  describes the "availability of digital signal processing components." Moreover, Mr. Lang admits

20  that he did not invent compression of audio/video information, or any improved method of data

21  compression, and his patents do not describe any particular hardware for audio compression, so

22  standard, known components must have been used.

23          Burst's second argument is that Kramer does not actually disclose faster-than-real-

24  time output when it says "output will be at a speed much faster (at least 100 times) than that

25  required for actual sound reproduction." Audio Anticipation Reply at 5. Even if the Court were

26  to accept Burst's strained logic on this point, Burst cannot deny that Kramer's express disclosure

27  of outputting faster than real-time would make faster-than-real-time output obvious.

28          Burst's third argument is that Kramer does not disclose "random access storage"

even though it states that "the systems of the preset invention" are portable cards whose memory allows "immediate recall of the data in any portion of the memory." Audio Anticipation Reply at 9. This teaching would make the use of random access memory obvious, even if it does not anticipate it, and there can be no dispute that random access memory was known, at least because Mr. Lang has acknowledged that he did not invent any new storage system.

Burst's fourth and final argument, which applies only to the "compressing" apparatus claims, is that Kramer fails to disclose the presence of a "compression means" in a "common housing" with the other components—input, storage, and output means. Apple believes that this limitation is inherently disclosed by Kramer's disclosure of an "encoding system," but if the Court finds otherwise, obviousness applies. As the Supreme Court stated in *KSR*, "when a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." *KSR*, 127 S.Ct. at 1740**.** All that is needed here is putting a sheet metal enclosure around the combination of the "encoding system" and at least one of the described memory cards, and one would have compression in a common housing with input, storage, and output. Wicker Decl., ¶ 13. There can be no dispute that the sheet metal, compression, input, storage, and output would each be performing "the same function it had been known to perform" and that the combination would "yield no more than one would expect," so the result is obvious as a matter of law. *See* Wicker Decl., ¶ 13.

### b.    Kepley Makes Obvious Burst's Audio-Only Claims

Burst makes five arguments in an effort to distinguish Kepley, none of which could avoid summary judgment of obviousness even if accepted.

Three of Burst's arguments about Kepley are similar to the arguments it makes regarding Kramer. First, Burst argues that Kepley does not disclose the kind of compression required by the Court's order when it refers to using "bandwidth compression" and "silence compression." Even if this were true, Burst cannot deny that it would have been obvious to perform compression that met the Court's definition for the reasons stated above with respect to Kramer. Moreover, the core of Burst's no-anticipation argument is that the "voice processor" in

1   Kepley does not necessarily encode differences between audio samples, because, as Dr Gersho

2   explains, there is a "rich variety of speech coding algorithms that were known prior to the filing

3   of the Kepley patent," some of which do not encode differences.  This argument itself shows that

4   it would have been obvious to use a technique such as DPCM, which does encode differences.

5       Second, Burst argues that Kepley fails to teach faster-than-real-time transmission

6   notwithstanding its express statement that "use of digital high speed transmission facilities of

7   speed greater than 9.6 Kbps enables the exchange of digitally encoded and compressed voice mail

8   messages faster than real time speech."  Audio Anticipation Reply at 12-13.  Again, even if the

9   Court were to accept Burst's strained logic on this point, Burst cannot deny that Kepley's

10  disclosure of transmitting faster than real-time makes faster-than-real-time transmission obvious.

11      Third, Burst argues that Kepley fails to meet the "common housing" requirement

12  of the apparatus claims.  Even if this were true, Kepley would still make Burst's claims obvious

13  for reasons analogous to those described  in the context of Kramer.  Wicker Decl., ¶ 14.

14      Burst's last two non-anticipation arguments also fail to survive an obviousness

15  analysis.   Burst claims that Kepley fails to disclose re-transmitting voice mail messages,

16  notwithstanding its disclosure of forwarding voice mail.  But it is common sense (and obvious)

17  that a forwarded voicemail is a re-transmitted voicemail.   Burst also argues that Kepley's

18  voicemail is not the claimed "audio/video source information" because it is not a "work."  Again,

19  even if that were correct, it would have been obvious that Kepley's voicemail system could

20  transmit songs or other audio that Burst admits are "works."[30]

21      ## 2.    The "Compressing" Method Claims ('839 claims 1, 76, '705 claim 12)

22      Each of the three asserted "compressing" method claims—'839 claims 1 and 76

23  and '705 claim 12—requires (1) receiving audio/video source information, (2) compressing it, (3)

24  storing it, and (4) transmitting it faster than real time.  '839 claim 1 was addressed in Apple's

25  Audio Anticipation Motion.  The two other claims, '839-76 and '705-12, differ primarily in that

26  they add the requirement that the "audio/video source information" must include "full motion

27

28  ---

[30] Kalay Decl., Exh. I [*The Cambridge Companion to Proust*] at 19 (describing listening to the opera over the telephone.)

video." '839 claim 76 also requires that the storage be on a "magnetic disk," while '705 claim 12 requires that the burst time period be "substantially" shorter than real time.

### a. Walter Anticipates '839 Claim 1 And '705 Claim 12, And Renders Obvious '839 Claim 76.

As explained above, Walter describes a video-on-demand system that uses "inter-frame differential pulse code modulation" and multiple fiber optic transmission lines in order to allow "a two hour movie [to] be transmitted in about 31 seconds." [Walter at 7:37-47]. Thus, Walter describes what Mr. Lang says he invented: creation of a time-compressed representation of video source information that is sent faster than real-time.[31] Walter also describes the other elements of Burst's claims: a "central data station" that receives video source information,[32] stores the digital time compressed representation of the video,[33] and transmits it to a receiving station faster than real-time.[34] Walter does not, however, mention the use of "magnetic disks" for storage—it describes "suitable high density memory devices." [2:13-18]. But storage on magnetic disks was well-known and routine at the time to one of ordinary skill, as evidenced by Mr. Lang's testimony that he used existing storage devices, and by the disclosure of such disks in

---

[31] Walter discloses the use of compressed audio and video data whose bit rate is reduced by using an "inter-frame differential pulse code modulation" (DCPM) technique, which according to the Walter patent was "known in the art." [7:25-34]. See also 2:15-18 and 7:32-36, 7:32-34 Walter explains that the compressed video programs can be sent from the "central data station" to a subscriber's "data receiving station" at a faster-than-real-time rate. Specifically, "a two hour movie can be transmitted in about 31 seconds" from the "central data station" to the customer's "data receiving station." [Abstract; 7:44-47].

[32] Walter discloses a "central data station" that receives the video data that is compressed and then stored in the memory module and then transmitted to the "data receiving station." [6:6-31; 7:38-47; Fig. 2]. "To facilitate the storage and manipulation of the video programs, and to allow the method to be placed under automatic computer control, the electrical data representing each video program is converted to compressed digital form and stored in suitable high density memory devices." [2:13-18].

[33] Walter discloses the use of memory module 102 in the receiving station that stores the received programs. [7:25-34]. This memory module is "arranged identically to memory modules 24-34 with sixteen parallel cells for containing the data." [7:8-11]. Memory modules 24-34 are the modules located in the "central data station," which store the compressed video prior to transmission to the customer. [7:8-11; 7:25-34]. Wicker Decl., ¶ 15.

[34] The Walter patent discloses the circuitry and devices for reading compressed video data from the memory module and transmitting it to the "data receiving station." The program is sent through the central data station's "output ports or terminals" which are shown in Figure 2 and sent across fiber optic lines at a faster-than-real-time rate. [6:6-31; 7:38-47; Fig. 2]; Wicker Decl., ¶¶ 15, 17.

the "Peripheral Storage" article Burst referenced in its patent application and submitted to the Patent Office.[35]  Magnetic disks were certainly "suitable high density memory devices."  Wicker Decl., ¶ 15.  Moreover, known magnetic disks could have been used in the normal manner in combination with the apparatus described in Walter to provide permanent storage of the compressed digital video information with entirely predictable results.   Wicker Decl., ¶ 15.  Accordingly, Walter anticipates '839 claim 1 and '705 claim 12 and at least renders obvious claim 76 of the '839 patent.

          **b.**       **Gremillet In Combination With Tescher Makes Obvious The "Compressing" Method Claims**

As described above, Gremillet describes a music-on-demand system that transmits music from a distribution center to a customer much faster than real-time: "a musical work lasting one hour can be transmitted in 18 seconds." [Gremillet at 2:8-12].  Tescher discloses a digital video compression technique that achieves a data rate of 0.239 Mbps ("2.39 x $10^5$ bits per second"), which is lower than the data rate of the music that is distributed faster than real-time in Gremillet ("approximately 0.5 Mbits/s").  [Tescher at at 11:52-12:1; Gremillet at 2:3-8].  Given this lower data rate, it would have been obvious that video data compressed as taught in Tescher could have been stored, transmitted, and received using Gremillet's faster-than-real-time media distribution system.   Wicker Decl, ¶ 16.   This would have been accomplished with all components performing their known functions, and would have achieved the predictable and obvious result of sending compressed video information faster-than-real-time.  Wicker Decl, ¶ 16.  Thus, Gremillet in combination with Tescher describes what Mr. Lang says he invented: creation of a compressed representation of video source information[36] that is sent faster than real-time.[37]

---

[35] Kalay Decl., Exh A [Lang Depo.] at 82:5-15; Kalay Decl., Exh. J [Peripheral Storage].

[36] Gremillet refers to the music it transmits as "compressed" but does not expressly describe a reduction in the number of bits used to represent the music: "[t]he compression of the sound information can be obtained by writing into a memory and then reading from the memory at the accelerated speed." [3:42-45].  Gremillet describes the "information flow rate" of the musical works it transmits as "approximately 0.5 Mbit/s."  This is less than the data rate of an uncompressed wideband audio signal (e.g. CD audio) which is approximately 0.7 Mbit/s, suggesting that the audio information in Gremillet has been compressed in a manner that reduces the number of bits used to represent the music.  *See* Docket #109, Hemami Decl., at 6 ("digital uncompressed wideband audio signal has a data rate of 705.6 Kilobits/second).  In any event, as described above it would have been obvious to combine Gremillet with any one of several known

Gremillet in combination with Tescher also discloses the other elements of Burst's claims: receiving audio/video source information,[38] storage of the digital time-compressed representation,[39] and transmission to a selected destination (the subscriber station).[40]  Gremillet does not disclose a "magnetic disk" for storage—it discloses a video disk or a video recorder [3:40-42; 4:26-39]. However, as explained above, storage on magnetic disks was admittedly well-known and routine and could have been substituted for the video disk with predictable results.  Wicker Decl., ¶ 16. Indeed, the Burst patents themselves describe video disks and magnetic disks as alternatives.[41] Thus, each of the "compressing" method claims ('839 claims 1 and 76, and '705 claim 12) is rendered obvious by Gremillet in combination with Tescher.

### 3.   The "Compressing" Apparatus Claims ('995 claim 1, '932 claim 4)

Each of the two asserted "compressing" apparatus claims—'995 claim 1 and '932 claim 4—mirrors the "compressing" method claims, except that they are in apparatus form.  Thus, each requires (1) an "input port or terminal" for receiving audio/video source information, (2) "a compressor/decompressor" for compressing the source information, (3) "random access storage"

---

compression technologies, including those disclosed in Tescher for compressing video.

[37] Gremillet describes a "need for a distribution system … which is able to make almost instantaneously available to the music lover the musical work of his choice," and discloses to meet that need a music on demand system for "the teledistribution of recorded information" that "offers[s], to requesting users, any piece of music of their choice . . . [transmitted] in a few seconds" from a distribution center using the "transmission channels used in television." [1:47-50; 1:64-68; 2:4-7; 3:5-10]. Gremillet explains "a musical work lasting one hour can be transmitted in 18 seconds." [2:11-12].

[38] Gremillet discloses "a bank of musical recordings recorded at a faster speed than normal (100 to 200 times faster)."  This "information recording bank" can be formed from "the sound information . . . by writing into a memory and then reading from the memory at an accelerated speed." [Gremillet at 3:42-44].  Tescher discloses that "analog video signals are coupled to the input of an analog processor unit."  [Tescher at 5:32-34, Fig. 1].

[39] Gremillet's "central data station" uses a "recording support [which] can be a video disk." [3:40-42].  The user's equipment has a "video recorder" which records the transmitted information: "the writing phase continues until the work has been completely recorded. However, as stated hereinbefore, this phase is of a short duration, in view of the high compression level of the recorder information (greater than 100)." [4:16-40]. This "recording can be kept on the video recorder for the purpose of listening to it later." [4:36-39].

[40] Gremillet describes a "broadcasting means consisting of a transmitter 31, a transmitting antenna 32, a receiving antenna 33, or a cable or optical fibres 34," that connect the distribution center with the subscriber equipment,  and whose information "flow rate is approximately 100 Mbits/s" [4:1-7].

[41] Kalay Decl., Exh. L ['932 patent] at 6:37-39 ("Other types of memory include the above mentioned optical disc memories, bubble memories, and magnetic disks").

for storing the compressed information, and (4) an "output port or terminal" for transmitting it faster than real-time.[42]    Furthermore, because of the agreed construction of "transceiver apparatus," these claims require each of these elements to be in a "common housing."

'995 claim 1 was addressed in Apple's Audio Anticipation Motion. '932 claim 4 differs from '995 claim 1 only in that the audio/video source information must include "full motion video" information, and in that the storage means must be a "magnetic disk."

### a.    Walter Anticipates '995 Claim 1 And Renders Obvious '932 Claim 4

As described above, the video-on-demand system of Walter allows "a two hour movie [to] be transmitted in about 31 seconds" from a "central data station" to a "data receiving station," and thus discloses what Burst claims to have invented.

Applying Walter to the remaining elements of the "compressing" apparatus claims turns on whether Walter's compression circuitry[43] is located inside the "central data station" or not.  If the compression circuitry in Walter is understood to be part of its "central data station,"[44] then that  "central data station" anticipates '995 claim 1 and all the elements of '932 claim 4 except the "magnetic disk."  Specifically, Walter's "central data station" includes an "input means,"[45] a "compression means,"[46] a "random access storage means,"[47] and an "output

---

[42] *See* Docket # 104, Claim Construction Order.

[43] Walter describes video data that is compressed using circuitry that performs an "inter-frame differential pulse code modulation technique [that] is known in the art, [although] additional circuitry may be added to avoid problems caused by rapid motion in the picture."  [7:25-34].

[44] As explained above, Walter suggests that compression occurs in the central data station by stating that "the digital data is compressed in memory modules 24-34 [which are in the central data station] by a technique known as inter-frame differential pulse code modulation"  [7:26-28].

[45] Walter explains that "the electrical data representing each video program is converted into compressed digital form," and discloses that this compression is performed in (unspecified) circuitry.  [2:16-19; 7:25-34].  While not expressly mentioned, this circuitry inherently has an input that receives audio/video source information and is coupled to the circuitry for compressing audio/video data, and thus is the claimed "input means."  Wicker Decl., ¶ 15.

[46] As previously stated, Walter describes circuitry that performs an "inter-frame differential pulse code modulation technique."  [7:25-34].

[47] Walter discloses storing the compressed video in "suitable high density memory devices."  [2:17-19]  Magnetic disks and optical disks were certainly "suitable high density memory devices" and are also random access storage devices, and are thus disclosed by implication.  Wicker Decl., ¶ 16.  At a minimum, Walter makes obvious the use of random access storage such as magnetic disks, because as explained previously storage on magnetic disks was well-

means,"[48] all within the "common housing" of the central data station.

At a minimum, regardless of whether the compression circuitry in Walter is part of its "central data station," Walter makes obvious the combination of elements required by '995 claim 1, because housing the input, compression, storage, and output functions together of the central data station would have been routine and straightforward. Wicker Decl., ¶ 15. There can be no dispute that in this arrangement the housing, compression, input, storage, and output would each be performing "the same function it had been known to perform" and that the combination would "yield no more than one would expect," *See* Wicker Decl., ¶ 15. Thus, the "central data station" is the claimed "transceiver" or an obvious variant thereof. *KSR,* 127 S.Ct. at 1740.

Furthermore, as described above, the magnetic disk storage required by '932 claim 4 was a known element that it would have been obvious and routine to add it to Walter, with predictable results. Wicker Decl., ¶ 16.

### b.    Gremillet In Combination With Tescher Renders Obvious '995 Claim 1 and '932 Claim 4

As explained above, Gremillet in combination with Tescher describes what Mr. Lang says he invented: creation of a compressed representation of video source information that is sent faster than real-time. The music-on-demand cable system of Gremillet '586 combined with the video compression system of Tescher also renders obvious the remaining elements of Burst's "compressing" apparatus claims. Specifically, Gremillet discloses a "distribution centre 10 [that] comprises a bank 11 of musical recordings recorded at a faster speed than normal" on "a video disk or video recorder." [3:37-42]. This bank of recordings on video disk satisfies the "random access storage means" limitation. It also renders obvious the "magnetic disk" limitation

---

known and routine at the time to one of ordinary skill. This is shown by Mr. Lang's testimony that he used existing storage devices, and by the disclosure of such disks in the "Peripheral Storage" article Burst referenced in its patent application and submitted to the Patent Office. ['995 patent at 4:2-5]. Moreover, known magnetic disks could have been used in the normal manner in combination with the apparatus described in Walter '387 to provide permanent storage of the compressed digital video information with entirely predictable results. Wicker Decl., ¶ 16.

[48] The compressed audio/video information in Walter is sent through the central data station's "output ports or terminals" which are shown in Figure 2 and sent across fiber optic lines. [6:6-31; 7:38-47; Fig. 2]. At a minimum, Walter makes obvious the use of "output ports or terminals" for transmitting data. Wicker Decl., ¶ 17.

because magnetic discs were known to be substituted for the optical disks, as shown by the Burst patents themselves. *See* Wicker Decl., ¶ 19. Furthermore, it is inherent that the music entered this bank of recordings somehow, and it would have been obvious to receive it through an input port or terminal from a standard audio device. Wicker Decl., ¶ 20. Thus, Gremillet makes obvious the "input means" of the claims. Gremillet also discloses the "output means": it describes transmitting music through "broadcasting means consisting of a transmitter 31, a transmitting antenna 32, a receiving antenna 33, or a cable or optical fibres 34," that connects the distribution center with the subscriber equipment. [4:1-7]. Figure 1 of Gremillet illustrates this broadcasting means as being outside the dotted line indicating the "distribution center" but coupled to it. Either the broadcasting means itself, or the illustrated output from the distribution center to the broadcasting means, satisfies the "output means" requirement of the claims. Thus, Gremillet shows a "distribution center" (i.e. a "transceiver apparatus") with "input means," "random access storage means," and "output means."

As explained above, Tescher discloses a digital video compression technique that achieves a data rate of 0.239 Mbps, which is lower than the data rate of the music that is distributed faster than real-time in Gremillet, and would thus have been obvious to use in conjunction with Gremillet's distribution system. Tescher illustrates in Fig. 1 "a block diagram illustrating an encoder incorporating the invention." [5:7-8]. This encoder uses both the intraframe and interframe compression mentioned in the Court's claim construction order. [1:40-45; 1:59-66; 2:32-43]. Thus, the illustrated video encoder is a "compressor" that satisfies the Court's construction of "compression means."

Accordingly, in combination Gremillet and Tescher make obvious Burst's "compressing" apparatus claims, because they collectively disclose a distribution center with "input means," "compression means," "random access storage," and "output means."

### 4. The "Receive Compressed" Method Claims ('839 claims 17 and 77, '705 claim 21) Are Made Obvious By Walter and the Combination of Gremillet and Tescher

Each of the three asserted "receive compressed" method claims—'839 claims 17 and 77 and '705 claim 21—requires (1) receiving compressed audio/video source information

1    faster than real-time, (2) storing it, and (3) re-transmitting it faster than real-time.  These claims

2    thus differ from the previously discussed method claims in that they require receiving compressed

3    source information, rather than receiving source information and then compressing it.

4            '839 claim 17 was addressed in Apple's Audio Anticipation Motion.  The two

5    other claims, '839 claim 77 and '705 claim 21, differ primarily in that they add the requirement

6    that the "audio/video source information" include "full motion video."  '705 claim 21 also

7    requires the video be "selected from a video library" and that the burst time period be

8    "substantially" shorter than real time.

9            As explained above, in Walter's video-on-demand system the "central data

10   station" transmits a "a two hour movie can be transmitted in about 31 seconds" to a "receiving

11   station." [7:37-47].   The compressed movie is stored in "suitable high density memory devices,"

12   organized into "memory modules," which are "arranged identically" at the "central data station"

13   and at the "receiving station." [7:8-11].  Walter also describes in some detail the circuitry and

14   devices used for reading data from the memory modules, converting it into optical data,

15   transmitting it through multiple parallel fiber optic lines faster than real-time to the receiving

16   station, where it is captured and stored.  [Abstract; 4:3-7:47].  In other words, Walter expressly

17   describes both the apparatus for faster-than-real-time transmission of video data from the memory

18   modules, and the apparatus for receiving and storing this faster-than-real-time transmission in the

19   memory modules.  Walter does not, however, explicitly disclose the specific *order* of the claimed

20   steps: it discloses "receiving compressed" (at the receiving station"), storing (at both the receiving

21   station and the central data station) and "transmitting" (at the central data station), but in the

22   opposite order.  Nonetheless, it would have been obvious and routine for one of skill in the art to

23   perform these steps in the order required by the claims.  Wicker Decl., ¶ 15.  The claimed order

24   could be motivated, for example, by a desire to quickly transfer a movie from a content provider

25   such as a movie studio to the central data station.  Wicker Decl., ¶ 15.  The same analysis applies

26   to the combination of Gremillet and Tescher, because again, each of the constituent steps of the

27   method is disclosed, just not in the required order.   Wicker Decl., ¶¶ 18, 20-21.

28           Regarding the additional limitations of '705 claim 21, Walter's disclosure that "a

two hour movie can be transmitted in about 31 seconds" satisfies the "substantially" faster than real-time limitation, as does Gremillet's disclosure that "a musical work lasting one hour can be transmitted in 18 seconds."  Furthermore, Walter expressly discloses a video library,[49] Gremillet expressly discloses a music library,[50] and Kepley expressly discloses an audio library.[51]

Accordingly, each of Burst's three asserted "receive compressed" method claims would have been obvious in light of either Walter or Gremillet in combination with Tescher.

### 5.    The "Receive Compressed" Apparatus Claim ('995 claim 17)

Burst's only "receive compressed" apparatus claim, '995 claim 17, encompasses audio-only information.  Thus, Burst does not have an "receive compressed" apparatus claim that is limited to full motion video.  Claim 17 of the '995 was addressed in Apple's Audio Anticipation Motion.  As explained above, if this claim is not anticipated by Kramer and/or Kepley, it is rendered obvious by those references.

### C.    The Dependent Claims

#### 1.    The "Editing" And "Monitor" Limitations ('995 claims 2, 3, 22, 80; '839 claims 2, 3, '705 claim 13)

Several of Burst's dependent claims add a limitation requiring "editing" the audio/video information," and some further require "monitoring" during editing.  Most of these "editing" claims encompass audio-only representations, with the exception of '705 claim 13, which requires editing video content.  Claim 22 of the '995 Patent adds to claim 1 a decompression means and a monitor means—the decompression means is discussed below.

Generally, the editing limitations in Burst's patents were obvious because it was known that once audio/video information was stored in digital form, it could be edited.  Wicker

---

[49] *See, e.g.,* Walter at 3:59-61 ("The electronic switching system 22 is electrically connected to a library of memory modules 24, 26, 28, 30, 32, 34 . . . .") and 6:7-10 ("In this particular embodiment, only six such memory modules 24-34 are illustrated, and each one contains a specific program for broadcasting.").

[50] *See, e.g.,* Gremillet '586 at 3:38-40 ("In a more detailed manner, the distribution centre 10 comprises a bank 11 of musical recordings recorded at a faster speed than normal (100-200 times faster).

[51] *See, e.g.,* Kepley '003 at 7:64-67 ("Both voice and non-voice files are stored by data base processor system 113 for voice mail service system 110.  The voice files will include announcements and messages.").

1  Decl., ¶ 24. As described above, the CompuSonics Corporation's DSP-2000 product digitized

2  and compressed audio data and performed editing of the digital audio files: "Because you are

3  now dealing wholly within the digital domain, the DSP-2002 lets you take advantage of the

4  following features: … real-time trial edits … razor-sharp edits, butt splices, and cross-fades."

5  Kalay Decl. Exh. H at APBU-00016099. The CompuSonics DSP-2000 Series demonstrates that

6  editing digitized and compressed audio information was known prior to Burst's patent

7  application. The fact that digital information is readily edited is confirmed, for example, by

8  Kepley, which describes editing the contents of a voicemail by appending comments to it.

9  [Kepley at 1:38-43]. Kepley also describes a processor as having the ability to "insert, modify,

10  [and] delete data in file." [Kepley at 6:68-8:9].

11  The CompuSonics system described also included the ability to monitor the stored,

12  time compressed digital representation of the audio information during editing.[52] Indeed, it is

13  clear that during editing, it is desirable for the user to be able to "identify" or "monitor" what s/he

14  is editing, be it through a display or speakers. Allowing the user to "identify" or "monitor" what

15  s/he is editing is a known element, and using it in its known manner cannot be said to produce

16  "unexpected results." Wicker Decl., ¶ 24.

17  Claims 2 and 3 of '995 Patent adds to apparatus claim 1 the limitation of an

18  "editing means"[53] for editing the time compressed representation. Apple does not contend that

19  the CompuSonics system literally satisfies the Court's construction of "editing means," because

20  that construction requires the editing instructions to be located in ROM. However, it would have

21  been obvious that software designed to operate in RAM could be loaded into ROM and run from

22  ROM, with predictable results. Wicker Decl., ¶ 25.

23  In sum, as shown by Kepley and CompuSonics, the addition of editing and/or

24  monitoring to any of the references discussed above would have been routine for one of ordinary

25  skill, and would have yielded predictable results. Wicker Decl., ¶¶ 24-25. Thus, the editing and

26

---

27  [52] *See e.g.* Kalay Decl., Exh. H at APBU-00016100 (describing CompuSonics' "displays").

28  [53] The Court has construed "editing means" to be "a processor executing stored editing software in ROM, a controller, and a high speed data bus, plus equivalents." *Id.*

1    monitoring claims are obvious in light of CompuSonics and the other references discussed herein.

2    ### 2.    "Semiconductor Memory" ('995 claim 7)

3    The storage means identified above for Kramer, Kepley, Walter, and Gremillet all

4    include semiconductor memory.[54]    In any event, random access memories comprising

5    semiconductor memories were well-known to those of ordinary skill in the art at the time, as

6    shown for example by the statements in Burst's patents. *See* Wicker Decl., ¶ 23. Thus, Kramer,

7    Kepley, and Walter all anticipate claim 7 or render claim 7 obvious when combined with the

8    knowledge of one of ordinary skill, and Gremillet anticipates claims 7 and renders claim 7

9    obvious when combined with the knowledge of one of ordinary skill and/or Tescher.

10    ### 3.    "Analog To Digital Conversion" ('995 claim 8)

11    Claim 8 of the '995 patent adds to claim 1 the requirement of an analog to digital

12    converter means that converts analog source information to digital form before passing it to the

13    previously claimed compression means. Gremillet and Kepley expressly disclose that the audio

14    source information is analog information and the use of an analog to digital converter in the

15    transceiver. [Gremillet at 5:7-9, Kepley at 1:63-2-2]. Tescher discloses both an analog to digital

16    converter and the compression of digital audio/video information into a digital time compressed

17    representation thereof. [5:32-37]. As explained above, the storage means of Gremillet and

18    Kepley store digital time compressed representations of audio/video source information. In any

19    event, analog audio/video source information, the use of analog to digital converters, and the

20    compression and storage of digital information were all very well known to those of ordinary

21    skill, and the combination of these elements with the teachings of Kramer, Kepley,[55] or Walter

22    would have been routine for one of ordinary skill. Wicker Decl., ¶¶ 8-9, 22. Thus, claim 8 is

23    obvious in light of any of these references combined with the knowledge of one of ordinary skill.

24    ### 4.    "Digital Source Information" ('995 claim 9 and '839 claim 9)

25    Claim 9 of the '995 and '839 patents each add to claim 1 the requirements that: (1)

26

---

27    [54] Wicker Decl., ¶ 23.

28    [55] The form of the source information in Walter is not expressly disclosed. However, one of skill in the art would have understood that analog to digital conversion occurred. Wicker Decl., ¶ 22.

1    the audio/video source information comprises digital audio/video source information; (2) the

2    compression means compresses the digital audio/video source information into a digital time

3    compressed representation having an associated [burst] time that is shorter than real time; and (3)

4    the random access storage means stores the compressed digital time compressed representation.

5    Claim 9 is thus the same as claim 8 except that the source information is in digital form and no

6    analog to digital converter is required.  Anticipation of claim 9 by Kramer and Kepley was

7    addressed in Apple's Audio Anticipation Motion.  To the extent that these claims are not

8    anticipated by Kramer and Kepley, claim 9 is obvious in light of those references individually

9    combined with the knowledge of one of ordinary skill.  Wicker Decl., ¶ 22.  Because one of

10   ordinary skill would be equally capable of designing a system with analog audio/video source

11   information that was then converted to digital audio/video information as a system with digital

12   audio/video data source information, and because the combination of the elements of claim 9 is

13   routine and predictable, claim 9 is also obvious in light of either of Walter or Gremillet '586 and

14   Tescher, combined with the knowledge of one of ordinary skill.

15          **5.    "Computer-Generated Information" ('995 claim 15 and '839 claim 15)**

16          Claim 15 of the '995 and '839 patents each adds to claim 9 the requirement that

17   the input means is coupled to an external computer and the digital audio/video source information

18   comprises computer-generated audio/video information.  CompuSonics expressly discloses the

19   use of computer-generated audio/video information.[56]  It would have been obvious and

20   straightforward to use computer-generated information in combination with the references

21   discussed herein.  Wicker Decl., ¶ 26.

22          **6.    "Video Library" ('995 claim 19 and '839 claim 19)**

23          Claim 19 of the '995 Patent adds to claim 17 (discussed above) a video library

24   storing a multiplicity of items of audio/video source information in said time compressed

25   representation for selective retrieval.  Claim 19 of the '839 Patent adds to claim 17 the

26   requirement that the source information comprises information received over a communications

27

28   [56]  Kalay Decl., Exh. H at APBU-00016099 ["S-t-r-e-t-c-h a sound" performed by the
     CompuSonics computer].

link from a video library storing a multiplicity of programs of time compressed representations of audio/video source information. As described above, Walter expressly discloses a video library,[57] and Gremillet expressly discloses a music library.[58]

### 7.    "Removable Recording Medium" ('995 claims 44, 45, 47; '839 claims 45, 47) and "Optical Disk" ('995 claims 51 and 52; '839 claim 51)

Claims 44, 45, and 47 of the '839 and '995 patents adds to claims 1, 2, and 17, respectively, the requirement of recording a compressed representation onto a removable recording medium. The use of removable recording media, including optical disks, was well-known and routine to one of ordinary skill. Wicker Decl., ¶ 27; Kalay Decl., Exh. L ['932 patent] at 4:7-17. Kramer shows the use of removable recording media, and Gremillet expressly discloses the use of removable recording media – video tape or video disk. [Gremillet at 3:41]. It would have been a routine design exercise with predictable results to add removable recording media (including optical disk media) to those systems that are not expressly described as including it. Wicker Decl., ¶ 27. Accordingly, these claims are obvious.

### 8.    The Decompression Limitations ('995 claims 20, 22, and 23, and '839 claims 20, 28)

Claims 20, 22 and 23 of the '965 patent, and claims 20 and 28 of the '839 patent add a decompression limitation, along with one or more limitations discussed above. Each of the references discussed herein expressly describe decompression. *See, e.g.,* Kramer at 4:27-64, Kepley at 15:33-44, Walter at 7:26-36, Gremillet at 3:55-62, Tescher at 4:24-42. Accordingly, the decompression limitations have no impact on validity with respect to these references, and claims 20, 22 add 23 of the '965 patent, and claims 20 and 28 of the '839 patent are invalid as obvious based upon the same combinations as the claims upon which they depend.

---

[57] *See, e.g.,* Walter at 3:59-61 ("The electronic switching system 22 is electrically connected to a library of memory modules 24, 26, 28, 30, 32, 34 . . .") and 4:7-10 ("In this particular embodiment, only six such memory modules 24-34 are illustrated, and each one contains a specific program for broadcasting.").

[58] *See, e.g.,* Gremillet '586 at 3:38-40 ("In a more detailed manner, the distribution centre 10 comprises a bank 11 of musical recordings recorded at a faster speed than normal (100 to 200 times faster).

1    **V.    CONCLUSION**

2         For the reasons stated herein, Apple's Motion For Summary Judgment of

3    Invalidity should be granted.

4    Dated:   July 13, 2007                    WEIL, GOTSHAL & MANGES LLP

5

6                                  By:    /s/  Nicholas A. Brown
                                        Nicholas A. Brown
7                                        Attorneys for Plaintiff
                                        Apple Computer, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28