Exh. G

Dockets.Justia.com

*Manually Executed with Exhibits*

87 13 7552

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-K

Annual Report Pursuant to Section 13 or 15(d)
of the Securities Exchange Act of 1934

For the fiscal year ended:          Commission file number:
February 28, 1987                    0-11611

RECD S.E.C.
'JUN 1 5 1987
*Fee 89*

COMPUSONICS CORPORATION
(Exact name of Registrant as specified in its charter)

Colorado                                   84-0909633
(State or other jurisdiction of            (IRS Employer
incorporation or organization)             Identification Number)

2345 Yale Street
Palo Alto, California                      94306
(Address of principal executive offices)   (Zip Code)

Registrant's telephone number, including area code
(415)-494-1184

Securities registered pursuant to Section 12(b) of the Act:
None

Securities registered pursuant to Section 12(g) of the Act:

RECEIVED

Common Stock, $.001 par value
(Title of Class)

JUN 17 1987

Warrants to Purchase Common Stock
(Title of Class)

Bechtel Information Services
Gaithersburg, Maryland

Indicate by check mark whether the Registrant (1) has filed all
reports required to be filed by Section 13 or 15(d) of the
Securities Exchange Act of 1934 during the preceding 12 months
(or for such shorter period that the Registrant was required to
file such reports), and (2) has been subject to such filing
requirements for at least the past 90 days. Yes  X  No      .

As of May 29, 1987, 112,418,349 shares of Common Stock, $.001 par
value, were outstanding and the aggregate market value of the
voting stock held by nonaffiliates of the Registrant was
$ 15,182,752, based on the average of the bid and asked prices on
that date ($.15) as reported by the National Quotation Bureau.

*This filing consists of* 73 *pages. Exhibit Index located on*
                          1
*pages 28, 29 and 30.*

COMPUSONICS CORPORATION
FORM 10-K

## PART I

Item 1.   Business.

(a)   General Development of Business.

(a)(1)  CompuSonics Corporation (the "Registrant") was organized
under the laws of the State of Colorado on March 24, 1983 as
CompuSound, Inc. On July 12, 1984 the Registrant's shareholders
approved the change of the Registrant's name to CompuSonics
Corporation.  The Registrant's principal activities since
inception have been devoted to obtaining equity capital and the
development and marketing of digital audio computers. During the
fourth quarter of the fiscal year ended February 28, 1987, the
Registrant's emphasis was on marketing and sales. The Registrant
has begun marketing the DSP-1000 Series, its digital audio
computers for home and professional use, and continues to market
its DSP-2002 for professional audio use.

On November 30, 1983, the Registrant concluded an initial public
offering of 32,500,000 shares of its Common Stock and received
net proceeds of $ 513,775.

On May 1, 1985, the Registrant concluded a public offering of
9,375,000 Units, each Unit consisting of one share of its Common
Stock and one Common Stock Purchase Warrant, and received net
proceeds of $1,336,583.

On October  31, 1986, the Registrant's Common Stock  Purchase
Warrants expired. From March 1, 1986 through October 31, 1986 the
Registrant received $ 1,166,211 from the exercise of  the
Warrants.

During the fiscal year ended February 28, 1987, the Registrant
has not been involved in any bankruptcy, receivership or similar
proceedings; has not undergone material reclassification, merger
or consolidation; has not acquired or disposed of any material
amount of assets otherwise than in the ordinary course of
business; and has not experienced any material change in its mode
of conducting business.

(a)(2)  Not applicable.

2

APBU00653388

(b)   Financial Information About Industry Segments.

Not applicable.

(c)   Narrative Description of Business.

(c)(1)(i) The Registrant's principal activities since inception have been devoted to obtaining equity capital and the development and marketing of digital audio computers. During the fourth quarter of the fiscal year ended February 28, 1987, the Registrant's emphasis was on marketing and sales. The Registrant continues marketing the CompuSonics DSP-2002, an audio computer for professional use, and the DSP-1000 personal audio computer for home and professional use. In March, 1987 the Registrant began marketing the DSP-1500 and 1200, its DSP-1000 Series products designed for professional broadcast use.

Conventional recording systems (analog systems) convert soundwaves into electrical impulses and then into waveforms cut into a vinyl medium (record disks) or imposed on magnetic particles on tape. On playback the waveforms are converted back into electrical impulses which drive loudspeakers that change the impulses back into sound through the mechanical motion of an electromagnet and speaker cone. The accuracy of the reproduced sound is dependent upon the quality of the record or the tape as well as the quality of the playback system itself. Contamination, noise, wear and the inherent background output of the record or tape are unavoidably present in recording and playback systems utilizing conventional analog technology.

Advances in computer technology have enabled the development of digital recording and playback systems. These recording systems sample the sound waves a number of times each second and translate the sound waves of each sample into a numerical value which is stored. On playback, the numerical values are converted into output voltage which drive the speakers. These numerical signals are virtually immune to distortion, error and degradation with time. Many of the sources of noise associated with analog equipment are eliminated, including tape hiss, tracking errors and surface defects. The major drawback of digital systems is the large amount of data that must be stored. Laser recording technology utilizing ultra high density digital storage has provided one solution to this problem. However, laser equipment presently available is either playback-only with no ability to record, such as the Compact Disc, or has recording data rate limitations which preclude real-time (live) recording of linearly encoded stereo digital audio.

The Registrant's digital system is based upon the fact that not all of the information contained in acoustic recordings is necessary to reproduce the original sounds. For example, a long note on one instrument or several seconds of silence can be represented in a shortened form without storing the entire period of sound or silence. The CompuSonics system provides the means of analyzing, coding and recording audio signals so that only the

3

APBU00653389

minimum necessary information is stored that will allow reproduction of the original signal. The Registrant utilizes advanced microcomputer chips to accomplish the recording of high-data-rate signals on a relatively low-data-capacity and/or low-data-rate media. Use of mathematically programmed Texas Instruments TMS320-series signal processing microcomputers enable the CompuSonics system to analyze, by dividing into blocks, what data are necessary to preserve and what can be safely left unrecorded for accurate reproduction of the audio signal. The input signal is sampled at 44,100 Hertz, the rate necessary to capture the full range of sound, and is converted to digital information. The Registrant's proprietary process by which digital information is stored on disks is adjustable, so the sound can be fine-tuned to each user's preferences. After the data have been analyzed and condensed, the system's circuits format, code and record the data. On playback, the process is reversed; the reduced information is reconstructed by microprocessors and then converted back to an analog signal by a conventional digital to analog convertor. The Registrant believes that the analysis stage of the CompuSonics system, which compresses and filters the digital-audio data rate and allows for high speed editing and greater data density, distinguishes it from conventional methods. The Registrant has shown that its process, trademarked as "CSX", allows for longer recording and playback time than pulse code modulated systems, which produce non-reduced digital recordings. See Item 1. "Business - The DSP-1000 Series."

## The DSP-2000 Series

The first product developed by the Registrant is the CompuSonics DSP-2000 Series (DSP = Digital Sound Producer or Digital Signal Processor), a multitrack digital audio recorder/editor for professional use. The DSP-2000 is capable of master recording in the standard Compact Disc format as well as the CSX format used in the Registrant's consumer level product. The DSP-2000 is a super-micro, multi-processor computer, configured as a single user workstation for the recording and editing of live and recorded music. The Registrant began marketing the DSP-2000 Series in October 1984. The DSP-2000 is offered with a standard software package, including the operating system, an on-line user manual, various software utilities and application software for the recording and editing of audio material. The Registrant's sales price range for DSP-2000 systems currently is between $34,000 and $199,000 depending on the system's size. The Registrant's standard DSP-2000 series model is the DSP-2002, a four channel, stereo in/stereo out, model. As of May 30, 1987 15 DSP-2000 series systems have been sold.

## The DSP-1000 Series

The Registrant currently is marketing three products in the DSP-1000 Series for professional and consumer use. The DSP-1000

4

APBU00653390

Series utilizes computer-type, high density floppy disks and recordable optical disks for data storage. These computers record, playback and edit digital recordings from any digital or analog source.

DSP-1500 and DSP-1200

The DSP-1500 is a record/playback computer for professional broadcast use. The DSP-1200 is a playback-only version of the DSP-1500. These products are marketed for use by members of the broadcast industry such as radio and television stations and discotheques as a substitute for tape cartridge recorder/players used primarily to record and playback music singles, commercials, public service announcements and other studio recordings. The Registrant also has identified the motion picture industry as a potential market and intends to market the DSP-1500 and 1200 for use as audio dubbers in motion picture editing and dubbing. The recording and playback capability of floppy disks, between 5 minutes of high fidelity audio and 38 minutes of mono speech, is sufficient for broadcast purposes. Current pricing is $5,995 for the DSP 1500, and $4,995 for the DSP-1200.

The Registrant has received written and oral purchase orders for approximately 125 DSP-1500 and 1200 units. Although there can be no assurance, the Registrant anticipates that these orders will be filled at the rate of 50 units per month, beginning in August, 1987. The Registrant currently has an inventory of 25 DSP-1500s, and 15 DSP-1200s.

Although the Registrant believes substantial markets exist for the DSP-1500 and 1200, it has not conducted any independent market studies. If a market does not exist for these products the Registrant's business may be adversely affected. The Registrant commenced commercial production of 1500s and 1200s in February, 1987. As of May 30, 1987 12 DSP-1500 and 1200 units have been sold or installed at customer locations.

DSP-1000

The DSP-1000 is an audio component, much like a turntable or tape deck, that is typically connected to the amplifier/receiver of a conventional stereo system. A user desiring to incorporate the DSP-1000 into existing broadcast equipment or a stereo component system need not purchase any other additional equipment. The user may record on the optical disk in the DSP-1000 from analog sources, such as records, CDs, tapes or radio stations. Although the quality of these recordings is limited by the input sources, further distortion and degradation are greatly reduced.

The DSP-1000 incorporates a computer industry standard 5 1/4" write-once read-many optical disk drive for audio record/playback functions. Using a commonly available double-sided disk, the DSP-1000 is currently capable of recording and playback of 120 minutes of stereo audio in its "mid" recording rate. At the "Hi" recording rate half that time may be recorded, and at the "Lo"

5

APBU00653391

recording rate, double that time may be recorded. For mono recordings at any recording rate twice as much recording time is available. The DSP-1000 is priced at $6,995. Single-sided disks are priced at $75, and double-sided disks at $135. As of May 30, 1987, 18 DSP-1000s and approximately 200 disks have been sold.

## General

In order to provide high-quality audio, the uncorrected errors that are present in all computer disks must be detected and corrected. The DSP 1000 uses error detection and correction circuits supplied with the disk drives that are the same as those used in other personal computer systems to reduce errors to the rate of 1 error for every trillion (million million) bits written or read.

It is unlikely that the DSP-1000 Series will render obsolete existing analog components, especially considering the lack of commercially available recordings in the floppy disk or optical disk format. There currently are no recordings available in the floppy disk or optical disk format that are used on the system developed by the Registrant. Until such recordings are available, if ever, users of the Registrant's system will be required to record from existing analog or digital recordings. The Registrant has been contacted by several record companies that have expressed an interest in making their audio libraries available in the Registrant's selected format; however, no agreements have been reached and there can be no assurance that any will be forthcoming.

The DSP-1000 Series also includes the circuits for an optional "telerecord" function which allows for receiving and recording digital transmissions over telephone lines. The Registrant believes that telerecording has commercial potential in two areas: first, in cable television digital carrier technology which currently exists but is not implemented, and second, in public access digital switched telephone networks, the first of which have been installed and are in operation in 24 major US cities. The coding and decoding circuitry for the telerecord function has been researched and developed by the Registrant. The communication network capable of digital transmission has been developed by AT&T and currently is available in some metropolitan areas. The Terminal Interface Unit needed to connect the Registrant's equipment to a digital telephone line is commercially available from a number of suppliers.

The first long distance telephone demonstration of the telerecord function of the Registrant's DSP-2000 Series, using AT&T's ACCUNET Switched 56 Service, was successfully completed on April 24, 1985. The optional telerecord function permits music to be digitally transmitted and received between remote data bases using ordinary telephone lines as the channel. ACCUNET permits voice, data and video information to be transmitted over AT&T's digital switched network facilities. Since the initial demonstration, further tests and demonstrations have taken place

6

APBU00653392

including a transmission of data between New York and Chicago. Further testing of the telerecord function will be conducted using the DSP-1000 Series and will require the continued cooperation of AT&T. A memorandum of understanding with respect to cooperation between AT&T and the Registrant was entered into on October 15, 1985, and provides for cooperation in testing and marketing the Registrant's products with ACCUNET for a 12 month period. Marketing of the Registrant's equipment containing the telerecord function circuitry will require successful completion of testing, identification of commercial applications and acceptance of digital telerecording by the commercial and consumer electronics markets. These events are still pending and there can be no assurance that such developments will occur.

## Production

The Registrant has contracted with SBE, Inc., Concord, California, a manufacturer of microcomputer systems, for the production of the Registrant's DSP 2000 Series products. SBE, Inc. manufactures the DSP-2000 on an original equipment manufacturer basis. SBE, Inc. produces certain components, integrates additional hardware and assembles the systems. SBE also provides software and hardware development consulting services to the Registrant and a software license for several software packages including the Unix-like REGULUS operating system and PROBUG debugger. The agreement is for an indefinite term, may be terminated on 30 days' notice by either party, and is based on SBE, Inc.'s standard rates for parts and services and on a negotiated rate for customized manufacturing. The cost of production varies according to the specifications and number of production steps of each system. The agreement is exclusive as to the Registrant's proprietary hardware and software. These subcontracted manufacturing capabilities are limited to about 100 4-channel DSP-2000's per year. The Registrant intends to continue to rely on this subcontractor for the DSP 2000 Series for the forseeable future.

Pursuant to a letter of intent dated May 2, 1985 between the Registrant, Sansui Electric Co., Ltd. ("Sansui") and Nissho Electronics Corp. ("Nissho"), Sansui expressed its intent to manufacture the printed circuit board of the DSP-1000 Series for the Registrant subject to observance of covenants of confidentiality on the part of Nissho and the Registrant's ability to provide adequate technical specifications. The circuit board manufactured by Sansui is to be sold to the Registrant through Nissho. Consummation of the arrangements is subject to the completion of ongoing discussions and the execution of definitive agreements. See "Business - Marketing and Distribution."

Manufacturing of the Registrant's DSP-1000 Series is currently on a subcontracted basis with several fabrication companies within the Santa Clara County area. The principal subcontractors are Sigma Circuits, of San Jose, California. Versatronex of Santa Clara, California, and EMJ Manufacturing, also of Santa Clara.

7

APBU00653393

Final quality control inspections and tests are performed by CompuSonics' staff engineers working within the subcontractor's facility. The Registrant estimates that its manufacturing capacity is 100 units per month given present staffing and subcontractors.

As of February 28, 1987 the Registrant had an inventory of completed machines and work-in-process valued at $ 146,649, including 10 complete DSP-1000s in inventory or in the field as dealer demonstration units.

See Item 7."Management's Discussion and Analysis of Financial Condition and Results of Operations" and Item 1.(c)"Business- The DSP-1000 Series."

The disks used in the Registrant's products are readily available from manufacturers who preformat and package them to increase density for use in high-density disk drives of the type used by the Registrant. The recordable optical disks used in the Registrant's DSP-1000 store up to 500 megabytes of information. The floppy disks used in the DSP-1500 and 1200 can store up to 30 megabytes of information.


Marketing and Distribution

The Registrant has begun a multi-phase marketing plan to attempt to establish itself as an innovator of digital audio technology. The first phase of this marketing plan was to introduce the Registrant's technology and display prototypes of the Registrant's products. This phase began with a press conference in New York City in May 1984 followed by a public relations campaign coupled with advertising in a wide variety of audio trade journals.

The second phase of the marketing plan is the manufacture and marketing of the Registrant's two product lines. This phase began in August 1984 with the delivery of a DSP-2000 to a recording studio for evaluation and testing. As a result of such evaluation and testing, the Registrant modified and redesigned certain aspects of the DSP-2000 prior to production. The first production models of the DSP-2000 became available for sale in October 1984, and 17 systems have been sold or ordered as of May 30, 1987. See "Business - Backlog."

One aspect of the final phase of the Registrant's marketing plan began in the fourth quarter of 1984. The Registrant implemented a licensing program with McIntosh Laboratory, Inc. and AVM Ferrograph, two well-established audio manufacturers. The Registrant currently does not contemplate making a major commitment to become a self-manufacturer of audio equipment, which would require the Registrant to obtain substantial additional financing.

8

APBU00653394

Initial distribution of the Registrant's products is based on independant audio dealers.  As of May 30, 1987 these dealers are:

Audiotechniques
New York City, NY 10019

Allied Broadcast Equipment
Richmond, IN  47374

Audio Images
San Francisco, CA 94107

Audio Intervisual Design Systems
Los Angeles, CA  90048

Valley Audio
Atlanta, GA 30340

Valley Audio
Nashville, TN  37204

Leo's Audio and Music Technology
Oakland, CA  94609

Listen Up Audio
Denver, CO  80209

Westlake Audio
Los Angeles, CA  90046

La Salle Music
Boston, MA  02215

Transient
Stockholm, Sweden

Fonvisa, S.A. DE C.V.
Mexico City, Mexico  06500

AVM Ferrograph
England, NE32 3HR

ADT Pacificom
Vancouver, B.C. CANADA V5M 1M3

United Video
Ottawa, Ont. CANADA  K1Y 4N6

Nissho Electronics
Chuo-Ku, Tokyo, 104  JAPAN

Foreign distribution of the Registrant's products involves unaffiliated trading companies and overseas importers.  Since the third quarter of 1984,  the Registrant has reached agreements or agreements  in principle with domestic and  foreign distributors

9

APBU00653395

for the export of both the DSP-1000 Series and DSP-2000 Series. These agreements are subject to numerous contingencies, primarily involving the evaluation of the Registrant's products by the other parties to the agreements. Because of these contingencies and the early stage of the Registrant's development, the Registrant is unable to predict the impact of these agreements on the Registrant's future operations.

The following is a summary of these agreements:

Nissho Electronics Corporation

On December 21, 1984, the Registrant entered into an exclusive distribution agreement with Nissho Electronics Corporation ("Nissho") of Japan for distribution and servicing of the DSP-2000 in Japan for a two year term which will be automatically extended for successive one year periods unless terminated, at the election of either party, on 120 days' written notice prior to the end of each such period. The selling price will be 80% of the Registrant's then current list prices, which may be changed upon 60 days' written notice. Each party has agreed to disclose know-how and technical information as required to allow each to perform its obligations under the agreement subject to a non-disclosure agreement. The Registrant has agreed to warrant such products for 12 months from purchase by repairing or replacing parts and products during the warranty period. The parties also agreed to consider other areas of cooperation, such as licensing and manufacturing; however, no such agreements have been consummated. Nissho also was designated as the Registrant's exclusive agent in Japan for the purpose of evaluating prospective licensees, subcontractors and vendors for the DSP-2000 and DSP-1000 in Japan. To date Nissho has not begun distribution under this agreement.

Sansui Electric Co., Ltd.

Pursuant to a letter of intent dated May 2, 1985 between the Registrant, Sansui Electric Co., Ltd. ("Sansui") and Nissho, Sansui expressed its intent to become a licensee of the DSP-1000. Sansui also expressed its intent to manufacture the printed circuit board of the DSP-1000 for the Registrant. The circuit boards manufactured by Sansui are to be sold to the Registrant through Nissho. While there are ongoing discussions between the Registrant, Nissho and Sansui, consummation of the arrangements is subject to the execution of definitive agreements.

Siemens AG

On December 18, 1984, the Registrant entered into a Memorandum of Understanding ("Memorandum") with Siemens Aktiengesellschaft Osterreich, Vienna ("Siemens"). The Memorandum contemplates the signing of a formal agreement which may vary the terms of the Memorandum. Under the Memorandum, Siemens placed an order for one DSP-2000 and certain peripheral equipment at a cost of $64,000 of which $6,400 was paid. Siemens agreed to evaluate several models

10

APBU00653396

of the Registrant's products, and if the results are
satisfactory, enter into a licensing agreement. The Registrant
delivered a DSP-2002 in Montreux, Switzerland for Siemens to
display in their trade show booth there in June, 1985. After the
show, the unit was returned to the Registrant. For cost
reasons, the Registrant declined to build a mixing desk version
of the DSP-2002 per Siemen's purchase order, and returned their
$6,400 deposit. Subsequently, Siemens has requested a DSP-1000
for evaluation. Due to a temporary shortage, Registrant has not
shipped a DSP-1000 unit to Siemens, but expects to do so in
August, 1987, with one of the first machines from the next
production run.

If a license agreement is entered into, it will provide that
Siemens has the nonexclusive worldwide right to manufacture
and/or sell the Registrant's products and Siemens will be the
sole licensee for the DSP-2000 in Austria and West Germany. The
Registrant will not grant any licensing rights to any other
company except Siemens for the DSP-2000 in Austria or West
Germany before Siemens has completed its evaluation. Siemens
will receive certain documentation with respect to the
Registrant's technology, subject to a nondisclosure agreement,
will be given updates to the technology free of charge for the
period of the licensing agreement and will not be able to
sublicense the technology. The Registrant will furnish, at
Siemens' expense, any training or technical support required by
the licensee to apply the licensed technology. The licensing
agreement has not yet been entered into and no further
negotiation has taken place between the Registrant and Siemens
with respect to a license agreement.

The Registrant further has agreed that Siemens will be its sole
representative for the DSP-2000 and DSP-1000 in Austria and
Germany. The Memorandum also provides that Siemens, at its
discretion, may enter into an ongoing cooperation agreement with
the Registrant on terms to be agreed upon and that Siemens may
purchase certain restricted shares of common stock of the
Registrant at one-third of the current market value; however,
no terms have been discussed and Siemens has not exercised this
option.

Allied Broadcast Equipment/Allied International

By an agreement dated October 15, 1984, the Registrant appointed
Allied Broadcasting Equipment/Allied International as a worldwide
non-exclusive authorized retail dealer of its products terminable
upon 30 days' written notice. This worldwide distributorship
right is limited to countries that are not included in any
exclusive distributorship agreements that may be entered into by
the Registrant. The dealer must pay for the Registrant's
products ordered on a net 30 day basis. Under its dealer
agreement, the Registrant warrants that its products are free
from manufacturing and material defects at the time of delivery
to the dealer. Except in the case of defective merchandise, the
Registrant is not obligated to accept any returns. If not

11

APBU00653397

terminated earlier for cause or upon notice, the agreement expires on December 31, 1987.

Syco Systems, Ltd.

On March 27, 1985, the Registrant granted to Syco Systems, Ltd. ("Syco"), London, England, nonexclusive, worldwide distribution rights to the DSP-2000 for an initial one year term, which term is automatically renewable at the end of such term, and from year to year thereafter. The terms of the agreement require the Registrant to supply DSP-2000 and 1000 Series computers on a per unit price based on the Registrant's then current price list minus 25%. Ten percent of the purchase price is payable by Syco at the time of order, with the balance due at shipment.

McIntosh Laboratory Inc.

On December 14, 1984, the Registrant granted to McIntosh Laboratory Inc. ("McIntosh") a nonexclusive worldwide manufacturing and marketing license for the DSP-1000 and any improvements which is valid for the life of the Registrant's patents and copyrights. Under the agreement, the Registrant provided McIntosh with specified documentation concerning the DSP-1000, including a DSP-1000 prototype for performance testing, in December, 1986. Registrant must supply, at McIntosh's expense, any training or technical support required to apply the licensed technology. McIntosh, subject to its favorable evaluation of the DSP-1000, has agreed to pay the Registrant $25,000 prior to commencement of production, a royalty, payable quarterly, of six percent of gross factory sales of the DSP-1000 until cumulative royalty payments reach $125,000, at which time the royalty rate will be reduced to one percent for the life of the agreement. If McIntosh makes an initial payment of $50,000 instead of $25,000, the royalty rate will be three percent until royalty payments total $50,000, at which time the rate will be reduced to one percent. As of May 30, 1987 the Registrant believes that McIntosh has been favorably impressed from the results of their testing, but has not yet made any commitments pending further evaluation of the market potential and cost of the Registrant's products.

AVM Ferrograph

On June 26, 1986, the Registrant granted AVM Ferrograph ("Ferrograph") a nonexclusive worldwide manufacturing and marketing license for the DSP-1500 and 1200, with an option to negotiate a license on the DSP-1000. This agreement includes provisions for licensing of any improvements for the life of the Registrant's patents and copyrights. Under the agreement the Registrant has provided Ferrograph with specified documentation concerning the DSP-1000 series products, including a DSP-1000 series prototype for performance testing. The Registrant must supply, at Ferrograph's expense, any training or technical support required to apply the licensed technology. Ferrograph has agreed to pay the Registrant $25,000 prior to commencement of

12

APBU00653398

production, a royalty, payable quarterly, of six percent of gross factory sales of the DSP-1500 until the cumulative royalty payments reach $125,000, at which time the royalty rate will be reduced to one percent for the life of the agreement.

On June 2, 1987 AVM Ferrograph agreed to pay an initial $ 5000 of the licence fee and placed a purchase order for 50 DSP-1000 series products, 10 of which are for immediate delivery. Further distribution and manufacturing arrangements are pending an evaluation of the manufacturing costs and market potential of the Registrant's products.

Fonvisa, S.A. DE C.V.

On March 4, 1987 the Registrant signed a letter of intent with Fonvisa, S.A. DE C.V. at Mexico City, Mexico granting an exclusive distribution right for a two year term to Fonvisa for the Registrant's products in Latin America and Mexico. Under the agreement, Fonvisa will be responsible for all advertising and marketing of the Registrant's products in Latin America, in exchange for a 10% commission earned on the invoiced amount for all sales made to customers residing in Mexico and Latin America. The Registrant agrees to provide a six month warranty on all products sold, and to assist in the training of a local technician for service of the Registrant's products in Latin America. The agreement is renewable by common consent every two years and may be terminated by either party giving 60 day written notice. Fonvisa has purchased one DSP-1000 , and a definitive contract pursuant to this letter of intent is pending their evaluation of the market for this technology in Latin America.

The evaluation and testing of the Registrant's products by the parties with whom it has entered into these agreements involves a number of steps, primarily: (1) engineering evaluation, (2) demonstrations and conducting engineering reviews of the Registrant's designs, (3) submittal by the Registrant of engineering documentation and (4) delivery by the Registrant of samples of the Registrant's products for evaluation. The Registrant has complied with the first three steps with respect to each of the existing agreements and believes that the balance of deliveries of the Registrant's samples in June 1987 will comply with step four. It is anticipated that any similar agreements entered into by the Registrant will contain similar provisions for testing and evaluation.

Investment in CompuSonics Video Corporation

In August 1985 the Registrant determined, after considering the funding and personnel resources available to it and the length of time it would take to develop a video recording and playback system, that it would assign the concept of a video recording and playback system to CompuSonics Video Corporation ("CVC"), a recently formed Colorado corporation. On September 12, 1985, the Registrant assigned the patent application rights to the digital video recording and playback system to CVC in exchange for

13

APBU00653399

300,000 shares of preferred stock of CVC. The Registrant had paid certain costs in the amount of $19,000 in connection with the preparation of the patent application and had provided research assistance in the preparation of the application valued at $15,500. The Registrant also sold CVC a DSP-2002 system during the fiscal year ended February 28, 1986. CVC paid the Registrant $35,250 for the system, which is the Registrant's list price for such systems.

The Registrant and CVC do not have any common officers or directors. The current President of CVC, John Stautner, was formerly the Vice President of the Registrant and is currently a shareholder of the Registrant. See "Principal Shareholders" and "Management - Stock Bonuses." Mr. Stautner does not have any control relationship with the Registrant and performs no services for the Registrant. The Registrant temporarily has allowed CVC to use an office for administrative purposes at the Registrant's executive offices, without any charge to CVC. The preferred stock held by the Registrant is convertible into 30,000,000 shares of CVC common stock or 30% of the 100,000,000 then outstanding shares of common stock. The Registrant intends to exercise the right to convert its shares of preferred stock, subject to a review of the tax consequences. The shares of stock issuable upon conversion will be "restricted securities." The transactions between the Registrant and CVC were approved by their respective boards of directors which have no common members.

On September 17, 1985 the Registrant granted CVC an exclusive license for the limited purpose of integrating the Registrant's digital audio technology into the video system being developed by CVC. The technology licensed may only be used in connection with the video system and was contingent upon CVC successfully completing its public offering. CVC completed its public offering in December of 1985 and paid a one-time license fee of $ 72,000.

(c)(1)(ii)  Not applicable.

(c)(1)(iii)  The Registrant is able to readily obtain its raw materials from a variety of sources.

(c)(1)(iv)  In April 1983 the Registrant filed a patent application for the CompuSonics "Audio Digital Recording and Playback System." In September 1984, the United States Patent Office issued a patent covering all 17 claims filed by the Registrant. This patent covers the underlying technology of the DSP-1000 and DSP-2000 systems. Patent applications have been filed under the International Patent Treaty to cover the European Economic Community and Japan. In December 1985 the Registrant was granted a patent for its "Magnetic Storage System," a magnetic storage apparatus capable of storing and retrieving data in a high density format. In January 1987 the Registrant was granted an additional patent covering the technology underlying the "Audio Digital Recording and Playback System." The Registrant will continue to file patent applications relevant to its

14

APBU00653400

products.  If any of the Registrant's existing or future patents are tested in litigation, such patents may not afford protection as broad as the claims made in the patent applications. Furthermore, the expense of enforcing the Registrant's patent rights against infringers would be costly.

(c)(1)(v)  Not applicable.

(c)(1)(vi) Not applicable since the Registrant is not required to carry substantial inventory.

(c)(1)(vii)  Not applicable.

(c)(1)(viii)  As of May 30, 1987, 15 DSP-2000's have been sold and an additional 2 systems have been ordered. The Registrant also has received orders for 125 DSP-1500s, DSP-1200s, and 1000s. For the fiscal year ended February 28, 1987 82% of the Registrant's sales were from DSP-2000 series products and 18% were from DSP-1000 series products; all sales made in prior years were from DSP-2000 series products. As of May 30, 1987 the Registrant has approximately $ 477,470 in backlog orders it believes to be firm, all of which is expected to be filled by fiscal year end, and has received approximately $ 27,623 in deposits for these orders. Some of these orders have been carried over from a backlog of $734,859 posted on May 30, 1986, which the Registrant was unable to fill in the fiscal year ended 1987 due to the delay in the availability of a suitable disk drive for the DSP-1500 and 1200 series products.  The orders may be cancelled if the products delivered by the Registrant are not satisfactory to the purchasers. The terms of such purchases vary according to the particular specifications ordered.

(c)(1)(ix)  Not applicable

(c)(1)(x)  The Registrant is in competition with all companies engaged in any or all of the designing, manufacturing and marketing of audio systems.  In particular, the Registrant is in competition with playback systems utilizing compact digital laser technology.  In addition, certain competitors have developed digital audio cassette tapes for home recording.  These "RDAT" units are expected to arrive in the US market during 1987. In the professional audio market, one US manufacturer, New England Digital, and two foreign manufacturers, AMS in the UK, and For-A, in Japan have begun marketing equipment similar to the DSP 2000 Series.  These competitors are selling their units at substantially higher prices than the Registrant without offering significant advantages in performance or warranty terms.

Although the Registrant is not aware of the development of any systems similar to its DSP 1000 Series, there can be no assurance that such systems will not be developed and marketed by competitors in the near future.  Many of the Registrant's competitors, such as Sony, Mitsubishi and Pioneer, have extensive experience and possess financial, technological and personnel resources substantially greater than the Registrant's.

APBU00653401

(c)(i)(xi)  In June 1983 the Registrant entered into a research agreement with the Massachusetts Institute of Technology ("MIT") for research and development of software for data compression, for the period June 30, 1983 through March 31, 1984.  The agreement was extended through February 28, 1985.  Although the Registrant's technology is protected, any new inventions or discoveries that may result from the sponsored research program will remain the property of MIT; however, the Registrant has retained the right to license such inventions or discoveries on an exclusive basis subject to a negotiated royalty.  Under the agreement, and its extension, the Registrant reimbursed MIT for all costs incurred by it in connection with the research amounting to $46,700.

On April 26, 1985, the Registrant entered into a research agreement with MIT for research and development for digital audio mixer automation (which is basically a sound editing system) covering the period March 1, 1985 through February 28, 1986.  The Registrant paid $25,000 to MIT upon execution of the agreement and was to pay an additional $24,000 on September 1, 1985.  Pursuant to a verbal agreement, amending the research agreement, the Registrant is to pay MIT $10,000 or to supply one of its digital audio systems to MIT in satisfaction of the amounts owing pursuant to the research agreement.  No payment or delivery of a system has been made.  Continued failure to satisfy the obligation owing to MIT could result in a loss of the licensing rights granted to the Registrant as applied to digital audio mixer automation.

The Registrant is continuing research and development of the DSP-1000, primarily for the purpose of achieving a higher level of data compression to allow more music to be recorded on the computer disk format used by the Registrant.  In addition, the Registrant is developing a DSP-1000 pro model (DSP 1000XLR) for sale to audio professionals.  The Registrant also intends to develop a smaller circuit board for use in lower cost models of the DSP-1000 for consumer and automobile audio systems.

During the fiscal years ended February 28, 1985, 1986 and 1987, the Registrant's research and development expenditures were $ 56,792, $ 436,492 and $ 304,390, respectively.

(c)(l)(xii)  Not applicable.

(c)(l)(xiii)  The Registrant has eight full-time employees, including its president, controller, five engineers and an administrative assistant.  The Registrant has and will continue to employ outside consultants for research and development of hardware and software.  See "Management."  In addition, the Registrant employs a part-time secretary on an as-needed basis.

Consultants

The Registrant utilizes the services of a number of consultants

16

APBU00653402

who are compensated on an hourly basis and, to a limited extent, through the issuance of options and stock bonuses: David Clementson, (DSP-2000 support), Trifox, Inc. (IBM PC interface software), Connsult, Inc. (DSP-1000 hardware), Congruent Concepts (DSP-1000 marketing), H. Brosious (DSP-2000 marketing), DuBois Communications (technical writing), Cypress Design Group (DSP-1000 chassis), and Michael Wolf (micro systems development).

(d)   Financial Information About Foreign and Domestic Operations and Export Sales.

Not applicable.

Item 2.   Properties.

In August, 1986, the Registrant moved its executive offices and research and development laboratories to Palo Alto, California. A lease for 2,832 square feet of office space has been entered into with a non-affiliated party. The lease provides for a rental payment of $3,360 per month commencing August 15, 1986 and $5,098 per month beginning February 15, 1987 and continuing until August 14, 1988. The Registrant believes this facility will meet its needs for the near future.

Item 3.   Legal Proceedings.

See Item 14.a) Financial Statements-Note 10, for a description of the settlement arrangements between the Registrant and several vendors who have filed claims against the Registrant.

As a result of an error by a former bookkeeper the Registrant owes past due withholding taxes to the Internal Revenue Service, the States of Colorado, Massachusetts and California in the amount of approximately $ 96,000 including interest and penalties. Continued failure to pay these past due taxes could result in increasing penalties and interest, tax liens on the assets of the Registrant and civil and criminal penalties against responsible officers of the Registrant. The Registrant has proposed a payment schedule agreement with the IRS that it believes can be met.

The Registrant is not a party to any other legal proceedings; however, certain accounts payable totalling approximately $15,000 remain in dispute and the intentions of the vendors regarding these amounts are not known.

Item 4.   Submission of Matters to a Vote of Security Holders.

No matter was submitted to a vote of the Registrant's shareholders during the fourth quarter of the fiscal year ended February 28, 1987.

APBU00653403

## PART II

**Item 5.  Market for Registrant's Common Equity and Related
         Stockholder Matters.**

**(a)    Market Information.**

The  principal  market on which the Registrant's Common Stock  is
traded is the over-the-counter market.  The stock has been listed
in  the National Daily Quotation Service "Pink Sheets"  published
by the National Quotation Bureau, Inc. since December 1, 1983.

The  range  of high and low bid quotations for  the  Registrant's
Common Stock on a quarterly basis is as follows:

|  | High Bid | Low Bid |
|---|---|---|
| **1985** | | |
| First Quarter.. | .20 | .18 |
| Second Quarter.. | .25 | .17 |
| Third Quarter.. | .18 | .12 |
| Fourth Quarter.. | .19 | .115 |
| **1986** | | |
| First Quarter.. | .22 | .17 |
| Second Quarter.. | .22 | .15 |
| Third Quarter.. | .185 | .14 |
| Fourth Quarter.. | .175 | .14 |
| **1987** | | |
| First Quarter.. | .175 | .12 |
| Second Quarter (at 29 May 1987).. | .175 | .10 |

*  Prices are interdealer quotations as reported by the  National
Quotation Bureau, Inc., New York, New York and do not necessarily
reflect retail markups, mark downs or commissions. The bid prices
for the third quarter of 1986 and subsequent are quotations  from
Blinder,  Robinson & Co.,  Denver,  Colorado,  a  principal
marketmaker in the Registrant's stock.

As of May 29, 1987  the bid and asked prices for the Registrant's
common stock were $ 0.11 and $ 0.19,  respectively,  as quoted by
the National Quotation Bureau, Inc.

APBU00653404

(b)   Holders.

As of May 30, 1987, the number of record holders of the Registrant's Common Stock was 2058 according to the Registrant's transfer agent.   This figure excludes an undetermined number of shareholders whose shares are held in "street" or "nominee" name.

(c)   Dividends.

The Registrant has never paid a dividend with respect to its Common Stock and does not intend to pay a dividend in the foreseeable future.

Item 6.   Selected Financial Data.

|  | Years ended February 28, | | | |
|  | 1987 | 1986 | 1985 | 1984 |
|---|---|---|---|---|
| Working capital | $ <377,275> | <479,280> | <548,320> | 474,440 |
| Cash and certificates of deposit | 75,243 | 2,677 | 255,956 | 459,462 |
| Inventories | 361,641 | 382,851 | 348,368 | 38,122 |
| Total assets | 680,510 | 675,945 | 779,983 | 519,444 |
| Total liabilities | 888,505 | 949,350 | 1,180,323 | 37,147 |
| Stockholders' equity <deficiency> | <207,995> | <273,405> | <400,340> | 482,297 |

|  | Years ended February 28, | | | |
|  | 1987 | 1986 | 1985 | 1984 |
|---|---|---|---|---|
| Gross sales revenue | $ 200,214 | 396,368 | 30,000 | 0 |
| Selling and marketing | 118,707 | 313,928 | 392,018 | 0 |
| Research and development | 304,390 | 336,492 | 260,157 | 56,792 |
| General and administrative | 602,349 | 1,180,238 | 700,628 | 99,993 |
| Total expenses | 1,267,897 | 2,178,570 | 1,380,303 | 145,062 |
| Net loss | <1,067,683> | <1,782,202> | <1,350,303> | <145,062> |
| Net loss per common and common equivalent share | <.01> | <.02> | <.02> | <.003> |

Item 7.   Management's Discussion and Analysis of Financial Condition and Results of Operations.

Results of Operations

For the period from February 29, 1984 to February 28, 1985, gross sales revenue was $ 30,000, expenses were $ 1,380,303 and net loss was $ 1,350,303. From February 28, 1985 to February 28, 1986, gross sales revenue was $ 396,368, expenses were $2,178,570 and net loss was $ 1,782,202. From February 28, 1986 to February

19

APBU00653405

28, 1987, gross sales revenue was $ 200,214, expenses were $ 1,267,897 and net loss was $ 1,067,683.

Gross sales revenues for the three year period totalled $ 626,582, 83% of which came from sales in the DSP-2000 series product line, 11% from a one-time licence fee of $ 72,000 received from CompuSonics Video in 1985, and 6% from sales in the newly introduced DSP-1000 series line. There were no significant sales made prior to the fiscal year ended February 28, 1986. Between the fiscal year ended February 28, 1986 and the year ended February 28, 1987 sales decreased 49%, due to a reduction of marketing and sales efforts for the DSP-2000 series and a concentration of the Registrant's time and resources on the production and marketing of the DSP-1000 Series products. Revenues are expected to increase as the DSP-1000 Series products gain acceptance in their respective markets.

Expenses for the three year period totalled $ 4,826,770, 21% of which were related to research and development costs, 17% to marketing and sales, and 51% to general and administrative expenses. Prior to the fiscal year ended February 28, 1987, the percentages related to marketing and sales, research and development and general and administrative expenses were consistent from year to year and in proportion to sales volume. Total expenses were reduced by $ 910,673 (41%) for the fiscal year ended February 28, 1987 compared to the prior year due to a consolidation of the Registrant's operations from three locations to its current location in Palo Alto. This consolidation, combined with a more centralized and streamlined control of operations, resulted in a savings of 49% in general and administrative expenses. Research and development costs were reduced by 30% primarily due to the reduction in research and development costs related to the completed DSP-2000 Series product line, and a savings in research and development costs for the DSP-1000 Series due to similarities in the technology for both product lines.

The Registrant is continuing to experience monthly operating losses, although income from sales has increased steadily since the Registrant began shipping the DSP-1000 Series in December, 1986. Revenues may increase further provided production continues smoothly and no serious product malfunctions appear in the installed base of units. See "Liquidity and Capital Resources" below.

Liquidity and Capital Resources

Working capital increased from inception to February 29, 1984 as a result of the completion on November 30, 1983 of the Registrant's initial public offering from which it received net proceeds of $ 513,775. Working capital decreased $ (1,022,760) from February 29, 1984 to February 28, 1985, increased $ 69,041 from February 28, 1985 to February 28, 1986, and increased $ 102,005 from February 28, 1986 to February 28, 1987. The working capital increase for the fiscal year ended February 28,

20

APBU00653406

1986 was due to the completion on May 1, 1985 of a public offering and the exercise in June 1985 of an over-allotment option by the underwriter of that offering from which the Registrant received net proceeds of approximately $1,336,583. The working capital increase for the fiscal year ended February 28, 1987 was due to the successful completion on October 31, 1986 of the Common Stock Warrant exercise period from which the Registrant received $ 1,166,211. The Registrant does not have any unused lines of credit. The Registrant continues to incur expenses in connection with the development of its products.

The Registrant anticipates meeting its working capital needs from revenue from operations and possible private financing secured by accounts receivable. Failure to meet sales projections would increase the Registrant's operating deficit and, if sufficient operating revenues are not achieved at a time when the Registrant requires additional working capital, the Registrant would be required to seek additional financing. See Item 1. "Business - Production" and "Business - Marketing and Distribution." In addition, the Registrant's future working capital requirements are dependent in part upon the recoverability and classification of recorded asset amounts or the amounts and classification of liabilities. See Item 14.(a) 1."Financial Statements".

Item 8.   Financial Statements and Supplementary Data.

The financial statements and supplementary data are listed under Item 14.

Item 9.   Disagreements on Accounting and Financial Disclosure.

On May 22, 1987 the Registrant reported to the Securities and Exchange Commission a change in the Registrant's Independent Certified Public Accountants. The Registrant has retained Peat Marwick Main & Co., with offices located at 55 South Market Street, San Jose, CA 95113, to perform an audit of the Registrant's financial statements for the fiscal year ended February 28, 1987.

APBU00653407

# PART III

Item 10. Directors and Executive Officers of the Registrant.

(a) and (b) Identification of Directors and Officers.

| Name | Age | Position |
|------|-----|----------|
| David M. Schwartz | 38 | President, Treasurer and Director |
| R. Brent Alderfer | 35 | Secretary and Director |
| Bernard W. Holmbraker | 59 | Vice President and Director |

The directors of the Registrant are elected to hold office until the next annual meeting of shareholders and until their respective successors have been elected and qualified. Officers of the Registrant are elected by the Board of Directors and hold office until their successors are elected and qualified.

David M. Schwartz. Mr. Schwartz has been an officer and director of the Registrant since its inception. He is a registered architect in Colorado, Massachusetts and the District of Columbia. From May 1982 to February 1983, he was a vice president of Enercorp, Inc., a publicly held business development company headquartered in Denver. He served as director of engineering of Enercorp, Inc. from August 1979 to May 1982, while such company was engaged in the field of solar energy. From 1977 to 1979, Mr. Schwartz was director of the Energy Design and Analysis Company, an engineering consulting company, specializing in computer aided design of energy systems. He received a B. Arch. degree from Carnegie Mellon University in 1972.

R. Brent Alderfer. Mr. Alderfer has been an officer and director of the Registrant since its inception. Since 1986 he has been a partner with the law firm of Alderfer and Herm, Denver, Colorado. He received his J.D. degree from Georgetown University Law School in 1977. From 1977 to 1980, he was an associate with the law firm of Dechert Price & Rhoads in Philadelphia, Pennsylvania, and from 1980 to 1981 was with its Denver office. From 1981 to 1986 he maintained a private practice including a partnership in the law firm of Brightwell, Reeves & Alderfer, Denver, Colorado.

Bernard W. Holmbraker. Mr. Holmbraker has been an officer and director of the Registrant since May 1983. Mr. Holmbraker currently is devoting his time to personal investments in stocks and real estate. He was the president of National Equipment Leasing Corporation, McLean, Virginia, from October 1979 until November 1982. From January 1976 to October 1979, he was the director of finance for Federal Leasing Corporation, McLean, Virginia. Mr. Holmbraker is a director of Gateway Communications, Inc., WMD Microdistributors, Inc., Touchstone Software, Inc., Equity Concepts, Inc., Precision Mico Devices,

APBU00653408

Page 23 of 73

Inc., and is a director, vice president and secretary/treasurer of Balboa Explorations, Inc., each of which is a publicly held company. Mr. Holmbraker holds a Bachelor of Arts degree in economics from Columbia University and a Bachelor of Law degree from Harvard University.

**Advisors**

Pursuant to the underwriting agreement entered into in connection with the Registrant's May 1985 public offering, the Registrant has agreed to appoint as an advisor to its Board of Directors the underwriter or its designee for a period of five years from the May 1, 1985, closing date of such offering. The advisor will advise the Registrant on corporate finance matters, but will have no authority or responsibility as a director and will have no voting authority. The advisor will be invited and entitled to attend all Board of Director meetings and will receive such compensation and reimbursement as directors are entitled to receive.

The Registrant also has entered into a management consulting agreement with Equitex, Inc., which is more fully discussed in Item 14.(a)3."Exhibit 10.7" and "Exhibit 10.22".

(c)Identification of Certain Significant Employees.
Not applicable.

(f)Involvement in Certain Legal Proceedings.
Not applicable.

(g)Promoters and Control Persons.
Not applicable.

Item 11. Executive Compensation.

(a) Cash Compensation.

The following table sets forth all remuneration paid in the fiscal year ended February 28, 1987 to all officers of the Registrant and the total amount of remuneration paid to the officers and directors as a group:

| Number of persons in group (1) | Capacities in which served | Cash compensation |
|---|---|---|
| All executive officers as a group (three persons during period) | Officers | $ 33,000 |

(1) Only one officer received cash compensation. No officer or director received remuneration exceeding $60,000 during the fiscal year ended February 28, 1987.

23

APBU00653409

(b)  Compensation Pursuant to Plans.

Although the Registrant does not have any formalized plans pursuant to which executive officers are compensated, it is anticipated that the Registrant will pay $36,000 to all of its executive officers as a group during the fiscal year ending February 28, 1988.  The Registrant reimburses its officers and directors for expenses incurred by them in connection with business performed on the Registrant's behalf, including expenses incurred in attending meetings.  Business expense reimbursements are not expected to exceed $ 10,000 as a group.

The Registrant has adopted the stock option plan described below under which its officers, directors, employees and consultants may receive compensation in the form of stock options.  The purpose of the plan is to provide incentives to such persons to maintain a high level of quality in their work for the Registrant by providing them with equity interests in the Registrant.  In furtherance of this purpose, the Registrant has granted stock options in the past and will, in all likelihood, continue to do so in the future.

From March 1, 1986 through May 30, 1987 the company granted to all of its current executive officers and directors as a group (3 persons, 1 of whom actually was granted options) options to purchase 300,000 shares of Common Stock at an average exercise price of $.05 per share.  During this period, no options were exercised by any members of this group.  As of May 30, 1987 exercise prices of the outstanding options granted to current officers, directors and employees ranged from $.0025 to $.10 per share.  As of May 30, 1987, options granted to officers, directors and employees to purchase up to 4,275,834 shares of Common Stock were outstanding.

The Registrant does not have pension, retirement, savings or similar plans.

Non-Qualified Stock Option Plan

On February 10, 1984, the Registrant adopted a Non-Qualified Stock Option Plan (the "Plan").  The Plan is intended to encourage ownership of stock of the Registrant by officers, directors, employees and consultants of the Registrant and to provide additional incentive for them to promote the success of the Registrant.  The Plan is for a term of ten years and provides for options to purchase up to 14,000,000 shares of Common Stock.  The Plan is administered by the Board of Directors which determines to whom options are granted and the exercise prices.  An Option is exercisable cumulatively to the extent of 25% of the underlying shares immediately upon the grant of the Option, 25%

24

APBU00653410

after the expiration of one year from the date of grant, 25% after the expiration of two years and the remaining 25% after three years. The options are nontransferable and may be exercised only by the optionee, and expire, if unexercised, upon the termination of the optionee's relationship with the Registrant.

A compensation expense relative to the granting of an option is recognized in the Registrant's financial statements to the extent the fair market value of the Registrant's Common Stock on the date of grant of option exceeds the option exercise price. See Item 14.(a)1."Financial Statements-Note(6)" for a further discussion of the options granted and exercised to date.


Stock Bonuses

During the fiscal year ended February 28, 1987 the Registrant has issued bonuses totalling 500,000 shares to certain employees and consultants. No bonuses were issued to any officers or directors of the Registrant during the year. A compensation expense relative to the granting of a stock bonus is recognized in the Registrant's financial statements equal to the fair market value of the Registrant's Common Stock on the date of grant of the bonus. Accordingly, the Registrant has recognized a compensation expense of $ 85,500 with respect to these stock bonuses.

(c)    Other Compensation.

Not applicable.

(d)    Compensation of Directors.

The Registrant reimburses its directors for expenses incurred by them in connection with business performed on the Registrant's behalf, including expenses incurred in attending meetings. No such reimbursements were made for the fiscal year ended February 28, 1987.

(e)  Termination of Employment and Change of Control Arrangement.

Not applicable.


Item 12.    Security Ownership of Certain Beneficial Owners and Management.


(a)(b)   Security Ownership of Certain Beneficial Owners and Management.

The following table contains information as of May 30, 1987 as to the beneficial ownership of shares of the Registrant's Common Stock by each person who, to the knowledge of the Registrant at that date, was the beneficial owner of five percent or more of

25

APBU00653411

the outstanding shares, each person who is a director of the Registrant and all officers and directors of the Registrant as a group.

| Name and address | Amount and nature of beneficial ownership | Percent of class |
|---|---|---|
| David M. Schwartz<br>26873 A Moody Road<br>Los Altos Hills, CA 94022 | 11,080,000 | 10% |
| R. Brent Alderfer<br>1600 Stout Street<br>Denver, Colorado 80202 | 325,000 (1) | less than 1% |
| Bernard W. Holmbraker<br>Post Office Box 101<br>Waterford, Virginia 22190 | 1,095,000 (2) | less than 1% |
| John P. and Kim Stautner<br>1118 Solana Drive<br>Mountain View, CA 94040 | 6,125,000 (3) | 6% |
| Officers and directors<br>as a group (three persons) | 12,500,000 | 11% |

(1) Includes 75,000 shares issuable in connection with the currently exercisable portion of an option for 300,000 shares granted to Mr. Alderfer on May 29, 1987.

(2) Includes 1,000,000 shares of Common Stock issuable upon exercise of an option for 1,000,000 shares granted to Mr. Holmbraker under the Registrant's 1984 Non-Qualified Stock Option Plan.

(3) Includes 1,750,000 shares beneficially owned but not yet issued pursuant to the exercise on April 29, 1987 of a stock option.

(c)   Changes in Control.
Not applicable.

Item 13.  Certain Relationships and Related Transactions.

(a)   Transactions with Management and Others.

In May 1983, the Registrant issued 22,000,000 shares of Common Stock to its President, David M. Schwartz, in exchange for $7,500 and the contribution to the Registrant of all his rights under the CompuSonics System patent application valued by the Registrant's Board of Directors at $14,500.  Mr. Alderfer was

26

APBU00653412

issued 400,000 shares of Common Stock in consideration for past services to the Registrant valued by the Registrant's Board of Directors at $1,000.

As of February 28, 1987, the Registrant had an account payable and accrued interest to David Schwartz in the amount of $ 110,671, which includes outstanding loans to the company, unreimbursed expenses and interest accrued from March 1, 1986 to February 28, 1987 at the rate of 9.5% per annum. The Registrant intends to repay Mr. Schwartz for these amounts.

In February, March and May of 1986 the Registrant borrowed $78,000 from Equitex, Inc. pursuant to three promissory notes. These loans bore interest at a rate of 12% per annum and were paid in full on November 5, 1986.

(b)    Certain Business Relationships.

Not applicable.

(c)    Indebtedness of Management.

Not applicable.

(d)    Transactions with Promoters.

Not applicable.

27

APBU00653413

PART IV

Item 14.  **Exhibits, Financial Statements, Schedules and Reports on Form 8-K.**

(a)   The following documents are filed as a part of this report immediately following the signature page.

   1.   Financial Statements and Supplementary Data.

|  | Page |
|---|---|
| Reports of Independent Certified Public Accountants................... | F-1 |
| Balance Sheets at February 28, 1987 and 1986.............................. | F-3 |
| Statements of Operations for the three years ended February 28, 1987. | F-4 |
| Statements of Stockholders' Equity <Deficiency> for the Three Years Ended February 28, 1987.............. | F-5 |
| Statements of Changes in Financial Position for the Three Years Ended February 28, 1987.................... | F-7 |
| Notes to Financial Statements....... | F-9 |

   2.   Financial Statement Schedules.

      Schedule IX Short-Term Borrowings...    S-1

   3.   Exhibits.

   3.1      Articles of Incorporation*.

   3.2      Bylaws*...

   4.1      Specimen Stock Certificate*.

   4.2      Warrant Agreement and Specimen Stock Purchase Warrants**.

   4.3      Selling Security Holders' Common Stock Purchase Warrant, Warrant Agreement and Specimen**.

   10.1     Non-Qualified Stock Option Plan, as amended**..

APBU00653414

10.2        Research Agreement between the
            Registrant and the Massachusetts
            Institute of Technology*..

10.2(a)     Massachusetts Institute of
            Technology Research Agreement**..

10.2(b)     Massachusetts Institute of
            Technology Research Agreement**..

10.3        Agreement between the Registrant
            and SBE, Inc.*..

10.4        Form of Investment Banking
            Consulting Agreement between the
            Registrant and Blinder Robinson
            & Co., Inc.**..

10.5        LKP International, Ltd.
            Advertising Agreement*.

10.6        Robert E. Griffin Inc. Public
            Relations Agreement*,.

10.7        Equitex, Inc. Consulting
            Agreement**..

10.8        Siemens AG Austria Memorandum of
            Understanding**..

10.9        McIntosh Laboratory Inc. Licensing
            Agreement**..

10.10       Nissho Electronics Corporation
            Exclusive Distributor
            Agreement**..

10.11       Nissho Iwai American Corp.
            Marketing Agreement**..

10.12       Allied Broadcast Equipment/Allied
            International Authorized Dealer
            Sales Agreement**..

10.13       Syco Systems Ltd. Distributor
            Agreement**..

10.14       Employment Agreement with Gary W.
            Schwede**..

10.15       Sansui Agreement**..

10.16       AVM Ferrograph Letter of Intent**..

10.17       Gary Schwede Letter of Understanding**..

29

APBU00653415

| 10.18 | Memo of Understanding with AT&T**.. | |
| 10.19 | Assignment Agreement with CVC**.. | |
| 10.20 | Licence Agreement with CVC**.. | |
| 10.21 | AVM Ferrograph Licencing Agreement***.. | Page 50 |
| 10.22 | Equitex, Inc. Consulting Agreement***.. | Page 68 |
| 10.23 | Fonvisa Letter of Intent***.. | Page 72 |

\*   Incorporated by reference from the Registrant's Registration
    Statement on Form S-18, No. 2-85133-D effective September 27,
    1983.
\*\*  Incorporated by reference from the Registrant's Registration
    Statement on Form S-1, No. 2-94844, effective April 12, 1985.
\*\*\* Filed herewith.


(b)   Reports on Form 8-K.

No reports were filed on Form 8-K during the last quarter of the
period covered by this report.

APBU00653416

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date:   June 11, 1987

                              COMPUSONICS CORPORATION
                              (Registrant)


                              By
                              David M. Schwartz, President

     Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.


Date:   June 11, 1987


                              David M. Schwartz, President
                              Treasurer and Director
                              (Principal Executive, Financial
                              and Accounting Officer)


Date:   June 11, 1987


                              W. Brent Alderfer, Director


Date: June  11, 1987


                              Bernard W. Holmbraker, Director


31

APBU00653417

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date:  June 11, 1987

COMPUSONICS CORPORATION
(Registrant)


By _____
David M. Schwartz, President

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.


Date:  June 11, 1987

David M. Schwartz, President, Treasurer and Director
(Principal Executive, Financial and Accounting Officer)


Date:  June 11, 1987

R. Brent Alderfer, Director


Date: June 11, 1987

Bernar W.        :aker, Director


31

APBU00653418

REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

Board of Directors
CompuSonics Corporation

We have examined the balance sheet of CompuSonics Corporation as of February 28, 1987, and the related statements of operations, stockholders' deficiency and changes in financial position for the year then ended. Our examination was made in accordance with generally accepted auditing standards and, accordingly, included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances. The financial statements of CompuSonics Corporation for the years ended February 28, 1986 and 1985 were examined by other auditors whose opinion, dated May 30, 1986, on those statements was qualified as being subject to the effects of such adjustments, if any, as might have been required had the outcome of the uncertainty discussed in the second paragraph of their opinion about the recoverability and classification of recorded asset amounts and the amounts and classification of liabilities been known.

As shown in the financial statements, the Company has incurred substantial losses since inception, accumulating a $4,354,376 deficit at February 28, 1987. As of that date, the Company's current liabilities exceeded its current assets by $377,275 and its total liabilities exceeded its total assets by $207,995. These factors, among others, as discussed in note 1, indicate that the Company may be unable to continue as a going concern. The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern.

In our opinion, subject to the effects on the financial statements of such adjustments, if any, as might have been required had the outcome of the uncertainty about the recoverability and classification of recorded asset amounts and the amounts and classification of liabilities referred to in the preceding paragraph been known, the 1987 financial statements referred to above present fairly the financial position of CompuSonics Corporation at February 28, 1987, and the results of its operations and the changes in its financial position for the year then ended, in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding year.

*Peat Marwick Main & Co.*

San Jose, California
May 28, 1987

F-1

APBU00653419

REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

Board of Directors
CompuSonics Corporation

We have examined the balance sheet of CompuSonics Corporation at February 28, 1986 and the related statements of changes in stockholders' equity, operations and changes in financial position for the years ended February 28, 1986 and 1985.    Our examinations were made in accordance with generally accepted auditing standards and, accordingly, included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances.

As shown in the accompanying financial statements, the Company incurred a net loss of $1,782,202 during the period from March 1, 1985 to February 28, 1986 and, as of that date, current liabilities exceeded its current assets by $479,280.  These factors indicated that the Company may be unable to continue in existence if additional financing is not obtained, and/or if the Company is not able to attain profitable operations.  The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or the amounts and classification of liabilities that might be necessary should the Company be unable to continue in existence.

In our opinion, subject to the Company's obtaining additional financing and/or the Company's ability to attain profitable operations and subject to the effects on the financial statements of such adjustments, if any, as might have been required had the outcome of the uncertainty about the recoverability and classification of recorded asset and liability amounts referred to in the preceding paragraph been known, the financial statements designated above present fairly the financial position of CompuSonics Corporation at February 28, 1986, and the results of its operations and changes in its financial position for the years ended February 28, 1986 and 1985 in conformity with generally accepted accounting principles applied on a consistent basis.

Also, in our opinion, the related supporting schedule for the year ended February 28, 1986 presents fairly the information set forth therein, subject to the effects on the schedule of such adjustment, if any, had the outcome about the recoverability and classification of recorded asset and liability amounts referred to above been known.

*Weiss & Company*

Weiss & Company
Certified Public Accountants

Denver, Colorado
May 30, 1986

F-2

APBU00653420

CompuSonics Corporation
Balance Sheets
February 28, 1987 and 1986

| ASSETS | 1987 | 1986 |
|---|---|---|
| **Current assets:** | | |
| Cash | $ 75,243 | 2,677 |
| Receivables | 40,997 | 48,735 |
| Inventories (note 2) | 361,641 | 382,851 |
| Prepaid expenses | 4,532 | 6,983 |
| Total current assets | 482,413 | 441,246 |
| Property and equipment (note 3) | 139,805 | 166,463 |
| Investment in affiliate (note 4) | - | 22,106 |
| Other assets | 58,292 | 46,130 |
| | $ 680,510 | 675,945 |

| LIABILITIES AND STOCKHOLDERS' DEFICIENCY | | |
|---|---|---|
| **Current liabilities:** | | |
| Notes payable | $    - | 25,000 |
| Current portion of capital lease obligations (note 9) | 23,858 | 26,553 |
| Accounts payable and accrued expenses | 605,368 | 691,060 |
| Payables to related parties (note 5) | 100,993 | 97,544 |
| Customer deposits | 31,469 | 67,869 |
| Liability to issue common stock (note 6) | 98,000 | 12,500 |
| Total current liabilities | 859,688 | 920,526 |
| Capital lease obligations, excluding current portion (note 9) | 28,817 | 28,824 |
| **Stockholders' deficiency (notes 5 and 6)** | | |
| Preferred stock | - | - |
| Common stock | 112,169 | 101,498 |
| Additional paid-in capital | 4,034,212 | 2,911,790 |
| Accumulated deficit | <4,354,376> | <3,286,693> |
| Total stockholders' deficiency | < 207,995> | < 273,405> |
| Commitments and contingencies (notes 9 and 10) | | |
| | $ 680,510 | 675,945 |

See accompanying notes to financial statements.

F-3

CompuSonics Corporation
Statements of Operations
For the three years ended February 28, 1987

|  | 1987 | 1986 | 1985 |
|---|---|---|---|
| Net product sales (note 8) | $ 200,214 | 324,368 | 30,000 |
| Cost of product sales | 190,728 | 211,241 | 20,085 |
| Gross margin on product sales | 9,486 | 113,127 | 9,915 |
| License fees | - | 72,000 | - |
|  | 9,486 | 185,127 | 9,915 |
| Operating expenses |  |  |  |
| Selling and marketing | 118,707 | 313,928 | 392,018 |
| Research and development | 304,390 | 436,492 | 260,157 |
| General and administrative | 602,349 | 1,180,238 | 700,628 |
|  | 1,025,446 | 1,930,658 | 1,352,803 |
| Loss from operations | 1,015,960 | 1,745,531 | 1,342,888 |
| Interest expense, net of interest income | 29,617 | 24,277 | 7,415 |
| Equity in net loss of affiliate (note 4) | 22,106 | 12,394 | - |
| Net loss | $1,067,683 | 1,782,202 | 1,350,303 |
| Net loss per common and common equivalent share | $ <.01> | <.02> | <.02> |
| Weighted average common and common equivalent shares outstanding | 110,653,717 | 101,388,247 | 87,776,237 |

See accompanying notes to financial statements.

F-4

APBU00653422

CompuSonics Corporation
Statements of Stockholders' Equity <Deficiency>
For the three years ended February 28, 1987

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Total Stockholders' Equity <Deficiency> |
| | Shares | Amount | | | |
|---|---|---|---|---|---|
| Balances at February 29, 1984 | 78,800,000 | $ 78,800 | 557,685 | <154,188> | 482,297 |
| Issuance of common stock in connection with: | | | | | |
| Stock bonus awards | 4,155,790 | 4,156 | 149,966 | — | 154,122 |
| Exercise of stock options | 954,166 | 954 | 1,557 | — | 2,511 |
| Sale of shares | 2,848,000 | 2,848 | 139,740 | — | 142,588 |
| Excess of fair value over exercise price on stock options granted | — | — | 168,445 | — | 168,445 |
| Net loss | — | — | — | <1,350,303> | <1,350,303> |
| Balances at February 28, 1985 | 86,757,956 | 86,758 | 1,017,393 | <1,504,491> | <400,340> |
| Issuance of common stock in exchange for cash through a public offering, net of expenses related to the offering of $357,699 | 9,375,000 | 9,375 | 1,132,926 | — | 1,142,301 |
| Issuance of common stock in exchange for cash pursuant to the Underwriter's exercise of the over-allotment option related to the public offering, net of related expenses of $30,718 | 1,406,250 | 1,406 | 192,876 | — | 194,282 |

(Continued)

Page 37 of 73

APBU00653423

CompuSonics Corporation
Statements of Stockholders' Equity (Deficiency)
For the three years ended February 28, 1987

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Total Stockholders' Equity (Deficiency) |
| --- | --- | --- | --- | --- | --- |
| | Shares | Amount | | | |
| Issuance of common stock in connection with: | | | | | |
| Stock bonus awards | 1,350,000 | 1,350 | 336,150 | – | 337,500 |
| Exercise of warrants | 1,725,000 | 1,725 | 43,225 | – | 44,950 |
| Exercise of stock options | 883,333 | 884 | 1,325 | – | 2,209 |
| Excess of fair value over exercise price of stock options granted | – | – | 1,656,867 | – | 1,656,867 |
| Adjustment to reflect forfeiture of stock options | – | – | <1,468,972> | – | <1,468,972> |
| Net loss | – | – | – | <1,782,202> | <1,782,202> |
| Balances at February 28, 1986 | 101,497,539 | 101,498 | 2,911,790 | <3,286,693> | <273,405> |
| Issuance of common stock in connection with: | | | | | |
| Exercise of warrants | 10,249,977 | 10,250 | 1,181,640 | – | 1,191,890 |
| Exercise of stock options | 120,833 | 121 | 182 | – | 303 |
| Services | 300,000 | 300 | 25,700 | – | 26,000 |
| Excess of fair value over exercise price of stock options granted | – | – | 54,000 | – | 54,000 |
| Adjustment to reflect forfeiture of stock options | – | – | <139,100> | – | <139,100> |
| Net loss | – | – | – | <1,067,683> | <1,067,683> |
| Balances at February 28, 1987 | 112,168,349 | $ 112,169 | 4,034,212 | <4,354,376> | <207,995> |

See accompanying notes to financial statements.

F-6

*Page 28 of 42*

APBU00653424

CompuSonics Corporation
Statements of Changes in Financial Position
For the three years ended February 28, 1987

| | 1987 | 1986 | 1985 |
|---|---|---|---|
| Uses of working capital: | | | |
| Net loss | $ 1,067,683 | 1,782,202 | 1,350,303 |
| Items not providing <requiring> working capital: | | | |
| Depreciation and amortization | <43,619> | <41,622> | <6,923> |
| Equity in net loss of affiliate | <22,106> | <12,394> | – |
| Excess of fair market value over exercise price of stock options granted, net of forfeitures | 85,100 | <187,895> | <168,445> |
| Working capital used by operations | 1,087,058 | 1,540,291 | 1,174,935 |
| Additions to other assets | 14,552 | 40,495 | 20,773 |
| Deferred costs related to public offerings | | 326,783 | 61,634 |
| Additions to property and equipment | 40,402 | 139,560 | 71,452 |
| Investment in affiliate | – | 34,500 | – |
| Reductions of capital lease obligations | 18,231 | – | – |
| Increase in working capital | 102,005 | 69,041 | – |
| | $ 1,262,248 | 2,150,670 | 1,328,794 |
| Sources of working capital: | | | |
| Disposals of property and equipment | 25,831 | – | – |
| Issuance of common stock for: | | | |
| Cash | 1,192,193 | 1,769,950 | 145,099 |
| Services | 26,000 | 339,709 | 154,122 |
| Increase in capital lease obligations | 18,224 | 22,011 | 6,813 |
| Assignment of patent rights | – | 19,000 | – |
| Decrease in working capital | – | – | 1,022,760 |
| | $ 1,262,248 | 2,150,670 | 1,328,794 |

(Continued)

F-7

APBU00653425

CompuSonics Corporation
Statements of Changes in Financial Position
For the three years ended February 28, 1987

| | 1987 | 1986 | 1985 |
|---|---|---|---|
| Changes in components of working capital: | | | |
| Increase <decrease> in current assets: | | | |
| Cash | $ 72,566 | <253,279> | <203,508> |
| Receivables | <7,738> | 40,877 | <919> |
| Inventories | <21,210> | 34,483 | 310,246 |
| Prepaid expenses | <2,451> | < 6,024> | 7,782 |
| | 41,167 | <183,943> | 113,603 |
| | | | |
| Increase <decrease> in current liabilities: | | | |
| Notes payable | <25,000> | 25,000 | -- |
| Current portion of capital | | | |
| lease obligations | <2,695> | 20,128 | 6,425 |
| Accounts payable and accrued expenses | <85,692> | <99,777> | 757,004 |
| Payables to related parties | 3,449 | <243,704> | 337,934 |
| Customer deposits | <36,400> | 32,869 | 35,000 |
| Liability to issue common stock | 85,500 | 12,500 | -- |
| | <60,838> | <252,984> | 1,136,363 |
| | | | |
| Increase <decrease> in working capital | $ 102,005 | 69,041 | <1,022,760> |

See accompanying notes to financial statements.

F-8

CompuSonics Corporation
Notes to Financial Statements
February 28, 1987 and 1986

(1) Summary of Significant Accounting Policies

(a) The Company
CompuSonics Corporation (the Company) was incorporated on March 24, 1983 to engage in the development, manufacture and marketing of digital audio computers. From inception (March 24, 1983) through the quarter ended November 30, 1985, the Company was considered a development stage enterprise. In the fourth quarter of fiscal 1986, the Company commenced principal operations and emerged from the development stage.

(b) Basis of Presentation
The Company has incurred losses since its inception. Continuity of the Company as a going concern is dependent upon obtaining additional financing and/or attaining profitable operations.

(c) Revenue Recognition
Revenue on product sales is recognized upon shipment. Customer deposits received in advance of product shipments are deferred and recognized as income upon shipment.

(d) Inventories
Inventories are stated at the lower of cost (first-in, first-out) or market (net realizable value).

(e) Property and Equipment
Purchased property and equipment are stated at cost less accumulated depreciation. Equipment recorded under capital leases is stated at the lower of the present value of the related minimum lease payments or the fair market value at lease inception, less accumulated amortization. Depreciation and amortization are provided using the straight-line method over the lease term or the estimated useful lives of the respective assets, generally five years.

Patent costs are amortized on the straight-line method over the estimated useful life of seventeen years. Trademark costs are amortized on the straight-line method over a five year estimated life.

(f) Investment in Affiliate
The Company's 30% investment in CompuSonics Video Corporation (Video) is accounted for on the equity method whereby the Company's portion of Video's net income or loss is included in the accompanying statement of operations. As of February 28, 1987, this investment has been completely written off to give effect to the Company's share of the net losses of Video.

F-9

APBU00653427

CompuSonics Corporation
Notes to Financial Statements

(g) <u>Net Loss Per Share</u>
Net loss per common and common equivalent share is based on the weighted average number of shares outstanding and equivalent shares assuming:

  *The stock options granted to employees, officers and directors and warrants given to noteholders at below market prices had been outstanding at the beginning of each period presented, and

  *The proceeds from the exercise of these stock options and warrants were used to repurchase common shares at the average market price per share using the "treasury stock" method.

(h) <u>Reclassifications</u>
Certain 1986 and 1985 balances have been reclassified to correct and conform with the 1987 financial statement presentation.

(2) <u>Inventories</u>

A summary of inventories follows:

|  | <u>1987</u> | <u>1986</u> |
|---|---|---|
| Raw materials | $ 214,992 | 281,320 |
| Work-in-process | 94,136 | 34,276 |
| Finished goods | 52,513 | 67,255 |
|  | $ 361,641 | 382,851 |

(3) <u>Property and Equipment</u>

A summary of property and equipment follows:

|  | <u>1987</u> | <u>1986</u> |
|---|---|---|
| Office furniture and equipment | $ 96,358 | 49,966 |
| Lab equipment | 41,272 | 105,400 |
| Vehicle | -- | 6,215 |
| Equipment under capital leases | 78,190 | 53,067 |
|  | 215,820 | 214,648 |
| Less accumulated depreciation and amortization | 76,015 | 48,185 |
|  | $ 139,805 | 166,463 |

Accumulated amortization on equipment under capital leases was $ 23,094 and $ 12,181 at February 28, 1987 and 1986, respectively.

F-10

APBU00653428

CompuSonics Corporation
Notes to Financial Statements

(4) <u>Investment in CompuSonics Video Corporation (Video)</u>

On September 12, 1985, the Company assigned the rights under its United States and foreign patent applications relative to a video recording and playback system to Video in return for 300,000 shares of Video's convertible preferred stock. The rights were valued at $34,500 which represented the cost to the Company of the patent applications of $19,000 and research and development costs of $15,500.

As holder of the convertible preferred stock, the Company is entitled to noncumulative cash dividends at an annual rate of $1.00 per share if and when dividends are declared by Video. The shares of preferred stock are non-redeemable and may be converted into 30,000,000 shares of common stock.

On September 17, 1985 the Company granted to Video a license to utilize digital audio technology with the video recording and playback system in exchange for $72,000 which was paid upon the closing of the entity's public offering. This amount is included in the 1986 statement of operations as license fee revenue. The Company incurred approximately $465,000 in research and development costs relative to this audio technology and its application.

(5) <u>Payables to Related Parties</u>

Payables to related parties consist of the following:

|  | 1987 | 1986 |
|---|---|---|
| Non-interest bearing, unsecured payable to officer and stockholder, due on demand. Amended in 1987 to include interest at 9.5% | $ 100,993 | 89,544 |
| Unsecured note payable bearing interest at 12%, due on demand | - | 8,000 |
|  | $ 100,993 | 97,544 |

F-11

APBU00653429

CompuSonics Corporation
Notes to Financial Statements

(6)  Capital Stock

Preferred Stock
The Company is authorized to issue 50,000,000 shares of $.001 par
value preferred stock.  No shares were issued or outstanding as
of February 28, 1987 or 1986.

Common Stock

The  Company is  authorized  to  issue  200,000,000  shares  of
$.001  par  value  common  stock.  As  of  February  28,  1987,
112,168,349 shares of common stock were issued and outstanding.

The Company's Non-Qualified Stock Option Plan,  as amended
on June 17,  1985,  provides for the granting of up to 14,000,000
shares  of its authorized but unissued common stock to  officers,
employees,  consultants and directors.  As of February  28,  1987
there  were  12,041,668 shares reserved for  issuance  under  the
Plan.  All  options expire no more than five years from the  date
granted  and are exercisable in annual increments of  twenty-five
percent beginning at the date of grant.

A summary of option transactions follows:

|                                  | Number of Shares | Option Prices |
|----------------------------------|-----------------:|--------------:|
| Balance at February 29, 1984     |        1,266,666 | $ .0025       |
| Granted                          |        4,250,000 | .005–.023     |
| Exercised                        |      < 954,166>  | .0025–.005    |
| Balance at February 28, 1985     |        4,562,500 | .0025–.023    |
| Granted                          |        7,346,667 | .015–.06      |
| Exercised                        |       <883,333>  | .0025         |
| Cancelled                        |     <6,458,334>  | .02–.06       |
| Balance at February 28, 1986     |        4,567,500 | .0025–.06     |
| Granted                          |          640,000 | .09–.10       |
| Exercised                        |       <120,833>  | .0025         |
| Cancelled                        |     <1,110,833>  | .023–.06      |
| Balance at February 28, 1987     |        3,975,834 | $ .0025–.10   |
| Exercisable at February 28, 1987 |        2,508,334 |               |

F-12

APBU00653430

CompuSonics Corporation
Notes to Financial Statements

As of February 28, 1987 there were 2,121,423 outstanding B Warrants to purchase common stock issued to the Company's underwriters in conjunction with the initial public offering of stock in November 1983. These warrants contain an exercise price of $.022 per share and expire in November 1987. In addition, there are 1,250,000 unregistered warrants issued to various parties in exchange for bridge financing obtained over the past three years (all the related debt had been paid off as of February 28, 1987). These warrants are exercisable at $.05 per share and expire in September 1988. A total of 3,371,423 shares of common stock are reserved for issuance pursuant to these warrants.

During fiscal 1987, the Company granted stock bonuses to employees and consultants totalling 500,000 shares. The Company recognized $85,500 of compensation expense in 1987 related to these bonuses. These shares, along with warrants exercised in the amount of $12,500, have not been issued as of February 28, 1987 and therefore, the amounts are classified as liability to issue common stock on the accompanying balance sheet.

(7) Income Taxes

The Company has net operating loss carryforwards of approximately $3,400,000 available to offset against future income subject to Federal income taxes. The Company also has research and experimental tax credit carryforwards of approximately $ 80,000 available to offset future Federal income taxes after utilization of the net operating loss carryforwards. These carryforwards expire primarily in 2000 thru 2002. The difference between the net operating loss carryforward for tax purposes and the accumulated deficit at February 28, 1987 is significantly attributable to the deferral for tax purposes of certain compensation expense related to stock options and bonuses.

The Tax Reform Act of 1986 substantially affects the ability of a corporation to utilize a net operating loss carryforward if there is a "Change of Ownership" after December 31, 1986. Among other things, a "Change of Ownership" can occur as a result of additional financing obtained through either private or public means. If a change in ownership, as defined, of the Company should occur, its ability to utilize the net operating loss carryforwards otherwise available to it could be significantly diminished.

F-13

APBU00653431

CompuSonics Corporation
Notes to Financial Statements

(8)  Segment Information

Since its inception, the Company has operated primarily in the
digital audio computer line of business. Sales to unrelated
customers, which individually accounted for ten percent or more
of the Company's revenues are as follows:

|      |    |         |
|------|----|---------|
| 1985 | $  | 30,000  |
| 1986 | $  | 74,500  |
|      |    | 77,750  |
|      |    | 107,250 |
|      | $  | 259,500 |
| 1987 | $  | 157,500 |

(9)  Lease Commitments

The Company leases equipment under agreements classified as
capital leases and office space under a noncancellable operating
lease. Rent expense aggregated approximately $ 45,000, $ 31,000
and $ 16,000 in 1987, 1986 and 1985, respectively. Future minimum
payments under these agreements are as follows:

| Fiscal year | Capital leases | Operating lease |
|-------------|----------------|-----------------|
| 1988        | $  35,000      | 61,000          |
| 1989        | 23,000         | 28,000          |
| 1990        | 8,000          | –               |
| 1991        | 4,000          | –               |
| 1992        | 2,000          | –               |
| Total minimum payments | 72,000 | $ 89,000 |
| Less portion representing interest | 19,325 | |
| Capital lease obligations | 52,675 | |
| Less current portion | 23,858 | |
|             | $  28,817      |                 |

F-14

CompuSonics Corporation
Notes to Financial Statements

(10) Contingencies

Litigation
On December 18, 19 5, a complaint was filed against the Company
in the Denver County District Court by a vendor in the amount of
$60,043 for component parts furnished to the Company plus costs
and attorney's fees. On December 4, 1986, a settlement agreement
was reached whereby the Company made an initial payment to the
vendor of $33,649, with the remaining balance to be paid in
twelve monthly payments of $2,873. The remaining liability is
classified in accounts payable and accrued expenses on the
accompanying balance sheet.

On January 21, 1986, a complaint was filed against the Company in
the Denver County District Court by a vendor in the amount of
$37,500 for developmental disk drives furnished to the Company.
The Company filed an answer alleging the disk drives failed to
meet the specifications and intended purpose. On July 16, 1986, a
settlement agreement was reached whereby the Company paid the
vendor a total of $9,000, and was allowed to retain 20 of the
disk drives in dispute. As part of the agreement mutual releases
were filed with the Court. All of these drives have been written
off from inventory as of February 28, 1987.

On December 15, 1986, a complaint was filed against the Company
in the Santa Clara County Court in the amount of $ 36,703 for
component sub-assembly boards furnished to the Company. On April
15, 1987 a settlement agreement was reached in the amount of
$ 33,203 which has been classified in accounts payable and
accrued expenses on the accompanying balance sheet. The Company
has made two payments of $ 10,000 each and the remaining balance
of $ 13,203 is due on June 15, 1987.

The Company has been threatened with other litigation. If filed,
management intends to vigorously contest any claims and believes
any liability that might result will not have a material effect
on the financial statements.

F-15

APBU00653433

CompuSonics Corporation
Notes to Financial Statements

Payroll Tax Contingency

The Company is delinquent for payroll tax liabilities of approximately $96,000 owed to the Internal Revenue Service and the states of Massachusetts, Colorado and California for calendar quarters within fiscal years 1986 and 1987. The liability is classified in accounts payable and accrued expenses on the accompanying balance sheet. The Company has pledged to remain current with its filing and payment requirements on a going forward basis and has made the required payment for the calendar quarter ended March 31, 1987. There can be no guarantee that the forebearance exercised to date by these taxing authorities will continue.

F-16

APBU00653434

CompuSonics Corporation
Schedule IX
Short-term Borrowings

| Column A | Column B | Column C | Column D | Column E | Column F |
|---|---|---|---|---|---|
| Category of aggregate short-term borrowings | Balance at end of period | Weighted average interest rate | Maximum amount outstanding during the period | Average amount outstanding during the period | Weighted average interest rate during the period |
| For the year ended February 28, 1985: | | | | | |
| Notes payable to banks | $ 349,200 | 12.3 % | $ 349,200 | $ 79,903 | 12.37% |
| For the year ended February 28, 1986: | | | | | |
| Notes payable to banks | $ 1,528 | 21 % | $ 449,200 | $ 190,987 | 13.63% |

The accompanying notes are a part of this statement.

S-1

Page 49 of 75

APBU00653435