1   MATTHEW D. POWERS (Bar No. 104795)
    matthew.powers@weil.com
2   GARLAND STEPHENS (admitted N.D.C.A.,
    Texas Bar No. 24053910)
3   garland.stephens@weil.com
    NICHOLAS A. BROWN (Bar No. 198210)
4   nicholas.brown@weil.com
    WEIL, GOTSHAL & MANGES LLP
5   Silicon Valley Office
    201 Redwood Shores Parkway
6   Redwood Shores, CA  94065
    Telephone: (650) 802-3000
7   Facsimile: (650) 802-3100

8   Attorneys for Plaintiff
    APPLE COMPUTER, INC.

9

10                    UNITED STATES DISTRICT COURT

11        NORTHERN DISTRICT OF CALIFORNIA DISTRICT OF CALIFORNIA

12

13  APPLE COMPUTER, INC.,                  Case No. C 06-0019 MHP

14            Plaintiff,            **DECLARATION OF DR. STEPHEN B.
                                    WICKER IN SUPPORT OF APPLE'S
15        v.                        MOTION FOR SUMMARY
                                    JUDGMENT OF INVALIDITY**
16  BURST.COM, INC.,
                                    Hon. Marilyn Hall Patel
17            Defendant.
                                    Complaint Filed:  January 4, 2006
18                                  Trial Date:  February 26, 2008

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DR. STEPHEN B. WICKER IN
SUPPORT OF APPLE'S MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY                              Case No. C 06-0019 MHP

Dockets.Justia.com

I, Dr. Stephen B. Wicker, declare as follows:

1.      I have personal knowledge of facts stated in this Declaration, and if called upon as a witness, could and would testify competently thereto.

2.      I have been retained by Weil, Gotshal & Manges on behalf of Apple Computer, Inc. ("Apple").

3.      I am currently a Professor in the School of Electrical and Computer Engineering at Cornell University.  My Curriculum vitae is attached as Exhibit 1.

4.      I have reviewed U.S. Patent Nos. 4,963,995, 5,057,932, 5,164,839, and 5,995,705 (collectively "the-patents-in-suit"), as well as their respective file histories, and the Claim Construction Order of May 8, 2007.

5.      I have also reviewed a number of references that are prior art to the Burst patents:  U.S. Patent No. 4,506,387 ("Walter"); U.S. Patent No. 4,499,568 ("Gremillet"); U.S. Patent No. 4,541,012 ("Tescher"); U.S. Patent No. 4,667,088 ("Kramer"); U.S. Patent No. 4,790,003 ("Kepley"); the June 15, 1987 CompuSonics Form 10-K and 1985 CompuSonics DSP 2002 brochure; and Warren, "Peripheral Storage:  Who's Got What" ("Peripheral Storage article").

6.      For purposes of this declaration I am using the level of skill of a person of ordinary skill in the art in December 1988 that was described by Dr. Hemami in her "Claim Construction Expert Report," dated October 20, 2006.  According to Dr. Hemami:  "In general, a person of ordinary skill in the art would work in the area of digital communication of audio/video source information. A person in this area could be specialized in digital communications having a familiarity with compression technology, or such a person could be specialized in compression technology having a familiarity with digital communications. Such a person of ordinary skill in the art would have had at least a bachelor's degree in electrical engineering with a at least two to three years of experience working on digital communication of audio/video source information. Alternatively, such a person of ordinary skill in the art would have had a master's degree in electrical engineering with one year of experience working on digital communication of audio/ video source information. As another alternative, such a person of ordinary skill in the art would

1    have had a Ph.D. degree in electrical engineering in the area of digital communication of audio/

2    video information."

3           7.    The process of digitizing audio data and/or video data was well-known,

4    commonly used, and routine for persons of ordinary skill in the art well by the mid-1980's.  I

5    personally worked with A/D and D/A converters in undergraduate and graduate laboratories in

6    1982.

7           8.    The compression of digital audio and/or video data was well known,

8    commonly used, and routine for those of skill in the art by the mid-1980's.  I studied these

9    techniques as a graduate student and practicing engineer in the early- to mid-1980s.

10          9.    The storage of digital data, including digital audio/video data, was well

11   known, commonly used, and routine for those of skill in the art well by the mid-1980s.  Use of

12   magnetic disks (e.g. hard drives or "Winchester" disks, as they were known) for storage of digital

13   data was well-known and routine in the mid-1980s.  It was also well known and routine at the

14   time to use external storage devices, connected for example via SCSI (Small Computer System

15   Interface) cables, such as those described in "Peripheral Storage:  Who's Got What" (which was

16   cited by Burst during the prosecution of U.S. Patent No. 5,057,932).  I studied and worked with

17   these technologies as a graduate student and practicing engineer in the early- to mid-1980s.

18          10.   The transmission of digital data, including digital audio/video data, was

19   well known, commonly used, and routine for those of skill in the art well by the mid-1980s.  A

20   number of high bandwidth digital transmission mechanisms were well known and commonly

21   used by persons of ordinary skill in the art by the mid-1980's, including Ethernet lines and T1

22   carriers in the public switched telephone network.  There were also high bandwidth interfaces for

23   transmission of digital data to storage devices, including for example the SCSI interface. I studied

24   and worked with these technologies as a graduate student and practicing engineer in the early- to

25   mid-1980s.  In particular, I was a member of teams that designed and implemented several high

26   bandwidth systems for wireless digital transmission between 1983 and 1987.

27          11.   One of ordinary skill in the art in 1980s would have understood that for any

28   given digital file representing a time-based source (e.g. a song or video), there is always a rate by

1    which you can send it faster than real-time.  Any time a digital file is sent over a connection

2    whose effective speed is higher than the effective data rate of the stored media, the transmission

3    will be faster than real-time.  This would have been the routine and predictable result of using

4    known transmission or storage technology in its ordinary way to move or copy a digital file

5    representing a time-base source over a connection whose effective speed is higher than the

6    effective data rate of the stored media.  For example, any time the content on a SCSI hard disk

7    was backed up to a backup tape, the content on the SCSI hard disk would be transferred to the

8    backup tape.  If the hard disk contained a digital media file, and the effective speed of the

9    connection was higher than the media data rate of the file, the transfer would be faster than real-

10    time.

11    12.    In the mid-1980's it was well known by persons of skill in the art that a file

12    with fewer bits would take less time to transmit over a given transmission medium than a file with

13    more bits.  In other words it would have been obvious to a person of ordinary skill in the art that

14    the transmission of any file over a given transmission medium would take less time when the file

15    was compressed than it would take when that same file was not compressed.

16    13.    **Kramer**.  Kramer describes and illustrates in its figures a portable card

17    used to store compressed music.  The portable card contains inputs, storage, and outputs.  Kramer

18    also describes compression of the audio information "outside the illustrated system" using

19    "differential pulse code modulation (DPCM)."  Kramer at 3:9-20.  It was well known and obvious

20    to one of ordinary skill in the art in the 1980s that DPCM compression could be performed in a

21    digital circuit, and that this could be done in a DSP chip or "compressor."  Kramer also describes

22    "encoding and replay systems."  Kramer at 3:43.  It would have been obvious and routine for one

23    of skill in the art to use the compression, storage, and outputs described in Kramer in a common

24    housing as a "encoding system" in order to compress music to be stored in anticipation of being

25    copied onto a portable card as described in Kramer.  For example, this could be accomplished by

26    putting a sheet metal housing with input ports for an audio source around a DPCM encoder and at

27    least one of the portable cards (which would store the compressed audio and then output it to

28    another portable card).  In that case, the sheet metal, input ports, compressor, storage, and output

1    would each be performing the same function it had been known to perform, and the combination

2    would yield no more than one would expect.

3            14.    **Kepley.**  Kepley's Figure 2 depicts a set of components that it would have

4    been obvious and routine for a person of ordinary skill in the mid-1980s to arrange inside a

5    common housing.  It was well known and obvious to one of ordinary skill in the art in the mid-

6    1980s that DPCM compression could be used to compress voice information such as voicemail,

7    and that DPCM compression could have been used to implement the "bandwidth compression"

8    described in Kepley.

9            15.    **Walter**.  Walter describes a "central data station" that stores and transmits

10   compressed digital video information much faster than real time.  Walter at Abstract, 7:17-47.

11   Walter also describes a "data receiving station" that receives the compressed digital video

12   information much faster than real time and stores it "for an indefinite period of time for viewing

13   at a later date."  Walter at Abstract; 4:3-7:47.  Walter discloses video data that is compressed

14   using an "inter-frame differential pulse code modulation technique [that] is known in the art,

15   [although] additional circuitry may be added to avoid problems caused by rapid motion in the

16   picture."  Walter at 7:25-34.  Walter does not expressly state where the "circuitry" that performs

17   this compression is located, but it would have been obvious and routine for one of skill in the art

18   in the mid 1980s to have located this circuitry in the "central data station."[1]  Doing so would have

19   resulted in the completely predictable result of compressing the video data in the central data

20   station.  Components for both compressing video and for receiving compressed video are

21   disclosed in Walter, and it would have been routine and straightforward for one of skill in the art

22   in the mid 1980s to arrange these inside or outside a housing.  For example, if one desired to

23   quickly transfer a movie from a content provider such as a movie studio to the central data station

24   _____

25   [1] Walter states that "the electrical data representing each video program is converted into
     compressed digital form," and discloses that this compression is performed in (unspecified)
26   "circuitry."  Walter at 2:16-19; 7:25-34.  This circuitry must have an input of some sort in order
     to receive the audio/video information that is "converted into compressed digital form."  Also,
27   this input must be "coupled" to the circuitry for compressing the audio/video data.  Accordingly,
     this compression circuitry necessarily has the claimed "input means" for receiving data to be
28   compressed.

DECLARATION OF DR. STEPHEN B. WICKER IN
SUPPORT OF APPLE'S MOTION FOR SUMMARY                    4
JUDGMENT OF INVALIDITY                                                          Case No. C 06-0019 MHP

1  for subsequent distribution to customers, one could have included the disclosed components for

2  receiving compressed video inside the central data station.  Arranging the described components

3  in this way would have been obvious and routine to a person of skill in the art in the 1980s, and

4  would have produced the predictable result that the central data station could receive compressed

5  video faster than real time, store it as described, and then retransmit it to a data receiving station

6  as described.

7          16.  Walter does not specifically mention using "magnetic disks" for storage; it

8  describes "suitable high density memory devices." Walter at 2:13-18.  However, magnetic disks

9  were well known to those of skill in the art in the mid-1980s and would have been known to be

10  "suitable high density memory devices."  Magnetic disks are "random access" storage devices.

11  Magnetic disks could have been used in their normal manner in the apparatus described in Walter

12  to provide permanent storage of the compressed digital video information with completely

13  predictable results.

14          17.  While Walter does not expressly mention "output ports or terminals" or "input

15  ports or terminals," it shows the interfaces for both receiving from and transmitting along fiber

16  optic cables, and it describes the associated circuitry and devices.  Thus, Walter does describe

17  both "input ports" and "output ports," though it does not literally use those words.

18          18.  **Tescher and Gremillet.**  The Tescher patent describes compression of

19  video data to a rate of 0.239 Megabits per second.[2]  This compressed video bit rate is substantially

20  less than the disclosed bit rate for audio data in Gremillet, which expressly describes sending that

21  audio data faster-than-real-time.  Because the compressed video in Tescher has a lower bit rate

22  than the audio described in Gremillet, it would have been obvious to a person of ordinary skill in

23  the art in the mid-1980s that using video compressed as described in Tescher, in combination

24  with the Gremillet transmission system, would have resulted in the faster-than-real-time

25  transmission of compressed video.  This would be accomplished using the compression and

26  _____

27  [2] Figure 1 in Tescher shows "a block diagram illustrating an encoder incorporating the invention."
Tescher at 5:7-8.  The encoder shown in Figure 1 in Tescher uses both "intraframe" and
"interframe" compression, as required in the Court's claim construction order.  Tescher at 1:40-

28  45; 1:59-66; 2:32-43.

decompression described in Tescher exactly as described. It would have achieved the predictable and obvious result of sending the Tescher-compressed video faster-than-real-time using the transmission system in Gremillet. It would have been obvious to do this by locating the compression circuitry of Tescher in the "distribution centre" described in Gremillet, so as to compress the video and record it (instead of music) in the Gremillet's "bank of musical recordings."

19.   Gremillet describes a "distribution centre 10 [that] comprises a bank 11 of musical recordings recorded at a faster speed than normal" on "a video disk or video recorder." Gremillet at 3:37-42. It would have been routine and obvious for one of skill in the mid-1980s to substitute a known magnetic disk or disk array for the video recorder, with completely predictable results. For example, the Burst patents that mention magnetic disks describe optical disks and magnetic disks as alternatives for storage of audio/video information. '932 patent at 6:37-39.

20.   The music recorded in this "bank of musical recordings" must have come from somewhere, and it would have been obvious to one of skill in the art in the mid 1980s that it could be received through an input port or terminal from a standard audio device.

21.   Gremillet discloses the components for receiving music faster than real-time at a customer's location, and for transmitting music faster than real-time from a "distribution center." If one desired to quickly transfer a song or movie from a content provider such as a record label or movie studio to Gremillet's "distribution center" for subsequent distribution to customers, one could have included the disclosed components for receiving music (or video, if combined with Tescher) inside the Gremillet's "distribution center." Arranging the described components in this way would have been obvious and routine to a person of skill in the art in the 1980s, and would have produced the predictable result that the "distribution center" could receive data faster than real time, store it as described, and then retransmit it to the customer's location as described.

22.   **Analog to Digital Converter; Digital Source Information.** It would have been obvious and routine for a person of ordinary skill in the art to use an analog to digital converter, which was a common element of digital systems in the mid-1980's, in conjunction

1    with the systems described in the Kramer, Kepley, Walter, Gremillet, and Tescher references,

2    because those references describe digital systems that operate on information (audio and video)

3    that typically originates from the world as analog data.  Indeed, one of ordinary skill in the art

4    would have understood from this fact and the disclosures of each of these references that analog

5    to digital conversion occurred.  Kramer at 3:10-11 ("The music is encoded … into digital form");

6    Kepley 5:37-39 ("the hardware necessary to digitize voice and successfully buffer it  …"); Walter

7    at 2:15-17 ("the electrical data representing each video program is converted into compressed

8    digital form"); Tescher 5:37-38 ("In the preferred embodiment eight bit digital samples are taken

9    at a 10.7 MHz sampling rate"); Gremillet Fig. 2 (showing "A to D converter");  Furthermore, the

10   results of using a digital to analog converter would have been entirely predictable (i.e. conversion

11   of analog data to digital form).  It also would have been obvious and routine for one of ordinary

12   skill in the art in the mid 1980s that to use a digital to analog converter to convert audio/video

13   source information into digital form prior to introducing it into the systems described in Kramer,

14   Kepley, Walter and Gremillet, resulting in the use of "digital source information."

15        23.    **Semiconductor memory**.  One type of storage that was commonly used

16   inside a computing device in the mid 1980s was random access memory (RAM).  Random access

17   memories comprising semiconductor chips were well-known to those of ordinary skill in the art

18   well before the mid-1980's.  One of ordinary skill in the art would have understood that the

19   random access storage means identified in Kramer, Kepley, Walter, and Gremillet all either

20   included or could have included semiconductor memory.

21        24.    **Digital Editing**.  The editing of audio and video files, as shown by the

22   CompuSonics device (e.g. 6/15/87 CompuSonics Form 10-K, 1985 CompuSonics DSP 2002

23   brochure), was common in the field of digital systems prior to December 27, 1988.  It would have

24   been obvious and routine for a person of ordinary skill in the art to combine editing of digital

25   audio or video files with the elements disclosed in Walter or Gremillet and Tescher, or with the

26   "encoding system" of Kramer, in order to edit master recordings for distribution.  The results of

27   doing this are entirely predictable and the combination would have worked together in a known

28   way: it would have edited the digital audio or video information.  During editing, it is desirable

1   for the user to be able to "identify" or "monitor" what s/he is editing, be it through a display or

2   speakers.  Allowing the user to "identify" or "monitor" what is being edited was well known in

3   the mid 1980s to one of skill in the art.

4           25.    The CompuSonics system presented an editing means which was stored in

5   Random Access Memory (RAM).  The Court's construction of "editing means" requires the

6   editing instructions to be located in ROM.  It would have been obvious to one of skill in the art in

7   the mid 1980s that software designed to operate in RAM could be loaded into ROM and run from

8   ROM, with predictable results.

9           26.    **Computer-Generated Audio/Video Information.**  In allowing editing

10  and modifying sound, the CompuSonics system shows the creation of computer-generated

11  audio/video information.  For example, the CompuSonics DSP 2002 brochure describes the

12  function of "S-t-r-e-t-c-h a sound."  This creates audio/video information that was generated by a

13  computer.  It would have been obvious and routine for a person of ordinary skill in the art to

14  combine this or other types of computer generated audio/video information with the elements

15  disclosed in Kepley, Walter, Gremillet and Tescher, or with the "encoding system" of Kramer.

16  For example, computer-generated information could have been used with the voicemail system

17  described in Kepley to inform someone who receives a voicemail when that voicemail was

18  recorded.  The results of using computer-generated source information are entirely predictable: it

19  would be handled exactly he same way as other source information.

20          27.    **Removable Recording Medium**.  Removable recording media, including

21  WORM optical disks, were well known to those of skill in the art by 1988, as shown for example

22  in the Burst patents.  '932 patent at 4:7-17.  It would have been obvious and routine for one of

23  skill in the art in 1988 to have combined a removable recording medium, such as a WORM drive

24  or a backup tape drive, with the systems of Kepley, Gremillet, or Walter, if for example one

25  wanted to have a mechanism for backing up data in the system.

26          I declare under penalty of perjury that the foregoing is true and correct.  Executed

27  in Ithaca, New York on the date below.

28

1   JUly 13, 2007                          _____
    Date                                   Stephen B. Wicker
2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28