1  PARKER C. FOLSE III (WA Bar No. 24895 – *Pro Hac Vice*)
   pfolse@susmangodfrey.com
2  IAN B. CROSBY (WA Bar No. 28461 – *Pro Hac Vice*)
   icrosby@susmangodfrey.com
3  FLOYD G. SHORT (WA Bar No. 21632 – *Pro Hac Vice*)
   fshort@susmangodfrey.com
4  SUSMAN GODFREY, L.L.P.
   1201 Third Avenue, Suite 3800
5  Seattle, Washington 98101-3000
6  (206) 516-3880 Tel
   (206) 516-3883 Fax
7
   SPENCER HOSIE (CA Bar No. 101777)
8  shosie@hosielaw.com
9  BRUCE WECKER (CA Bar No. 078530)
   bwecker@hosielaw.com
10 HOSIE McARTHUR LLP
   One Market, 22nd Floor
11 San Francisco, CA 94105
   (415) 247-6000 Tel.
12 (415) 247-6001 Fax
13 *(additional attorneys listed on signature page)*

14 Attorneys for Defendant/Counterclaimant
   BURST.COM, INC.
15

16              UNITED STATES DISTRICT COURT
17     FOR THE NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO)

18

19 APPLE COMPUTER, INC.,              Case No. 3:06-CV-00019 MHP

20         Plaintiff/Counterdefendant,

21         v.

22 BURST.COM, INC.,
23
           Defendant/Counterclaimant
24

25 **DEFENDANT BURST.COM, INC.'S OPPOSITION TO PLAINTIFF APPLE COMPUTER,**
26 **INC.'S SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**

27              **CORRECTED VERSION**

28

# TABLE OF CONTENTS

I.      SUMMARY ..................................................................................................... 1

II.     BACKGROUND OF INVENTION................................................................... 2

III.    STANDARD FOR SUMMARY JUDGMENT OF
        ANTICIPATION/OBVIOUSNESS ................................................................. 3

IV.     SECONDARY INDICIA EVIDENCE CONFIRMS NON-OBVIOUSNESS ................... 4

        A.      Industry Praise, Satisfaction of Long-Felt Need, and Industry
                Skepticism................................................................................................. 5

        B.      Commercial Success ................................................................................. 7

        C.      Licensing of Burst Patents and Products................................................. 7

V.      KRAMER DOES NOT INVALIDATE ANY INDEPENDENT AUDIO
        CLAIMS........................................................................................................... 8

        A.      Kramer Does Not Render '995 Claim 1 Obvious................................... 8

                1.      It is Not Obvious to use "Random Access Storage" in Kramer ................ 8

                2.      It Would Not be Obvious to use FTRT Transmission in
                        Kramer ........................................................................................... 9

                3.      It is Not Obvious to use the "Compression Means" in Kramer .............. 10

                4.      Kramer Does Not Render Obvious a "Transceiver Apparatus" ............... 11

        B.      Kramer Does Not Render '995 Claim 17 Obvious................................. 12

        C.      Kramer Does Not Render '839 Claims 1 or 17 Obvious ....................... 12

VI.     KEPLEY DOES NOT INVALIDATE ANY INDEPENDENT AUDIO
        CLAIMS........................................................................................................... 13

        A.      Kepley Does Not Render '995 Claim 1 Obvious................................... 13

                1.      Kepley Does Not Disclose or Render Obvious a "Transceiver
                        Apparatus" ...................................................................................... 13

                2.      Kepley's Voice is Not "Audio/Video Source Information".................. 13

                3.      It Would Not be Obvious to use the "Compression Means" in
                        Kepley ............................................................................................. 14

                4.      It Would Not be Obvious to use FTRT Transmission in Kepley............. 14

        B.      Kepley Does Not Render '995 Claim 17 Obvious................................. 15

        C.      Kepley Does Not Anticipate '839 Claims 1 and 17 ............................. 16

VII.    WALTER DOES NOT INVALIDATE ANY INDEPENDENT CLAIMS ..................... 16

        A.      Walter Does Not Invalidate '995 Claim 1 or '932 Claim 4 ................... 16

                1.      Walter Does Not Disclose or Render Obvious a "Transceiver
                        Apparatus" ...................................................................................... 16

                2.      Walter's Central Data Station Does Not Include Compression................ 17

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
5907/1011.0010

i

|  |  |  |  |  |
|---|---|---|---|---|
| | | 3. | Walter lacks the Claimed "Random Access Storage/Magnetic Disk" | 18 |
| | B. | | Walter Does Not Invalidate '839 Claims 1, 76 or '705 Claim 12 | 18 |
| | C. | | Walter Does Not Invalidate '839 Claims 17, 77 or '705 Claim 21 | 19 |
| VIII. | | | THE GREMILLET/TESCHER COMBINATION DOES NOT INVALIDATE ANY INDEPENDENT CLAIMS | 20 |
| | A. | | The Combination Does Not Invalidate '995 Claim 1 or '932 Claim 4 | 20 |
| | | 1. | Gremillet Does Not Disclose Many Limitations | 20 |
| | | 2. | Tescher Does Not Disclose Many Limitations | 20 |
| | | 3. | Gremillet and Tescher Cannot be Combined | 21 |
| | B. | | The Combination Does Not Invalidate '839 Claims 1, 76 or '705 Claim 12 | 21 |
| | C. | | The Combination Does Not Invalidate '839 Claims 17, 77 or '705 Claim 21 | 22 |
| IX. | | | THE DEPENDENT CLAIMS ARE VALID | 22 |
| | A. | | The "Editing Claims" are Not Obvious ('995 Claims 2-3, 20, 23; '839 Claims 2-3, 20; and '705 Claim 13) | 22 |
| | B. | | The "Semiconductor Memory Claim" is Valid ('995 claim 7) | 23 |
| | C. | | The "Analog to Digital Converter Claim" is Valid ('995 Claim 8) | 23 |
| | D. | | The "Digital Source Information Claims" are Valid ('995 Claim 9 & '839 Claim 9) | 24 |
| | E. | | The "Computer-Generated Information Claims" are Valid ('995 Claim 15 & '839 Claim 15) | 24 |
| | F. | | The "Video Library Claims" are Valid ('995 Claim 19 & '839 Claim 19) | 24 |
| | G. | | The "Removable Recording Medium Claims" ('995 Claims 44-45, 47; '839 Claims 45, 47) and the "Optical Disk Claims" ('995 Claims 51-52; '839 Claim 51) are Valid | 25 |
| | H. | | The "Decompression Claims" are Valid ('995 Claims 20, 22-23; '839 Claims 20, 28) | 25 |
| X. | | | CONCLUSION | 26 |

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
5907/1011.0010

ii

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Sandoz, Inc.*, 2007 WL 1549498 (N.D. Ill. 2007) ................................................3

*Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350 (Fed. Cir. 1984) ......................16

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387 (Fed. Cir. 1988) ..................7

*Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966) ...............................................3, 4

*In re Fritch*, 972 F.2d 1260 (Fed. Cir. 1992)................................................................................4

*In re Omeprazole Patent Litigation*, 490 F.Supp.2d 381 (S.D.N.Y. 2007) ...................................4

*KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727 (2007)...............................................................1, 4

*Metabolite Labs, Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354 (Fed. Cir. 2004) ..........7, 16

*Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d
    1559 (Fed. Cir. 1992) ..............................................................................................................5

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342 (Fed. Cir. 2007) ......................5

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 2007 WL 1839698 (Fed. Cir.
    June 28, 2007) ......................................................................................................................3, 4

*Tec Air, Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d 1353 (Fed. Cir. 1999)................................7

*U.S. v. Adams*, 383 U.S. 39 (1966)................................................................................................4

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044 (Fed. Cir. 1988)........................................4

*Vulcan Engineering Co. Inc. v. Fata Aluminum, Inc.*, 278 F.3d 1366 (Fed. Cir. 2002) ...............5

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540 (Fed. Cir. 1983).............................5

*Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1993)...........................................................5

*WMS Gaming, Inc. v. Int'l Game Technology*, 184 F.3d 1339 (Fed. Cir. 1999)......................5, 7

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

iii

1  Defendant Burst.com, Inc. ("Burst") opposes Plaintiff Apple Computer, Inc.'s ("Apple") Second

2  Invalidity Motion of Burst's '995, '932, '839 and '705 Patents, W ex. 22-25, as follows[1]:

3  **I.    SUMMARY**

4  *Business Week* calls Richard Lang a "legitimate visionary" and "tech clairvoyant." This

5  notwithstanding, Apple disparages Mr. Lang and his invention. In Burst's Opposition ("Opposition"

6  or "Opp.") to Apple's first motion ("1st SJ"), Burst established that Kepley and Kramer do not

7  anticipate. Apple now shifts to obviousness and four new references.[2]

8  Apple presents a wishful description of *KSR Int'l Co. v. Teleflex, Inc.*, 127 S. Ct. 1727

9  (2007). Rather than effecting a sea change, *KSR* embraces the same basic obviousness framework

10  that has existed for several decades and reaffirms that "a patent composed of several elements is not

11  proved obvious merely by demonstrating that each of its elements was, independently, known in the

12  prior art." *KSR*, 127 S.Ct. at 1741. Instead, there must be an "apparent reason to combine the

13  known elements in the fashion claimed by the patent at issue." *Id.* at 1740-41 (emphasis added).

14  Apple's motion suffers from multiple fatal flaws under *KSR*. First, Apple mischaracterizes

15  Mr. Lang's invention by ignoring myriad claim limitations. Second, Apple fails to prove that there

16  are no material fact disputes regarding the scope of the prior art and the differences between the

17  prior art and the claimed inventions, both of which are factual inquiries for the jury. Third, Apple

18  ignores strong objective evidence of non-obviousness.

19  Apple's obviousness arguments also invite legal error. Ignoring the "teaching, suggestion, or

20  motivation" (TSM) test that *KSR* describes as "helpful," most of Apple's obviousness arguments

21  rely on Kramer, Kepley or Walter *individually*. The thrust of Apple's motion on Kramer, Kepley

22  and Walter is that even if the reference is missing four, five or six limitations, a claim is obvious

23  because: (i) those missing limitations are generally known in the prior art; and (2) it would be

24

25  [1] Burst's supporting declarations, which attach exhibits, include: (1) Daniel Walker dec. ("W"); (2)

26  Richard Lang dec. ("L"); (3) Dr. Doug Tygar dec. ("T"); (4) Dr. Allen Gersho dec. ("G2"), as well as his original dec. filed 6/7/07 ("G"); (5) Dr. Sheila Hemami dec. ("H2"), as well as her original

27  dec. filed 6/7/07 ("H"); and (6) Bruce McFarlane dec. ("M").

28  [2] U.S. Patent Nos. 4,790,003 ("Kramer"), 4,667,088 ("Kepley"), 4,506,387 ("Walter"), 4,499,568 ("Gremillet"), and 4,541,012 ("Tescher"). Apple also relies on "CompuSonics" art.

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

1

1  "predictable" to reconstruct the reference by substituting in the known missing components. Burst

2  has found no cases where a court finds obviousness by simply substituting myriad prior art

3  components into an otherwise deficient, <u>single</u> reference. Apple's approach smacks of hindsight. In

4  most cases, Apple does not even attempt to offer an "apparent reason" for the combination,

5  notwithstanding *KSR*'s requirement. Apple also violates the tenet that a claim must be viewed as a

6  "whole" (35 U.S.C. §103) by repeatedly treating a limitation in isolation and simply arguing that the

7  limitation is "obvious" because it is known in the prior art.

8  **II.    BACKGROUND OF INVENTION**

9      Mischaracterizing Mr. Lang's deposition, Apple argues that the only thing Mr. Lang claims

10  to have invented is the "idea of sending compressed audio or video faster than real-time [FTRT]."

11  2nd SJ 3. This is false – Mr. Lang, in fact, testified that his invention includes many components. W

12  ex. 2. In any event, it is the language of the claims that controls the scope of the invention.

13      '932 Claim 4 is representative. It covers an "audio/video transceiver apparatus," meaning

14  the components must be in a single housing. Because "the steps of Burst's patents are necessarily

15  sequential" (C.C. Ord. 24), the components must be configured to allow each function to occur in a

16  specific order. First, the "input" port receives large "full motion video programs." These programs

17  or works must have a temporal dimension and creative merit. Next, the "compression means"

18  reduces the number of bits of video by performing specific compression algorithms designed for

19  "efficient storage, transmission, and reception." '995 2:46-51. The time compressed video is then

20  efficiently stored in "random access storage" (*e.g.*, a magnetic disk), providing random access to

21  any given segment of video. Random access allows easy viewing and "provides convenience in the

22  editing of stored data." '995 2:59-3:2. Finally, the random access storage allows the compressed

23  video to be efficiently located and transmitted through an "output" port that sends the compressed

24  video to an external device faster than it would take to play in real-time (*i.e.*, FTRT).

25      Representative '932 Claim 4, therefore, covers an integrated device that incorporates

26  specialized components specifically configured to provide for the most efficient processing of a/v

27  digital data, including receiving, compressing, decompressing, storing, viewing, editing, recording,

28  and transmitting FTRT. This claimed consumer electronics device is nothing like Kramer (large

1 "encoding system" at a record store), Kepley (large voice mail system), Walter (large video

2 distribution center), Gremillet (large music distribution center) and Tescher (large video

3 teleconferencing system). Furthermore, the elements of Mr. Lang's invention, when combined as

4 claimed, were not predictable or a natural evolution as Apple suggests. At the time of the '995

5 filing in December 1988, the data compression industry was focused on techniques for reducing file

6 size to squeeze more into limited memory. It did not focus on delivery techniques. In contrast, the

7 broadcast industry focused on improving channel capacity for broadcasting or streaming radio and

8 television signals in order to provide more <u>real-time</u> channels. Under this broadcast paradigm,

9 media was transmitted in real-time to a recipient who consumed content as it was received. Apple's

10 obviousness arguments rely on 20-20 hindsight and ignore the limited knowledge and focused view

11 of one of ordinary skill in the 1980s operating in these disparate technological areas.

12 **III.     STANDARD FOR SUMMARY JUDGMENT OF ANTICIPATION/OBVIOUSNESS**

13     Anticipation and inherency law is set forth in Burst's first Opposition (incorporated by

14 reference). Apple bears the burden of proving invalidity by <u>clear and convincing</u> evidence. *Takeda*

15 *Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 2007 WL 1839698, at *3 (Fed. Cir. June 28, 2007).

16 For a claim to be obvious, every limitation must be disclosed in a combination of prior art. *See*

17 *Abbott Labs. v. Sandoz, Inc.*, 2007 WL 1549498, at *4 (N.D. Ill. 2007) ("the need to demonstrate the

18 presence of all claim limitations in the prior art . . . has not been obviated" by *KSR*).

19     Under *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966), as confirmed by

20 *KSR*, the obviousness issue requires determination of the following factual inquiries: (1) the scope

21 and content of the prior art; (2) differences between the prior art and the claims; and (3) the level of

22 ordinary skill in the pertinent art. The fourth factual inquiry concerns "secondary considerations

23 [such] as commercial success, long felt but unsolved needs, failure of others, etc., . . . to give light

24 to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham*,

25 383 U.S. at 17-18. Such fact intensive inquiries are not easily decided on summary judgment.

26     Apple argues that *KSR* replaced the obviousness inquiry with an invitation to invalidate

27 patents whenever the claimed invention seems "predictable." This is not what the Supreme Court

28 said. In fact, the Supreme Court embraced the same basic "obviousness" framework enunciated in

1  *Graham* in 1966. *KSR*, 127 S. Ct. at 1734. In doing so, the *KSR* Court rejected rigid application of

2  the Federal Circuit's TSM test, which required "some motivation or suggestion to combine [] prior

3  art teachings" to prove obviousness, but held that the test provides "helpful insight." *Id.* at 1734,

4  1741; *see also Takeda*, 2007 WL 1839698, at *5.

5      *KSR* also holds that there must be an "<u>apparent reason</u> to combine the known elements in the

6  fashion claimed by the patent at issue." *KSR*, 127 S.Ct. at 1740-41 (emphasis added). "This is so

7  because inventions in most, if not all, instances rely upon building blocks long since uncovered, and

8  claimed discoveries almost of necessity will be combinations of what, in some sense, is already

9  known." *Id.* at 1741; *see also U.S. v. Adams*, 383 U.S. 39, 51-52 (1966). By imposing the

10 "apparent reason" requirement, the *KSR* Court reaffirmed the bedrock principle that "a patent

11 composed of several elements is not proved obvious merely by demonstrating that each of its

12 elements was, independently, known in the prior art." *KSR*, 127 S.Ct. at 1741. *KSR* also reaffirmed

13 that "when the prior art teaches away from combining certain known elements, discovery of a

14 successful means of combining them is more likely to be non-obvious." *Id.* at 1740.

15      Accordingly, *KSR* merely calibrates obviousness law by moving from rigid application of

16 the TSM test to a test that requires an "apparent reason" to combine prior art. *KSR* further requires

17 that a factfinder's "apparent reason" analysis must be "explicit." *Id.* at 1741. Requiring a reason

18 for the prior art combination guards against "the distortion caused by hindsight bias" and

19 "arguments reliant upon *ex post* reasoning." *Id.* at 1742; *see also Graham*, 383 U.S. at 36 (warning

20 courts "to '[avoid] hindsight,' ... and to resist the temptation to read into the prior art the teachings

21 of the invention in issue"). "This is because the genius of invention is often a combination of

22 known elements that in hindsight seems preordained." *In re Omeprazole Patent Litigation*, 490

23 F.Supp.2d 381, 516-17 (S.D.N.Y. 2007). Accordingly, a factfinder cannot use the Burst patents as a

24 "blue print" or "instruction manual" to piece together the prior art teachings in order to combine the

25 right ones in the right way so as to create the claimed inventions. *In re Fritch*, 972 F.2d 1260, 1266

26 (Fed. Cir. 1992); *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1050-51 (Fed. Cir. 1988).

27 **IV.     SECONDARY INDICIA EVIDENCE CONFIRMS NON-OBVIOUSNESS**

28      Objective evidence of non-obviousness "may be the most pertinent, probative, and revealing

1   evidence available to aid in reaching a conclusion on the obvious/nonobvious issue," *W.L. Gore &*

2   *Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1555 (Fed. Cir. 1983) (*abrogated on other grounds by*

3   *Markman*), and such evidence "can often serve as insurance against the insidious attraction of the

4   siren hindsight" *id.* at 1553.

5        **A.    Industry Praise, Satisfaction of Long-Felt Need, and Industry Skepticism**

6        Objective evidence of non-obviousness includes solving a long-standing industry problem,

7   receiving industry praise, and skepticism of an expert.[3]   Each of these non-obviousness indicia is

8   satisfied.  Burst (previously called Explore Technology, Inc. and Instant Video Technologies, Inc. –

9   L ¶ 1) demonstrated prototypes of its invention in January 1991 at the Consumer Electronics Show

10  (CES).  L ¶ 4-9.  Burst's innovation was captivating, in part, because it eschewed the real-time

11  transmission convention.  One famous tech pundit wrote: "They [Burst] were demonstrating things

12  that other people couldn't do."  W ex. 1.  Similarly, shortly after the CES, the *Philadelphia Inquirer*

13  praised Burst's new approach, stating that "'video-library-on-demand may sound far-fetched and

14  futuristic, but some experts say it's plausible, particularly with the advent of technology patented by

15  [Burst]."  W ex. 3.  The article acknowledged that "[b]efore [Burst's invention], video could only be

16  transmitted in 'real time' – meaning that a two-hour movie would take two hours to transmit."  *Id.*

17  The director of strategic assessment at Southwestern Bell stated that he was "excite[d]" and

18  "impressed with [Burst's] technology."  *Id.*  Another engineer quoted in the article also praised the

19  Burst invention, stating "My feeling is, this is new, and it may change the way video signals are

20  transmitted, but it won't change it overnight."  *Id.*

21       Things did not change "overnight."  Indeed, for a decade, Burst swam against the tide of the

22  real-time convention, although it was praised along the way.  For example, in the September 1999

23  *NewMedia Magazine* (a large publication serving the digital content market), an industry

24  commentator wrote:  "While Microsoft and RealNetworks are futzing around on the desktop with

25

26  _____

27  [3] *See, e.g., PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1376 (Fed. Cir. 2007)
    (skepticism); *Vulcan Engineering Co. Inc. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1373 (Fed. Cir.
    2002) (industry praise); *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*,

28  976 F.2d 1559, 1574-75 (Fed. Cir. 1992) (satisfaction of long-felt need).

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

5

1  advertising deals and strategic partnerships, startup [Burst] is doing something that really advances

2  the state of the art of streaming video.  [Burst's] Burstware promises the instant gratification of

3  streaming, but with smoother video playback and better use of bandwidth" through its use of

4  "bursting."  W ex. 5; *see also* W ex. 4.  Significantly, this solved the industry's problem of jittery

5  reception and black-out periods caused by imperfections in the real-time streaming model.  L ¶ 10.

6        The praise notwithstanding, experts expressed skepticism.  During licensing discussions in

7  2000, Microsoft questioned whether Burst's invention worked better than the real-time streaming

8  model.  One Microsoft engineer wrote that he "can't help but be a bit skeptical that [Burst's claimed

9  content delivery advantages] could in fact be achieved."  L ¶ 11, ex. 1.  Another skeptical Microsoft

10  executive wrote that Microsoft would "need to see . . . a demonstration that the burst solution is

11  viable."  L ¶ 11, ex. 2.  In response, Burst hired Approach, Inc., a testing laboratory used by

12  Microsoft.  L ¶ 14, ex. 5.  After evaluating Burst's FTRT technology, Approach issued a glowing

13  report praising the Burst technology and proving Microsoft's engineers wrong.  *Id.*

14        For further confirmation, Microsoft approached Burst customers including Excite@Home.

15  In an email, the Microsoft executive, finally a believer, wrote that Microsoft engineers "have been

16  skeptical of [Burst's] technology for a variety of reasons," but that Excite@Home told Microsoft it

17  was "impressed with Burst."  L ¶ 12, ex. 3.  Another email from Excite@Home's head of broadband

18  product development went so far as to call Burst "[t]he future of Excite@Home video distribution."

19  L ¶ 13, ex. 4.  In summary, the Microsoft executive wrote that he "believe[s] we should revisit our

20  stance with regard to [Burst] and even consider acquisition."  L ¶ 12, ex. 3.

21        The praise continues today.  In 2006, *Business Week* succinctly stated, "A legitimate

22  visionary, [Mr. Lang] patented a method for transmitting data over digital networks that turned out

23  to be years ahead of its time."  W ex. 1.  The article further states that Mr. Lang's "record as a tech

24  clairvoyant is impressive.  When the rest of the world was focused on stuffing 500 channels onto

25  cable TV, [Burst] was devising ways to use digital networks to deliver content more efficiently and

26  reliably" by using transmission "bursts."  *Id.*  The article's conclusion speaks volumes:  "After

27  spending the 1990s trying to perfect 'real-time streaming' of content [ ] titans including Apple,

28  Microsoft, and Real [Networks] have since embraced Lang's general approach."  *Id.*

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

6

**B.    Commercial Success**

Commercial success of "an invention is significant to determinations of obviousness." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1391 (Fed. Cir. 1988). Commercial success turns, in part, on evidence of sales volume and/or market share of infringing products. *Tec Air, Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d 1353, 1361 (Fed. Cir. 1999). The commercial success of Apple's infringing[4] iPod, iTunes client software, and iTunes Music Store (iTMS) is almost unfathomable.[5]   Combined revenues for the iPod, iTMS, and Apple computers with iTunes client preinstalled, from January 2001 through the most recent quarter, are more than $33 billion dollars in the U.S. M App. B.

Burst's patented features are at the core of Apple's commercial success.   Fast download speed is a primary feature of the iTMS and the iPod.   W ex. 12-15.   For example, when Apple was determining whether to enter the MP3 player market, "fast and convenient connectivity" for downloading songs was seen as a "key feature." W ex. 16.   An Apple executive also testified that download speed was one of three key performance metrics by which Apple gauged the success of the iTMS.   W ex. 17; *see also* W ex. 18 (Casanova, QuickTime exec).   Customer surveys conducted by Apple also corroborate that fast transmission speed is critical for the iPod and iTMS.   W ex. 19.

**C.    Licensing of Burst Patents and Products**

Evidence of licensing activity is also indicative of non-obviousness. *WMS Gaming* 184 F.3d at 1359-60; *see also Metabolite Labs, Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1368 (Fed. Cir. 2004).   In the 90s, Burst granted five patent licenses.   L ¶ 15, ex. 6-10.   And Microsoft paid $60 million in 2005 for a nonexclusive license under the patents-in-suit.[6] L ¶ 16, ex. 11.   Burst

---

[4] To establish infringement and show nexus between the claimed inventions and Apple products, Burst submits its expert infringement reports (without claim charts).   T ex. 1; H2 ex. 3.

[5] iTunes client software has been downloaded more than 750 million times worldwide (W ex. 6) and is the most used software application on Mac computers (W ex. 7).   Apple has sold over 100 million iPods.   W ex. 8-10.   iTMS has now downloaded more than 3 billion songs/videos, making Apple the third-largest U.S. music seller currently.   W ex. 10, 11.

[6]   This license was part of the settlement in the Burst/Microsoft litigation, which involved both patent and antitrust issues.   The evidence itself shows that the $60 million payment was for a nonexclusive patent license (L ex. 11), and Apple's arguments to the contrary are based on speculation and inferences that cannot be drawn in its favor on summary judgment.

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

7

1    also successfully licensed its Burstware software product to over 20 companies between 1999 and

2    2003. *Id.* ¶ 13, ex. 12 (license sample). The key feature of the Burstware product was transmitting

3    audio/video content FTRT. L ¶ 10. Indeed, all of these licensees took licenses because they wanted

4    to enjoy the benefits of Burst's patented technology that allows transmission FTRT. L ¶ 17.

5    **V.    KRAMER DOES NOT INVALIDATE ANY INDEPENDENT AUDIO CLAIMS**

6    Apple contends that the following independent audio claims are rendered obvious by

7    Kramer *individually*: '995 Claims 1, 17 and '839 Claims 1, 17. The numerous claim distinctions

8    show Apple cannot carry its heavy burden, especially in view of Burst's secondary indicia evidence.

9    **A.    Kramer Does Not Render '995 Claim 1 Obvious**

10    **1.    It is Not Obvious to use "Random Access Storage" in Kramer**

11    Kramer's card memory is a serial access "bubble memory." Opp. 11-13; G2 ¶ 9-15. Kramer

12    repeatedly confirms this by referring to "storage serially," "retrieval serially," and a "circular shift

13    register." Kr. Ab.; 1:63-64; 2:25-28; 3:42-45; 4:1-2. Apple's expert does not challenge this

14    conclusion. Instead, Apple cites Kramer's "Background" section, which refers to prior art memory

15    "arranged so as to allow immediate recall of the data stored in any portion of the memory." 2nd SJ

16    12. But this language only describes prior art (Kr. 1:35-37) and is unrelated to Kramer's invention.

17    G2 ¶ 11. Additionally, Apple's reliance on the words "immediate recall" is misplaced because those

18    words do not imply random access in the context of Kramer, as Dr. Gersho explains. G2 ¶ 11-12.

19    Kramer, in fact, teaches away from random access storage by emphasizing serial access. G2

20    ¶ 11-15. Additionally, Kramer's sole purpose is audio playback, which results from a serial bit

21    stream. G2 ¶ 13. Burst's invention, in contrast, further includes editing and utilizes random access

22    to provide "convenience in the editing of stored data." *E.g.*, '995 2:67 - 3:2. Random access storage

23    facilitates editing because each piece of data can be directly accessed. Kramer, however, does not

24    contemplate editing. G2 ¶ 13. Without a need for random access, it is nonsensical to modify

25    Kramer when doing so would substantially increase the cost and complexity.[7] G ¶ 11-15. Thus, a

26

---

27    [7] The "circular shift register" of Kramer has a single input port ("storage serially") and a single

28    output port ("retrieval serially"). This serial access architecture simplifies the system design,
      implementation and operation. G2 ¶ 11-15. While random access storage requires complex logic

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

8

1 | person of ordinary skill would not have a reason to use random access storage in Kramer.  G2 ¶ 15.

2 | **2.    It Would Not be Obvious to use FTRT Transmission in Kramer**

3 |     No Apple expert has stated that Kramer discloses FTRT transmission.  It does not, and there

4 | is no reason to modify Kramer to include FTRT transmission.  Kramer's system is devoted to real-

5 | time play back of audio and is incapable of FTRT transmission.  Opp. 9-11; G ¶ 12-14; G2 ¶ 16-38.

6 | Figures 1 and 2 of Kramer show that neither the card nor the replay unit have any form of memory

7 | other than card memory 22.  Without additional memory, Dr. Gersho opines that if audio were read

8 | out of memory 22 FTRT (as Apple alleges), then the audio would fly through the demultiplexer,

9 | decoders and replay unit (with no memory to slow it down by storing it) and be played back at

10 | "chipmunk" speed, which is unintelligible.  G ¶ 13-14; G2 ¶ 19-20.

11 |     In response, Apple argues audio is read out of memory 22 one-hundred times over the course

12 | of the playback period (*i.e.*, for Kramer's 210 second song, the song is read out of memory 100

13 | times resulting in 2.1 second read cycles).  1st SJ Reply 7.  Apple specifically argues that "each time

14 | [the song is read out in a 2.1 second cycle], the decoder reads only one out of every 100 bits, so it

15 | can achieve the 'required slower reproduction rate.'"   The graphic attached as Appendix A

16 | illustrates the untenable nature of Apple's position.   Data for Kramer's sub-bands is stored

17 | sequentially in memory 22 in an "interleaved fashion."  G2 ¶ 29-30; Kr. 4:51-52.  Under Apple's

18 | four sub-band/four decoder contention (Reply 7-8), the serial bit stream has a bit sequence: r(ed)1,

19 | b(lue)1, g(reen)1, p(urple)1, r2, b2, g2, p2, r3, b3, g3, p3, and so forth.  G2 ¶ 29-30.  Each decoder

20 | for a sub-band reads the data "by taking, e.g. only one out of every 100 bits of information

21 | presented to it at a time."  Kr. 4:47-52.  As illustrated, this means that the sequence of bits the first

22 | (red) decoder accepts on the first (2.1 second) cycle is: r1, r26, r51, r76, r101, and so forth where

23 | r26 is the 101st bit in the serial stream, r51 is the 201st bit, etc.  G2 ¶ 31.  But this sequence is

24 | useless for reproducing the first 2.1 seconds of the first (red) sub-band of audio since it is missing

25 | 24 out of every 25 needed bits.  *Id.*  Similarly, the other sub-bands (*e.g.*, blue sub-band) will also be

26 |

27 |

28 | circuitry to randomly access each memory cell, such addressing logic is not required for a circular shift register because only one input and one output need to be accessed.

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

9

1   missing 24 out of every 25 needed bits for the first 2.1 second cycle. *Id.*[8]

2   Apple's sole theory of FTRT transmission – memory 22 is read out 100 times during

3   playback – is therefore meritless.[9]  In fact, memory would never be repeatedly read out to achieve a

4   one-time playback.  G2 ¶ 21, 23.  Dr. Gersho's declaration also explains why Kramer teaches 100

5   decoders and 100 sub-bands that result in real-time transmission.  G2 ¶ 24-27.

6   It is not obvious to reconfigure Kramer to achieve FTRT transmission.  One of ordinary

7   skill, recognizing Kramer's audio playback purpose, would not add costly and complex circuitry that

8   might provide FTRT transmission.[10]  G2 ¶ 36-38.  This would give the memory card a completely

9   different function – an unnecessary function – not contemplated by Kramer.  And Apple has not

10  shown such specialized circuitry existed, which is not surprising in light of Dr. Gersho's point that

11  Kramer's bubble memory could not operate at Apple's suggested FTRT speed.  G2 ¶ 23, 37.  In

12  short, it would not be obvious to add expensive, complex FTRT functionality to the Kramer

13  invention, which is all about real-time playback.  *See generally* G2 ¶ 16-38.

14  **3.    It is Not Obvious to use the "Compression Means" in Kramer**

15  Kramer lacks a compressor that "reduc[es] the number of bits."  Opp. 7-9.  Kramer's "music

16  signal is encoded . . . <u>into digital form</u>" using DPCM, which describes using DPCM to convert an

17  analog signal into a digital signal (*i.e.*, analog to digital conversion).  G ¶ 11; G2 ¶ 39-40.  Apple's

18  expert admits this by quoting the above words in Kramer for the proposition that it discloses

19  "analog to digital conversion."  Wicker ¶ 22.  Encoding an analog signal (no bits) into digital form

20  (with bits) does not involve "reducing the number of bits," as required.  G ¶ 11; G2 ¶ 39-40.

21

22

23  [8] Further, under Apple's theory, the phrase "the intervening 99 bits will be read on subsequent cycles of memory" means that on the second (2.1 second) cycle, another one out of 100 bits will be read by each decoder.  G2 ¶ 32.  As illustrated, the sequence of bits accepted by the first (red) decoder during the 2nd cycle would be:  r2, r27, r52, r77, r102, and so forth, which is again useless for reproducing the next 2.1 seconds of the first (red) sub-band of audio.  *Id.*  Thus, each cycle would result in an unintelligible audio output from the memory card.  *Id.*

26  [9] Dr. Gersho's declaration also explains why Kramer's vague language that recording "can take a very short time" does not indicate FTRT transmission of any sort.  G2 ¶ 34.

27  [10] The cost and complexity of a circuit increases dramatically as clock speed increases, meaning one would always want to use the lowest clock rate necessary.  G2 ¶ 21.  Apple's obviousness theory would require incredibly high clock speeds not envisioned.

1        Apple argues that "analog to digital" DPCM falls within the Court's construction. Reply 3-

2   5. It does not. Burst's patents state that reducing the number of bits means taking a <u>digital signal</u>

3   <u>with bits</u> and representing it with fewer bits. *E.g.*, 995 4:65-68; G2 ¶ 55. The Court's *Markman*

4   Order confirms this. C.C. Ord. 10 ("Data compression accomplishes this reduction <u>on digital</u>

5   <u>information</u> in certain ways such as encoding patterns and redundancies in fewer bits").[11]

6        It is not obvious to substitute digital DPCM for analog DPCM in Kramer. Digital DPCM

7   (which reduces bits using digital circuitry) and analog DPCM (which converts an analog signal to a

8   digital signal using analog circuitry) employ distinct methodologies and technologies in processing

9   signal differences. G2 ¶ 41-47. Digital circuitry implementation would increase both the cost and

10  complexity of the Kramer "encoding system" without any reason for doing so. G2 ¶ 44-47.

11  Accordingly, Dr. Gersho concludes that one of ordinary skill would not have an "apparent reason"

12  to use digital DPCM instead of analog DPCM in Kramer's "encoding system."[12] G2 ¶ 44-47.

13          **4.    Kramer Does Not Render Obvious a "Transceiver Apparatus"**

14       Apple concedes that Kramer's memory card does not meet the single housing requirement.

15  Reply 10. It then shifts gears to the record store's "encoding system." Yet Apple admits that

16  "Kramer does not say expressly whether this 'encoding system' is contained within a single

17  housing." Reply 11. In fact, Kramer "does not say" much about the encoding system, which lacks

18  the claimed input, random access storage and FTRT transmission. G2 ¶ 48-49. Given the lack of

19  description, Apple concocts incredible inherency and obviousness arguments. Apple cannot prove

20  that Kramer's encoding system is "necessarily" a single housing, as required for inherency. *Id.*

21  

---

22  [11] Contrary to Apple's assertion (Reply 3), Dr. Hemami never opined that analog DPCM constitutes
    the claimed compression means. H2 ¶ 11. As Dr. Hemami's tutorial slides illustrate, her statements

23  concerning DPCM are clearly directed to the digital form of DPCM where an already digitized
    input signal is compressed by reducing the input signal's bits. H2 ¶11, ex. 1, 2.

24  [12] Apple's reliance on *Bellamy's* statement that digital processing "is generally the most effective
    means of implementing a DPCM algorithm" is misplaced. 2nd SJ 11. *Bellamy* is a 1991 publication

25  that does not reflect the state of the art in 1988 and it only deals with speech/voice, which is a very
    different animal than the claimed wideband audio. G2 ¶ 44-47; H ¶ 15-26. Because of the much

26  more demanding requirements of audio (*e.g.*, higher sampling and bit rates), the complexity of
    digital circuitry for audio was far greater than for speech. G2 ¶ 44-47. Hence, while digital

27  processing might have been preferred for speech (as *Bellamy* suggests), this does not imply that one
    of ordinary skill would find it obvious to use digital DPCM in Kramer, which is an audio (not a

28  speech) system. *Id.*

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

11

1   Apple is left with the untenable obviousness theory that the "compression, storage and
2   outputs described in Kramer" could be arranged in the missing common housing "by putting a sheet
3   metal housing with input ports for an audio source around a DPCM encoder and at least one of the
4   portable cards (which would store the compressed audio and then output it to another portable
5   card)." Wicker ¶ 13. Apple has used the claimed invention as a blue print. Unlike Burst's
6   integrated device, the record shop's encoding system derives no benefit from a common housing
7   and therefore one of ordinary skill would not proceed as suggested by Apple. G2 ¶ 48-49. Nor does
8   it make sense to place a portable memory card inside a "sheet metal box" that renders it un-portable.
9   *Id.* And even if reconstructed, the Kramer encoding system would still lack the claimed random
10  access storage, compression means and FTRT transmission for the reasons set forth above.

11      **B.    Kramer Does Not Render '995 Claim 17 Obvious**

12      Apple shifts back to Kramer's memory card for '995 Claim 17, but provides no analysis. As
13  shown, Kramer lacks the claimed random access storage and "time compressed representation,"
14  which requires a "reduced number of bits." G2 ¶ 39-40. Nor does Kramer disclose that the card
15  receives compressed audio FTRT. G2 ¶ 16-38. Apple's reference to recording in a "very short
16  time" is not clear and convincing evidence given its vagueness. G2 ¶ 35. In any event, Apple has
17  taken the position that the recording time and replay time are identical (Reply 6-7), which would
18  mean that recording is done in real-time, just like transmission from card to card. G ¶ 16-38. Apple
19  offers no reason why Kramer should be completely reconfigured to add the missing limitations.

20      **C.    Kramer Does Not Render '839 Claims 1 or 17 Obvious**

21      Apple does not address '839 Claims 1 and 17 in any detail. It fails to provide evidence that
22  there is any reason to modify Kramer by adding the following missing limitations: (1)
23  "compressing" audio/video source information into a "time compressed representation" (Kramer
24  has no reduction in bits); (2) compressing *after* receiving the audio/video source information
25  (Kramer's alleged compression occurs at the encoding system *before* the card's receipt); (3) FTRT
26  receipt (Kramer is real-time); (4) FTRT transmission (Kramer is real-time); and (5) FTRT re-
27  transmission (Kramer is real-time). G ¶ 11-14; G2 ¶ 16-38.

28      In sum, Apple's hindsight analysis makes a mockery of the obviousness standards.

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

12

## VI.    KEPLEY DOES NOT INVALIDATE ANY INDEPENDENT AUDIO CLAIMS

Apple contends that the following independent audio claims are rendered obvious by Kepley *individually*: '995 Claims 1, 17 and '839 Claims 1, 17. Kepley's voice mail system is nothing like the patented integrated device and Apple's hindsight driven arguments should be rejected.

### A.    Kepley Does Not Render '995 Claim 1 Obvious

#### 1.    Kepley Does Not Disclose or Render Obvious a "Transceiver Apparatus"

Kepley lacks the claimed common housing. H ¶ 29; H2 ¶ 25-30. Apple's expert does not challenge this conclusion.[13] Nor has Apple offered any reason why Kepley would be modified to include a single housing. Unlike the patented integrated device, a bulky voice mail system has no need for a single housing. H2 ¶ 25-28. In fact, a single housing is impractical due to Kepley's many processor cables. *Id.* ¶ 27-28. On the one hand, creating holes for each cable would be unwieldy, and on the other hand, bundling the cables through a single hole complicates maintenance. *Id.* ¶ 27. Furthermore, telephone equipment was built modularly for easy expansion (*e.g.,* adding cards), but a common housing enclosure makes expansion difficult. *Id.* ¶ 28.

#### 2.    Kepley's Voice is Not "Audio/Video Source Information"

The claimed "audio/video source information" is limited to a work, which requires "creative" effort that is lacking in a voice mail. H ¶ 11-28. Dr. Hemami summarizes the profound distinctions between speech/voice and the claimed wide band audio in her first declaration. H ¶ 16. In truth, processing of speech and audio are different fields of art. H ¶ 14-28; H2 ¶ 13. Apple's expert does not contest this.[14] Although some works (*e.g.,* audiobooks) consist entirely of spoken

---

[13] Instead, Apple focuses on the "dotted lines" and "interface" in Izeki, claiming that Burst's arguments as to Izeki apply to the very different voice mail system of Kepley. Reply 15-16. Apple has taken statements out of context and over-generalized. Interfaces can be internal or external, and dotted lines in patent figures don't imply anything in the abstract. H2 ¶ 29-30. For Kepley, because dotted lines do not indicate a common housing, the lines around the voice mail system 110 do not indicate a single housing. H2 ¶ 30.

[14] Apple relies on the '932 Patent (Reply 14): "a user can dictate an <u>audio presentation</u> and send it to a remote location (e.g., an office) at an accelerated rate without having to monopolize the transmission medium (e.g., the fiber optic cable) for an extended length of time." '932 12:29-34 (emphasis added). This passage is not in the '995 Patent, and it does not help Apple's cause. An "audio presentation" is a work because presentations require creative effort. Additionally, the passage emphasizes the objective of not "monopoliz[ing] the transmission medium," which the Burst invention accomplishes by, for example, using a microphone connected to a transceiver that

1    voice, Kepley does not disclose any works of this kind.  Nor would it make sense (or be obvious) to

2    receive, store, or send such works using the Kepley system.  Kepley discloses no means for

3    receiving pre-recorded works, and there would never be any reason to create a vocal work in the

4    first instance by reciting it into a voice mail system by telephone.  H2 ¶ 17-19.

5          **3.     It Would Not be Obvious to use the "Compression Means" in Kepley**

6          The "compression means" requires a specific compression algorithm.  C.C. Ord. 9.  Kepley

7    fails to teach any specific algorithms and the claimed algorithm is not inherent.  G ¶ 19-27.  Apple's

8    Reply wrongly contends that "silence compression necessarily" includes the claimed algorithm.

9    Reply 15.  Not surprisingly, it cites no supporting evidence, which clearly does not exist.  G ¶ 27;

10   G2 ¶ 52-54.  Nor does silence compression make sense for audio works because such works rarely

11   contain enough silence to justify such compression.  G2 ¶ 54.  This further underscores that

12   speech/voice (which use silence compression) and audio are fundamentally different and therefore

13   are not obvious variants of each other.  Apple's obviousness argument also fails.  The thrust of

14   Apple's argument is three-fold:  many speech compression algorithms exist, a subset of them (*e.g.*,

15   digital DPCM) use the claimed algorithm, and it would be obvious for Kepley to use this subset.

16   Apple offers no "reason" why it would be obvious to select this subset, which is fatal under *KSR*.

17         **4.     It Would Not be Obvious to use FTRT Transmission in Kepley**

18         Dr. Hemami's initial declaration shows why Kepley's system is incapable of FTRT

19   transmission.  *See generally* H ¶ 34-50.  Her second declaration shows why Kepley falls far short of

20   Apple's obviousness mark as well.  *See generally* H2 ¶ 16-24.  Speech and the claimed wideband

21   audio have widely divergent characteristics.  For example, speech is concentrated in the frequency

22   range of 200 Hz to 3.2-3.4 kHz, while wideband audio spans the entire range of human hearing (5 –

23   20kHz).  H ¶ 21.  Due to their greater complexity, digitized audio works have much higher data

24   rates than speech.  H ¶ 22 (compare CD-quality audio at 705 Kb/s with speech at 64 Kb/s).  Kepley

25   does not disclose and could not process the higher data rates required for audio works.  H2 ¶ 16-24.

26

27   stores and then transmits the recorded work FTRT.  In contrast, Apple's "extended voice mail

28   message" (Reply 14) would monopolize a phone line for "an extended length of time" while the
message is being recorded, which defeats the invention's objective.

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

14

1    Apple argues that an opera/song could be sent over phone lines to Kepley's voice mail

2    system, where the opera/song is recorded and processed so that it could be transmitted FTRT. 2nd

3    SJ 13. It makes no sense to record a song in this manner – no one would hold a telephone receiver

4    up to a stereo speaker so that the receiver functioned as a microphone. H2 ¶ 17. Also problematic

5    for Apple is the fact that sending the song over the phone system would eliminate frequencies

6    between 3.2kHz and 20kHz, filtering out 85% of the frequency content. H ¶ 23; H2 ¶ 17. The

7    resulting digital signal would be unacceptable, further underscoring the fallacy in Apple's claim. *Id.*

8    Moreover, Burst's Opposition establishes that Kepley's LAPD/X.25 protocol has a default

9    data rate of only 9.6 kb/s that cannot be used to transmit Kepley's 16 kb/s voice mail FTRT, much

10   less an audio work with higher data rates. H ¶ 48. In response, Apple contends it would be obvious

11   to use higher speed T1 lines or Ethernet, which are not mentioned in Kepley. Reply 13. Apple fails

12   to provide a compelling reason for the suggested overhaul of the Kepley system. As Dr. Hemami

13   explains, modifying Kepley to solve the slow transmission problems would be "at best impractical

14   and more likely impossible." H2 ¶ 20-24. She states that implementing T1 lines or ethernet in

15   Kepley "would require replacing the entire telephone infrastructure, including all switching offices

16   and signal conditioning equipment." *Id.* ¶ 20. Additionally, "installation and use of a T1 line would

17   not only be costly … [it] would only be able to communicate with other voice mail systems also on

18   T1 lines, thereby severely limiting its usefulness or making extreme the cost of implementing a

19   complete system." *Id.* ¶ 23. Installation of ethernet suffers from the same impracticalities. *Id.* ¶ 24.

20   **B.    Kepley Does Not Render '995 Claim 17 Obvious**

21   As shown, Kepley lacks the "transceiver apparatus," "audio/video source information,"

22   "time compressed representation," and FTRT transmission limitations that are common to '995

23   Claims 1 and 17. The additional '995 Claim 17 limitation of retransmitting FTRT is also not

24   present. Opp. 22-23. Dr. Hemami's declaration reinforces that Kepley, including the section on

25   which Apple relies, "wholly fails to address the concept of retransmission." H2 ¶ 14-15; H ¶ 55.

26   Apple has not offered an expert declaration or any other evidence establishing a reason why one of

27   ordinary skill would reconstruct Kepley to include a FTRT re-transmission feature.

28

**C.    Kepley Does Not Anticipate '839 Claims 1 and 17**

As shown, Kepley's voice mail does not constitute the claimed "audio/video source information" or "time compressed representation" of that source information. H ¶ 11-28. Nor does Kepley disclose any form of FTRT reception (required by '839 claim 17), FTRT transmission (required by '839 claim 1) or FTRT re-transmission (required by '839 claim 17). There is simply no FTRT operation in Kepley, and Apple has not presented a clear and convincing reason to modify Kepley to include such an operation. H ¶ 34-50, 55; H2 ¶ 16-24.

**VII.    WALTER DOES NOT INVALIDATE ANY INDEPENDENT CLAIMS**

The PTO considered Walter in the '932, '839 and '705 Patents. W ¶ 25-29, ex. 24-28. This makes Apple's clear and convincing burden even more difficult to meet. *Metabolite Labs*, 370 F.3d at 1367-68 (Fed. Cir. 2004); *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984).[15]    The above notwithstanding, Apple contends numerous independent claims are either anticipated or rendered obvious by Walter *individually*. The Court should reject Apple's attempt to second guess the PTO, especially in view of the numerous claim distinctions over Walter.

**A.    Walter Does Not Invalidate '995 Claim 1 or '932 Claim 4**

Apple contends that Walter anticipates '995 Claim 1 and renders obvious '932 Claim 4. 2nd SJ 17-18. '932 Claim 4 is narrower than '995 Claim 1 because it is limited to "full motion video programs" and magnetic disk storage. Walter lacks the "transceiver apparatus," "compression means," and "random access storage/magnetic disk" elements of these two claims.

**1.    Walter Does Not Disclose or Render Obvious a "Transceiver Apparatus"**

Walter is the only Apple reference that discloses full motion video programs. It teaches a central data station and a data receiving station. The central data station includes a series of memory modules, which are "preprogrammed" with video programs. When a user requests a video, it is transmitted over optical fibers from the central data station to the data receiving station, where

---

[15] Apple will claim that Burst did not adequately describe Walter in its IDS. Not only is this argument false, it ignores that the examiner clearly had opportunity to review Walter over and over. W ex. 26-28. Apple's argument is sour grapes and is based on the faulty premise that the examiner did not closely review Walter. The PTO rules require that an examiner must consider every reference and his check mark next to the reference means he specifically reviewed it. *Id.* MPEP 609 (W ex. 29).

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

16

1    the user can play the video in "real time."   Apple relies exclusively on the central data station,

2    which is essentially a video distribution center.   Nothing in Walter suggests that the components of

3    the central data station are in a single housing.   To the contrary, the central data station is an

4    expansive amalgam of diverse components.   H2 ¶ 38.   There is no reason (and Apple provides

5    none) to include all of these components under one housing, which is likely impossible given their

6    physical breadth.   *Id.* ¶ 35, 38-39.   Indeed, one of ordinary skill would never think of a video

7    distribution center as having a single housing.   *Id.*

8                    **2.    Walter's Central Data Station Does Not Include Compression**

9            Walter's figures do not show a compressor at the central data station.   This is because

10   Walter's alleged compression is performed elsewhere.   H2 ¶ 35, 40-42.   Apple admits Walter

11   "suggests that the compression occurs elsewhere."   2nd SJ 5.   It then argues there is an "ambiguity"

12   in Walter.   Ambiguities cannot qualify as clear and convincing evidence.   Moreover, Dr. Hemami

13   cites evidence throughout Walter that shows compression does not occur at the central data station.

14   H2 ¶ 40.    She notes that the spec repeatedly refers to the memory modules as storing

15   "preprogrammed" compressed video data.   *Id.*; Walter Abstract, 2:13-18, 2:30-35, 2:58-64, 4:10-13,

16   9:40-44, 9:55-57, 11:16-19.    The word "preprogrammed" reinforces that compression occurs

17   elsewhere, which means that the common housing requirement cannot be met.[16]   H2 ¶ 35, 40-43.   It

18   also means that the required sequence of the claims, which dictates compression *after* receiving

19   video, is not met.   Instead, video arrives at Walter's central data station in a *pre*-compressed form.

20   Absence of compression also means that the central data station does not have the required

21   compressor "coupling" to the claimed "input" and "random access storage/magnetic disk."

22           Nor can Apple prove that it would be obvious to modify the central data station to include

23   the compression means.   Walter, in fact, <u>teaches away</u> from this configuration because it

24   emphasizes that the memory modules should be "preprogrammed" with compressed data elsewhere.

25   H2 ¶ 40, 43.   And adding a compressor at the central data station would increase costs and

26   _____

27   [16] Dr. Hemami states that the passage Apple relies on – "the digital data is compressed in memory
     modules" – does not indicate compression at the central data station because memory modules, by
28   definition, cannot perform compression and instead only provide storage.   H2 ¶ 42.

1  complexity. *Id.* ¶ 43. Such reconstruction would require not only a compressor, but sophisticated

2  circuitry allowing the compressor to receive video source information from an input (not disclosed)

3  and to transfer the compressed data to memory. *Id.* Accordingly, there is no apparent reason to add

4  the claimed compression means to Walter.

5          **3.**     **Walter lacks the Claimed "Random Access Storage/Magnetic Disk"**

6       It is clear that Walter's "[m]emory module [containing the *pre*-compressed video] is of the

7  recirculating shift register type." Walter 6:36-37; H2 ¶ 45-46. As shown with Kramer, a

8  recirculating shift register is serial – not random – access. H2 ¶ 45-46. Walter states that the shift

9  register uses the "bit rotation logic method" to allow "data [to be] retrieved from memory module

10  196 in a parallel fashion and [ ] transmitted to the fiber optic lines of the data bus, which also

11  operate in parallel." Walter 6:36-47; Fig. 3. Thus, Walter's recirculating shift register and bit

12  rotation logic allow parallel transmission of video. H2 ¶ 45-46. Walter states that this arrangement

13  increases transmission speed by allowing for sequential operations and parallel channel delivery.

14  Walter, in fact, <u>teaches away</u> from random access storage by emphasizing this specialized

15  recirculating shift register memory, around which the system functionality is designed. *Id.* Thus,

16  contrary to Apple's argument that random access storage/magnetic disks would be "suitable high

17  density memory devices," Walter makes clear that he believes the only suitable memory is the

18  disclosed recirculating shift register memory. *Id.*

19       In light of the above, it is not obvious to modify Walter to include the claimed random

20  access storage, from which Walter teaches away. *Id.* ¶ 44-46. Additionally, there is no reason to

21  use random access in Walter because it does not contemplate editing. *Id.* ¶ 44. Also as with

22  Kramer, using random access storage would increase both the cost and complexity of Walter for no

23  justifiable reason. *Id.* ¶ 44-46. Dr. Hemami, therefore, concludes that one of ordinary skill would

24  not have an "apparent reason" to use random access storage in Walter. *Id.*

25          **B.**     **Walter Does Not Invalidate '839 Claims 1, 76 or '705 Claim 12**

26       Apple contends that Walter anticipates '839 Claim 1 and '705 Claim 12 and renders obvious

27  '839 Claim 76. 2nd SJ 13-15. Each claim requires that compression occur *after* "receiving

28  audio/video source information." '839 Claim 76 further requires a random access magnetic disk to

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

18

store "full motion video programs." As shown, Walter teaches away from random access memory and therefore does not invalidate '839 Claim 76. As also shown, Walter fails to disclose the claimed sequence of compressing *after* receipt of the video because Walter's compression, if any, occurs *before* the video arrives at the central data station.

Engaging in hindsight, Apple tries to reconfigure Walter by first arguing that it would be routine to place a compressor in the central data station. In a leap, Apple then contends that the undisclosed compression site (*e.g.*, "a content provider") could be rigged to include sophisticated transmission capabilities and the central data station could be rigged to include receiving capabilities, miraculously resulting in transmission from the compression site to the central data station. Burst has shown that Walter teaches away from including a compressor in the central data station. H2 ¶ 35, 40-43. Moreover, it is not obvious to install complex transmission equipment at the compression site, which would dictate further complications such as securing communications links between the compression site and a central data station not even equipped to receive such transmissions. H2 ¶ 35-37. Nor is it appropriate to "mix and match" components from the central data station and the data receiving station, which serve entirely different purposes. H2 ¶ 33-35.

### C.    Walter Does Not Invalidate '839 Claims 17, 77 or '705 Claim 21

Apple asserts that '839 Claims 17, 77 and '705 Claim 21 are obvious based on Walter. 2nd SJ 19-21. Each claim requires receiving the time compressed representation FTRT, storing it, and re-transmitting it FTRT. '839 Claim 77 and '705 Claim 21 are further limited to compressed full motion video programs that are received FTRT through "selective retrieval" from a "video library."

Apple again tries to conform Walter to the claims by mixing and matching components from the central data station (*e.g.*, transmission) and the data receiving station (*e.g.*, receipt). Apple then employs hindsight to rig the undisclosed compression site with transmission capabilities and to rig the central data station with receiving capabilities, which magically results in FTRT transmission between the two sites. As shown, Apple has provided no evidence to support its substantial Walter reconfiguration that is illogical, more costly, and leads to numerous complications. H2 ¶ 33-37. Nor would one of ordinary skill be driven to mix and match components from pieces of equipment that are very different technically and functionally. *Id.* 33-35. Apple's hindsight should be rejected.

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

19

## VIII.  THE GREMILLET/TESCHER COMBINATION DOES NOT INVALIDATE ANY INDEPENDENT CLAIMS

Apple contends numerous independent claims are rendered obvious by combining Gremillet and Tescher.  But the combination fails to disclose many claim limitations and is unworkable.

### A.    The Combination Does Not Invalidate '995 Claim 1 or '932 Claim 4

#### 1.    Gremillet Does Not Disclose Many Limitations

Gremillet discloses a distribution center 10 that sends music (not video) to user equipment 20 over a television transmission channel 30.  Gremillet's distribution center fails to meet the transceiver limitation, and there is no reason to use a single housing for a large distribution center. H2 ¶ 77.  Gremillet also lacks the claimed random access storage/magnetic disk because the video disk/video recorder at the distribution center is an analog storage medium.  H2 ¶ 84.  There is no reason to modify Gremillet to include the more costly and complex claimed storage.  *Id.*

Gremillet also lacks the claimed compression means.  H2 ¶ 80-83.  Apple effectively concedes as much.[17]  2nd SJ 19.  Without a compressor, Gremillet necessarily fails to disclose the claimed "time compressed representation" and the claimed FTRT transmission of the compressed representation.  Apple concedes these points as well.  Finally, Gremillet's music distribution system has nothing to do with "full motion video programs" per '932 claim 4.  H2 ¶ 79.

#### 2.    Tescher Does Not Disclose Many Limitations

Tescher discloses a method of compression for a video teleconferencing system.  *E.g.* Tescher 11:52-57.  Such systems are, by definition, real-time systems.  H2 ¶ 57-62.  As a real-time system, Tescher fails to disclose the claimed "time compressed representation having a [burst] time period" and "output" that "transmi[ts] away" FTRT.  *Id.*  Tescher also lacks the claimed "transceiver apparatus" and "random access storage/magnetic disk."  H2 ¶ 54, 58.

Apple contends that Tescher discloses a "compressor" which implements "a digital video compression technique that achieves a data rate of 0.239 Mbps."  2nd SJ 19.  But Tescher's video is not the claimed "full motion video programs" required by '932 Claim 4.  As Dr. Hemami explains,

---

[17] In a footnote, Apple half-heartedly tries to suggest that Gremillet may refer to data compression. 2nd SJ 15, n. 36.  Dr. Hemami's declaration explains that Apple's argument is meritless. H2 ¶ 80-82.

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

20

1  video teleconferencing is a form of extremely <u>limited</u> motion video, focusing on movement of the

2  "head and shoulders." H2 ¶ 63-73. This limited movement enables a compressed video data rate of

3  .239 Mbps. *Id.* Applying the Tescher compression algorithm to true full motion video would result

4  in a nearly unrecognizable video. *Id* ¶ 63-65. Further, no person of ordinary skill would ever

5  consider a video teleconferencing signal a "program," as required by '932 Claim 4. *Id.*  ¶ 56.

6  Programs, like works, require creative effort.

### 3.    Gremillet and Tescher Cannot be Combined

8       As shown, the Gremillet/Tescher combination would lack many claim limitations, namely,

9  the "transceiver apparatus," "random access storage/magnetic disk," and "full motion video

10 programs" ('995 Claim 4). This is fatal to Apple's obviousness argument. *Velander*, 248 F.3d at

11 1364. Moreover, Apple has offered no reason supporting the combination.

12       The alleged combination is untenable. First, audio music distribution systems (Gremillet)

13 and video teleconferencing systems (Tescher) require very different technologies to operate. One of

14 ordinary skill would not be motivated to combine these two different technologies. H2 ¶ 88-93.

15 Second, data compression is unnecessary to Gremillet, and adding data compression (much less

16 video data compression) would increase costs and complexity. H2 ¶ 80-83. Third, Tescher's video

17 teleconferencing deals only with real-time two-way conferencing. H2 ¶ 57-62. "Burst"

18 transmission of videoconferencing is simply impossible, which teaches away from a FTRT system.

19 *Id.* ¶ 89. Fourth, the Tescher video compression data rate of .239 Mb/s is suitable only for "talking

20 heads" in teleconferencing – not "full motion video programs." H2 ¶ 63-73.

21       Finally, the combination is unworkable. Tescher's compression algorithm fundamentally

22 produces variable-rate data, meaning each frame is represented by a variable number of bits. H2 ¶

23 74-75. Gremillet is fundamentally designed to operate on fixed-rate data. If the Gremillet fixed-

24 rate system were used with Tescher's variable-rate data, there would be no playback output because

25 Tescher's bit stream could not be processed properly by Gremillet's system. H2 ¶ 90-92. To make

26 Gremillet and Tescher work together, if possible, would require complex additions. H2 ¶ 93.

### B.    The Combination  Does Not Invalidate '839 Claims 1, 76 or '705 Claim 12

28       Even if combined (which is unworkable), neither Gremillet nor Tescher disclose the claimed

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

21

1  "full motion video programs," as required by '839 Claim 76 and '705 Claim 12.  Additionally, as

2  shown, the distribution center of Gremillet does not include the "magnetic disk" of '839 Claim 76,

3  and there is no reason to modify Gremillet to include such storage.  Thus, even if combined, Apple

4  fails to satisfy the basic requirement that an alleged combination must teach all claim elements.

5         **C.**    **The Combination Does Not Invalidate '839 Claims 17, 77 or '705 Claim 21**

6        As shown, Gremillet and Tescher lack the claimed full motion video programs and the

7  claimed "receiving" of a time compressed representation FTRT.  Nor do they disclose a "video

8  library."  Further, Apple has failed to offer any reason supporting the combination, which is

9  unworkable.  Apple's arguments as to these claims are especially nonsensical because they rely on

10  mixing and matching various components from the Gremillet distribution center and user

11  equipment, as well as rigging an undisclosed "content provider" with FTRT transmission

12  capabilities, which magically results in FTRT transmission between the content provider and the

13  substantially reconfigured distribution center.  Moreover, such a substantial reconfiguration is

14  illogical, more costly, and leads to numerous complications.  H2 ¶ 74-93.

15  **IX.**    **THE DEPENDENT CLAIMS ARE VALID**

16        Apple also fails to prove that the references include the additional dependent claim

17  limitations.  Nor does Apple offer justifiable reasons for its alleged obviousness combinations.

18  Furthermore, these claims are valid because they depend from valid independent claims.

19        **A.**    **The "Editing Claims" are Not Obvious ('995 Claims 2-3, 20, 23; '839 Claims 2-3,**

20                    **20; and '705 Claim 13).**[18]

21        Apple relies on CompuSonics ("CS") and Kepley for "editing."  Apple misinterprets Kepley,

22  which does not include any of the claimed editing functionality, but merely describes basic

23  computer functionality that does not involve editing the voice mails.  H2 ¶ 31-32.  Apple also fails

24  to provide an "apparent reason" to make the alleged combinations.  Kepley is a voice mail system

25  that has nothing to do with processing video or the claimed wideband audio.  Therefore, there is no

26  compelling reason to combine Kepley's alleged editing functionality with any other reference.  H2 ¶

27   

28  [18] Apple only addresses '995 Claims 2-3, 22 & 80, '839 Claims 2 & 3, and '705 Claim 13.  Yet '995
Claims 20 & 23 and '839 Claim 20 also require editing, while '995 Claim 22 does not.

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

22

1    94.  Nor is there a reason to combine CS with the other references.  H2 ¶ 95-96.  CS was used in

2    professional recording studios, which have nothing to do with video teleconferencing (Tescher) or

3    commercial distribution centers that sell pre-recorded works in their original form (Kramer, Walter,

4    Gremillet).  H2 ¶ 31, 44, 52, 55, 84-85, 94-96.

5         '705 Claim 13 requires editing video, but CS and Kepley have nothing to do with editing

6    video.  W ex. 20.  Additionally, with respect to '995 Claim 3 and '839 Claim 3, Kepley is not

7    relevant because it lacks the claimed monitor.

8         '995 Claims 20 and 23 and '839 Claim 20 require selectively decompressing the stored time

9    compressed representation, editing it, and then storing the edited representation.  Neither CS nor

10   Kepley teach decompressing an audio work and then editing it.  H2 ¶ 32; W ex. 21 (Schwartz); Ke

11   7:56-67; 7:68-8:5; 8:25-32.  Accordingly, none of Apple's references teach these claim elements.

12   **B.  The "Semiconductor Memory Claim" is Valid ('995 claim 7)**

13        None of Apple's references teach random access "semiconductor memory" coupled to a

14   "compression means" for storing a time compressed representation, as '995 Claim 7 requires.

15   Kramer's bubble memory is not random access and is not coupled to a compression means.  Kr. 4:1-

16   4.  Kepley's "disk storage 203" is not semiconductor memory and is not within the same common

17   housing as any (alleged) compression means.  Ke 14:32-38.  Walter's recirculating shift register is

18   not random access and is not coupled to a compression means.  Walter 6:36-39.  Gremillet's "video

19   disk or a video recorder" is not semiconductor memory, is not random access and is not contained

20   within the same housing as a (non-existent) compression means.  Gr. 3:40-42.[19]

21   **C.  The "Analog to Digital Converter Claim" is Valid ('995 Claim 8)**

22        '995 Claim 8 requires an "analog to digital converter means" in the transceiver common

23   housing of claim 1, but none of Apple's references satisfy the common housing requirement.

24   Although not mentioned in Apple's motion, '995 Claim 8 further requires the claimed "compression

25

26   [19] Additionally, Apple has not provided any reason to combine random access semiconductor

27   memory with Kramer, Kepley, Walter or Gremillet.  Semiconductor memory was expensive in the
     late 1980s, and it would not have been obvious to replace the cheaper storages disclosed in Kepley

28   and Gremillet with semiconductor memory.  Moreover, as shown, Kramer and Walter both teach
     away from using random access memory by emphasizing serially accessing memory.

1  means" and "random access storage," which are lacking in Kramer, Kepley, Walter or Gremillet.

2  And, for the reasons stated above, it would not be obvious to modify those references.

**D.  The "Digital Source Information Claims" are Valid ('995 Claim 9 & '839 Claim 9)**

4  Burst's first Opposition shows that neither Kepley nor Kramer discloses digital source

5  information, as required.  Opp. 14-15; 24.  With respect to Kepley, Apple now agrees. 2nd SJ 23.

6  The sequence of Claim 9 further requires that compression occur *after* the digital source

7  information is received.  But, as shown, Gremillet has no compression and Walter's alleged

8  compression occurs *before* receipt at the central data station.

**E.  The "Computer-Generated Information Claims" are Valid ('995 Claim 15 & '839 Claim 15)**

11  '995 and '839 Claim 15 relate to "computer-generated" source information and receiving

12  source information from a computer.  The CS "S-t-r-e-t-c-h A Sound" feature, on which Apple

13  relies, simply provides that "any sound can be put into a tape loop of any size or duration, extending

14  a sound bite almost infinitely."  G2 ¶ 50-51.  Thus, CS allows the user to loop a sound generated

15  from an external source, but it does not actually generate the sound.  *Id.*  Apple, therefore, has failed

16  to present a single reference showing "computer-generated" information.  Nor has Apple provided

17  any reason to combine the CS looping functionality (which is inadequate in any event) or actual

18  computer-generated functionality with Kramer, Kepley, Walter, Gremillet or Tescher.  *Id.*

**F.  The "Video Library Claims" are Valid ('995 Claim 19 & '839 Claim 19).**

20  '995 and '839 Claim 19 depend from claim 17 and further specify receiving audio/video

21  source information by "selective retrieval" from a "video library."  Apple relies exclusively on

22  Walter and Gremillet.  Yet Apple concedes that Gremillet does not disclose the claimed video

23  library.  2nd SJ 25.  Additionally, as shown, the alleged Gremillet/Tescher combination is

24  unworkable and adding another missing element will not change that.

25  For Walter, the PTO expressly considered that reference in allowing '839 Claim 19, which

26  makes Apple's burden even more difficult to meet.  *Metabolite Labs*, 370 F.3d at 1367-68.  And

27  with respect to '995 Claim 17 (from which Claim 19 depends), Apple does not assert that Walter

28  invalidates that claim, either by itself or in combination with another reference.  Thus, Apple simply

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

24

1    has no invalidity theory vis-à-vis Walter as to '995 Claim 19.

2        **G. The "Removable Recording Medium Claims" ('995 Claims 44-45, 47; '839 Claims
3            45, 47) and the "Optical Disk Claims" ('995 Claims 51-52; '839 Claim 51) are Valid.**

4        Kramer does not anticipate the Removable Recording Medium Claims as shown in Burst's

5    first Opposition. Opp. 15-16. Nor does Kramer disclose the use of CDs or erasable optical discs as

6    required by the Optical Disk Claims. Similarly, Gremillet and Walter fail to teach the elements of

7    the Removable Recording Medium Claims and the Optical Disk Claims. H2 ¶ 47-48, 80-83, 86.

8        Nor is there a compelling reason to add the claimed features to Kramer, Gremillet or Walter.

9    Gremillet and Walter distribute information over communications links to users and would not have

10   a reason for including removable recording media capabilities at the distribution centers. H2 ¶ 47,

11   87. And since Gremillet and Walter presumably obtain their source information from content

12   providers, there is no reason to include capabilities of receiving from a CD or erasable optical disk.

13   H2 ¶ 48, 86. For similar reasons, one of ordinary skill would not modify Kramer in a way that

14   includes the claimed features.

15       **H.   The "Decompression Claims" are Valid ('995 Claims 20, 22-23; '839 Claims 20, 28)**

16       '995 Claims 20 and 23 and '839 Claim 20 each require selectively decompressing the time

17   compressed representation, editing that decompressed representation, and then re-storing the edited

18   decompressed representation. These claims are not invalid for the reasons discussed above in

19   section IX.A. '995 Claim 22 and '839 Claim 28 require selectively decompressing the time

20   compressed representation of audio/video source information and then visually displaying that

21   decompressed representation for viewing by the user. None of Kramer, Kepley, Walter, Gremillet or

22   Tescher teaches those claim limitations.[20] Further, Apple has not offered any reason to combine a

23   visual display of decompressed audio/video source information with any reference limited to audio,

24   *e.g.*, Kramer, Kepley and Gremillet.

25   _____

26   [20] Kramer (no compression as claimed and therefore no claimed decompression, and no visual
     display of audio); Kepley (only teaches visually displaying text corresponding to the message
27   sender's telephone number and delivery time – not decompressed audio/video source information);
     Walter central data station (no compression, decompression or visual display); Gremillet (no
28   compression, decompression or visual display); Tescher (only teaches a compression/decompression
     algorithm – does not teach visually displaying anything).

1  X.    **CONCLUSION**

2     Burst respectfully requests that the Court deny Apple's motion due to the myriad fact

3  disputes regarding the scope and content of the prior art, the differences between the prior art and

4  the claimed inventions, and the secondary considerations.

5

6  Dated: August 29, 2007

7     PARKER C. FOLSE III
      (WA Bar No. 24895 – *Pro Hac Vice*)
8     pfolse@susmangodfrey.com
      IAN B. CROSBY
9     (WA Bar No. 28461 – *Pro Hac Vice*)
      icrosby@susmangodfrey.com
10    FLOYD G. SHORT
      (WA Bar No. 21632 – *Pro Hac Vice*)
11    fshort@susmangodfrey.com
      SUSMAN GODFREY, L.L.P.
12    1201 Third Avenue, Suite 3800
      Seattle, Washington  98101-3000
13    (206) 516-3880 Tel.
      (206) 516-3883 Fax
14

15    SPENCER HOSIE (CA Bar No. 101777)
      shosie@hosielaw.com
16    BRUCE WECKER (CA Bar No. 078530)
      bwecker@hosielaw.com
17    HOSIE McARTHUR LLP
      One Market, 22nd Floor
18    San Francisco, CA 94105
      (415) 247-6000 Tel.
19    (415) 247-6001 Fax
20

21    MICHAEL F. HEIM
      (TX Bar No. 9380923 – *Pro Hac Vice*)
22    LESLIE V. PAYNE
      (TX Bar No. 0784736 – *Pro Hac Vice*)
23    HEIM, PAYNE & CHORUSH, L.L.P.
      600 Travis Street, Suite 6710
24    Houston, TX  77002
      (713) 221-2000 Tel.
25    (713) 221-2021 Fax
26
      ROBERT J. YORIO (CA Bar No. 93178)
27    ryorio@carrferrell.com
      V. RANDALL GARD (CA Bar No. 151677)
28    rgard@carrferrell.com

BURST.COM, INC.'S OPPOSITION TO APPLE COMPUTER INC.'S
SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

26

1                            COLBY B. SPRINGER (CA Bar No. 214868)

2                            cspringer@carrferrell.com

                           CARR & FERRELL LLP

3                            2200 Geng Road

                           Palo Alto, CA  94303

4                            (650) 812-3400 Tel.

                           (650) 812-3444 Fax

5

6                            ATTORNEYS FOR DEFENDANT

                           BURST.COM, INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND MOTION FOR SUMMARY JUDGMENT OF INVALIDITY CASE NO. 3:06-0019MHP
6106/1011.0010

1

### CERTIFICATE OF SERVICE

2

    I hereby certify that a true and correct copy of the above and foregoing **DEFENDANT**

3

**BURST.COM, INC'S OPPOSITION TO PLAINTIFF APPLE COMPUTER, INC.'S**
**SECOND MOTION FOR SUMMARY JUDGMENT ON INVALIDITY** served as follows on

4

the following counsel of record:

5

        Nicholas A. Brown                  *via Electronic Mail and*

6

        Matthew D. Powers                *Federal Express*
        WEIL, GOTSHAL, & MANGES, LLP

7

        201 Redwood Shores Parkway
        Redwood Shores, CA 94065

8

9

        Garland T. Stephens              *via Electronic Mail*
        WEIL, GOTSHAL, & MANGES, LLP

10

        700 Louisiana, Suite 1600
        Houston, TX 77002

11

12

13

August 29, 2007

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

{00200589v1}