1  MATTHEW D. POWERS (Bar No. 104795)
   matthew.powers@weil.com
2  GARLAND T. STEPHENS (admitted N.D.C.A.,
   Texas Bar No. 24053910)
3  garland.stephens@weil.com
   NICHOLAS A. BROWN (Bar No. 198210)
4  nicholas.brown@weil.com
   WEIL, GOTSHAL & MANGES LLP
5  Silicon Valley Office
   201 Redwood Shores Parkway
6  Redwood Shores, CA 94065
   Telephone: (650) 802-3000
7  Facsimile: (650) 802-3100

8  Attorneys for Plaintiff
   APPLE COMPUTER, INC.
9

10                    UNITED STATES DISTRICT COURT

11                    NORTHERN DISTRICT OF CALIFORNIA

12

13  APPLE COMPUTER, INC.,                Case No. C 06-0019 MHP

14              Plaintiff,                **REPLY BRIEF IN SUPPORT OF
                                          APPLE'S SECOND MOTION FOR
15       v.                               SUMMARY JUDGMENT OF
                                          INVALIDITY**
16  BURST.COM, INC.,
                                          Date: September 18, 2007
17              Defendant.                Time: 2:00 p.m.
                                          Hon. Marilyn Hall Patel
18
                                          Complaint Filed: January 4, 2006
19                                        Trial Date: February 26, 2008

20

21

22

23

24

25

26

27

28

Reply Brief In Support Of Apple's Second Motion For                    Case No. C 06-0019 MHP
Summary Judgment Of Invalidity                  \\.PSF\Parallels Share\Apple-Burst\!! Invalidity PostCC\Reply ISO
                                                                Obviousness SJ FINAL w TOC.DOC

Dockets.Justia.com

**TABLE OF CONTENTS**

**Page**

I. Introduction ............................................................................................................................ 1

II. The *KSR* Decision Requires Courts To Apply Common Sense In Evaluating Validity ................................................................................................................................. 3

III. Common Sense Shows That Burst's Claims Are Obvious ..................................................... 3

IV. Burst's "Secondary Considerations" Arguments Should Be Completely Discounted ............................................................................................................................. 6

    A. Burst Has Failed To Show The Required "Nexus" Between Its Invention And Its Claimed Secondary Considerations Of Non-Obviousness ................................................. 6

    B. Burst Fails To Mention Key Facts About Its Alleged "Industry Acclaim" ....................... 7

    C. Evidence Of Apple's Commercial Success Does Not Help Burst .................................... 8

    D. The Microsoft Settlement Does Not Support Nonobviousness ........................................ 8

V. Walter Invalidates Each Of Burst's Independent Claims ....................................................... 8

    A. Walter Anticipates Claims '839-1 And '705-12 ............................................................... 8

    B. Each Of The Remaining Independent Claims Is Obvious Or Anticipated ....................... 9

        1. Burst's "Common Housing" Arguments Should Be Rejected Because There Was Ample Motivation To Arrange The Elements Disclosed In Walter As Required By The Claims ................................. 10

           a. It Would Be Obvious To Modify The Central Data Station ......... 10

           b. It Would Be Obvious To Modify The Receiving Station ............. 12

        2. It Would Be Obvious To Modify Walter To "Receive Compressed" Before "Transmitting" ................................................................................... 13

        3. Walter Anticipates Or Renders Obvious Random Access Storage .......... 13

VI. Kramer Invalidates Burst's Clams ....................................................................................... 14

VII. Each Of The Dependent Claims Is Invalid .......................................................................... 15

VIII. Conclusion ........................................................................................................................... 16

**TABLE OF AUTHORITIES**

**Page**

*Advanceme Inc. v. RapidPay, LLC*,
    2007 WL 2350644 (E.D. Tex. Aug. 14, 2007) .................................................................. 3

*Asyst Tech. Inc., v. Empak, Inc.*,
    2007 WL 2255220 (N.D. Cal. Aug. 3 2007) .................................................................... 3

*Dystar Textilfarben GmbH v. C.H. Patrick Co.*,
    464 F.3d 1356, 1364 (Fed. Cir. 2006). ........................................................................... 14

*Frazier v. Layne Christensen Co.*,
    2007 WL 1875909 (Fed. Cir. June 29, 2007) ................................................................. 3

*Friskit Inc., v. RealNetworks, Inc.*,
    2007 WL 2156239 (N.D. Cal. July 26, 2007) ................................................................. 3

*In re Icon Health & Fitness, Inc.*,
    2007 WL 2189161 (Fed. Cir. Aug. 1, 2007) .................................................................... 3

*In re Trans Texas Holdings Corp.*,
    2007 WL 2377009 (Fed. Cir. Aug. 22, 2007) .................................................................. 3

*KSR Int'l Co. v. Teleflex, Inc.*,
    127 S.Ct. 1727 (2007). ....................................................................... 3, 6, 9, 10, 12

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*,
    485 F.3d 1157 (Fed. Cir. 2007) ................................................................................. 3, 5

*Pharmastem Thereapeutics, Inc. v Viacell, Inc.*,
    491 F.3d 1342 (Fed. Cir. 2007) .......................................................................... 3, 5, 6, 7

*Semiconductor Energy Lab. Co. v. Chi Mei Optoelectronics Corp.*,
    2007 WL 1793770 (N.D. Cal. June 19, 2007) ............................................................. 3, 14

## I. INTRODUCTION

Burst is on the horns of a dilemma. On one side, Burst has been telling this Court and the press that "Mr. Lang's invention [was] to establish a new model for digital media delivery. They reflected the innovation that delivery of audio and video works could be accomplished faster than real time."[1] Yet, as Burst must now concede, Walter and many other references indisputably show that this "innovation" was in fact widely known in the prior art.

To avoid this point, Burst argues that Mr. Lang's invention is actually much narrower – a consumer media distribution system using "an integrated device that incorporates specialized components specially configured to provide for the most efficient processing of a/v digital data." [Opp. at 2.] But this narrower "innovation" is nowhere mentioned in the press and other alleged secondary indicia of non-obviousness on which Burst now so heavily relies to oppose this motion, and for good reason. Given that the allegedly "fundamental innovation" of faster-than-real-time media distribution was actually well known, the narrower fall-back position Burst now adopts is *at best* an obvious variation of these well-known systems.

The "innovation that delivery of audio and video works could be accomplished faster than real time," is clearly anticipated by Walter's video-on-demand cable system, which stores a library of movies "in compressed digital form" so that "a two hour movie can be transmitted in about 31 seconds" to cable set-top boxes for viewing on a normal television. [Mot. at 4-5.] Burst does not dispute this.[2] In fact, Burst does not deny that Walter discloses each of the steps required by claims '839-1 and '705-12, namely receiving audio/video data, compressing it, storing the compressed data, and then transmitting it faster-than-real-time. [Opp. at 18-19.] Burst's only argument in defense of these claims is that Walter does not disclose receiving audio/video data before compressing it, and this argument is illogical on its face: if something is present to be compressed, it must have been previously received. [*Id.*]

---

[1] Brown Decl., Exh. A [CC Hearing Tr.] at 9-10; see also Second SJ Motion ("Mot.") at 2-3.

[2] Brown Decl., Exh. B [Hemami Depo.] at 119 ("A. Walter certainly mentions that the digital data is compressed, yes. Q. Okay. And then it also teaches storing that compressed digital video in memory, right? A. The compressed digital video is in the memory modules, yes. Q. Okay. And then it also discloses transmitting that compressed digital video that was stored in memory faster than real-time, right? A. *Walter doesn't use those words but certainly 31 seconds for a 2 hour movie we would call faster than real-time.*")

Reply Brief In Support Of Apple's Second Motion For
Summary Judgment Of Invalidity              1

The additional limitations in Burst's other claims also don't rise to the level of patentable innovations. The claims do not recite any elements, or combinations of elements, that did not already exist in 1980s computers. Burst's expert Dr. Hemami admitted in deposition that before Burst's invention, it was known that audio information could be digitized and loaded onto a computer,[3] that computers could store audio information,[4] and that audio information stored on a computer could be copied across a network just like any other file, producing faster than real-time transmission.[5] Dr. Hemami also admits that it was known that computers could compress audio files,[6] and that compressed files would be transmitted faster than uncompressed files.[7]

The limitations Burst now relies on most heavily—the "common housing" aspect of "transceiver apparatus" and "random access storage," were also present in virtually all computers in 1988, which were contained in a plastic or sheet metal housing and which contained RAM and magnetic hard disk drives. Thus, there is no real dispute that the all of the limitations of the claims were known to persons of ordinary skill in the art before Burst's alleged invention. Importantly, these are the very same activities Burst now accuses of infringement: receiving audio in a computer, compressing it, and transmitting faster than real time to an attached storage device.[8] Since the accused functions are all in the prior art, Burst's claims must be held invalid.

---

[3] *Id.* at 62 ("A. I think there was equipment that could digitize audio and put that audio on to some type of format or entity such that it could be introduced into the computer. Q. Okay. And persons of ordinary skill in the art understood that at the relevant time, right? A. I think that certainly audio compression people would be well aware of that.")

[4] *Id.* at 61 ("Q. A person of ordinary skill in the art would have understood that you could store audio files on a Unix workstation or an IBM/PC or an Apple Mac II at the time, right? A. Certainly that they could be stored. It may not have been trivial to get them on to a particular machine.")

[5] *Id.* at 74 ("Q. It certainly would have been known to one of ordinary skill many the art that you could transfer a file, an audio file, let's say, on one Unix work station hard disk to a hard disk residing on another machine on the same network, right? A. I believe that was possible. Q. And with Ethernet, that transfer would have happened faster than real-time, correct? … A. I think it would be reasonable to expect that the transmission time for the audio file would be less than the playback time of the original file.")

[6] *Id.* at 29-32.

[7] *Id.* at 38 (Q. And it's essentially the law of nature that fewer bits takes less time to send over a given channel, right? A. All other things being equal, yes.")

[8] Burst's nonobviousness arguments based on the "specialized" integrated device supposedly claimed in '932-4 are particularly inconsistent with its infringement allegations. Burst is not accusing a specialized VCR-ET apparatus as disclosed in its patents. Rather, Burst is accusing faster-than-real-time transmission of media files from the internet to a computer and a computer to an iPod. These actions are no different than the faster-than-real-time copying of a compressed

## II. THE KSR DECISION REQUIRES COURTS TO APPLY COMMON SENSE IN EVALUATING VALIDITY

Burst's opposition wrongly seeks to minimize the impact of the Supreme Court's decision in *KSR Int'l Co. v. Teleflex, Inc*. Both district court and Federal Circuit decisions reflect *KSR*'s impact on patent law, and particularly its emphasis on the need for courts to apply common sense in evaluating validity, rather than being constrained by the rigid requirement of an express "motivation to combine." For example, in the four months since *KSR* was decided, the Federal Circuit has found obviousness at least five times, twice overturning a jury verdict of validity.[9] In this district, three courts have applied *KSR* and found obviousness as a matter of law, either on summary judgment or in granting JMOL.[10] Other districts have done the same.[11]

The Federal Circuit's recent decision in *Pharmastem* is particularly significant. In *Pharmastem*, the Federal Circuit overturned a jury verdict of validity, notwithstanding (1) expert testimony in support of the patent, (2) the PTO's decision in reexamination to allow the claims over some of the prior art at issue, and (3) extensive evidence of industry acclaim, commercial success, long-felt need, and licensing. The Federal Circuit made clear that the basis for its finding of obviousness was that the prior art spelled out both the result the patentee achieved, and the means to that result. *Pharmastem*, 491 F.3d at 1364. The *Pharmastem* decision shows that *KSR* has empowered courts to find obviousness as a matter of law—notwithstanding contrary expert opinions and extensive evidence of "secondary considerations"—when common sense shows that the "invention" was obvious in light of the admitted prior art.

## III. COMMON SENSE SHOWS THAT BURST'S CLAIMS ARE OBVIOUS

Here, common sense shows that Burst's claims were obvious in light of the audio file across a computer network that Dr. Hemami admits was known in 1987.

---

[9] *Pharmastem Thereapeutics, Inc. v Viacell, Inc.*, 491 F.3d 1342 (Fed. Cir. 2007) (reversing denial of JMOL to find obviousness); *Frazier v. Layne Christensen Co.*, 2007 WL 1875909 (Fed. Cir. June 29, 2007) (affirming JMOL of obviousness, designated as not for citation); *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157 (Fed. Cir. 2007) (affirming finding of obviousness after bench trial); *In re Icon Health & Fitness, Inc.*, 2007 WL 2189161 (Fed. Cir. Aug. 1, 2007); *In re Trans Texas Holdings Corp.*, 2007 WL 2377009 (Fed. Cir. Aug. 22, 2007).

[10] *Semiconductor Energy Lab. Co. v. Chi Mei Optoelectronics Corp.*, 2007 WL 1793770 (N.D. Cal. June 19, 2007); *Friskit Inc., v. RealNetworks, Inc.*, 2007 WL 2156239 (N.D. Cal. July 26, 2007); *Asyst Tech. Inc., v. Empak, Inc.*, 2007 WL 2255220 (N.D. Cal. Aug. 3 2007) (designated as not for citation).

[11] *E.g., Advanceme Inc. v. RapidPay, LLC*, 2007 WL 2350644 (E.D. Tex. Aug. 14, 2007).

undisputed prior art. There was nothing novel in the 1980s about speeding up the time required to make a copy of an audio/video recording, including doing so in less time than it would take to view the recording. The music and video distribution industry for decades relied on high-speed duplication to make tapes for mass distribution. And the rapid progress in the computer industry which is so regular and predictable as to be called "Moore's *Law*," has both driven and been driven by the desire to move data at ever-higher speeds. Anyone who has ever copied either a digital data file or a tape understands the motivation to do it faster.

Even if the prior art did not so clearly disclose Burst's alleged invention (which it does), the alleged invention is nothing more than the common-sense application of well-known digital technologies to the established practice of making copies quickly, to achieve the well-known benefit of not having to wait longer for the copy to finish. The use of compression to reduce the time required to download a file was very well known, as shown for example by the following article from a 1986 Byte magazine, a widely read, non-academic publication in the computer industry at the time:

> Using data-compression techniques, you can shorten files by compressing the information they contain. But **data compression can do more than just save disk space. It can also cut down on the time needed to transmit large files between computers**, especially if the transmission is done over slow links like telephone lines. **If you compress the file before sending it and uncompress it on the receiving end, you can reduce the total time for the transmission**.[12]

This reflects simple common sense. As Dr. Hemami admitted, compression was widely used for making files smaller, and it is "essentially a law of nature," that all else being equal, a smaller file will take less time to copy or move from one place to another.[13]

Mr. Lang's own account of his alleged conception confirms that he did nothing more than apply these well-known digital technologies to the established practice of making copies quickly, to achieve the well-known benefit of saving time. Asked "where did the idea for faster than realtime transmission come from?", Mr. Lang explained that his thought process began

---

[12] Brown Decl. Exh. C [Byte article] at APBU00665410 (emphasis added).
[13] Brown Decl., Exh. B [Hemami Depo.] at 38 (Q. [I]t's essentially the law of nature that fewer bits takes less time to send over a given channel, right? A. All other things being equal, yes.")

Reply Brief In Support Of Apple's Second Motion For
Summary Judgment Of Invalidity                4

as he was thinking about a way to design around Go Video's patent on a dual deck VCR:

> So, my thought process began in thinking about the dual deck VCR. And from there, I went to that – the idea of replacing one of the decks with random access memory hard drive or some other type of memory that could be accessed, and where editing could take place and there would be an option of going back to a new tape. … When I was thinking about that, I realized that as part of that process, that the information would have to be digitized, compressed, and in that compressed form, it was entirely electronic and in a form that I realized was taking up less space, and so I just started thinking about well, I wonder if that could be transmitted over some kind of a phone line or satellite or something. And that's – I think that's when the idea occurred to me a really cool feature would be to have an output to this machine where you could take whatever you produced on it and send it at a very rapid rate to another machine.

[Lang 7/23/03 Depo. at 113-115.] As this testimony shows, the insight Mr. Lang claims to have had, while thinking about copying a videotape onto a hard drive or other memory instead of to the second deck of a dual-deck VCR, was that it would be "really cool" if the digitized and compressed information on the hard drive could be sent "at a very rapid rate to another machine." This insight was nothing more than the natural result of applying commonplace digital technology to the widespread practice of high-speed tape duplication, or the widespread practice of transferring a file from one computer to another. It was not patentable "invention."

Here, as in *Pharmastem*, the prior art spells out both the benefits that the patentee claimed to have achieved, and the means to achieve them. Contrary to Burst's claim that "specialized components specially configured" are required or disclosed in Burst's patents, Mr. Lang admits he did not invent or improve any technology for digitization, compression, storage, or transmission. Here, as in *Pharmastem*, there is no evidence that Mr. Lang solved any particular problem that existed in the prior art, or made any choice that produced unexpected results. In fact, the evidence shows that Mr. Lang was "not technical" and was incapable of building the device described in his own patent.[14] On this point, this case presents a much more compelling case of obviousness than *Pharmastem*.

---

[14] Kalay Decl., Exh. A [Lang Depo.] at 234:6-23 (testifying that he was "not an electrical engineer, [so] its not in my field of expertise to build it."). *See Leapfrog*, 485 F.3d at 1162 ("Our conclusion [of obviousness] is further reinforced by testimony from the sole inventor at trial that he did not have a technical background, could not have actually built the prototype himself, and relied on the assistance of an electrical engineer…").

In *Pharmastem*, the inventors were acknowledged, even by the defendant, as "trailblazers" and "pioneers." There was no dispute that they had made a real and significant contribution to science. Here, in stark contrast, there is no evidence that Mr. Lang made *any* contribution to science or the useful arts. The only contribution Mr. Lang claims to have made was disclosing and promoting the concept of faster-than-real-time transmission, a concept that even Burst now acknowledges is disclosed in Walter. In light of the Supreme Court's admonition that the results of "ordinary innovation" are not patentable, because "[g]ranting patent protection to advances that would occur in the ordinary course without real innovation retards progress," Burst's patents should be invalidated. *KSR*, 127 S.Ct. at 1732, 1746.

## IV. BURST'S "SECONDARY CONSIDERATIONS" ARGUMENTS SHOULD BE COMPLETELY DISCOUNTED

### A. Burst Has Failed To Show The Required "Nexus" Between Its Invention And Its Claimed Secondary Considerations Of Non-Obviousness

As stated above, Burst is now arguing that Mr. Lang's invention is not merely faster-than-real-time transmission, but rather is an "integrated device that incorporates specialized components specially configured to provide for the most efficient processing of a/v digital data, including receiving, compressing [etc.]." [Opp. at 2.][15] Yet, when arguing that "secondary considerations" such as commercial success and industry praise preclude summary judgment, Burst falls back on describing its invention as faster-than-real-time transmission: "Burst's patented features are at the core of Apple's commercial success. Fast download speed is a primary feature of the iTMS and the iPod." [Opp. at 7.]

For example, the 2006 Business Week article cited by Burst as evidence of industry praise reports Lang as saying that Burst's patents cover "superfast transmission of content, such as songs and video, over networks." [Walker Decl. Exh. 1.] Similarly, the 1991 Philadelphia Inquirer article describes Burst's patent as on "technology that 'compresses' video so it can be sent in one quick 'burst.'" [Walker Decl. Exh. 3.] These statements are tied to the concept of faster-than-real-time transmission, not a specific combination of elements, and cannot

---

[15] This position is necessary to Burst's argument that Apple is engaging in impermissible hindsight when it points out that well-known technologies such as random access storage would be obvious to use in conjunction with faster-than-real-time transmission.

Reply Brief In Support Of Apple's Second Motion For
Summary Judgment Of Invalidity                    6

support nonobviousness of the combination. *Pharmastem*, 491 F.3d at 1365.

Burst cannot have it both ways. If Burst's innovation was the concept of faster-than-real-time transmission of compressed audio/video, no "secondary considerations" can change the fact that Burst did not invent this. If, on the other hand, Burst's inventive contribution is a specific "integrated device that incorporates specialized components [etc.]," Burst has not shown the required nexus between that "inventive contribution" and its alleged evidence of commercial success, industry praise, and skepticism. *Pharmastem*, 491 F.3d at 1365 (rejecting evidence of praise that was not shown to be "based on any inventive contribution"). Mr. Lang has admitted he did not invent or improve storage technology. [Mot. at 2.] Certainly, Mr. Lang did not invent the concept of putting a housing around computer components. Because Burst can no longer claim that it invented faster-than-real-time transmission, all of its commercial success evidence is irrelevant because it has no nexus to Burst's newly styled "invention."

### B. Burst Fails To Mention Key Facts About Its Alleged "Industry Acclaim"

Burst's characterization of the "praise" it received is misleadingly incomplete. For example, Burst relies extensively on a 2006 Business Week article without mentioning that the article was written because of Burst's litigation with Apple, not because of its patented technology. Receiving press coverage because one has sued high profile parties (Microsoft and Apple) is very different from receiving press coverage driven by the merits of one's invention. Burst's litigation driven press coverage is evidence of media-savvy, not nonobviousness.

Burst also omits the fact that the Southwestern Bell executive was "impressed" by Burst's technology based on a mistaken belief that Burst had "an absolute breakthrough in compression technology." [Walker Decl. Exh. 3.] The truth, as Mr. Lang has admitted, is that Burst did not invent any improved compression technology at all. [Mot. at 2.] After a year of failed efforts to get the misguided "D2D" compression scheme of their own devising to work, Burst turned to Intel's DVI technology to build the CES demonstration prototypes that garnered the 'praise' Burst now claims. [Brown Decl., Exh. O (Mincer Depo.) at 40-42, 263-266.]

Finally, Burst fails to mention a telling comment made in 1991 by M.I.T.'s Andrew Lippman about Burst's supposed vision: "It's like trying to squeeze a river through a

Reply Brief In Support Of Apple's Second Motion For
Summary Judgment Of Invalidity                                7

straw. You've got do something to make the river smaller or the straw bigger." [Walker Decl. Exh. 3.] Burst, of course, did neither. As described above, Mr. Lang has admitted that he improved neither compression technology nor transmission technology.

### C. Evidence Of Apple's Commercial Success Does Not Help Burst

Burst's argument that its "patented features are at the core of Apple's commercial success" is not credible. [Opp. at 7.] Burst has presented *no* evidence that connects any of Apple's success to faster-than-real-time transmission. Rather, the evidence Burst submitted shows that Apple has had greater success than its competitors in both the portable music player business and the music download business *despite the fact* that Apple's competitors *also* employ faster-than-real-time transmission. This shows that Apple's success with iPod and iTunes is due to other factors. Furthermore, the fact that Burst seeks to rely on Apple's success, while failing to offer any evidence of its own success, is itself telling. Burst's failure to show *any* business that it generated after a supposedly "captivating" 1991 demonstration at CES shows that its innovation was a commercial failure. [*See* Opp. at 5.] Burst's VCR-ET was completely unsuccessful.

### D. The Microsoft Settlement Does Not Support Nonobviousness

The $60 million litigation settlement paid by Microsoft to Burst is also not evidence of nonobviousness. That payment was not made because of Burst's patents, but because of a serious spoliation issue. The settlement occurred on the eve of a hearing regarding a spoliation motion founded on evidence of extensive missing emails and an email from Microsoft vice-president James Allchin telling employees, "Do not archive your mail. Do not be foolish. 30 days." [Brown Decl., Exh. E ("First Bill, Now Steve" in IP Law & Business, April 2006).] The judge in the case had already said that "the Allchin e-mail was 'significant,' and [that] Microsoft's explanations were 'somewhat dubious.'" [*Id.*] Tom Burt, Microsoft's deputy general counsel for litigation, was quoted as saying "We didn't think we had exposure on the patent issues—our case was good—but there were these other things going on." [*Id.*]

## V. WALTER INVALIDATES EACH OF BURST'S INDEPENDENT CLAIMS

### A. Walter Anticipates Claims '839-1 And '705-12

There is no dispute that Walter discloses compressing video, storing the

compressed video, and transmitting the compressed video faster-than-real-time.[16] For two independent claims, '839-1 and '705-12, Burst's <u>only</u> argument that they are not anticipated is that Walter "fails to disclose the claimed *sequence* of compressing *after* receipt of the video." [Opp. at 18-19.] This argument fails as a matter of simple logic, because the video must be received in order to be compressed. Walter states that "the electrical data representing each video program is converted to compressed digital form and stored in suitable high density memory devices." [Walter at 2:16-19.] While Walter does not state where the electrical data representing each video program came from, it must have been received somehow from somewhere or it would not be present to compress and store.[17] Thus, claims '839-1 and '705-12 are anticipated.

### B.   Each Of The Remaining Independent Claims Is Obvious Or Anticipated

Burst draws three distinctions between Walter and its remaining independent claims: (1) Walter does not arrange the right elements, such as the "compression means", in a "common housing" with storage and transmission (claims '995-1, '995-17, and '932-1); (2) Walter only discloses performing the "receive compressed" step *after* the "transmitting" step, not before it as required by some claims ('995-17, '839-17, '839-77); and (3) Walter does not disclose random access storage or a magnetic disc (claims '995-1, '995-17, '932-4, and '839-76).

Notwithstanding *KSR*'s clear statement that "the results of ordinary innovation are not the subject of exclusive rights under the patent laws," Burst never explains how any of these three alleged distinctions from Walter somehow make its claims an inventive improvement over Walter. *KSR*, 127 S.Ct. at 1746. The failure to even attempt such an explanation is telling evidence that Burst did not contribute anything more than "ordinary innovation," which is not patentable.

What Burst does argue is that there is no "reason" to modify Walter to use random access storage or to include the claimed elements in a common housing, and that Walter "teaches

---

[16] Brown Decl., Exh. B [Hemami Depo.] at 119.

[17] Burst also appears be arguing that the method claims require each of the steps to be performed at a single location when it states that "because Walter's compression, if any, occurs *before* the video arrives at the central data station," the claimed sequence of receiving and then compressing is not met. [Opp. at 19.] But Burst's method claims do not specify where *any* of the claimed steps must be performed, and thus cannot require that the steps be performed at a single location.

away" from doing so. As shown below, Burst is wrong on both counts.

### 1. Burst's "Common Housing" Arguments Should Be Rejected Because There Was Ample Motivation To Arrange The Elements Disclosed In Walter As Required By The Claims

Burst makes two related "common housing" arguments. For the "compressing" apparatus claims, '995-1 and '932-4, Burst argues that Walter's central data station is not in a "common housing" and does not perform compression. For the "receive compressed" apparatus claim, '995-17, Burst argues that Walter does not show receiving compressed video in the same housing that transmits it. Even if true, these arguments do not save Burst's patents from obviousness. Under *KSR*, the Court must consider whether a person of ordinary skill in 1988, "facing the wide range of needs created by developments in the field of endeavor, would have seen a benefit" to modifying what Walter discloses in order to obtain the alleged improvement provided by, e.g., a "common housing." *KSR*, 127 S.Ct. at 1744.[18] In this case, there is nothing novel about placing a housing around a group of components in a single location. This is true for both Walter's central data station (which houses the video library and transmits to consumers) and Walter's data receiving station (the VCR-like device that receives the transmitted video). As shown below, ordinary common sense shows motivation to modify *both* the central data station and the data receiving station such that *either* would satisfy all the limitations of Burst's claims.

#### a. It Would Be Obvious To Modify The Central Data Station

For example, Walter makes clear that video distributors operating the central data station need to obtain content from somewhere. Walter also makes clear that this content needs to be compressed before it is transmitted to consumers. Accordingly, the operator of the central data station would be motivated to include a system for digitizing conventionally taped video content and compressing it for transmission as Walter describes. Indeed, Dr. Hemami, acknowledges that "compression at a centralized location to which original [video] content would be mailed by content providers" was known in 1987. [2nd Hemami Decl., ¶ 36.] With this obvious change,

---

[18] The Court must also ask "whether the improvement is more than the predictable use of prior-art elements according to their established functions." *KSR*, 127 S.Ct. at 1740. This not at issue here. Apple showed that re-arranging Walter's elements in a common housing would have had predictable results, and Burst did not argue otherwise. [Wicker Decl., ¶ 15, Opp. at 16-19.]

the central station would compress, store, and transmit video, eliminating the primary distinction Burst draws between Walter and the "compressing" apparatus claims ('995-1 and '932-4).

Common sense also indicates that video distributors would also be motivated use the Walter system not only for distributing video to consumers, but also to distribute video content from movie or television studios to video distributors. [Wicker Decl., ¶ 15.] Burst does not challenge that this makes sense and would be obvious to implement. Instead, Burst argues that this would be "impractical." [2nd Hemami Decl., ¶ 36.] In fact, it is no more impractical than using Lang's own invention to distribute video, and for precisely the same reasons – it is expensive (but not difficult) to lay fiber optic lines. More importantly, just because it would be expensive or would require work to implement does not mean that such an implementation is novel and patentable. As described above, the central data station must receive the electronic data from the studios somehow, and it makes perfect sense that the providers could send the data the same way that it is sent to consumers. Thus, Burst's primary distinction between Walter and the "received compressed" apparatus claim ('995-17) should be rejected.

Common sense further shows a reason to put the equipment for a "central data station" into a "common housing": housing equipment together can make it easier and more convenient to market, sell, ship, and/or install, and helps keep out dust.[19] Someone hoping to supply a burgeoning video-on-demand industry with mass-produced and ready-made "central data stations" would have been motivated to package the equipment described in Walter into a single housing to obtain a product that was easier to ship and install. Housing the equipment of the central data station together would be "routine and straightforward." [Wicker Decl., ¶ 15.]

Finally, Dr. Hemami describes the "central data station" of Walter as an installation that "resides at the cable system head-end," and states that these "[c]able head-ends are commonly housed in dedicated buildings." [Hemami Decl. 38.] While Dr. Hemami plainly does not consider a "dedicated building" to be a "common housing," it certainly is. In any event, common sense shows that the difference between housing something in small dedicated building

---

[19] There are many examples, including computers (the IBM PC and Apple II housed processor, disk drives, etc together) and cell-phone base stations.

Reply Brief In Support Of Apple's Second Motion For
Summary Judgment Of Invalidity                          11

and housing it in a sheet metal enclosure is not significant and would evaporate in the ordinary course of progress in the electronic arts. Computers used to fill a room, but they evolved into PCs in suitcase sized boxes and now are carried around in pockets. Constant innovation through the efforts of thousands of skilled engineers has fulfilled Gordon Moore's "Law" through nearly 40 years of miniaturization, but it was not innovation to wrap a box around the steadily shrinking components. *KSR*, 127 S.Ct. at 1746 ("Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress").

### b. It Would Be Obvious To Modify The Receiving Station

Turning to the consumer side, common sense shows that a person thinking about selling the consumer "data receiving station" described in Walter—which Dr. Hemami called a "essentially a set-top box"[20]—would have been motivated to include with it features already known at the time in similar devices, such as a VCR[21] or a computer. The Burst patents themselves show the VCR and its features are relevant prior art by describing them in their "Background" and "Prior Art" sections. ['995 patent at 1:5-62.] Consumers have long been known to want to make copies of music and video content that they have. The Burst patents are directed to solving this well-known problem. VCRs typically allowed consumers to connect one VCR to another to allow copying of a video.[22] ['995 patent at 1:30-34.] This known market demand provides ample motivation to include in the consumer "data receiving station" shown in Walter an "output port" for transmitting the received compressed video content to another external storage device to make another copy. Doing so would add the ability to "transmit away" to the consumer "data receiving station" described in Walter, which is contained in a "common housing." This eliminates Burst's only distinction between Walter and the "received

---

[20] Brown Decl., Exh. B [Hemami Depo.] at 120.

[21] Dr. Hemami admitted that convention VCR technology was capable of delivering a two-hour movie faster than real time, so long as the trip home from the video store was less than two hours. Brown Decl., Exh. B [Hemami Depo.] at 96-97.

[22] Similarly, many radios had dual cassette decks, which allowed them to record radio transmissions onto a tape, and then copy that tape onto another tape for backup or to share with a friend. As digital music distribution became widely available to consumers with the advent of MP3, the internet, and companies such as Napster, the copying of digital music came with it, much to the dismay of many copyright owners.

compressed" apparatus claim ('995-17).

Similarly, just as some VCRs come with front-panel inputs so consumers can plug in their video cameras, one would be motivated to add the ability to compress video to the consumer's "data receiving station" to give consumers the ability to plug in their video cameras and use the "data receiving station" with their own content. Doing so would add a "compression means" to the "data receiving station" described in Walter, thereby eliminating the distinction Burst claims between Walter and the "compressing" apparatus claims ('995-1 and '932-4).

### 2. It Would Be Obvious To Modify Walter To "Receive Compressed" Before "Transmitting"

As discussed above, it would have been obvious to modify the Walter system to allow one to "receive compressed" data before transmitting it away. [Wicker Decl., ¶ 15.]

### 3. Walter Anticipates Or Renders Obvious Random Access Storage

Claim '995-1, '995-17, and '932-4 require "random access storage," and claim '839-76 requires a specific type of random access storage, "one or more magnetic disks." There is no dispute that Walter calls for "suitable high density memory devices." [Walter at 2:16-19.] Dr. Wicker's testimony that magnetic disks were "suitable high-density storage devices" is uncontradicted. [Wicker Decl. ¶ 16.] It is also undisputed that using RAM and magnetic disks was well-known and routine to those of ordinary skill.[23] [Mot. at 14-15.] Accordingly, Walter anticipates the "random access storage" and "magnetic disks" elements.

Burst's response is that Walter "teaches away from random access storage [such as magnetic disks] by emphasizing this specialized recirculating shift register memory." [Opp at 18, 2nd Hemami Decl. at 45-46.] Burst also argues that "there is no reason to use random access in Walter because it does not contemplate editing." [Opp. at 18.] Both arguments are wrong.

First, Burst's argument that "there is no reason to use random access [storage] in Walter" is contradicted both by common sense and by Walter itself. Walter describes a video-on-demand system that allows a user to select a program from a central library. [Walter at 1:42-56.] Simple common sense shows that random access is useful in allowing arbitrary selections of

---

[23] Brown Decl., Exh. B [Hemami Depo.] at 83. ("Q. … We've already talked about the use of disk drives being well known at the time, to store digital data is that right. A. Yes.")

Reply Brief In Support Of Apple's Second Motion For
Summary Judgment Of Invalidity                      13

1  videos from a library.  Thus, Walter provides a reason to use random access storage.

2  Furthermore, Burst is wrong when it asserts that there is no reason for Walter to allow random access *within* a video.  Burst's only explanation for this assertion is that Walter "does not contemplate editing."  But editing is hardly the only reason to use random access storage.  For example, Walter describes handing multiple simultaneous user requests by "transmitting only a portion" of one user's requested program before starting to transmit to another user.  This procedure creates a need for random access within a video as soon as two or more users request the same video.  If a first user has received one half of video A, and the system stops its transmission to him in order to handle a request from a second user who also wants video A, the system will have to be able to jump to the beginning of video A to transmit to the second user, and then jump back to the half-way point when it is time to complete delivery to the first user.  Thus, Walter itself provides a powerful motivation to use "random access storage."

Second, Burst's argument that Walter teaches away because it's preferred embodiment uses a "specialized recirculating shift register memory" is wrong as a matter of law. As this court has explained, "a reference's failure to mention a particular use does not constitute teaching away from that use." *Semiconductor Energy Lab. Co.*, 2007 WL 1793770 at *18, *Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1364 (Fed. Cir. 2006).  Walter calls for "suitable high density memory devices," which undisputedly include magnetic disks. The fact that the preferred embodiment happens to use memory modules "of the recirculating shift register type," instead of an alternative such as magnetic disks does not imply that Walter "teaches away" from magnetic disks.  There are no statements disparaging magnetic discs in Walter.  Moreover, Dr. Wicker's testimony that magnetic disks "could have been used" in Walter with "completely predictable results" is uncontradicted.  [Wicker Decl. ¶ 16.]

### VI.  KRAMER INVALIDATES BURST'S CLAMS

Most of Burst's discussion of Kramer is duplicative of the arguments it made in its earlier opposition, as it repeats the same four arguments made earlier.  Apple rebutted those arguments in its June 21 reply brief.  With regard to Burst's argument that Kramer does not disclose random access storage, one additional point is significant.  Kramer states that "systems

of the present invention are portable, most conveniently of the credit card size," and that "systems of this type with magnetic bubble memories are known, e.g. as described in U.S. Pat. No. 3,786,445." [Kramer at 1:23-27.] U.S. Patent No. 3,786,445 expressly states that "[i]n the embodiment shown a *random access* charge transfer semiconductor buffer memory 39 is included along with its associated read and write control circuits …" [Brown Decl., Exh. F (U.S. Patent No. 3,786,445) at 2:44-47.] Thus, Kramer clearly discloses random access storage known in the prior art for use in the "present invention."

Another recent development is the deposition of Mr. Kramer, which Burst took after Apple filed its Motion. That deposition provided clear and convincing evidence that each of the arguments Burst is making is wrong. For example, Mr. Kramer confirmed that his patent describes faster-than-real-time transmission of compressed music. [Brown Decl., Exh. G (Kramer Depo.) at 117-18, 120.] Moreover, the prototype Mr. Kramer built of his invention actually performed faster-than-real-time transmission. [*Id.* at 279-80.] Mr. Kramer's prototype also shows that it would have been obvious to include the functions of receiving, compressing, storing, and transmitting in a "common housing," because that is exactly what the prototype did. [*Id.* at 203-207.] The prototypes could also edit the compressed music data. [*Id.* at 200-201.]

## VII. EACH OF THE DEPENDENT CLAIMS IS INVALID

Burst has not shown that any of the dependent claims add anything innovative to its dependent claims, nor has Burst shown that any of the dependent claims describe an element that was not previously known. For example, Burst does not meaningfully contradict Dr. Wicker's testimony that "it would have been obvious and routine for a person of ordinary skill in the art to combine editing of digital audio or video files with the elements disclosed in Walter or Gremillet and Tescher, or with the "encoding system" of Kramer, in order to edit master recordings for distribution." [Wicker Decl., ¶ 24.] Instead, Burst argues that there is no "reason" to combine the editing taught by Compusonics with other references. [Opp. at 22-23.] Yet, as quoted above, one good reason is to edit the master recordings intended for distribution through the systems described in Walter, Gremillet, or Kramer.

Apple will address Burst's remaining arguments at the hearing.

**VIII.  CONCLUSION**

      For the reasons stated herein, Apple's Motion for Summary Judgment of Invalidity should be granted.

Dated:  September 6, 2007        WEIL, GOTSHAL & MANGES LLP

By:     /s/    
Nicholas A. Brown
Attorney for Plaintiff
Apple Computer, Inc.