# Exhibit E

# IP Law & Business

FROM THE PUBLISHER OF THE AMERICAN LAWYER
iplawandbusiness.com

**Sandoz to FDA: Make Up Your Mind**
**The U.S. Army's Odd Copyright Policy**

APRIL 2006

INSIDE: SPECIAL BIOTECH SECTION

## First Bill, Now Steve

Richard Lang believes he holds key patents for online video delivery. Now, after making Microsoft pay $60 million, he wants a piece of Apple.

Burst CEO and founder Richard Lang



# First Bill, Now Steve

Burst.com settled its **patent suit** with Microsoft for **$60 million**. Now the tech company wants a **piece of Apple**.

**By Eriq Gardner**

ichard Lang just cashed a $60 million check from Microsoft Corporation, yet he is holed up in a tiny cubicle in a cramped Santa Rosa, California, office composing a mammoth list of his enemies. It's unexpected behavior coming from Lang, a laid-back 52-year-old, who, when he's not relaxing at home with his wife, or tending to his 11-acre Sonoma County horse ranch, enjoys taking leisurely trips to the scenic coastal towns of his home state. Then again, never discount the fury of a man who believes he's changed the media business forever, only to be brushed aside like the horse manure that gets cleaned from his estate each day.

Lang, the chief executive and founder of Burst.com, figures he deserves much more than $60 million. Fifteen years ago, with patents describing new ways to deliver video to consumers, Lang set out with a $2 million check from the band U2 to "change the paradigm," as he likes to put it. He built a public company that at one point employed 110 engineers, lawyers, and other staff. Then, he says, Microsoft got in the way, and whatever millions he spent on business development were no match for the software giant's might.

Burst went bust before Lang could achieve his dream, but the paradigm of the video delivery business changed anyway. Today, consumers no longer just watch video that's broadcast to them over airwaves. They can now view it on their computer screen. They download it to their iPods. They even pause shows on their TV screens.

Lang believes he holds the patents on much of this progress, and that Apple Computers, Inc., RealNetworks Inc., Tivo Inc., several cable giants, and many others working on video-on-demand services owe him serious cash. Each morning, Lang kisses his wife good-bye and heads to his cubicle, where he scans newswires and checks e-mail from fired-up Burst.com shareholders. He talks to his lawyers throughout the day, and adds names to his enemies list—a database full of perceived infringers.

After settling the Microsoft litigation, Lang and his lawyers from San Francisco's Hosie, Frost, Large & McArthur turned their attention to Apple. The two companies attempted to negotiate a licensing pact. But Apple broke off talks, brought in Weil, Gotshal & Manges's star IP litigator, Matthew Powers, and sued Burst, looking to invalidate its patents. In February, Lang's lawyers were busy putting the finishing touches on a patent infringement counterclaim against Apple. Lang believes Burst is owed hundreds of millions of dollars in royalties from iTunes and iPod sales. "I couldn't get out of bed each morning if I truly believed I wasn't rightfully entitled to all this," he says.

The delivery of moving images to a small screen has always inspired tremendous awe—and provoked fierce intellectual property battles. Even before television was introduced to the public

ANDY FRIEBURG



Richard Lang (left) and Spenser Hosie

in 1939 at the World's Fair in New York, the medium was the subject of an intense patent fight, pitting lone California inventor Philo Farnsworth against RCA Corp. The electronics giant eventually paid Farnsworth $1 million for licensing rights to his patents, but it wasn't until much later—after Farnsworth checked himself in and out of a sanatorium, became an alcoholic, and died severely depressed—that he became known as the inventor of television, the guy who figured out how to transmit a picture to a television via the airwaves.

Over the past two decades, engineers have been working on ways to transmit video through Internet pipelines. During the early 1990s, networks were slow, computer processors were weak, and few dreamed of a future when movies and TV shows would one day be available upon demand. But as technology progressed, that vision attracted a number of startups, including ViVo, VXtreme, RealNetworks, Starlight Networks, and others.

Lang was one of the early dreamers. He says that he figured out his digital delivery method by 1987, the equivalent of inventing the pick-axe in the late Ice Age. That year, Lang left his job as chief executive of Go-Video, a tiny video technology company, bringing along his coworker and future wife, Lisa Walters. They founded a company called Explore Technology, and within a year, with the help of Fenwick & West, began filing for patents covering various aspects of receiving, delivering, and processing audio and video content. The first of these patents—more than 175 claims would be issued in total—were issued by the Patent and Trademark Office in 1990. Hedging their bets, Lang and his wife also founded a video publishing company, Video Press Inc. This would later prove to be a critical move.

It's easy to be skeptical about Lang's patents—and the man behind them. Lang did not attend a prestigious engineering school like the Massachusetts Institute of Technology, but graduated with an associate of arts degree in communications and foreign languages from Scottsdale Community College in Arizona. Unlike RealNetworks, Inc., chief executive Rob Glaser, who was a manager at Microsoft, Lang never worked for a big technology company. Perhaps the greatest bit of fodder for skeptics: Lang knows no computer code and hardly touched a computer before getting his patents.

So how did he do it?

> Going through Microsoft's documents in discovery, Hosie noticed something puzzling: **E-mails were missing from both before and after each company meeting with Burst.**

Lang waves away critics by saying he is an autodidact who loves playing with video technology. In 1987, while he was still at Go-Video, Lang became the patented inventor of the world's first dual-deck VCR. And Lang had a big idea about online video delivery: He believed that, like highways, computer networks often become congested. But it's not always rush hour, and sometimes the opportunity for data to burst forward presents itself. Lang thought the best online video delivery method would be to grab as much video information as possible during those "bursty" moments, store it locally, and feed it to the video player when necessary.

Although Lang hadn't ironed out all of the technical kinks, he realized that pursuing a patent on the "apparatus and method" of his system was a good idea. He and his lawyers from Fenwick & West looked into the prior art in the realm of video compression and storage technology. Lang says he was surprised to learn that "not one [patent] applied compression technology to delivery time."

In Lang's mind, delivery time was a key variable in sending digital video. Network speeds were fickle, after all, and if a consumer could watch downloaded or streaming video without delivery hiccups, they would be able to enjoy a much richer experience. Lang says his approach differed greatly from what other companies and engineers were investigating in the early 1990s. Others aren't so sure. "It was a remarkable improvement at the time, although technologically it was an incremental and almost obvious next step with the technology," says Larry Bouthillier, director of software development at Harvard Business School and a streaming media expert. "I can't say whether it was or should have been patentable, but it was very cool at the time."

After getting his patents, Lang went searching for funding. Through their work at the video publishing company, Lang and his wife learned that the band U2 was looking for good business opportunities. Skeptical but optimistic, Lang sent the group his business plan. And when U2 came to California on the band's 1992 ZooTV tour, the Oakland Coliseum provided the backdrop for a unique meeting. Before their concert, the band gathered in a nearby bungalow to hear Lang's idea and see a demonstration. During the meeting, one band member, The Edge, considered the techie of the group, was particularly intrigued, says Lang: "He was very excited. They all kept asking questions. They saw the possibilities, both educational and as a way to deliver music on demand. They were also interested that there wouldn't be

tapes, there'd be no waste, it'd be environmentally friendly."

U2 cut Lang a check for $2 million, buying a 44 percent share in the company. Later, when the technology was used to provide the band's fans with free concert footage, The Edge told *The Hollywood Reporter*, "We wanted to give something back to [our] fans."

"The money allowed us to hire engineers, begin development, and get patents all around the world," Lang says. The company also went to industry trade shows and showed off new technology—an instant video transceiver and receiver—that Lang and company had built. In 1991 the group made a splash at the annual Consumer Electronics Show in Las Vegas. "The technology has the capacity to revolutionize the transmission and reception of programming for broadcast and cable operators," the *Christian Science Monitor* reported.

Over the next few years, Lang's company, which renamed itself Instant Video Technologies in 1992 (it would adopt Burst.com in 2000), brought in more employees and waited for technology, and others in the industry, to get up to speed.

By the mid-1990s, a number of companies had grown interested in delivering video through the Internet. Many, like Progressive Networks (which later renamed itself RealNetworks) and Apple Computer (through its media platform, QuickTime), pursued a "streaming" model, which was not altogether different from the old broadcast standard, where media would be sent and consumed in real time. In theory, under the streaming model, a 30-minute video clip is sent and seen in 30 minutes. Practically speaking, that almost never happened.

Lang believes his method is much better, and figures the technological edge would have made Burst as big as Apple or Real. But Burst put its money on the wrong horse. In the mid-1990s, Intel Corp., Sun Microsystems, Inc., and Netscape Communications Corp. cooperated with each other on a new software platform. Burst worked hard with engineers from Intel and Sun to develop a video player for this joint venture.

Then Microsoft allegedly got in the way. U.S. district court judge Thomas Penfield Jackson's findings of fact in the U.S. Department of Justice antitrust suit show how Microsoft pressured Intel to walk away from this joint venture. Microsoft did not intend to hurt Burst specifically; nevertheless, when Intel announced it was pulling the plug in 1998,

> When **U2 came to California** on their 1992 Zoo TV tour, a **bungalow behind** the Oakland Coliseum provided the **backdrop for a meeting** with Lang.

Burst's diminished prospects were the collateral damage.

Burst set its sights lower, announcing that it would sell its technology, called Burstware, as a plug-in to the Windows Media player. Burst soon found a bit of success here, convincing cable giant SBC Communications Inc. to make a $5 million investment in the company.

Struggling with its own video player, Microsoft became interested, too. Between October 1999 and December 2000, Burst and Microsoft executives met seven times and, under a non-disclosure agreement, Burst detailed allegedly sensitive technical information about delivering video at speeds Faster-Than-Real-Time (a registered trademark of Burst). This included a copyrighted "how to" Burst simulator, a confidential patent application, and technical papers describing in detail the algorithmic basis for the use of an optimal delivery system. Burst also introduced Microsoft to various customers and to third-party testing evaluation that it considered a trade secret.

Meanwhile, after the Intel/Sun venture collapsed, Burst ramped up for its second big chance to get its name out to the public. In early 2000, U2 announced that anyone who downloaded Burst's plug-in would be able to view U2's upcoming PopMart concerts for free. Thousands of U2 fans complied, and Burst made $500,000 in server sales that year—a burst of good fortune.

Then Microsoft pulled the plug. Shortly before the tour was about to begin, Microsoft told its consumers that they needed to upgrade to a new version of Windows Media. Not much about the upgrade was different, but, to Lang's horror, Burst's plug-in stopped working with it. Lang says that Microsoft promised him a technical solution, but none ever came. Lang also says that Microsoft offered him $1 million for licensing rights, an offer Lang felt was insulting.

Over the next few months, in the midst of a stock market collapse, Burst, reeling, restructured, offering additional stock to creditors, and renegotiating its debts. In three months, Burst's stock went from $5.50 a share to 20 cents. Lang fired all but two employees and took a fifty percent pay cut.

Microsoft might have assumed that Burst had lived up to its name (in fact, a later e-mail revealed through discovery showed that one of Microsoft's employees had been closely tracking the company's sinking share price). But Burst wasn't dead yet.

Lang pleaded with shareholders and creditors for patience. Faced with obliteration, Lang pointed to the company's biggest asset—its intellectual property: "We told them

our IP portfolio had tremendous value, and if they all agreed to wait, they'd be rewarded." Those creditors might have gone either way, Lang says, but in December 2001 Microsoft introduced yet another new version of Windows Media, called Corona. The new player included a new feature called FastStream, which, a Microsoft press release touted, "automatically optimizes the delivery of streaming audio and video to take advantage of the full bandwidth available to the user."

Lang says the infringement seemed obvious. According to him, "People in the audience [at Microsoft's announcement] said, 'Hey, isn't that Burst's way of doing things?' " Suddenly the creditors backed off, and Lang even managed to raise more capital.

In early 2002 Lang went around the San Francisco area, shopping for a law firm that would take his case against Microsoft on contingency. Many politely declined. Then one attorney, Spenser Hosie, name partner at eight-lawyer Hosie, Frost, stepped up. Hosie is not shy about self-promotion, calling himself a "tenacious lawyer," and boasting about his 2004 victory for the state of Louisiana in a royalty fraud trial that resulted in a $111 million jury verdict against energy giant Chevron Corp. When Lang showed up at his office, Hosie said he never heard of Burst.com, aside from a billboard on Highway 101 of a man urinating next to Niagara Falls, with the caption, "Why stream when you can burst?" But as Lang told his story, Hosie grew interested. The 49-year-old lawyer likes to prep for juries by arguing before his son, then 11, and this seemed like the type of case his young jury consultant would understand. Besides, 90 percent of Hosie's client roster is engaged on contingency, and after spending two months examining Burst's patents, reviewing internal e-mail, and speaking with those familiar with Lang's situation, Hosie decided to take the case on a "leap of faith."

In June 2002 Burst filed a lawsuit in Baltimore federal district court against Microsoft, alleging five counts of antitrust behavior, three counts of patent and trade secrets infringement, and two counts relating to Microsoft's alleged breach of the nondisclosure agreement. The suit might have gotten more attention had it not been for the fact that in the wake of the Department of Justice's successful antitrust suit against Microsoft, Burst was far from alone in suing Microsoft. In the same district, Microsoft was fending off antitrust suits brought by Sun, Netscape, Be Inc., and more than 100 cases filed by consumers.

"The DOJ case and the number of follow-on cases was a real liability for us," says Hosie. "People saw us as a copycat suit, and it really wasn't. We weren't arguing that consumers paid too much per copy [of Windows]. Ours was profoundly different."

Perhaps everyone should have paid more attention, because Hosie was about to give the entire anti-Microsoft community a potentially remarkable gift. As part of discovery, in late 2002 Microsoft, represented by Sullivan & Cromwell, Sidley Austin, and Preston Gates & Ellis, handed over 180 boxes of documents, perhaps trying to bury Hosie's small firm in a mountain of paperwork.

It didn't work. Hosie says he spent the next six weeks putting the papers in chronological order and reading each, one-by-one. "I noticed something puzzling," Hosie says. "There would be these big gaps in terms of the e-mail. There would be e-mails talking about the coming meeting [with Burst], but not after, no commenting about the meeting. I started to ask myself, 'Why these gaps?' "

In fact, the gaps were much bigger than Hosie first thought. For the seven meetings between Burst and Microsoft conducted between October 1999 and December 2000, e-mails were missing approximately one week before each meeting, and up to a month after each meeting. In all, there were 35 missing weeks. The case quickly evolved into an embarrassing set of repeated motions to compel Microsoft to hand over the e-mail. (During these pre-trial motions, lawyers representing Sun Microsystems and RealNetworks, including deputy general counsel Dave Stewart, sat in attendance.)

Each time, Microsoft came back, pleading ignorance, and Judge Frederick Motz instructed the company to search harder, looking into employee PCs, servers, and off-site backup tapes. Eventually, after the third motion to compel, Microsoft uncovered an e-mail sent in 2000 by James Allchin, group vice president of Microsoft's platforms group, telling employees, "Do not archive your mail. Do not be foolish. 30 days."

This 30-day rule was directly in conflict with several court orders in various cases requiring Microsoft to keep relevant e-mail. It also contradicted testimony from Microsoft in-house lawyers, in depositions in various cases, who made assurances that the company was doing its best to encourage document retention. At a hearing on May 20, 2004, Judge Motz said the Allchin e-mail was "significant," and Microsoft's explanations were "somewhat dubious." The

> Hosie had seen a **Burst.com billboard** on Highway 101 featuring a man urinating next to Niagara Falls, with the caption, **"Why stream when you can burst?"**

judge told Hosie he could spend as much time as he wanted deposing Allchin and Microsoft chairman Bill Gates about it.

Sidley Austin partner John Treece, representing Microsoft, responded, "I feel a little blindsided."

Speaking from his Chicago office in March, Treece explains that large companies with many employees have a tough time holding on to documents. Plus, there were technical glitches, he says. Microsoft's lawyers searched the company's archived e-mail for "burst," but the common word produced a lot of irrelevant messages. Then, the lawyers tried searching for the word with a capital B. Treece blames a technical adviser for botching the job, adding that his team offered the judge a "mea culpa," but that Hosie "rode [the issue] throughout the case. . . . [Hosie is] very good at being a thorn in your side on these discovery matters. . . . He would say that because we didn't produce an e-mail that we were trying to hide it. Not the case."

Nevertheless, Hosie brought a spoilage motion, requesting that Judge Motz instruct the jury that the missing e-mails were intentionally destroyed by Microsoft in order to prejudice the jury. On Thursday, March 10, 2005, Judge Motz was set to rule on this, but the lawyers spent 12 hours on the phone with each other through the night, hammering out a last-minute settlement, a onetime $60 million licensing fee for Burst's technology.

The Burst lawsuit was one of many that Microsoft has recently settled. Microsoft spokesperson Stacy McCredy says that Allchin's message to employees only addressed internal company e-mail "not covered by any retention obligation," adding, "Burst's claims are without merit, and the technology at issue in this court proceeding is based on Microsoft's own work and innovation."

So why did Microsoft settle? Tom Burt, Microsoft's deputy general counsel for litigation, says that in deciding when to settle and when to fight, the lawyers there consider two factors. First, whether they are on solid legal ground. And second, what kind of jury story they'll be telling. Burt won't say the Burst case was settled precisely because of the spoilage issue, but does call the lawsuit a "complicated, unusual case, very different from our other suits." He adds, "We didn't think we had exposure on the patent issues—our case was good—but there were these other things going on."

Since the settlement, Lang has been inundated with inquiries from shareholders inquiring about Burst's plans. Lang answered them with a press release on April 5, 2005, announcing the company would distribute the cash to shareholders, minus Hosie's nearly $22 million cut and $4 million set aside to keep the company running until at least 2010. Most importantly, the company announced its new business model—demanding licensing fees from patent infringers.

One month later, in a Hyatt hotel in Santa Rosa, Lang met with shareholders, who all wanted to know Burst's next targets. The company's impending legal activities have inspired a cult of followers, Web sites like burstinvestors.com, and message board chatter. Eric Walters, Burst's vice president of operations and one of three employees now at the company, says he gets e-mails every day from shareholders and tech observers, looking to impart IP tips.

Because the Microsoft suit settled, the merits of Lang's patents had never been put to the test. That changed on January 5, 2006, when Apple filed suit against Burst in San Francisco federal district court, seeking a declaratory judgment that the patents are invalid and Apple's technology non-infringing.

Before then, the two companies spent months negotiating a licensing deal. It's hard to determine how far negotiations actually went, but Lang says Burst "bent over backwards so [Apple] wouldn't lose face, including keeping things private." In other words, Lang says, Apple didn't want to publicly that it had not pioneered this video technology.

During those months of negotiation, Apple started selling video clips at its iTunes store for download on a new video iPod. Ironically, Apple hired U2 to promote the new device, licensing concert footage from the band. (After the Microsoft settlement, U2 cashed out its Burst stock.) Apple made $537 million in iPod revenue in the last quarter of 2005, and Hosie says that for starters, Burst would expect about 2.5 percent of that in royalties.

In response, Apple spokesperson Kristin Huguet says, "Burst.com approached Apple claiming that some of our products violate their patents. But we don't agree. Unfortunately, we've been unable to resolve the disagreement with Burst directly. So we've asked the court to decide."

At press time Burst hadn't answered Apple's complaint, but Hosie and Lang both say they will file a patent infringement suit against the company. Lang says that the iPod infringes several of his patents, including one (5,164,839) detailing a method for transferring video programs in digital format. "Imagine what it would be like if you had to fill your iPod in real time?" Lang asks.

> In a **blog post** now famous among **Burst followers,** Charles Wiltgen, a former **Apple executive,** called Lang's patents, "**streaming snake oil.**"

Many observers may see Burst as the new NTP, Inc., the company that wrangled a $613 million settlement from the maker of the BlackBerry. There may be some truth to this: Some of Lang's crucial patents expire within the next few years, and those patents have more than a few critics. In a blog post that is now infamous among Burst followers, former Apple executive Charles Wiltgen, who headed the company's QuickTime division in the 1990s, called the patents "streaming snake oil," writing, "Burst.com is one of the last vestiges of the P.T. Barnums that contributed to the terminal overinflation of the Internet bubble." (Now a consultant, Wiltgen says he stands by those comments.)

On the other hand, many of Burst's patents run longer than 10,000 words each, and have been cited as prior art in more than 200 later patents. In 2001, for example, Apple applied for a patent on "reliable real-time transport protocol" that included prior art references to nine Burst patents—indicating at the very least that Apple was aware of Burst's IP five years ago. This February, the PTO issued the patent.

Since Apple filed suit, Burst's stock price has increased—although it's hardly booming. Burst climbed 70 percent, from an anemic $1.04 per share to a slightly less-paltry $1.75. Robert Cringely, a tech pundit on PBS, has been an avid Burst follower. "When I stumbled on Burst, I was living in Santa Rosa," he says. "I realized that they weren't patent scammers in any sense, but legitimate techies who would much rather sell their code than sue people."

Cringely thinks that Burst will not only crush Apple in court, but will "eventually license the world." Cringely explains: "I spoke to Apple and Real and found that neither would deny in private that they were using Burst IP, but both were confident in Microsoft's ability to crush little companies through litigation. Only this was a different kind of little company—one that had a burn rate low enough to outlast even Microsoft, a contingency law firm with very deep pockets from past successes, and really a heck of a case."

From his Santa Rosa cubicle, Lang seems a long ways from experiencing the psychological downfalls of Philo Farnsworth, but one question makes him sit up in his chair and make his face go a little flush. Is he the latest "patent troll" haunting American business? Not in the slightest, he responds. "Patent trolls don't spend a decade working to develop and license their patents," he says. "If it wasn't for Microsoft, we wouldn't be in the patent licensing business."

Lang says he's quite prepared to embark upon this road toward relentless litigation, saying he owes it to investors who have faithfully stuck by the company. "We've worked with the system from day one, and played by the rules every step of the way." He sighs, adding, "It shouldn't be this hard to make money from an invention." ∎

## COMING UP IN  LAW&BUSINESS

**July**
- Patent Litigation Survey: The Most Active Patent Practices
- IP Europe
- Big Deals
- In House Profile

SPACE CLOSING: MAY 29 | MATERIAL DEADLINE: JUNE 6

**August**
- Inventors and Lawyers
- Tech Buys
- Trial Tips
- Big Suits

SPACE CLOSING: JUNE 27 | MATERIAL DEADLINE: JULY 5

   

To reserve space or for further information, contact:

Display and Consumer Advertising  
212-545-6242

Law Firm Advertising  
212-545-5987

International (London)  
+44 20 7936 9847

To subscribe to IP Law & Business, call 212-545-5990 or e-mail: circ@alm.com

www.alm.com    ALM