1   MATTHEW D. POWERS (Bar No. 104795)
    Email:  matthew.powers@weil.com
2   GARLAND T. STEPHENS (Admitted NDCA,
    Texas Bar No. 24053910)
3   Email:  garland.stephens@weil.com
    NICHOLAS A. BROWN (Bar No. 198210)
4   Email:  Nicholas.brown@weil.com
    WEIL, GOTSHAL & MANGES LLP
5   Silicon Valley Office
    201 Redwood Shores Parkway
6   Redwood Shores, CA  94065
    Telephone: (650) 802-3000
7   Facsimile: (650) 802-3100

8   Attorneys for Plaintiff
    APPLE COMPUTER, INC.

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12
     APPLE COMPUTER, INC.,                  Case No. C 06-0019 MHP
13
                      Plaintiff,
14                                          **PLAINTIFF APPLE COMPUTER,
                                            INC.'S MOTION TO STRIKE THE
          v.                                DECLARATIONS OF DRS. GERSHO
15                                          AND HEMAMI, AND RICHARD
     BURST.COM, INC.,                       LANG**
16
                      Defendant.            Date:  September 18, 2007
17                                          Time:  2:00 p.m.
                                            Hon. Marilyn Hall Patel
18
                                            Complaint Filed:  January 4, 2006
19                                          Trial Date:  February 26, 2008

20

21

22

23

24

25

26

27

28

1    **I.      APPLE'S MOTION TO STRIKE BURST'S DECLARATIONS**

2              In this case, Burst has repeatedly instructed its witnesses not to answer important

3    questions.  This tactic has successfully limited Apple's ability to cross-examine Burst's witnesses.

4    Accordingly, Apple now moves to strike the declarations submitted by Dr. Gersho, Dr. Hemami,

5    and Mr. Lang in support of Burst's oppositions to Apple's motions for summary judgment.[1]  As

6    shown below, Burst's refusal to allow its witnesses to answer important questions was not an

7    isolated occurrence.  Rather, it was a repeated problem that has unfairly limited Apple's ability to

8    cross-examine Burst's witnesses about the subject matter of their declarations.

9              In the alternative, Apple moves the Court to draw an adverse inference from

10   Burst's refusal to allow its witnesses to respond to Apple's questions.

11

12   **A.      The Court Should Strike Dr. Gersho's Declaration, Or In The Alternative
             Draw An Adverse Inference From Burst's Instructions Not To Answer**

13            The two declarations submitted by Dr. Gersho focus on the Kramer reference, and

14   also provide opinions about the Kepley and CompuSonics references.  Yet, under the guise of

15   limiting the deposition to the "scope of his declaration," Burst repeatedly refused to allow Apple

16   to use these same references to cross-examine Dr. Gersho, even when the questions were

17   specifically directed to the statements in his declaration.

18            Q.    And this is, to be clear, your Declaration in Opposition to
                   Apple's Second Motion for Summary Judgment of
19                 Invalidity.  Right?
             A.    Yes.
20           Q.    If you turn to paragraph 38.  Could you just read the first
                   sentence out loud?
21           A.    "Not only does Kramer not suggest faster than real-time
22                 transmission, it would have been entirely surprising and
                   unexpected for anyone to conceive of or propose the idea of
23                 transmitting audio in a burst mode given the statement of
                   technology and the consumer product market in the late
24

25   _____

26   [1] Burst initially refused to allow Apple to even depose the experts who submitted declarations in
     support of Burst's oppositions to Apple's summary judgment motions.  Accordingly, Apple
     moved to strike those declarations.  Burst then reconsidered and offered depositions of its experts
27   on the subject matter of their declarations if Apple would agree to withdraw its motion to strike.
     Apple agreed, and took the depositions of Burst's experts.  Accordingly, Apple hereby withdraws
28   its previously filed motion to strike, which is now moot.

     MOTION TO STRIKE THE DECLARATIONS OF DRS.
     GERSHO AND HEMAMI, AND RICHARD LANG                1                Case No. C 06-0019 MHP

1                      1980s and early 1990s."

       Q.      What did you mean by that sentence?

2        A.      I think it's pretty clear.  I'm not sure how to answer.

       Q.      I guess what I'm asking is, is that sentence intended to

3                  mean only that it wouldn't have been obvious to send audio

                 in a burst mode in view of Kramer or something more

4                  general?

5        A.      At the time I was thinking about Kramer.  So I don't know

                 if -- I don't remember if -- at the time I wrote this, if I was

6                  thinking more broadly or not.

7        Q.      Would it have been obvious to a person of ordinary skill in

                 the art to transmit audio in a burst mode if they had the

8                  Kepley patent in their possession in 1987?

    MR. PAYNE:  Same objection.  Don't answer that.  Beyond the

9                  scope of the declaration.

10 Brown Decl., Exh. A [Gersho Depo. at 54:13-55:17].

11        Q.      Now, looking back at your declaration, we started to look at

                 paragraph 38.  And this is, again, the paragraph where in

12                  the first sentence you say that "it would have been entirely

                 surprising and unexpected for anyone to conceive of or

13                  propose the idea of transmitting audio in a burst mode

                 given the state of the technology and the consumer product

14                  market in the late '80s and early '90s."  Right?

15        A.      Yes, I said that.

       Q.      But Kepley did conceive of it.  Right?

16     MR. PAYNE:  Objection.  Form.  I'm going to instruct him not to

                 answer.  It's beyond the scope.

17     THE WITNESS:  May I answer?

18     MR. PAYNE:  He's asking a specific question about Kepley.  So

                 that's beyond the scope of your declaration.  So I'm going

19                  to instruct you not to answer.

20 Brown Decl., Exh. A [Gersho Depo. at 90:16-91:6].

21          These instructions were improper and unfair.  Dr. Gersho's expert declarations

22 discuss the Kepley reference.  Dr. Gersho declares that he has "read and studied" Kepley.  [First

23 Gersho Decl., Docket #108 at ¶ 8].  As Apple has shown, Kepley expressly describes transmitting

24 audio faster than real-time.  Yet Burst refused to allow Apple to use Kepley to cross-examine Dr.

25 Gersho about his statement that "it would have been entirely surprising and unexpected for

26 anyone to conceive of or propose the idea of transmitting audio in a burst mode given the state of

27 the technology and the consumer product market in the late '80s."  Given that Kepley directly

28 contradicts this statement, and that Dr. Gersho had "read and studied" Kepley, this was an

1

2

important line of questioning.  Burst prevented it from occurring.

3

This was not an isolated incident or a mistake.  On twenty-eight separate occasions

4

Burst instructed Dr. Gersho not to answer deposition questions.  And as shown by the following

5

excerpts, Burst deliberately foiled Apple's repeated attempts to use the Kepley reference to cross-

6

examine Dr. Gersho about the opinions he expressed about the validity of the Burst patents:

7

> Q.    And the next sentence there [in Kepley] says,
> "Advantageously, the transmission facilities are high-speed
> digital facilities of the type used for computer data file
> transfers."  Right?

8

> A.    That's what it says.
> Q.    Then it goes on to say, "The use of digital high-speed

9

> transmission facilities of speed greater than 9.6 kilobits per
> second enables the exchange of digitally encoded and

10

> compressed voice mail messages faster than real-time
> speech."  Do you see that?

11

> A.    Yes, I see it.
> Q.    Do you have any reason to disagree with that?

12

> MR. PAYNE:  I'm going to object and instruct him not to answer.
> It's beyond the scope of his declaration. It's in transmission

13

> areas.

14   Brown Decl., Exh. A [Gersho Depo. at 79:3-17].

15

> Q.    What is your understanding of what Mr. Lang invented?
> A.    Well, first of all, I guess every claim is a separate

16

> invention.  So I don't know if I could say in general, but I
> could address specific -- like claim 1 of '995 is the one that

17

> comes to mind most.
> Q.    Okay.  Let's go with that one.

18

> A.    And his invention has four major components: the input
> means -- let's see -- random access storage means, and

19

> compression means, and output means, if I recall.  Those
> are --

20

> Q.    Okay.  And is it your testimony that Mr. Lang is the first
> person ever to have combined those?

21

> A.    I didn't comment on that in my depositions.  I don't recall
> testifying to that specifically.

22

> Q.    Do you have a view?
> MR. PAYNE:  This is beyond the scope of his declaration.  I

23

> guess, yeah, you can answer in the context of your
> declarations.

24

> THE WITNESS:  I believe so, yes.
> BY MR. STEPHENS:

25

> Q.    And what's the basis for that belief?
> A.    Well, I haven't seen -- I haven't seen these four elements

26

> combined in -- in any of the prior art references that I've
> seen before.

27

> Q.    Of course you did see them combined in Kepley.  Right?
> MR. PAYNE:  Objection. Form.

28

> MR. STEPHENS:  Are you going to instruct him not to answer?

MOTION TO STRIKE THE DECLARATIONS OF DRS.
GERSHO AND HEMAMI, AND RICHARD LANG                    3                    Case No. C 06-0019 MHP

1      MR. PAYNE:  Yeah.  It's beyond the scope of the declaration.

2    Brown Decl., Exh. A [Gersho Depo. at 131:2-132:8].

3           Q.      Do you have an opinion about whether or not it would have
                    been surprising or unexpected for anyone to conceive of or
4                   propose the idea of transmitting voice audio in a burst
                    mode in the late '80s?
5           MR. PAYNE:  Yeah, I'm going to instruct him not to answer.

6    Brown Decl., Exh. A [Gersho Depo. at 96:22-97:12]

7           As these passages show, Burst repeatedly prevented Apple from cross-examining

8    Dr. Gersho about the core subject matter of the pending summary judgment motion his

9    declaration was submitted to oppose.  Accordingly, the Court should strike Dr. Gersho's

10   declaration.  In the alternative, the Court should draw an adverse inference from Burst's refusal to

11   allow Dr. Gersho to respond to these questions such as "Would it have been obvious to a person

12   of ordinary skill in the art to transmit audio in a burst mode if they had the Kepley patent in their

13   possession in 1987?"

14

15          **B.      The Court Should Strike Richard Lang's Declaration, Or Draw An Adverse
                     Inference From His Refusal To Answer Questions**

16          As with Dr. Gersho, on multiple occasions Burst instructed Richard Lang not to

17   answer deposition questions.  With Mr. Lang, Burst's basis for its instructions was an off-the-

18   record conversation in which Mr. Lang apparently concluded that he "could not separate" his

19   attorney's advice from his own opinions on a range of significant issues.  Based on this, Mr.

20   Lang refused to explain how he believed his invention differed from what was disclosed in

21   Walter:

22          MR. FOLSE: While we were off the record and before Mr. Lang spent
                    much time looking at this patent [Walter], I determined from
23                  speaking with him that he had had extensive conversations about
                    the patent and points of distinction with counsel from Carr &
24                  Ferrell. And so based on that, I need to instruct the witness on the
                    record to avoid waiver of the attorney/client privilege not to
25                  respond to the pending question or questions concerning the extent
                    to which this patent does or does not anticipate the patents-in-suit,
26                  to the extent that in so responding he would be disclosing the
                    content of privileged communications that he had with his
27                  attorneys at Carr Ferrell, or any other counsel.  If he's able to
                    answer the question without doing that, fine. But if he is not, then I
28                  would instruct him not to answer.

Brown Decl., Exh. C [Lang Depo. at 368] (emphasis added).

    Q.  … Well, first of all, did you take any time to read the patent on the break?

    A.  I started to read it.

    Q.  How much time did you spend reading it?

    A.  About a minute.

    Q.  And then what happened?

    A.  Well, then I discussed the fact with my attorney that it's – I can't -- I can't separate my views on this patent and how it compares to my patents from the views that came about as a result of the conversations that I had with my patent attorneys.  And as a result of that discussion, my attorney has asked me to not answer these questions.

Brown Decl., Exh. C [Lang Depo. at 369-370].

    Q.  So you don't have an independent understanding of how your invention differs from Walter, correct?

    A.  That's not what I said.  I said I can't separate my independent opinions from those that have resulted from my conversations with patent counsel.

    Q.  Well, to the extent you have an independent understanding of how your invention is different from Walter, please tell me what it is.

    A.  I can't identify it.

    Q.  Okay. If you're asked at trial to tell how your invention is different from Walter, how would you answer that question?

    A.  I don't know what I'll say at trial.

    Q.  I'm asking you to think now about what you would say if you were asked at trial how your invention is different from Walter.

    A.  You're asking me to speculate on a future event.

    Q.  I'm asking you to think about a future event and if you have any idea or can come up with an idea of what you'll tell the jury about how your invention is different than Walter, tell me that.

    MR. FOLSE: By the way, despite the phraseology of that question, my instruction regarding disclosure of privileged communications at this deposition still stands.

    Q.  Can you answer the question?

    A.  No.

Brown Decl., Exh. C [Lang Depo. at 378-379].

      Burst's use of privilege to shield the sole named inventor of the patents in this case from testifying about how his invention differed from Walter is inconsistent with its current effort to use Mr. Lang's testimony to defend its patents from Walter.[2]

      In addition to refusing to explain how his invention differed from Walter, Mr.

---

[2] *See Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir, 2003) ("The privilege which protects attorney-client communications may not be used both as a sword and a shield"); *In re Echostar*, 448 F.3d 1294, 1301 (Fed. Cir. 2006) (describing use of "the attorney-client privilege as both a sword and a shield" as an "abuse" to be prevented).

1

2

3

4

Lang refused to explain what basis Burst has for its assertion that Apple's success with the iPod shows the "commercial success" of Burst's alleged invention.     Appearing as Burst's representative under F.R.C.P. 30(b)(6) regarding alleged commercial success of Burst's invention, Mr. Lang testified as follows:

5

6

7

8

9

10

11

12

13

14

15

16

17

> Q.  Do you have any basis to believe that Burst's patented technology has contributed to the success of the iPod, and if so, what's your basis?
> MR. YORIO: Objection on the ground that it's compound, but go ahead. In the interests of expediting things, go right ahead.
> A:  I -- I do believe it's contributed. My basis is rooted in -- in an understanding of which of the -- which of the various aspects of the Burst patents are -- are practiced by the iPod and various Apple products. And the – the specifics regarding which ones and in what way are -- my opinion in those areas are precisely what I – I cannot separate from the opinions that I now hold as a result of the conversations that I've had with my attorneys.
> Q.  Okay. Can you give me your best understanding sitting here today as to how Burst's patented technology contributed to the success of the iPod?
> A.  I think -- you know --
> MR. YORIO: Same objection.
> A.  Just -- my answer is just the same one that I just gave. I don't have a different answer for that.
> Q.  So you can't answer that question without revealing communications you've had with your attorneys; is that right?
> A.  That's correct.
> MR. BROWN: And Bob, I take it you're instructing him not to reveal those communications?
> MR. YORIO: I am.

18

Brown Decl., Exh. D [Lang Depo. at 768-69].

19

20

21

22

23

24

25

26

27

Here again, Burst's use of privilege to shield Mr. Lang from explaining how Burst's claimed invention allegedly contributed to the iPod's success is inconsistent with its current effort to use the iPod's success as evidence of nonobviousness.  Accordingly, the Court should strike Mr. Lang's declaration.  In the alternative, the Court should draw an adverse inference from Burst's refusal to allow Mr. Lang to respond to these questions.  It would be patently unfair to allow Burst to shield Mr. Lang from cross-examination about how his invention allegedly differs from Walter, and how his invention allegedly contributed to the success of the iPod, while still allowing his testimony to support Burst's oppositions to the pending summary judgment motions.

28

**C.     The Court Should Strike Dr. Hemami's Declaration, Or In The Alternative Draw An Adverse Inference**

Burst used a similar tactic when it presented Dr. Hemami for deposition, albeit to a lesser degree that with Dr. Gersho and Mr. Lang:

> Q.     (By Mr. Stephens)  Sure.  So, when you're copying an audio file from one disk to another disk in a Unix workstation in the mid Eighties, the time required to make that copy isn't restricted to the amount of time required to play that file back, right?
> MR. PAYNE:  Objection, form.  Where -- what are you talking about, Unix-based workstations?  That's not a declaration --
> MR. STEPHENS:  Make your objection.  Stop --
> MR. PAYNE:  I'm going to instruct her not to answer the question.
> MR. STEPHENS:  You're going to -- okay.
> MR. PAYNE:  It's beyond the declaration.
> MR. STEPHENS:  All right.  You're going to instruct her not to answer?
> MR. PAYNE:  If you've got a specific prior art --
> THE WITNESS:  I'm sorry, could I take a break and --
> MR. STEPHENS:  No.  There's a question pending.
> MR. PAYNE:  -- you've got specific prior art in the declaration.  You're suggesting hypotheticals that assume facts not in evidence.  And, so, I have no choice but to instruct her not to answer.

Brown Decl., Exh. B [Hemami 9/4/2007 Depo. at 81:3-82:1].

This instruction, like the instructions to Dr. Gersho, unfairly constrained Apple's ability to cross-examine Dr. Hemami.  Accordingly, the Court should strike the Hemami declarations, or in the alternative draw an adverse inference from Burst's refusal to let Dr. Hemami respond to this question.

Dated: September 17, 2007                    WEIL, GOTSHAL & MANGES LLP


                                             By:  _____/s/_____
                                                   Nicholas A. Brown
                                                   Attorneys for Plaintiff
                                                   APPLE COMPUTER, INC.