# Exhibit A

```
            UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
                 SAN FRANCISCO DIVISION

APPLE COMPUTER, INC.,

      Plaintiff/Counterdefendant,

vs.                         Case No. C06-00019 MHP

BURST.COM, INC.,

      Defendant/Counterclaimant.
_____/

             DEPOSITION OF ALLEN GERSHO

             Tuesday, September 11, 2007

                       VOLUME I

                    Pages 1 - 222

REPORTED BY:  VALERIE J. EAMES, CSR NO. 9021, RPR, CRR
```

---

```
 1            A P P E A R A N C E S
 2
 3
 4    For PLAINTIFF/COUNTERDEFENDANT:
 5       WEIL, GOTSHAL & MANGES LLP
 6       BY:  GARLAND T. STEPHENS
 7            ATTORNEY AT LAW
 8       700 Louisiana, Suite 1600
 9       Houston, Texas  77002
10       (713) 546-5044; Fax (713) 224-9511
11       garland.stephens@weil.com
12
13
14    For DEFENDANT/COUNTERCLAIMANT:
15       HEIM, PAYNE & CHORUSH LLP
16       BY:  LESLIE V. PAYNE
17            ATTORNEY AT LAW
18       6710 Chase Tower
19       600 Travis Street
20       Houston, Texas  77002
21       (713) 221-2000; Fax (713) 221-2021
22       lpayne@hpcllp.com
23
24
25
```

---

```
 1            A P P E A R A N C E S
 2                  (Continued)
 3
 4    ALSO PRESENT:
 5       DAN MOTTAZ VIDEO PRODUCTIONS, LLC
 6       BY:  CHRISTOPH GEMES
 7       182 Second Street, Suite 202
 8       San Francisco, California  94105
 9       (415) 624-1300
10
11       JAYNA WHITT, PATENT COUNSEL, APPLE COMPUTER
12       (Via Telephone)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

```
 1                    I N D E X
 2
 3  WITNESS                               EXAMINATION
 4                                           PAGE
 5  ALLEN GERSHO
 6     By Mr. Stephens                        8
 7
 8
 9  EXHIBITS:                                PAGE
10   251  Declaration of Allen Gersho in      54
11        Opposition to Apple's Second Motion for
12        Summary Judgment of Invalidity
13   252  Declaration of Allen Gersho in Support  57
14        of Burst's Opposition to Apple's Motion
15        for Summary Judgment of Invalidity
16        Based on Kramer and Kepley Patents
17   253  CompuSonics document                  97
18   254  CompuSonics Corporation document with a  101
19        "received" stamp date of 6/17/87
20
21
22        EXHIBITS MARKED PREVIOUSLY AND APPENDED
23              Exhibit No. 109, 364
24
25
```

9/11/2007  Allen Gersho

```
 1              I N D E X
 2            (continued)
 3
 4    SECTION OF TRANSCRIPT REQUESTED MARKED BY MR. STEPHENS
 5                 PAGE   LINE
 6                  47    14
 7
 8
 9     QUESTIONS NOT ANSWERED BY THE WITNESS
10                 PAGE   LINE
11                  12    12
12                  28    10
13                  29     3
14                  43     4
15                  43    24
16                  46     8
17                  47    24
18                  50     7
19                  51    20
20                  55    12
21                  74    14
22                  77     1
23                  77    12
24                  79    14
25                  83    20
```

9/16/2007  3:14 PM                                      5

9/11/2007  Allen Gersho

```
 1     QUESTIONS NOT ANSWERED BY THE WITNESS
 2                (continued)
 3                 PAGE   LINE
 4                  85    24
 5                  86     7
 6                  90    25
 7                  97     7
 8                 101    15
 9                 102    10
10                 102    16
11                 103    15
12                 104    20
13                 105    10
14                 105    25
15                 123    16
16                 125    20
17                 132     2
18                 155     7
19                 156     7
20                 160    25
21                 214    21
22                 215     9
23                 215    16
24                 215    23
25                 216     3
```

9/16/2007  3:14 PM                                      6

9/11/2007  Allen Gersho

```
 1        BE IT REMEMBERED that pursuant to Notice, and on
 2    Tuesday, September 11, 2007, commencing at the hour of
 3    8:50 a.m., thereof, at 1901 Avenue of the Stars,
 4    Suite 950, Los Angeles, California, before me, VALERIE J.
 5    EAMES, a Certified Shorthand Reporter, the following
 6    proceedings were had:
 7              P R O C E E D I N G S
 8        THE VIDEOGRAPHER:  Good morning.  This marks the
 9    beginning of Volume I, videotape number 1 in the
10    deposition of Mr.-- of Dr. Allen Gersho in the matter of
11    Apple Computer, Incorporated versus Burst.com.  And the
12    case has been filed with the United States District Court
13    Northern California of District -- Northern California
14    District Court of San Francisco Division, Case
15    No. C06-00019 MHP.
16        Today's date, September 11th, year 2007, and the
17    time on the video monitor is approximately 8:50 a.m.  The
18    location of the deposition is 1901 Avenue of the Stars,
19    here -- Suite 950, Los Angeles, California.  And we're at
20    the law offices of Susman & Godfrey.
21        And if we could please ask the attorneys to
22    introduce themselves for the record.
23        MR. STEPHENS:  Garland Stephens of Weil, Gotshal
24    & Manges representing Apple.
25        MR. PAYNE:  Les Payne for defendant Burst.com.
```

9/16/2007  3:14 PM                                      7

9/11/2007  Allen Gersho

```
 1        THE VIDEOGRAPHER:  My name is Christoph Gemes.
 2    I am a video specialist, and I am employed by Dan Mottaz
 3    Video Productions, LLC, 182 Second Street, Suite 202,
 4    San Francisco, California 94105.
 5        And if we could please ask the court reporter to
 6    state her name for the record.
 7        THE REPORTER:  Valerie Eames.
 8        THE VIDEOGRAPHER:  Very well.  And at this time
 9    if we could please ask you to swear in the witness.
10            ALLEN GERSHO,
11    called as a witness by the Plaintiff/Counterdefendant,
12    and who, having been administered the oath by me, was
13    examined and testified as hereinafter set forth:
14        THE VIDEOGRAPHER:  Okay.  At this time,
15    Counselor.
16              EXAMINATION
17    BY MR. STEPHENS:
18        Q.  Good morning, Dr. Gersho.
19        A.  Good morning.
20        Q.  Could you please state and spell your name for
21    the record.
22        A.  Allen Gersho, A-l-l-e-n G-e-r-s-h-o.
23        Q.  And what's your home address?
24        A.  4604 Via Gennita, Santa Barbara, California.
25        Q.  You've submitted a couple of declarations in
```

9/16/2007  3:14 PM                                      8

9/11/2007 Allen Gersho

```
1    A.   No.  I -- nothing in my personal life would be
2   connected.
3    Q.   How about a particular graduate student?  Can
4   you recall a particular graduate student that worked with
5   the Sun workstations and the time roughly when they were
6   under your supervision?
7    A.   No.  I had many students and visiting
8   researchers.  It's difficult to remember the time periods
9   when each was there.
10   Q.   Sun workstations were available by the
11  mid-1980s, though.  Right?
12   A.   I don't know that.
13   Q.   You're just not sure.
14        Okay.  Well, let's talk a little bit about what
15  you did with the PDP11-24.  How did you use that in the
16  laboratory in connection with the development and
17  research on speech, audio, and video compression?
18   A.   The students would write software to evaluate
19  algorithms using this computer.
20   Q.   Did it include hardware that could digitize
21  audio?
22   A.   I think so.  I think so.
23   Q.   Would you agree that by the mid-1980s, that
24  people of skill in the art in this case -- you understand
25  what I mean by that -- right? -- people of skill in the
```

9/11/2007 Allen Gersho

```
1   relevant art to this case?
2    A.   Yes.
3    Q.   Would you agree that by the mid-1980s people of
4   skill in the relevant art to this case were quite
5   familiar with hardware for digitizing audio and storing
6   it in computer systems?
7    A.   Some were and some weren't.  I think there's a
8   variety of backgrounds of people that still qualify as
9   skilled in the art.
10        I'd like to correct something I said before --
11   Q.   Okay.
12   A.   -- that our equipment may have had the ability
13  to digitize voice.  When you said "digitize audio," I
14  don't mean -- I wasn't agreeing to digitizing any form of
15  audio, such as wideband audio.
16   Q.   But speech is a form of audio.  Right?
17   A.   It depends --
18        MR. PAYNE:  Object as to form.
19        Go ahead.  You can answer.
20        THE WITNESS:  The term "audio" does not have a
21  precise definition out of context.  Some will say it does
22  not include speech, depending on the context.
23  BY MR. STEPHENS:
24   Q.   But some would say it does include speech,
25  again, depending on the context.  Right?
```

9/11/2007 Allen Gersho

```
1    A.   In some context some might say so, but I'm just
2   speculating.  I can't be specific here.
3    Q.   Okay.  So you think that it did have hardware
4   for digitizing speech.  Is that right?
5    A.   Yes.
6    Q.   Did you ever have hardware for digitizing audio
7   with a wider bandwidth than just speech?
8    A.   At some time we -- I believe we may have had
9   such a capability in my laboratory.
10   Q.   How about with the PDP11-24?
11   A.   No.
12   Q.   Do you recall when you got the capability of
13  digitizing speech on a PDP11-24?
14   A.   I can't say with certainty.  I think it came
15  with -- we may have bought the audio equipment together
16  with the computer at the same time.
17   Q.   Okay.  So that would have been in roughly 1981?
18   A.   If I'm correct about that recollection, yes.
19   Q.   Did the PDP11-24 have magnetic disk storage?
20   A.   I assume it had some form of storage.  I don't
21  remember.
22   Q.   Can you think of any other kind it might have
23  had instead of disk storage?
24   A.   It had floppy disk drives.
25   Q.   And floppies are a form of magnetic disk.
```

9/11/2007 Allen Gersho

```
1   Right?
2    A.   That's true.
3    Q.   Did it have a high-speed magnetic disk?
4    A.   I don't recall.
5    Q.   It had the random access memory.  Right?
6    A.   I had no awareness of the internal design of the
7   computer.  Now, I can make an assumption, but I don't
8   specifically know that.
9    Q.   Well, virtually all general purpose computers in
10  the '80s had random access memory.  Right?
11   A.   I'm not an expert on computers.  I know it
12  was -- it's common to have random access memory in
13  digital computers.
14   Q.   And it was common in the mid-'80s for digital
15  computers to have random access memory.  Right?
16   A.   I suppose so.
17   Q.   And it was common for them to have magnetic disk
18  drives in the mid-1980s as well.  Right?  By "them," I
19  mean digital computers.
20   A.   I think that's probably correct.
21   Q.   Would you agree, then, that it's likely that
22  your PDP11-24 had a magnetic disk drive?
23        MR. PAYNE:  Objection.  Form.
24  BY MR. STEPHENS:
25   Q.   By that I mean a high-speed one, not a floppy.
```

*9/11/2007 Allen Gersho*

```
 1         MR. PAYNE:  Same objection.
 2         THE WITNESS:  I'm not sure what kind of storage
 3  it had.
 4  BY MR. STEPHENS:
 5     Q.  Okay.  Now, you said that your graduate students
 6  used the PDP11 to write software to evaluate algorithms.
 7  Is that right?
 8     A.  Yes.
 9     Q.  And those algorithms included audio compression
10  algorithms.  Is that right?
11     A.  Where audio means voice.
12     Q.  Okay.  Now, the -- during your tenure from 1980
13  to 1998, you also worked on wideband audio compression as
14  well.  Is that right?
15     A.  I did.
16     Q.  Was there work in the signal compression
17  laboratory in the '80s on wideband audio compression as
18  well?
19     A.  I'm not certain, but my best recollection is --
20  began -- it may have begun in the early '90s.
21     Q.  Was the PDP11 connected to any other computers?
22     A.  No.
23     Q.  Was it connected to external storage of any
24  kind?
25     A.  I don't think so.  I don't recall, but I don't
```

9/16/2007 3:14 PM                                            21

*9/11/2007 Allen Gersho*

```
 1  think so.
 2     Q.  Now, in the process of evaluating algorithms for
 3  speech compression, did your graduate students in the
 4  mid-'80s use speech compression algorithms to compress
 5  speech that was digitized into the PDP11?
 6     A.  As I recall, most of the source material for
 7  experimenting with speech compression may have been
 8  provided to us by an outside organization.
 9     Q.  What was the name of that outside organization?
10     A.  In different time periods, I've had some
11  relationships with a few companies, and one or another
12  company may have -- you know, may have provided us with
13  some files that are used for demonstrating speech
14  compression.  And so I'm not sure which company at which
15  time.  But Bell Laboratories definitely at some time gave
16  me some source files.
17     Q.  Any others that you're aware of?
18     A.  I don't recall specifically.
19     Q.  Did your graduate students ever use the speech
20  digitization facility that your PDP11 had?
21     A.  They used the digital-to-analog facility
22  frequently.
23     Q.  What about the analog to "dility" -- excuse
24  me --
25     A.  Analog to digital?
```

9/16/2007 3:14 PM                                            22

*9/11/2007 Allen Gersho*

```
 1     Q.  Yes.  Thank you.
 2     A.  I don't recall if we really digitized our own
 3  source material.  If so it was -- it would have been very
 4  infrequent.  Mostly it was -- there was interest in
 5  listening to speech files.
 6     Q.  But your system certainly had the capability of
 7  recording your own source material.  Right?
 8     A.  I believe it had the capability of recording
 9  speech from a microphone input.
10     Q.  And you're just not sure whether people used
11  that in their research.  Is that right?
12     A.  That's right.
13     Q.  Now, it certainly would have been within the
14  normal skills of a graduate student working in your
15  laboratory to record some speech using the
16  analog-to-digital facility, and then compress it using a
17  compression algorithm on the PDP11.  Right?
18     A.  A couple things here.  The -- certainly some --
19  some, perhaps not all, of my students would have known
20  how to digitize speech from -- coming in from a
21  microphone and use it as input to a speech compression
22  algorithm.
23     Q.  Okay.  In fact, that was one of the main reasons
24  for developing speech compression algorithms is to
25  compress speech that you encode using an
```

9/16/2007 3:14 PM                                            23

*9/11/2007 Allen Gersho*

```
 1  analog-to-digital encoder.  Right?
 2     A.  No.
 3         MR. PAYNE:  Objection.  Form.
 4         THE WITNESS:  No.  The main reason was to study
 5  speech algorithms and evaluate how they work, not the --
 6  the purpose was not to compress speech files.  It was to
 7  study compression algorithms.
 8  BY MR. STEPHENS:
 9     Q.  But the reason to study compression algorithms
10  is to compress speech that has been encoded using an
11  analog-to-digital encoder.  Correct?
12     A.  No.
13     Q.  How would you do it, then?
14     A.  No.  The reason for studying compression of
15  speech was help students get Ph.D.s to publish papers,
16  and perhaps to achieve results that might be useful in
17  the real world.
18     Q.  How would those results be useful in the real
19  world?
20     A.  Engineers in industry reading our publications
21  may find it useful to apply one of the algorithms to some
22  real world product.
23     Q.  And what kind of real world product might they
24  apply it to?
25     A.  One of the main applications of voice
```

9/16/2007 3:14 PM                                            24

## Page 37

1   MR. PAYNE: Objection. Form.
2   THE WITNESS: It seems there are many components
3   here. I want to be sure I give a correct answer as I
4   don't want to make a sweeping statement.
5   BY MR. STEPHENS:
6   Q. Okay.
7   A. You put in too many pieces here for me to be
8   clear.
9   Q. Okay. Well, I want to make sure you're clear.
10  So if there's -- you need some clarification, just let me
11  know, and I'm happy to add some clarification.
12  A. I've already said that you can have -- it's
13  possible to have improved efficiency using some form of
14  DPCM compared to just using a PCM. Okay?
15      So I'm not sure beyond that what you're trying
16  to find out.
17  Q. I'm trying to find out if it's possible to use a
18  digital DPCM encoder with an analog-to-digital encoder in
19  a way that's substantially equivalent to using analog
20  DPCM. That's my question. Is it possible to use --
21      MR. PAYNE: Objection. Form.
22      THE REPORTER: And I didn't get -- "I'm trying
23  to find out if it's possible to use a digital DPCM
24  encoder" --
25  ///

## Page 38

1   BY MR. STEPHENS:
2   Q. -- to get substantially equivalent results to
3   using an analog DPCM encoder --
4       MR. PAYNE: Objection. Form.
5   BY MR. STEPHENS:
6   Q. Using an appropriate analog-to-digital converter
7   with the DPCM encoder.
8       MR. PAYNE: Objection. Form.
9       THE WITNESS: The term "substantially equivalent
10  results" is a little vague here. There may -- the
11  results may -- if the results include the complexity, the
12  practicality of implementing it --
13  BY MR. STEPHENS:
14  Q. Specifically excluding the complexity and
15  practicality of implementing it. I'm only asking you to
16  focus on the output.
17      MR. PAYNE: Is there a question?
18      MR. STEPHENS: Yes.
19      MR. PAYNE: I don't know the question.
20  BY MR. STEPHENS:
21  Q. Go ahead and answer, sir. If you don't
22  understand it, please let me know, and I'll be happy to
23  clarify it.
24  A. It might help if you repeat the question so I
25  make sure I'm answering the correct question.

## Page 39

1   Q. Okay. Is it possible to use a digital-to-analog
2   encoder and a digital DPCM encoder to get the same output
3   substantially -- from substantially the same input as an
4   analog DPCM encoder without regard to the complexity of
5   the circuitry or cost?
6       MR. PAYNE: Objection. Form.
7       THE WITNESS: You said "the same output," and
8   the answer would be no to the same output.
9   BY MR. STEPHENS:
10  Q. But I said "substantially."
11  A. Well, you said -- "substantially the same
12  input," you said.
13  Q. Well, I meant to say both substantially the same
14  input and substantially the same output. I think that's
15  what I said. But that's fine if it wasn't clear.
16      So with that in mind, would you please answer
17  the question.
18      MR. PAYNE: Objection. Form.
19      THE WITNESS: I believe that it is possible to
20  get a similar quality audio output -- sorry -- a similar
21  quality digital representation of audio by the two
22  alternative methods: one of analog-to-digital
23  conversion, followed by a digital DPCM circuit, as with
24  a -- a DPCM encoding system, depending on the -- if one
25  suitably chooses the number of bits and assigns these

## Page 40

1   correctly.
2   BY MR. STEPHENS:
3   Q. So the audio quality would be equivalent. Is
4   that right?
5       MR. PAYNE: Objection. Form.
6       THE WITNESS: The audio quality represented by
7   the bit stream coming from either of the two options
8   might be similar.
9   BY MR. STEPHENS:
10  Q. And what about the number of bits required to
11  represent that audio signal?
12  A. It is possible to have fewer bits coming from
13  the circuit with DPCM. Oh, sorry. Wait a minute. I
14  withdraw that.
15      Both cases we're talking about -- about starting
16  with an analog input.
17  Q. Yeah. In fact, we can say it's the identical
18  analog input.
19  A. Okay. It is possible to have some saving in
20  bits by using DPCM rather than not using DPCM. But
21  that's not the issue right now. You're just saying
22  that -- oh, the bit rate of the output is what you're
23  trying to get.
24  Q. So what I'm after is whether or not a person
25  having the appropriate knowledge of analog and digital

9/11/2007 Allen Gersho

## Page 53

```
 1   computer to computer.  I have done some copying of files
 2   to a flash drive and then from the flash drive to another
 3   computer.
 4       Q.   Okay.  And you typically have to wait while the
 5   copy to the flash drive is made.  Right?
 6       A.   Yes.
 7       Q.   And all other things being equal, it's desirable
 8   for that process to happen faster rather than slower.
 9   Right?
10            MR. PAYNE:  Objection.  Form.
11            THE WITNESS:  I usually have other things to do
12   and -- after I give a copy order.  So it doesn't bother
13   me.  But I suppose some people may be impatient.
14   BY MR. STEPHENS:
15       Q.   Did you ever use UNIX to UNIX Copy protocol,
16   UUCP?
17       A.   I've heard the term, but I don't recall ever
18   using it.
19       Q.   Were your Sun workstations that you used at your
20   research center networked?
21       A.   Certainly in the '90s.  I don't recall when
22   they -- when we started to have network workstations.
23       Q.   And those Sun workstations are UNIX
24   workstations.  Right?
25       A.   They were a version of UNIX offered by Sun
```

## Page 54

9/11/2007 Allen Gersho

```
 1   Microsystems.
 2       Q.   Do you know if they supported UUCP?
 3       A.   I don't want to speculate.  I don't know for
 4   sure.
 5       Q.   Okay.  Was compression used in -- well, I have
 6   something else.
 7            If you could mark this, please.  I think the
 8   next exhibit number is 251.
 9            (Exhibit No. 251 was marked.)
10   BY MR. STEPHENS:
11       Q.   Do you recognize your declaration?
12       A.   Yes.
13       Q.   And this is, to be clear, your Declaration in
14   Opposition to Apple's Second Motion for Summary Judgment
15   of Invalidity.  Right?
16       A.   Yes.
17       Q.   If you turn to paragraph 38.  Could you just
18   read the first sentence out loud?
19       A.   "Not only does Kramer not suggest faster
20       than realtime transmission, it would have
21       been entirely surprising and unexpected for
22       anyone to conceive of or propose the idea of
23       transmitting audio in a burst mode given the
24       statement of technology and the consumer
25       product market in the late 1980s and early
```

## Page 55

```
 1   1990s."
 2       Q.   What did you mean by that sentence?
 3       A.   I think it's pretty clear.  I'm not sure how to
 4   answer.
 5       Q.   I guess what I'm asking is is that sentence
 6   intended to mean only that it wouldn't have been obvious
 7   to send audio in a burst mode in view of Kramer or
 8   something more general?
 9       A.   At the time I was thinking about Kramer.  So I
10   don't know if -- I don't remember if -- at the time I
11   wrote this, if I was thinking more broadly or not.
12       Q.   Would it have been obvious to a person of
13   ordinary skill in the art to transmit audio in a burst
14   mode if they had the Kepley patent in their possession in
15   1987?
16            MR. PAYNE:  Same objection.  Don't answer that.
17   Beyond the scope of the declaration.
18   BY MR. STEPHENS:
19       Q.   So your declaration is not intended to convey
20   the view that Mr. Lang's alleged inventions are not
21   obvious in view of Kepley.  Is that right?
22       A.   I need to think about it.  I don't recall right
23   now what my intent was, if it was broader or not.
24            MR. PAYNE:  Can you read back the question,
25   please.
```

## Page 56

9/11/2007 Allen Gersho

```
 1            (The record was read as follows:
 2            "Q  So your declaration is not intended to
 3        convey the view that Mr. Lang's alleged
 4        inventions are not obvious in view of Kepley.
 5        Is that right?")
 6            THE WITNESS:  I do not believe I was thinking
 7   about Kepley in this context --
 8   BY MR. STEPHENS:
 9       Q.   Okay.
10       A.   -- one way or the other.
11       Q.   Have you expressed a view in connection with
12   this litigation whether or not Mr. Lang's alleged
13   inventions are obvious in view of Kepley?
14       A.   I don't recall.  You know, I've had a number of
15   phone conversations --
16            MR. PAYNE:  Don't talk about phone
17   conversations.  If you're going to limit it to the
18   declaration --
19   BY MR. STEPHENS:
20       Q.   My intention is to ask you about your
21   declarations.  That's what I meant.
22       A.   I don't -- no, I don't recall right now.
23       Q.   So you're not sure whether you did or not.
24   You're not saying you didn't.
25       A.   That's correct.
```

## Page 77

1  Q.  Can you think of any reason other than
2  forwarding it?
3      MR. PAYNE:  Objection.  Form.  I'm going to
4  instruct him not to answer.  This has nothing to do with
5  compression.
6      I'm instructing you not to answer.
7  BY MR. STEPHENS:
8  Q.  If you'll turn now to column 12.  Line 47,
9  there's a section that begins "Voice Mail Message
10 Forwarding."  Do you see that?
11 A.  Yes.
12 Q.  That shows that the system is designed for
13 forwarding voice mails.  Right?
14     MR. PAYNE:  You're beyond the scope of his
15 declaration.  You're getting into issues of transmission.
16 I instruct him not to answer this line of questioning,
17 unless you can explain to me why it's tied to
18 compression.
19     MR. STEPHENS:  I've already explained the
20 relevance to his declaration, and I'm not going to
21 continue.  You can make your instructions, and we'll just
22 take it up with the judge.
23     MR. PAYNE:  Okay.
24 BY MR. STEPHENS:
25 Q.  Now, on the next column, 13, there's a

## Page 78

1  discussion of the data call connection to transmit voice
2  mails.  Right?
3  A.  I don't know where -- where is it?
4  Q.  So, for example, starting at line 29.
5  A.  Yes, there's the discussion of data call
6  connections in this patent.
7  Q.  And it says there at line 29, that "This data
8  call connection can be established using various types of
9  transmission facilities."  Do you see that?
10 A.  Yes.
11 Q.  And in the 1980s, AT&T had various types of
12 transmission facilities that it made available to its
13 business customers.  Right?
14 A.  I don't know that.  I mean I know that they had
15 various transmission facilities, but I don't know what's
16 made available to customers other than the operating
17 companies which it owned at the time.  It wasn't -- they
18 weren't customers.
19 Q.  So you don't know whether what's described in
20 here about making data call facilities of various types
21 available to support voice mail systems is an accurate
22 description of AT&T's business at the time.  Is that
23 right?
24 A.  I believe that voice mail systems was a part of
25 AT&T's business.

## Page 79

1  Q.  Including the Audix system.  Right?
2  A.  I understand that that was developed by AT&T.
3  Q.  And the next sentence there says,
4  "Advantageously, the transmission facilities are
5  high-speed digital facilities of the type used for
6  computer data file transfers."  Right?
7  A.  That's what it says.
8  Q.  Then it goes on to say, "The use of digital
9  high-speed transmission facilities of speed greater than
10 9.6 kilobits per second enables the exchange of digitally
11 encoded and compressed voice mail messages faster than
12 realtime speech."  Do you see that?
13 A.  Yes, I see it.
14 Q.  Do you have any reason to disagree with that?
15     MR. PAYNE:  I'm going to object and instruct him
16 not to answer.  It's beyond the scope of his declaration.
17 It's in transmission areas.
18 BY MR. STEPHENS:
19 Q.  In column 14, around line 5, there's a sentence
20 that begins, "At step 706, the destination voice mail
21 service system transmit protocol identifiers to
22 originating voice mail service system to indicate the
23 signaling format."  Do you see that?
24 A.  Yes.
25 Q.  Is that something that's referred to as a

## Page 80

1  protocol negotiation?
2  A.  I don't know.
3  Q.  You don't know about protocol negotiation?
4  A.  No.
5  Q.  Do you know if the Kepley system would support
6  more than one protocol for transmission of voice mail
7  messages?
8  A.  I don't know.
9  Q.  In column 14, around line 58, there's a sentence
10 that says, "This voice mail message illustrated in
11 Figure 4 can be of any length."  Do you see that?
12 A.  Yes.
13 Q.  Is there any inherent limit on the length of a
14 voice mail message that can be stored using voice mail
15 compression mechanisms of the kind that you're familiar
16 with that existed in the mid-'80s?
17 A.  Well, there has to be a length limitation.
18 There's a limited -- disk storage space was expensive in
19 those days.  It was -- they had a limited disk storage.
20 They're not going to let someone talk forever and leave a
21 message of three hours.
22 Q.  Okay.  But other than the limit imposed by the
23 amount of storage available, was there any other limit?
24 A.  There may be technical limits involving with
25 the -- involving the implementation of the compression.

**Page 81**

1  I can't -- I don't know -- not just the compression.  I
2  mean the interfacing and the circuitry and so on.  I
3  don't know enough about the hardware to -- and how things
4  are implemented in circuits to say one way or the other.
5      Q.  So you don't have any reason to disagree with
6  that statement -- is that right? -- that the voice mail
7  message can be of any length, other than there has to be
8  some limit to the amount of storage available?
9          MR. PAYNE:  Objection.  Form.
10         THE WITNESS:  At the moment I can't think of
11 specific reasons other than the ones I've already
12 referred to that -- for putting a limit on the length of
13 the message.
14 BY MR. STEPHENS:
15     Q.  Which ones did you refer to other than the disk
16 drive?
17     A.  One, the disk storage space.  And the other is
18 that implementation constraints for interfacing
19 circuitry, which I don't understand well enough that
20 there could be issues there.
21     Q.  So you don't know of any, but there could be
22 some?
23     A.  That's true.
24     Q.  Okay.
25     A.  I can think of another limitation.

**Page 82**

9/11/2007  Allen Gersho

1      Q.  Okay.
2      A.  That the number of calls coming in -- the
3  computer processor has limited capability, and it just
4  can't keep processing one call forever when there's -- it
5  can be overloaded and it can only handle so many
6  simultaneous calls.
7      Q.  But that's true regardless of how long a
8  particular message is.  Right?
9      A.  Well, it's just --
10     Q.  How many are happening at the same time.
11     A.  No.  The longer it is, the more it ties up some
12 of the resources of the system, and therefore it reduces
13 the ability of the system to handle as many other
14 messages as it could.
15     Q.  So that's a reason to make things happen quickly
16 and short.  Right?
17     A.  That would be a reason to put a limit on the
18 duration of the message.
19     Q.  Okay.  But that's not an engineering limitation.
20 That's just a decision about how to manage a bunch of
21 simultaneous calls.  Is that right?
22     A.  It is an engineering limitation, I think.
23     Q.  If there was only one user for the system, it
24 wouldn't be a limitation.  Right?
25     A.  The system would be defined differently.  The

**Page 83**

1  whole -- the sign of the system, the engineering would be
2  very different if it was limited to one user.
3      Q.  Okay.
4      A.  You could use an answering machine.
5      Q.  If you'll look at column 16 now of the Kepley
6  patent -- actually, before we go there, at the bottom of
7  column 15, at line 65, there's a sentence that says, "The
8  transmission of the digitally encoded, compressed voice."
9  Do you see that?
10     A.  Column 15, line 65?
11     Q.  Yes.  And that sentence carries onto the top of
12 the next column.  Could you just read that sentence out
13 loud.
14     A.  "The transmission of the digitally
15         encoded, compressed voice mail message over
16         high-speed digital facilities also is
17         timewise efficient compared to transmitting
18         the analog version of the voice mail
19         message."
20     Q.  Could you explain that, please?
21         MR. PAYNE:  Same objection.  Same instruction,
22 beyond the scope of his declaration.
23 BY MR. STEPHENS:
24     Q.  In column 16 there, at line 11, there's a
25 sentence that says, "Destination voice mail service

**Page 84**

9/11/2007  Allen Gersho

1  system receives each 128 byte segment, and it goes on
2  from there."  Do you see that?
3      A.  Yes.
4      Q.  That's talking about the destination voice mail
5  system receiving the digitally encoded, compressed voice
6  mail message.  Right?
7      A.  Perhaps I could read the context a bit.
8      Q.  Sure.  Go ahead.
9      A.  Yes.
10     Q.  So that's a description of the destination voice
11 mail saving -- voice mail service system receiving the
12 digitally encoded, compressed mail message and then
13 storing it on a magnetic disk.  Right?
14         MR. PAYNE:  Objection.  Form.
15         THE WITNESS:  It's -- it doesn't mention
16 compressed, but it is -- it's receiving a segment of the
17 message.  So presumably that's the digital compressed
18 voice.
19 BY MR. STEPHENS:
20     Q.  Then it stores it in the database processor.
21 Right?
22     A.  That's what it says.
23     Q.  And that database processor we saw had a
24 magnetic disk for storage.  Right?
25     A.  I don't know.

9/11/2007  Allen Gersho

```
 1     Q.   Look back at Figure 2.
 2          MR. PAYNE:  Objection.  Form.
 3          THE WITNESS:  Figure 2 shows an element number
 4   203 that looks like a symbol for a magnetic disk storage.
 5   BY MR. STEPHENS:
 6     Q.   So just to be clear, then, what's happening in
 7   the patent, with reference to Figure 1, we have the
 8   system 110 receiving a voice mail message from a handset
 9   where somebody's leaving a voice mail message.  Are you
10   with me now?
11     A.   Figure 2?
12     Q.   Figure 1.  So you have --
13     A.   Oh, yes.
14     Q.   -- in Figure 1 the voice mail service system 110
15   receives a voice mail message from somebody using a
16   telephone handset.  Right?
17     A.   Yes, that's one option here.
18     Q.   Okay.  And then the voice storage processor
19   digitally compresses it and stores it in the database
20   processor.  Right?
21     A.   The voice storage processor does compress it
22   and -- yes, I believe it's stored in the database
23   processor.
24     Q.   Then the database processor transmits it over
25   high-speed digital facilities in a manner that's timewise
```

9/11/2007  Allen Gersho

```
 1   efficient, compared to sending the analog version to the
 2   voice mail system 150.  Right?
 3          MR. PAYNE:  I'm going to object.  It's beyond
 4   the scope of the declaration.  Instruct him not to
 5   answer.
 6   BY MR. STEPHENS:
 7     Q.   So then the database processor transmits that to
 8   the voice mail service system 150.  Right?
 9          MR. PAYNE:  Same objection.  Same instruction.
10   BY MR. STEPHENS:
11     Q.   Somehow the voice mail gets from database
12   processor 113 to the database processor 153.  Right?
13     A.   Where's 153?
14     Q.   That's in the voice mail service system 150.
15     A.   Yes, I believe so.
16     Q.   And then there, that digitally compressed voice
17   mail file is stored in database processor 153 on a
18   magnetic disk.  Right?
19     A.   Yes.
20          MR. STEPHENS:  Why don't we take a break to
21   change the tape.
22          THE VIDEOGRAPHER:  We're off the record at
23   approximately 1:48 a.m.  That concludes tape 1.
24          THE WITNESS:  Did you say 1:48?  10:48.
25          THE VIDEOGRAPHER:  I'm sorry.  10:48.
```

9/11/2007  Allen Gersho

```
 1          (Recess taken.)
 2          THE VIDEOGRAPHER:  We're back on the record.
 3   This is the beginning of tape 2.  The time is
 4   approximately 10:58 a.m.
 5          Counselor.
 6   BY MR. STEPHENS:
 7     Q.   Dr. Gersho, looking back at your second
 8   declaration, which I think was 251, if I remember right.
 9   That's the Declaration of Allen Gersho in Opposition to
10   Apple's Second Motion.  Do you have that?
11     A.   Yes.
12     Q.   Do I have the number right, 251, on the exhibit?
13     A.   Yes.
14     Q.   In paragraph 38 -- actually, before we get
15   there, let me ask another question or two about Kramer --
16   excuse me -- about Kepley.
17          Now, you worked for AT&T for a number of years.
18   Right?
19     A.   Yes, I did.
20     Q.   Did you file any patent applications while you
21   were working for AT&T?
22     A.   Yes.
23     Q.   So there are some AT&T-issued patents that
24   you're named as an inventor on?
25     A.   That's correct.
```

9/11/2007  Allen Gersho

```
 1     Q.   Is it your experience that when AT&T filed for a
 2   patent, AT&T as a company did so because they believed
 3   there was an invention there worth patenting?
 4     A.   I couldn't say that.  I think they wanted to
 5   patent everything they could.  That was my impression.
 6     Q.   Okay.  But it -- was it your view or your
 7   understanding that AT&T's policy was to fulfill all the
 8   requirements of the patent office, laws and regulations,
 9   in filing an application?
10     A.   I don't know their policy.  They never discussed
11   it with me.
12     Q.   Do you think AT&T would file patent applications
13   for things that didn't work?
14          MR. PAYNE:  Objection.  Form.
15          THE WITNESS:  I don't think they filed any
16   perpetual motion machines, but I know one patent that
17   they filed -- that was filed and issued of mine that was
18   totally useless.
19   BY MR. STEPHENS:
20     Q.   "Useless" is different than "not working."
21          Do you think they filed patent applications for
22   things that didn't work?
23     A.   I have no reason to assume that, but -- no, I
24   shouldn't speculate.  I don't know.  Who knows.  There
25   may be a reason.
```

1    Q.   Okay. Well, looking at the Kepley patent, that
2  was assigned to AT&T. Right?
3    A.   Uh-huh. Yeah.
4    Q.   And it was published no later than
5  December 1988. Right? That's the issue date on the
6  patent?
7    A.   If you say so.
8    Q.   That's the issue date anyway?
9    A.   Uh-huh. Yeah.
10   Q.   Would you agree that that reflects the state of
11 the art in voice mail systems at the time?
12   A.   I don't have any opinion on that, because I
13 don't know the field. I don't know how many other
14 patents were filed prior to this.
15        And to clarify my previous answer, they may
16 indeed have filed for patents that don't work. Because
17 sometimes patents are drawing-board things without
18 actually implementing and it may turn out it doesn't
19 work, and we may not know until later.
20   Q.   Okay. But they didn't do it intentionally.
21 Right?
22   A.   I have no reason to believe they would do it
23 intentionally.
24   Q.   AT&T was pretty good at making things work.
25 Right?

9/11/2007  Allen Gersho

1    A.   We had a lot of talented engineers at Bell
2  Laboratories, AT&T Bell Laboratories.
3    Q.   And they were obviously very good at high-speed
4  data transmission. Right?
5    A.   Most of the areas that I was involved in were
6  not high-speed data transmission. So I don't know
7  specifically, you know. There were some -- I know there
8  were some notable screwups. They put in a lot of money
9  into something that -- a lot of time in developing
10 something that turned out not to be useful in digital
11 transmission. That was in the research area.
12   Q.   Okay. And they were good at compression.
13 Right?
14   A.   Yes. There was a lot of expertise in the area
15 of voice compression.
16   Q.   Now, looking back at your declaration, we
17 started to look at paragraph 38. And this is, again, the
18 paragraph where in the first sentence you say that "it
19 would have been entirely surprising and unexpected for
20 anyone to conceive of or propose the idea of transmitting
21 audio in a burst mode given the state of the technology
22 and the consumer product market in the late '80s and
23 early '90s." Right?
24   A.   Yes, I said that.
25   Q.   But Kepley did conceive of it. Right?

1         MR. PAYNE: Objection. Form. I'm going to
2  instruct him not to answer. It's beyond the scope.
3         THE WITNESS: May I answer?
4         MR. PAYNE: He's asking a specific question
5  about Kepley. So that's beyond the scope of your
6  declaration. So I'm going to instruct you not to answer.
7  BY MR. STEPHENS:
8    Q.   Well, Kepley was part of the state of the
9  technology at the time. Right?
10   A.   I gather Kepley was involved in digital
11 switching. I have no reason to believe he was involved
12 in compression.
13   Q.   Well, the device described in there uses
14 compression. Right?
15   A.   I believe he just assumed that the people who
16 know compression would provide him with a compression
17 algorithm to fit into their box.
18   Q.   And that was perfectly possible. Right?
19   A.   I don't know. Depends what the constraints are
20 and what the objectives are.
21   Q.   Well, there were many voice codecs, as you point
22 out, that were known to people of skill in the art at the
23 time. Right?
24   A.   Yes, there were.
25   Q.   Okay. And some of them would have been suitable

9/11/2007  Allen Gersho

1  for use in a voice mail system described by Kepley.
2  Right?
3    A.   I'm not sure -- I'm not sure I could make a
4  sweeping statement about -- depends what his constraints
5  and objectives were.
6    Q.   Is it your testimony that there was no codec
7  known to people of skill in the art that could have been
8  used in Kepley in 1988?
9    A.   No, that's not my testimony.
10   Q.   Was there any?
11   A.   I can't say, unless we specifically define the
12 constraints of what they need to achieve in that context.
13   Q.   I'm just asking about what's describe in the
14 patent. So if a person of ordinary skill read the patent
15 in 1988, would they have been able to find a compression
16 algorithm that would work in that system that's described
17 in there?
18   A.   See, if I recollect -- recollect correctly, that
19 he was describing a 16-kilobit-per-second rate or -- is
20 that -- I don't remember. But I'm trying to define this
21 question more precisely.
22        If he was seeking a compression method that
23 produced 16-kilobit-per-second speech, I will definitely
24 agree that there were compression algorithms for voice
25 speech that could achieve 16 kilobit rate of --

**Page 93**

9/11/2007 Allen Gersho

1  Q.  Okay.  And could have been used in the system
2  that's described there.  Right?
3  A.  Again, that depends on the whole family of
4  constraints, engineering constraints, but whether -- what
5  would be suitable.  It's not sufficient that it had the
6  right bit rate.
7  Q.  I'm just asking about the constraints that are
8  described in the patent.  Is there anything in there that
9  you can point to that says, no, there's no codec that
10 would allow you to build the system that's described
11 here?
12 A.  Well, I don't know the patent well enough to
13 have the totality --
14 Q.  You have it right there.  Take a look.
15 A.  I don't know if you want me to read the whole
16 patent.
17 Q.  I want you to do what you need to satisfy
18 yourself.  Tell me if there's a reason in there that you
19 couldn't build the system that's described.
20     MR. PAYNE:  I'm going to object to form.  You're
21 talking about the compression or the whole system?
22     MR. STEPHENS:  I'm talking about whether there's
23 any reason that he knows of that there was -- that you
24 could not use a known compression algorithm to build the
25 system that's described.

**Page 94**

9/11/2007 Allen Gersho

1     THE WITNESS:  If you say that I know of, if
2  there's any reason I know of, at this point I don't know
3  of a specific reason why you cannot find some algorithm
4  that would be suitable for this application.
5  BY MR. STEPHENS:
6  Q.  So, now, would you agree that if Kepley was
7  considered to be part of the state of the technology at
8  the time, that your statement in paragraph 38 about it
9  being entirely surprising and unexpected for anyone to
10 conceive of or propose the idea of transmitting audio in
11 a burst mode is wrong?
12 A.  You know, I don't know Kepley.  I never met him,
13 and I don't know if he was part of this -- how -- to what
14 extent he represents the state of the technology, you
15 know.
16 Q.  Okay.  So you don't know whether Kepley would be
17 part of the state of the technology.  Right?  And I mean
18 by -- when I say "Kepley," I mean the patent.
19 A.  I assume the patent examiners found the patent
20 worthy of issuance.  So under that assumption, the patent
21 was presumed to have -- to have validity.
22 Q.  So if you assume that what's described in Kepley
23 is part of the state of the technology in the late '80s
24 and early '90s, then your statement that it would be
25 entirely surprising and unexpected for anyone to conceive

**Page 95**

9/11/2007 Allen Gersho

1  of or propose the idea of transmitting audio in a burst
2  mode is wrong.  Correct?
3  A.  Could you give me the first part of that
4  question again?
5  Q.  Yes.  If you assume that Kepley, the patent, was
6  part of the state of the technology in the late '80s,
7  then your statement that it is -- it would have been
8  entirely surprising and unexpected for anyone to conceive
9  of or propose the idea of transmitting audio in a burst
10 mode is wrong?
11 A.  I can't say that.  First of all, you want to
12 assume that Kepley was part of the state of technology.
13 That's -- under that hypothesis -- hypothetically,
14 because I don't know for sure what role he played,
15 whether he was -- you know, a significant role there,
16 whether he was --
17 Q.  I'm asking about a person of ordinary skill in
18 the art, not about Kepley as a man.  I'm not asking about
19 his role in the state of the art.
20     I'm saying if a person of skill in the art knew
21 about Kepley.  Right?  And by "Kepley," I'm referring to
22 the patent, not the man.
23 A.  Yeah.
24 Q.  If they had in their hands Kepley --
25 A.  Right.

**Page 96**

9/11/2007 Allen Gersho

1  Q.  -- so that that's part of the state of the
2  technology -- this is known technology in 1988 -- then
3  your statement that it would have been entirely
4  surprising and unexpected for anyone to conceive of or
5  propose the idea of transmitting audio in a burst mode is
6  wrong, because Kepley, the document, proposes that.
7  Right?
8     MR. PAYNE:  Objection.  Form.
9     THE WITNESS:  No, I don't agree with that.
10 First of all, my statement refers to audio.  And I have
11 been assuming for -- in the context of Kramer
12 specifically, that audio refers to wideband music for
13 entertaining the consumer.
14 BY MR. STEPHENS:
15 Q.  So you weren't suggesting that it would not have
16 been -- that it would have been entirely surprising and
17 unexpected for anyone to conceive of or propose the idea
18 of transmitting voice/audio in a burst mode.  Right?
19 A.  My statement was not addressing voice
20 specifically.  So I'm not -- I didn't give an opinion
21 about that in the statement.
22 Q.  Do you have an opinion about whether it would
23 have been obvious to conceive of or propose the idea of
24 transmitting voice/audio in a burst mode in the late
25 '80s?

```
 1         MR. PAYNE:  That's beyond the scope of his
 2    declaration as stated.
 3         MR. STEPHENS:  Are you going to instruct him not
 4    to answer?
 5         MR. PAYNE:  What's the question again?
 6    BY MR. STEPHENS:
 7    Q.   Do you have an opinion about whether or not it
 8    would have been surprising or unexpected for anyone to
 9    conceive of or propose the idea of transmitting voice
10    audio in a burst mode in the late '80s?
11         MR. PAYNE:  Yeah, I'm going to instruct him not
12    to answer.
13         MR. STEPHENS:  If you could mark this, please.
14         (Exhibit No. 253 was marked.)
15    BY MR. STEPHENS:
16    Q.   Dr. Gersho, the court reporter has handed you
17    Exhibit 253.  This is a CompuSonics document.  Have you
18    seen this before?
19    A.   Yes, I believe I've seen it.
20    Q.   What's the system described in it?
21    A.   Some kind of audio processing workstation.
22    Q.   And it's an audio editing system.  Right?
23    A.   I --
24         MR. PAYNE:  Go ahead.
25         THE WITNESS:  I believe they do mention that it
```

```
 1    does editing.  As I recall -- I haven't seen this in a
 2    while, but it -- I shouldn't speculate.  I don't know for
 3    sure, but I --
 4    BY MR. STEPHENS:
 5    Q.   Okay.  And it stores digitally compressed
 6    wideband audio in random access storage.  Right?
 7         MR. PAYNE:  Objection.  Form.
 8         THE WITNESS:  I have to refresh my memory.
 9    BY MR. STEPHENS:
10    Q.   Take a moment to look it over, if you need to.
11    A.   The system does store audio in digital form that
12    has been encoded.
13    Q.   And that's wideband audio.  Right?
14    A.   I believe so.
15    Q.   And it stores it in random access memory?
16         MR. PAYNE:  Objection.  Form.
17         THE WITNESS:  I believe they do mention random
18    access memory, but I don't know if that's the storage
19    means.
20    BY MR. STEPHENS:
21    Q.   Just, for example, if you look at the page with
22    production number ending 699, there's a section entitled
23    "Instant-Access Storage."  Do you see that?
24    A.   Yes.
25    Q.   And it says:
```

```
 1         "Say goodbye to endless loading or
 2         unloading of tape reels or carts.  With the
 3         DSP-2002's disk-based storage system, your sound
 4         effects or music can now be located by
 5         high-speed random access."
 6    A.   Yes.
 7    Q.   That shows that the digitally encoded wideband
 8    audio is stored on a high-speed random access disk.
 9    Right?
10         MR. PAYNE:  Objection.  Form.
11         THE WITNESS:  It shows that high-speed random
12    access storage is being used for the audio.  I have to
13    put the pieces together to see if it's -- that the
14    encoded version is so stored, in fact.
15    BY MR. STEPHENS:
16    Q.   Well, it has to be digitally encoded in order to
17    be stored on a disk.  Right?
18    A.   It has to be in digital form, yes.
19    Q.   And then if you'll look at the end of the
20    document, there's a sort of specification section.  I
21    think that's the name of it.  And then near the bottom,
22    there's a section "Encoding Format."  Do you see that?
23    A.   I see "Audio Storage and CSX Encoding."  Is that
24    the section you mean?
25    Q.   Yes, that's the section I'm talking about.
```

```
 1         And that shows a variety of sample rates.
 2    Right?
 3    A.   Yes.
 4    Q.   And those sample rates are sufficient to store
 5    wideband audio.  Right?
 6    A.   Depending on the quality that you want.  There
 7    are different versions of audio.
 8    Q.   Well, 50 kilohertz is wide enough to store the
 9    entire frequency band that human hearing is capable of
10    sensing.  Right?
11    A.   Probably, yes.
12    Q.   It's not probable; it's certain.
13    A.   Well, there's some people that believe that --
14    that they're useful -- people with good hearing may
15    believe they can hear beyond the usual range that we
16    assume.
17    Q.   But the usual range that's assumed by
18    professionals working in the field is 20 Hertz to
19    20 kilohertz.  Right?
20    A.   Something like that.
21    Q.   And 50-kilohertz sampling rate is plenty to
22    store that full range.  Right?
23    A.   Yes.
24    Q.   Okay.  So the system was capable of storing
25    wideband audio by any normal definition.  Right?
```

## Page 129

```
1   And let's just try and do this as quickly as we can so I
2   can avoid Dr. Gersho having to make his car.
3           THE VIDEOGRAPHER:  We are off the record at
4   approximately 11:57 a.m., tape 2.
5           (Whereupon, a lunch recess was taken.)
```

## Page 130

```
1               AFTERNOON PROCEEDINGS
2           THE VIDEOGRAPHER:  We are back on the record.
3   The time is approximately 12:45 p.m., tape 2.
4           Counselor.
5   BY MR. STEPHENS:
6       Q.  Dr. Gersho, we've looked at a number of
7   different documents today, and those are all documents
8   you had reviewed and understood in preparation for
9   executing your declarations.  Right?
10      A.  To varying degrees.  Not all of them have I
11  studied all parts.
12      Q.  How did you determine which parts to study when
13  you were reviewing them?
14      A.  I guess I looked for the parts that was most
15  relevant to my area of expertise.  And knowing that there
16  was another expert that was covering a lot of material
17  related to the transmission communication, and I mainly
18  oriented to compression.
19      Q.  Okay.  So your area of expertise primarily is
20  compression.  Is that right?
21      A.  Yeah.
22      Q.  You also read and understood Mr. Lang's patents.
23  Right?
24      A.  I did read all four patents at the very
25  beginning, and I believe I understood them.  But they're
```

## Page 131

```
1   not fresh in my mind, though.  It's been awhile.
2       Q.  What is your understanding of what Mr. Lang
3   invented?
4       A.  Well, first of all, I guess every claim is a
5   separate invention.  So I don't know if I could say in
6   general, but I could address specific -- like claim 1 of
7   '995 is the one that comes to mind most.
8       Q.  Okay.  Let's go with that one.
9       A.  And his invention has four major components:
10  the input means -- let's see -- random access storage
11  means, and compression means, and output means, if I
12  recall.  Those are --
13      Q.  Okay.  And is it your testimony that Mr. Lang is
14  the first person ever to have combined those?
15      A.  I didn't comment on that in my depositions.  I
16  don't recall testifying to that specifically.
17      Q.  Do you have a view?
18          MR. PAYNE:  This is beyond the scope of his
19  declaration.  I guess, yeah, you can answer in the
20  context of your declarations.
21          THE WITNESS:  I believe so, yes.
22  BY MR. STEPHENS:
23      Q.  And what's the basis for that belief?
24      A.  Well, I haven't seen -- I haven't seen these
25  four elements combined in -- in any of the prior art
```

## Page 132

```
1   references that I've seen before.
2       Q.  Of course you did see them combined in Kepley.
3   Right?
4           MR. PAYNE:  Objection.  Form.
5           MR. STEPHENS:  Are you going to instruct him not
6   to answer?
7           MR. PAYNE:  Yeah.  It's beyond the scope of the
8   declaration.
9   BY MR. STEPHENS:
10      Q.  Now, going back to your declaration, No. 251,
11  Exhibit 251, paragraph 38, you say:
12          "It would have been entirely surprising and
13          unexpected for anyone to conceive of or propose
14          the idea of transmitting audio in a burst mode
15          given the state of technology and the consumer
16          product market in the late 1980s and early
17          1990s."
18          Do you see that?
19      A.  Yes.
20      Q.  What is the idea of transmitting audio in a
21  burst mode?
22      A.  Well, the idea is focused on a specific quantity
23  of audio that is in digital form and sending it in a
24  faster time than realtime.  The faster than the playback
25  time, the time it takes to get it from one place to
```

1  A. I bought CDs at some point, but I didn't --
2  Q. No professional involvement?
3  A. -- get the -- in professional involvement in the
4  CD industry.
5  Q. Okay. Do you know how, for example, audio
6  cassettes were manufactured?
7  A. No, I don't.
8  Q. So you don't know whether people used high-speed
9  tape duplicators to make copies of audio tapes to
10 distribute and sell?
11 A. I -- this is all analog.
12 Q. For audio tapes, that's right?
13 A. I mean the phrase "high-speed tape duplicator"
14 makes sense to me, but I don't have experience with it.
15 I never -- I never looked at what goes into such devices.
16 Q. But you would agree that when you're making
17 copies and you're not actually listening to the copy that
18 you're making, if you're doing it to distribute music, it
19 makes sense to do that quickly. Right?
20 A. I'm not sure. I could see pros and cons.
21 Q. Well, all other things being equal, faster is
22 better. Right?
23 A. Well, I don't think all other things are equal.
24 Q. But clearly if you're trying to make a million
25 CDs, then you want to be able to manufacture them

1  quickly. Right?
2      MR. PAYNE: Objection. Form.
3      THE WITNESS: Yeah. But, I mean, if a printing
4  press can print thousands of pages per minute, it's just
5  stamping out material. I don't know if it has anything
6  to do with sending data faster than realtime.
7  BY MR. STEPHENS:
8  Q. Well, of course it does. Because if you're
9  sending data faster than realtime from one disk to
10 another, you're doing it to make a copy. Right?
11     MR. PAYNE: Objection. Form.
12     THE WITNESS: In your hypothetical situation, if
13 you are sending data from one disk to another and if that
14 is needed to make a copy, then digital transmission is
15 being involved internally here.
16 BY MR. STEPHENS:
17 Q. Okay. And that's how you make a copy of a file
18 from one disk to another. Right?
19 A. Well, not with audio cassette.
20 Q. I'm not asking about audio cassettes now. I'm
21 asking about a file on a disk.
22 A. Well, there are many ways of creating a file,
23 but if you're -- if you're transferring a file from one
24 place to another, a digital file from one place to
25 another, then it would get stored on the destination

1  location.
2  Q. And the way you do that is by transmitting the
3  electronic data representing the file from one disk to
4  another. Right?
5  A. I suppose so. I don't see anything wrong with
6  that.
7  Q. And the computer industry, including the
8  personal computer industry and other parts of it, have
9  spent huge sums of money over the last four or five
10 decades to make that process happen faster. Right?
11     MR. PAYNE: Objection. Form. You're way beyond
12 the scope of his declaration.
13     MR. STEPHENS: Are you going to direct him not
14 to answer?
15     MR. PAYNE: Yeah.
16 BY MR. STEPHENS:
17 Q. If you have an audio file on a computer --
18 computer work -- a Sun workstation's hard drive and you
19 copy that audio file to an external hard drive, would
20 that copy happen faster than realtime?
21     MR. PAYNE: Objection. Form.
22     THE WITNESS: I'm not an expert on the insides
23 of what goes on in computer processing or computer
24 communication. But, first of all, the realtime issue
25 would only come up if the file happened -- is audio. Is

1  that part of your question?
2  BY MR. STEPHENS:
3  Q. Let's say it was an audio file.
4  A. Yeah. So if it's an audio file, I guess it
5  depends -- I can't say it's not possible that it would be
6  faster than realtime.
7  Q. Okay. In fact, let's assume that it's a PCM
8  encoded 44.1 kilohertz 16-bit stereo file -- let's say
9  mono file, and you copy that from one hard drive to
10 another on the Sun workstations that your laboratory used
11 in the mid to late '80s, would that copy happen faster
12 than realtime?
13     MR. PAYNE: Don't answer that question. Assumes
14 facts not in evidence. Garland, come on.
15     MR. STEPHENS: This man has put out a statement
16 about technology that he's admitted depends on the
17 workstations that were in his office. And I'm trying to
18 figure out how they work. Direct him not to answer and
19 we'll go on, if that's what you're intending to do.
20     MR. PAYNE: Okay.
21     MR. STEPHENS: Are you directing him not to
22 answer?
23     MR. PAYNE: Yeah, yeah, because you've been
24 critical --
25     MR. STEPHENS: You don't have to explain it.

```
 1   times.  And on the next pass, you take the next --
 2       A.   Yeah.
 3       Q.   -- the second bit for that sub-band.
 4       A.   Yeah.
 5       Q.   What's wrong with that?
 6       A.   But as I noted, that it seems to either
 7   repeatedly send the entire data from the memory to feed
 8   it out to the demultiplexer and decoders a hundred times
 9   repeatedly is -- doesn't make any sense and isn't
10   feasible.
11       Q.   If you did it, though, the numbers work out.
12   Right?
13       A.   I don't know, because I -- to talk about
14   reproduction of sound, I don't think it would reproduce
15   intelligible sound.  So I don't know if the -- if it
16   makes sense to assess -- the hundred times reproduction
17   of what sound?  Of garbage?
18       Q.   So you're basing your rejection, even of
19   exploring whether the arithmetic works out, on your
20   conclusion that it wouldn't result in an audible signal.
21   Is that right?
22       A.   That question is a little confusing.
23       Q.   I'm just trying to understand why, when you do
24   your counting, r1, b1, g1, et cetera --
25       A.   Right.
```

9/11/2007  Allen Gersho

```
 1       Q.   -- in an attempt to show that the numbers don't
 2   work out, you're actually counting from the multiplexer
 3   rejecting 99 out of a hundred and not the decoder, as the
 4   reference actually says.
 5       A.   What the reference says is the decoder is
 6   taking.  It doesn't say reject --
 7       Q.   Taking one out of a hundred bits presented to --
 8       A.   Yeah, taking one out of a hundred.  And it is,
 9   but not by choice.  Because the demultiplexer is only
10   letting it take one out of a hundred.
11       Q.   The demultiplexer is what does the presenting.
12   Right?  That's how the circuits show.
13       A.   Well, it's -- and it's only -- but it is doing
14   the one out of a hundred.  In order to deinterleave, it
15   has to -- it makes sense the demultiplexer has to be
16   deinterleaving.
17       Q.   Well, is it true, sir, that the counting that
18   you did in an attempt to show that the numbers don't work
19   out as the signal is presented to the decoders is based
20   on the demultiplexer doing the rejecting of 99 out of a
21   hundred bits?  That's right, isn't it?
22       A.   Well, it's equivalent to the decoder taking one
23   out of a hundred.  The demultiplexer is --
24       Q.   I just want a clear answer.
25       A.   Yeah.
```

```
 1       Q.   So when we're talking about the -- taking only
 2   one out of a hundred bits, you're talking about the
 3   hundred bits being on the line leading into the
 4   demultiplexer.  Right?
 5       A.   Yes.
 6       Q.   Okay.  And that's what you were using for all of
 7   the counting that appears in your declaration.  Right?
 8       A.   In that illustrative example, yes.  I could
 9   construct another example based on your hypothesis that
10   would also lead to nonsensical results.
11       Q.   Right now I'm only asking about what's actually
12   in your declaration.  And that's based on the
13   demultiplexer seeing the 100 bits, not the decoder.
14   Right?
15       A.   Well --
16       Q.   Let me be just be a little clearer.  "Seeing" is
17   the wrong word.
18            The 100 bits you're talking about are on the
19   line leading into the demultiplexer, 24, in Figure 1.
20   Right?
21       A.   Yes.
22       Q.   And they're not 100 bits on the line leading
23   from the demultiplexer to the decoder.  Right?
24       A.   Yes.
25       Q.   And you have not worked out an example where the
```

9/11/2007  Allen Gersho

```
 1   100 bits, of which only one is taken by the decoder, are
 2   present on the line leading from the demultiplexer to the
 3   decoder.  Is that right?
 4       A.   I think -- I have worked out that example.  I
 5   think it's just the taking.  It's just a matter of how
 6   you interpret the statement.  The way I understand
 7   Kramer, this is not the same thing.
 8       Q.   I'm not asking about the interpretation now of
 9   the language in Kramer.  I'm asking about how you
10   actually worked it out.
11            So the 100 bits, though, were not present on the
12   line leading from the demultiplexer to, for example, the
13   rightmost decoder, 26.  Right?
14       A.   The hundred bits is what is coming in, yes.
15       Q.   Into the demultiplexer?
16       A.   Into the demultiplexer.
17       Q.   And they're not present on the line leading from
18   the demultiplexer to the decoder.  Right?
19       A.   To one specific decoder, right.
20       Q.   Okay.  So if you were going to correct the
21   language in column 4 that we were looking at, about the
22   demultiplexer starting line 45, what would you have it
23   say?
24       A.   Well, there are a lot of ways to correct it.
25   One way would be by taking "e.g. only one out of every
```

## Page 209

```
 1  hundred bits of information presented to the decoder at a
 2  time" -- sorry -- "presented to the demultiplexer."  So
 3  it would be --
 4      Q.  So just to be clear, the way you would correct
 5  it --
 6      A.  Yeah.  "Presented to" -- instead of "presented
 7  to it," I would say "presented to the demultiplexer."
 8      Q.  Now, looking at your declaration in Exhibit 251,
 9  in column -- excuse me -- in paragraph 19, you're talking
10  about the black box argument?
11      A.  Yes.
12      Q.  And you put that in both your declarations?
13      A.  Uh-huh.
14      Q.  And you make the argument that if the data is
15  sent a hundred times faster than the time it takes to
16  play it back, that you'd have to store it; otherwise, you
17  wouldn't be able to play it back.
18          And the way you put that is "as long as the data
19  is transmitted only once from memory to the box."  Right?
20      A.  Yes.  Under that condition, it's impossible
21  to -- to have -- it would not make sense of
22  faster-than-realtime input if the output is realtime.
23      Q.  Okay.  But if you did transmit it a hundred
24  times and only took 1/100 of the data each time it was
25  sent, then that wouldn't be an issue.  Right?
```

## Page 210

```
 1      A.  Well, I think it would be a practical
 2  impossibility to transmit it a hundred times.
 3      Q.  I understand you have reasons that you think
 4  that you couldn't transmit it a hundred times.  But if
 5  you did, the black box argument that you make does not
 6  work.  Right?
 7      A.  Yes.  The same -- the black box argument, as I
 8  worded it, would not apply under your hypothetical
 9  scenario.
10      Q.  Okay.
11      A.  It would require pretty tricky -- actually, I'm
12  not even sure that's right.  I'm just trying to think of
13  what could be inside the black box without memory so that
14  you could actually organize the data.
15      Q.  It might have a very small amount of memory, but
16  it wouldn't -- you wouldn't need anything like the amount
17  of memory to store the entire --
18      A.  I would have to think about that, actually.  My
19  argument that it's an impossibility is limited to only
20  one pass of memory.  But under your hypothesis, suppose
21  that it was a hundred times.  I have to think a little
22  bit how to --
23      Q.  Just have a counter?
24      A.  -- what could be done inside the box that
25  would --
```

## Page 211

```
 1      Q.  Just have a counter that counts up to a hundred
 2  and then takes the next bit.  When the counter reaches a
 3  hundred, then it starts over again.  Wouldn't that work?
 4      A.  No.
 5      Q.  Why not?
 6      A.  Because it's not counting up to a hundred.
 7  You'd have to wait for the entire -- the entire data to
 8  pass through, and then -- in other words --
 9      Q.  You could interleave it on the multiple
10  sub-bands.  And it does get somewhat more complicated
11  there.  But if you look at it as if it was only one band,
12  it's actually quite simple.  Right?
13      A.  If there's only one band, it would be much
14  simpler.  But you really have to hold data to the right
15  time in order to get the right -- the right bit for the
16  right sub-band.  If you don't get one pass, you get it
17  the next pass.
18      Q.  You could do this --
19          MR. PAYNE:  Whoa, whoa.
20          THE WITNESS:  It's kind of tricky.  I'd have to
21  spend a little bit of time thinking about whether or not
22  it is possible.  Although what I am acknowledging is --
23  and that you are correct, that the argument I gave by
24  itself does not apply and does not show the impossibility
25  of faster-than-realtime input with a realtime output if
```

## Page 212

```
 1  you had more than one pass.
 2  BY MR. STEPHENS:
 3      Q.  Okay.  And you could arrange the kind of pass,
 4  again, if we restrict ourselves to a single band, by a
 5  rotating shift register that simply -- that holds a
 6  hundred bits and outputs those hundred bits over and over
 7  and over again at a speed of a hundred times faster than
 8  realtime, and at each point at which the decoder reads
 9  one bit, you take that bit out of the recirculating shift
10  register and add the next bit from the song into the
11  recirculating shift register at that point.  Right?  So
12  you'd have --
13      A.  You don't have the next bit from the song if
14  you're throwing away 99.
15      Q.  No.  I'm talking about what you're sending from
16  the memory.  So part of the memory circuit would be this
17  recirculating shift register I'm talking about.
18      A.  So this is a hypothetical not involving sub-band
19  coding?
20      Q.  That's right.  I'm hypothesizing for a single
21  band in order just to avoid the complexity of the
22  interleaving sub-bands.
23      A.  Well, I -- it bothers me to make such a
24  hypothesis because it completely changes the situation.
25  It doesn't simply avoid complexity.  It becomes
```

```
1    A.    Okay.
2         THE VIDEOGRAPHER:  We are off the record at
3    approximately 3:02 p.m.  This concludes Volume I of the
4    deposition and tape 3.
5         (WHEREUPON, the September 11, 2007,
6         deposition of ALLEN GERSHO was adjourned
7         at 3:02 p.m.)
8
9
10
11         _____
                    ALLEN GERSHO
12
```

9/11/2007  Allen Gersho

```
1         I, VALERIE J. EAMES, Certified Shorthand
2    Reporter, No. 9021, hereby certify that the foregoing
3    deposition of ALLEN GERSHO, VOLUME I, was taken by me at
4    the time and place herein set forth, at which time the
5    witness was put under oath by me;
6         That the said deposition was taken down by me in
7    shorthand and thereafter transcribed under my direction
8    and supervision, and I hereby certify the foregoing
9    deposition is a full, true, and correct transcript of my
10   shorthand notes so taken; and that the witness was given
11   an opportunity to read and correct said deposition and to
12   subscribe the same.
13        Should the signature of the witness not be
14   affixed to the deposition, the witness shall not have
15   availed himself or herself of the opportunity to sign or
16   the signature has been waived.
17        I further certify that I am neither counsel for
18   nor related to any party to said action, nor am I in
19   anywise interested in the outcome thereof.
20        IN WITNESS WHEREOF, I have subscribed my name
21   this 14TH day of SEPTEMBER, 2007.
22
23
24               _____
25                    VALERIE J. EAMES, CSR
```