# Exhibit B

Dockets.Justia.com

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

APPLE COMPUTER, INC.,            )

    Plaintiff/Counterdefendant,)

                                )

vs.                              )    CASE NO. C06-00019 MHP

                                )

BURST.COM, INC.,                 )

    Defendant/Counterclaimant.   )


ORAL VIDEOTAPED DEPOSITION

SHEILA HEMAMI

SEPTEMBER 4, 2007

VOLUME 2


    ORAL VIDEOTAPED DEPOSITION OF SHEILA HEMAMI, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on the 4th day of September, 2007, from 8:22 a.m. to 2:03 p.m., before Dana Richardson, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Weil, Gotshal & Manges, L.L.P., 700 Louisiana, Suite 1600, Houston, Texas 77002, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

    Job No. 1601-84301

Page 2

1         APPEARANCES
2  FOR PLAINTIFF:
3     Mr. Garland T. Stephens
       WEIL, GOTSHAL & MANGES, L.L.P.
4      700 Louisiana, Suite 1600
       Houston, Texas 77002
5      Telephone: (713) 546-5044 - Fax: (713) 224-9511
       E-mail: garland.stephens@weil.com
6          -and-
7      Ms. Jayna Whitt - (via telephone)
       APPLE, INC.
8      1 Infinite Loop, MS 3-PAT
       Cupertino, CA 95014
9      Telephone: (408) 974-4262
       E-mail: jwhitt@apple.com
10
    FOR DEFENDANT:
11
       Mr. Leslie V. Payne
12     HEIM, PAYNE & CHORUSH, L.L.P.
       600 Travis Street, Suite 6710
13     Houston, Texas 77002
       Telephone: (713) 221-2003 - Fax: (713) 221-2021
14     E-mail: lpayne@hpellp.com
15  ALSO PRESENT:
16     Mr. George White, Videographer
17
18
19
20
21
22
23
24
25

Page 3

1              INDEX
2                                    PAGE
3  SHEILA HEMAMI
4  Examination by Mr. Stephens .................... 4
   Signature Page ............................. 202
5  Court Reporter's Certificate .................. 203
6
7            EXHIBITS
8
9  EXHIBIT      DESCRIPTION           PAGE
10
11  Exh.247    Declaration of Sheila S. Hemami   58
              in Support of Burst.Com, Inc.'s
12            Opposition to Plaintiff Apple
              Computer, Inc.'s Motion for
13            Summary Judgment on Invalidity
              Based on Kramer and Kepley
14            Patents
15  Exh.248   Declaration of Dr. Sheila        111
              Hemami in Opposition to Apple's
16            Second Motion for Summary
              Judgment of Invalidity
17
    Exh.249   Walter Patent No. 4,506,387,    111
18            Bates Nos. APBU-00000814
              through APBU-00000823
19
    Exh.250   Kepley Patent No. 4,790,003,    189
20            Bates Nos. APBU-00003776
              through APBU-00003793
21
22
23
24
25

Page 4

08:21:50  1          THE VIDEOGRAPHER: Beginning the deposition of
08:21:51  2  Sheila Hemami. It is the 4th of September, year 2007. The
08:21:56  3  time is 8:22. We're on the record.
08:22:00  4          If the attorneys want to introduce themselves
08:22:02  5  for the record, then we can swear in the witness and go.
08:22:08  6          MR. STEPHENS: Garland Stephens of Weil,
08:22:10  7  Gotshal & Manges representing the plaintiff, Apple.
08:22:13  8          MR. PAYNE: Les Payne for defendant, Burst.
08:22:17  9          MR. STEPHENS: I should also mention that
08:22:19 10  present monitoring the deposition on the phone is Jayna Whitt,
08:22:22 11  in-house counsel for Apple.
         12              SHEILA HEMAMI,
         13  having been first duly sworn, testified as follows:
         14              EXAMINATION
         15  BY MR. STEPHENS:
08:22:32 16      Q. Good morning, Dr. Hemami.
08:22:34 17      A. Morning.
08:22:34 18      Q. I'd like to ask you first about your opinion about
08:22:37 19  the person of ordinary skill in the art as it relates to the
08:22:40 20  patents in this lawsuit. You summarized that opinion in
08:22:45 21  declarations that you filed in support of Burst's opposition
08:22:48 22  to Apple's motions for summary judgment; is that right?
08:22:52 23      A. I think it only appeared in the second declaration.
08:22:56 24  It certainly was in the second.
08:22:57 25      Q. Okay. Now, one of the things that you said is that a

Page 5

08:23:02  1  person of ordinary skill in the art at the time of the patent
08:23:08  2  application leading to the '995 patent was filed would have
08:23:12  3  had an understanding of digital communications technologies
08:23:15  4  and their available bandwidths and audio and/or video
08:23:19  5  compression techniques. Do you remember that?
08:23:21  6      A. Yes.
08:23:24  7      Q. What kind of digital communications technologies and
08:23:29  8  available bandwidths would a person of ordinary skill in the
08:23:32  9  art at the time the '995 patent application was filed have?
08:23:38 10      A. So, the digital communication techniques that I had
08:23:42 11  in mind were -- let me start off by sort of giving a -- a very
08:23:47 12  general classification. One would be the types of digital
08:23:51 13  communication techniques that one would learn about in, say,
08:23:55 14  an undergraduate overview course on digital communication.
08:24:00 15  So, various modulation strategies for over-the-air
08:24:07 16  communication, terrestrial and satellite; assorted air control
08:24:12 17  coding that might go with those techniques; and essentially,
08:24:18 18  at a lower level, digital signalling strategies. For example,
08:24:23 19  understanding the PCM in the context of digital communication
08:24:27 20  was a modulation technique. I believe that such a person
08:24:32 21  would also be aware of the various types of landline or
08:24:43 22  cables, physical media, rather than over-the-air propagation
08:24:49 23  media for digital communication, including both copper wire
08:24:54 24  and also fiber optic. So, I guess following up on that, one
08:25:01 25  would understand, one would know available bandwidths, the --

### Page 78

```
10:19:05  1      Q.  As a -- as a very general principle, that's true,
10:19:08  2   right?
10:19:08  3      A.  Well, in some applications, yes. It's the data
10:19:11  4   movement, which is the bottleneck. In other applications, it
10:19:15  5   may well be the -- the computing.
10:19:17  6      Q.  Okay. But in many applications and particularly in
10:19:19  7   many multimedia applications, it's how fast you can move data,
10:19:23  8   right?
10:19:24  9      A.  I think that multimedia has been also -- "hampered"
10:19:29 10   is the wrong word. Multimedia has a lot of computational
10:19:32 11   requirements, and I think that it's -- it's not fair to say
10:19:36 12   it's solely data transfer speeds within the machine that
10:19:40 13   that -- that have -- that are the issue for multimedia.
10:19:46 14      Q.  Okay. But it's "an" issue for multimedia, right?
10:19:47 15      A.  It is "an" issue for multimedia. But, again, as I
10:19:51 16   mentioned, the driving data rate for MPEG was getting video
10:19:55 17   off a CD.
10:19:56 18      Q.  Okay. And, so, once I have a multimedia file on my
10:20:00 19   hard drive and I want to copy it to another hard drive, what
10:20:04 20   determines how fast that copy occurs?
10:20:10 21      A.  Well, we have the -- the computer itself has to --
10:20:16 22   operating system has to deal with issuing commands and causing
10:20:23 23   the copy to occur at a higher level. The disk drives have I/O
10:20:32 24   speeds, as you mentioned, which are caused by both the
10:20:37 25   fundamental physical read/write data rate off the disk as well
```

### Page 79

```
10:20:41  1   as the level of error correction and any other signal
10:20:43  2   conditioning or pre- or post-processing they have to do on the
10:20:48  3   data to get it off.
10:20:48  4      Q.  Okay.
10:20:49  5      A.  And, of course, you know, they are connected by some
10:20:50  6   type of bus. So, we have the fundamental speed of the bus as
10:20:55  7   well.
10:20:56  8      Q.  But there's nothing in that process of copying a file
10:21:00  9   from one disk to another that restricts the transfer speed to
10:21:06 10   the time required or the speed required for playback; is that
10:21:11 11   right?
10:21:13 12          MR. PAYNE: Objection, form.
10:21:14 13      A.  Well, the -- speed required? Speed required for
10:21:19 14   playback?
10:21:20 15      Q.  (By Mr. Stephens) In other words, the -- the time it
10:21:22 16   takes to transfer a multimedia file from one disk to another
10:21:27 17   on a computer in the mid Eighties was not restricted to the
10:21:30 18   amount of time required to play that file back, right?
10:21:37 19          MR. PAYNE: Objection, form, assumes facts.
10:21:39 20      A.  I guess I don't know that. I mean, you could
10:21:41 21   certainly imagine building a system where you did put some
10:21:45 22   type of constraint on what was going on.
10:21:49 23      Q.  (By Mr. Stephens) I'm not -- I'm not asking about an
10:21:49 24   imaginary system. I'm asking about a typical multimedia -- a
10:21:52 25   typical Unix workstation used by a person of ordinary skill in
```

### Page 80

```
10:21:56  1   the art.
10:21:57  2          MR. PAYNE: Objection, form.
10:21:57  3      A.  Well, first off, I don't know that the term
10:21:59  4   "multimedia file" even existed --
10:22:02  5      Q.  (By Mr. Stephens) Well, let's say audio file.
10:22:05  6      A.  -- in the 1988 time frame. So, however the audio was
10:22:08  7   represented, it was simply bits. And as far as the file
10:22:14  8   system is concerned, bits are bits and the bits will be moved
10:22:17  9   from Point A to Point B and there's no reason to expect that
10:22:20 10   the bits that happen to belong to an audio file would be
10:22:23 11   treated any better or any worse than the bits that belong to,
10:22:27 12   say, a -- a user's dissertation file.
10:22:31 13      Q.  So, the computer doesn't know how long it would take
10:22:34 14   to play that audio file back when it's moving it from one disk
10:22:38 15   to another, right?
10:22:40 16      A.  A generic, ignorant computer without prior
10:22:45 17   programming or special features, certainly it has no way to
10:22:49 18   know anything. The -- what the computer knows about the data
10:22:51 19   is really just the file system structure and how big it is and
10:22:55 20   where it is.
10:22:55 21      Q.  So, the transfer time would not be limited to or
10:23:01 22   restricted to the amount of time required to play that file
10:23:04 23   back, right?
10:23:06 24          MR. PAYNE: Objection, form, incomplete
10:23:08 25   hypothetical.
```

### Page 81

```
10:23:15  1      A.  Sorry, I lost my train of thought. Can you repeat
10:23:17  2   the question?
10:23:17  3      Q.  (By Mr. Stephens) Sure. So, when you're copying an
10:23:20  4   audio file from one disk to another disk in a Unix workstation
10:23:24  5   in the mid Eighties, the time required to make that copy isn't
10:23:28  6   restricted to the amount of time required to play that file
10:23:31  7   back, right?
10:23:32  8          MR. PAYNE: Objection, form. Where -- what are
10:23:33  9   you talking about, Unix-based workstations? That's not a
10:23:36 10   declaration --
10:23:37 11          MR. STEPHENS: Make your objection. Stop --
10:23:38 12          MR. PAYNE: I'm going to instruct her not to
10:23:40 13   answer the question.
10:23:41 14          MR. STEPHENS: You're going to -- okay.
10:23:41 15          MR. PAYNE: It's beyond the declaration.
10:23:41 16          MR. STEPHENS: All right. You're going to
10:23:41 17   instruct her not to answer?
10:23:43 18          MR. PAYNE: If you've got a specific prior
10:23:45 19   art --
10:23:45 20          THE WITNESS: I'm sorry, could I take a break
10:23:45 21   and --
10:23:47 22          MR. STEPHENS: No. There's a question pending.
10:23:48 23          MR. PAYNE: -- you've got specific prior art in
10:23:51 24   the declaration. You're suggesting hypotheticals that assume
10:23:54 25   facts not in evidence. And, so, I have no choice but to
```

Sheila Hememi    -    9/4/07

22 (Pages 82 to 85)

### Page 82

```
10:23:59  1   instruct her not to answer.
10:24:00  2       Q.  (By Mr. Stephens)  Are you going to follow your
10:24:01  3   counsel's advice?
10:24:02  4       A.  Yes.
10:24:01  5       Q.  Okay.
10:24:02  6           THE WITNESS:  Is it okay if we take a little
10:24:04  7   break?
10:24:05  8           MR. STEPHENS:  Then we can take a break.
10:24:07  9           All right.  I'll be asking for another day of
10:24:09 10   deposition with this witness after we move to compel on this
10:24:10 11   point.
10:24:15 12           THE VIDEOGRAPHER:  Off the record at 10:24.
10:24:17 13           MR. PAYNE:  And the objection stands.
         14           (Recess taken)
10:35:26 15           THE VIDEOGRAPHER:  Beginning of Tape 3 to the
10:35:28 16   deposition of Dr. Hemami.  The time is 10:35.  We're back on
10:35:33 17   the record.
10:35:33 18       Q.  (By Mr. Stephens)  Okay.  Dr. Hemami, let's see, we
10:35:37 19   were still talking about a person of ordinary skill in the art
10:35:40 20   in the mid Eighties.  Now, it would have been known to such a
10:35:44 21   person that analog-to-digital and digital-to-analog convertors
10:35:51 22   were things that were available to them, right?
10:35:56 23       A.  Yes.  The existence of A to D and D to A would have
10:35:59 24   been known.
10:36:01 25       Q.  And that's true both for audio and for video; is that
```

### Page 83

```
10:36:03  1   right?
10:36:07  2       A.  Yes.  Although, the A-to-D conversion video were
10:36:13  3   substantially more specialized and difficult to get; but they
10:36:16  4   would be aware that it was possible to do that.
10:36:19  5       Q.  Okay.  And I think we've already talked about the use
10:36:29  6   of disk drives being well known at the time to store digital
10:36:35  7   data; is that right?
10:36:36  8       A.  Yes.
10:36:40  9       Q.  Now, was it known to use external storage devices
10:36:43 10   like disk drives on a SCSI interface?
10:36:54 11       A.  Storage external to a computer that contained the CPU
10:37:04 12   unit was known, yes.
10:37:12 13       Q.  And the Small Computer Systems Interface or SCSI
10:37:14 14   interface, that was also known, right?
10:37:18 15       A.  I don't know what the time was on the SCSI interface.
10:37:20 16       Q.  Would you agree that, at least with respect to
10:37:23 17   personal computers, the primary types of personal computers in
10:37:27 18   the marketplace at the time were PCs and Apple Macintoshes?
10:37:32 19       A.  I think we called them IBMs at the time.
10:37:34 20       Q.  Okay.
10:37:36 21       A.  Certainly the -- well, there were actually quite a
10:37:38 22   lot of computers.  I had several Commodore computers.  I think
10:37:44 23   that Radio Shack's Tandy brand had a fair chunk of the market.
10:37:49 24   And I think we -- we referred to IBMs and IBM clones.
10:37:53 25       Q.  Okay.  And Apple Macintoshes were available?
```

### Page 84

```
10:37:58  1       A.  They were available; but they certainly did not have,
10:38:01  2   I think, really very much market base.
10:38:03  3       Q.  Okay.
10:38:04  4       A.  They were expensive.  I -- they were also, I think,
10:38:08  5   really marketed very much to academic institutions and perhaps
10:38:13  6   not so much to the general public.
10:38:15  7       Q.  So, a person who had recently graduated with a
10:38:20  8   electrical engineering degree might well have owned an Apple
10:38:25  9   Macintosh, right?
10:38:26 10       A.  No, I don't think I would say they might well have
10:38:27 11   owned.  They may have used one, depending on what institution
10:38:33 12   they went to.
10:38:33 13       Q.  Okay.  Well, they were commonly known at least,
10:38:36 14   right?
10:38:36 15       A.  Certainly after the commercial during the Super Bowl,
10:38:39 16   I think they were commonly known.
10:38:41 17       Q.  And that was the Big Brother commercial you're
10:38:44 18   referring to?
10:38:45 19       A.  Yes.
10:38:46 20       Q.  And Apple Macintoshes had SCSI ports so that you
10:38:50 21   could use an external disk drive; is that right?
10:38:53 22       A.  I do not know if that's right or not.  I do not
10:38:55 23   remember what was on the back of those units.
10:38:57 24       Q.  Okay.  Well, certainly SCSI interfaces for external
10:39:01 25   computer drives were available on many platforms, right?
```

### Page 85

```
10:39:04  1       A.  I don't know that.  I don't actually know what -- I
10:39:06  2   don't remember what was sitting off the back of those units.
10:39:09  3       Q.  Okay.  Fair enough.  Amigas were another type of
10:39:13  4   computer that was available at the time; is that right?
10:39:15  5       A.  Amigas did exist, yes.
10:39:29  6       Q.  Now, for any given file representing audio, there is
10:39:36  7   some rate at which it will be transferred faster than
10:39:39  8   real-time, right?
10:39:44  9       A.  I -- this question is a little bit vague.  Perhaps
10:39:48 10   you could be more specific for the -- what's going on.
10:39:50 11       Q.  Okay.  Fair enough.  Sure.  In your -- your tutorial,
10:39:52 12   you talked about faster-than-real-time transmission being
10:39:57 13   determined by simply taking the amount of time it takes to
10:40:00 14   transmit a file and comparing that to the amount of time it
10:40:02 15   takes to play back that file and if it's -- if the time
10:40:08 16   required to transfer is less than the time required to play
10:40:11 17   back, then you've transmitted faster than real-time.  Do you
10:40:13 18   remember that?
10:40:14 19       A.  Yes.  That's -- that's an accurate representation of
10:40:16 20   what I said in my tutorial.
10:40:18 21       Q.  Okay.  So, for any given file, there's some
10:40:20 22   transmission rate at which it will be transmitted faster than
10:40:24 23   real-time, correct?
10:40:25 24       A.  According to how I explained it, yes, that's correct.
10:40:32 25       Q.  And there's generally going to be at least an average
```

Page 202

```
 8    I declare under penalty of perjury that the
 9   foregoing is true and correct.
10
11          _____
12              SHEILA HEMAMI
13
14
15      SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned
16   authority, by the witness, SHEILA HEMAMI, on this the
17   _____ day of _____, _____.
18
19          _____
20              NOTARY PUBLIC IN AND FOR
21              THE STATE OF _____
22
23   My Commission Expires: _____
```

Page 203

```
 1   STATE OF TEXAS
     COUNTY OF HARRIS
 2          REPORTER'S CERTIFICATE
 3       I, Dana Richardson, a Certified Shorthand Reporter
 4   in and for the State of Texas, do certify that this
 5   deposition transcript is a true record of the testimony
 6   given by the witness named herein, after said witness
 7   was duly sworn by me. The witness was requested to
 8   review the deposition.
 9       I further certify that I am neither attorney or
10   counsel for, related to, nor employed by any parties to
11   the action in which this testimony is taken and,
12   further, that I am not a relative or employee of any
13   counsel employed by the parties hereto or financially
14   interested in the action.
15       I further certify that the amount of time used by
     each party at the deposition is as follows:
16
         Mr. Garland T. Stephens: 04:42
17
         SUBSCRIBED AND SWORN TO under my hand and seal of
18   office on this the _____ day of _____.
19       /s/ Dana Richardson
20       _____
21       Dana Richardson, CSR
         Texas CSR 5386
22       Expiration: 12/31/07
         Merrill Legal Solutions, Firm No. 210
23       315 Capitol, Suite 100
         Houston, Texas 77002
24       Phone (713) 426-0400
         Fax (713) 426-0600
25
```