1  MATTHEW D. POWERS (Bar No. 104795)
   matthew.powers@weil.com
2  GARLAND T. STEPHENS (admitted N.D.C.A.,
   Texas Bar No. 24053910)
3  garland.stephens@weil.com
   NICHOLAS A. BROWN (Bar No. 198210)
4  nicholas.brown@weil.com
   WEIL, GOTSHAL & MANGES LLP
5  Silicon Valley Office
   201 Redwood Shores Parkway
6  Redwood Shores, CA 94065
   Telephone: (650) 802-3000
7  Facsimile: (650) 802-3100

8  Attorneys for Plaintiff and Counterdefendant
   APPLE COMPUTER, INC.

9

                        UNITED STATES DISTRICT COURT

                       NORTHERN DISTRICT OF CALIFORNIA

                            SAN FRANCISCO DIVISION

| APPLE COMPUTER, INC., | Case No. 06-CV-00019 MHP |
|---|---|
| Plaintiff and Counterdefendant, | **APPLE COMPUTER, INC.'S AMENDED ANSWER TO BURST.COM, INC.'S AMENDED COUNTERCLAIM AND COUNTERCLAIM FOR DECLARATORY JUDGMENT** |
| v. | |
| BURST.COM, INC., | |
| Defendant and Countercomplainant. | Hon. Marilyn Hall Patel |
| | Complaint Filed: January 4, 2006 |
| | Trial Date: February 26, 2008 |

APPLE COMPUTER, INC.'S ANSWER TO
BURST.COM, INC.'S AMENDED
COUNTERCLAIM AND COUNTERCLAIM                                        Case No. 06-CV-0019 MHP

Counterclaim defendant Apple Computer, Inc. answers defendant Burst.com, Inc.'s Amended Counterclaim ("Burst's Counterclaim") as follows:

**PARTIES**

1. Apple admits that Burst maintains its principal place of business at 613 Fourth St., Suite 201, Santa Rosa, California, 95404. Apple does not have sufficient knowledge or information as to the truth of the remaining allegations set forth in paragraph 1 of Burst's Counterclaim and on that basis these allegations are denied.

2. Apple admits that it is a California corporation with its principal place of business at One Infinite Loop, Cupertino, CA 95014.

**JURISDICTION AND VENUE**

3. Apple admits that Burst's Counterclaim alleges acts of infringement of a United States patent and that this Court has subject matter jurisdiction over those claims. Apple further admits that venue is proper in this Court for those claims.

4. Apple admits that it is subject to the personal jurisdiction of this Court and that Burst's Counterclaim is substantially related to the claims asserted by Apple against Burst in this action. Apple admits that it provides products and services in the Northern District of California but denies that they are "infringing."

**BACKGROUND**

5. Apple admits that U.S. Patent No. 4,963,995 (the "'995 patent") issued October 16, 1990, and that Exhibit A to Burst's Counterclaim appears to be an accurate copy of the '995 patent, titled "Audio/Video Transceiver Apparatus Including Compression Means." Apple does not have sufficient knowledge or information as to the truth of the remaining allegations set forth in paragraph 5 of Burst's Counterclaim and on that basis those allegations are denied.

6. Apple admits that U.S. Patent No. 5,057,932 (the "'932 patent") issued October 15, 1991 and that Exhibit B to Burst's Counterclaim appears to be an accurate copy of the '932 patent. Apple also admits that U.S. Patent No. 5,164,839 (the "'839 patent") issued November 17, 1992 and that Exhibit C to Burst's Counterclaim appears to be an accurate copy of

1 the '839 patent. Apple admits that U.S. Patent No. 5,995,705 (the "'705 patent") issued November 30, 1999 and that Exhibit D to Burst's Counterclaim appears to be an accurate copy of the '705 patent. Apple admits that Richard A. Lang is named as the inventor on the face of the '995, '932, '839, and '705 patents. Apple admits that according to the records of the United States Patent Office and the face of the '995 patent, the application for the '995 patent was filed on December 27, 1988. Apple further admits that the '932, '839, and '705 patents each states on its face that it is related to a continuation-in-part of the application filed on December 27, 1988, and that these patents are part of the same "family" in that sense. Apple does not have sufficient knowledge or information as to the truth of the remaining allegations set forth in paragraph 6 of Burst's Counterclaim and on that basis those allegations are denied.

7. Apple admits that the '995, '932, '839 and '705 collectively contain 186 patent claims. Apple admits that according to the records of the United States Patent Office and the face of the '995 patent, the application for the '995 patent was filed on December 27, 1988. Apple further admits that the '932, '839, and '705 patents each states on its face that it is related to a continuation-in-part of the application filed on December 27, 1988. Except as otherwise expressly admitted herein, Apple denies the allegations set forth in paragraph 7 of Burst's Counterclaim.

8. Apple does not have sufficient knowledge or information as to the truth of the allegations set forth in paragraph 8 of Burst's Counterclaim and on that basis these allegations are denied.

9. Apple admits that according to public records, there was a previous lawsuit between Burst and Microsoft Corporation in which Burst accused Microsoft of antitrust violations and of infringing the '995, '839, and '705 patents. Apple admits that according to press releases and news reports, Microsoft paid Burst $60 million pursuant to a settlement of that lawsuit, and obtained a license to Burst's entire patent portfolio as a result of that settlement. Apple does not have sufficient knowledge or information as to the truth of the remaining allegations set forth in paragraph 9 of Burst's Counterclaim and on that basis these allegations are denied.

10. Apple admits that Burst contacted Apple in 2000 and 2002 regarding

Burst's interest in having Apple acquire Burst. Apple further admits that Burst informed Apple in 2000 that it owned issued patents, and that Apple was thereby aware of those patents. Apple denies that it has developed or sold infringing products as alleged in paragraph 10 of Burst's Counterclaim. Apple does not have sufficient knowledge or information as to the truth of the remaining allegations set forth in paragraph 10 and on that basis these allegations are denied.

11. Apple admits that it manufactures and sells computer hardware and software, portable digital media players under the brand name "iPod," as well as software under the brand name "iTunes." Apple admits that it markets iPod and iTunes on its website and elsewhere, and that its website contains a tab labeled "iPod + iTunes." Apple admits that it sells or has sold products branded as "iPod, iPod Shuffle, iPod Nano, iPod Mini, iPod Video, and iPod U2" and that its revenue from iPod sales in its fiscal year 2005 was more than two billion dollars. Apple denies that any of its audio and video products and services infringe any of the Burst patents. Apple further denies that Burst is entitled to damages on sales of Apple's iPod. Apple further denies all the remaining allegations in paragraph 11.

12. Apple admits that it manufactures and distributes iTunes software, which can be and is used for audio and video applications. Apple admits that the iTunes software is sometimes preloaded on computers sold by Apple. Apple admits that the Mac OS operating system is normally preloaded on Apple computers sold to consumers. Apple admits that it distributes iTunes software for use on Apple computers with the Mac OS and for use on computers manufactured by other companies that use the Windows operating system. Apple admits that it distributed more than 2 million copies of iTunes software in 2005, but denies that its iTunes software infringes any of the patents asserted in Burst's counterclaim including when it is used in conjunction with Macs, iPod devices, or the iTunes Store. Apple further denies that Burst is entitled to damages. Apple further denies all the remaining allegations in paragraph 12.

        13.     Apple admits that paragraph 13 of Burst's Counterclaim accurately quotes from its website at "www.apple.com/itunes/overview/." Apple denies that its iTunes Store infringes any of the patents asserted in Burst's counterclaim and denies that Burst is entitled to damages. Apple further denies all the remaining allegations in paragraph 13.

        14.     Apple admits that paragraph 14 of Burst's Counterclaim accurately quotes from Apple's Mac OS X Quicktime Streaming Server 5.5 administration guide. Apple further admits that paragraph 14 of Burst's Counterclaim accurately quotes a portion of its website at "www.apple.com/quicktime/technologies/streaming/." Apple denies that any of its alleged "QuickTime suite of products" infringes any of the patents asserted in Burst's counterclaim and denies that Burst is entitled to damages. Apple further denies all the remaining allegations in paragraph 14.

        15.     Apple admits that it manufactures, sells and uses computers that can be used to run iTunes software and the alleged "QuickTime suite of products" and that Apple's website describes the "Skip Protection" feature as set forth in paragraph 14 of Burst's Counterclaim. Apple further admits that certain "Macs" are sold with Quicktime Player and iTunes preinstalled but denies that QuickTime Player or iTunes software is "infringing." Apple denies that the manufacturing, selling, or using of Apple computers or servers sold by Apple infringes any of the patents asserted in Burst's counterclaim and denies that Burst is entitled to damages. Apple further denies all the remaining allegations in paragraph 15.

## COUNT I

        16.     Apple denies the allegations in paragraph 16 of Burst's Counterclaim.

        17.     Apple denies the allegations in paragraph 17 of Burst's Counterclaim.

        18.     Apple denies the allegations in paragraph 18 of Burst's Counterclaim.

        19.     Apple denies the allegations in paragraph 19 of Burst's Counterclaim.

        20.     Apple denies the allegations in paragraph 20 of Burst's Counterclaim.

        21.     Apple denies the allegations in paragraph 21 of Burst's Counterclaim.

## BURST'S PRAYER FOR RELIEF

        22.     Apple denies that Burst is entitled to any of the relief it requests in

paragraphs (a) through (i) of Burst's Counterclaim.

## BURST'S DEMAND FOR JURY TRIAL

23. Apple denies that Burst is entitled to a trial by jury on all issues.

## APPLE'S AFFIRMATIVE DEFENSES

24. Apple asserts the following affirmative defenses and reserves the right to allege additional defenses as they are discovered.

## FIRST DEFENSE

25. The complaint fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

26. Apple has not infringed, and is not infringing, either directly or indirectly, contributorily or otherwise, any asserted claim of Burst's patents in this action.

## THIRD DEFENSE

27. Each of the asserted claims of the '995, '932, '839 and '705 patents is invalid for failure to comply with the requirements of the patent laws of the United States, including but not limited to the provisions of 35 U.S.C. § 101, 102, 103, and 112.

## FOURTH DEFENSE

28. The relief sought by Burst for the alleged infringement of any claim of the '995, '932, '839, and '705 patents is barred in whole or in part by the doctrine of laches.

## FIFTH DEFENSE

29. The relief sought by Burst for the alleged infringement of any claim of the '995, '932, '839, and '705 patents is barred in whole or in part by the doctrines of waiver and/or estoppel.

## SIXTH DEFENSE

30. The relief sought by Burst for the alleged infringement of any claim of the '995, '932, '839, and '705 patents is barred in whole or in part by 35 U.S.C. § 286.

## SEVENTH DEFENSE

31. The relief sought by Burst for the alleged infringement of any claim of the '995, '932, '839, and '705 patents is barred in whole or in part by 35 U.S.C. § 287.

## EIGHTH DEFENSE

32. The claims of the '995, '932, '839, and '705 patents are unenforceable because Richard Lang and his counsel, William Hein, committed inequitable conduct during the prosecution of the Burst patents.

33. Messrs. Lang and Hein committed inequitable conduct during prosecution of the Burst patents by intentionally withholding from the PTO the fact that Mr. Lang was incapable of practicing the claimed invention, and by disclosing only an inoperable embodiment of the claimed invention instead of making an enabling disclosure. Specifically, Mr. Lang disclosed only one device for performing compression in the '995 patent, the AMD 7971 fax compression chip. This chip could not be used to practice the claimed invention using the disclosure in Mr. Lang's application, and Mr. Lang knew of no one who had ever used it successfully. *See* Lang Depo. 1/8/07 at 200:11-15 ("**Q**: Who are you aware of that built a video compressor using the AMD 7971 fax chip? **A**: I'm not aware of anyone specifically. **Q**: So you don't know if it's ever been done? **A**: I don't know."). Further, Mr. Lang knew that the only disclosed embodiment of the '995 patent was inoperable and would not enable one of skill in the art to practice the invention. Mr. Lang himself could not have built the described embodiment using the disclosure in the patent. *See* Lang Depo. 1/8/07 at 232:18-234:23 ("**Q**: But if you didn't and you were working on your own, but otherwise had whatever resources you needed, meaning tools, equipment, integrated circuits, software, would you be able to build what's described in the '995 patent? **A**: I'm not an electrical engineer, it's not in my field of expertise to build it. **Q**: So the answer is "No," correct? **A**: Correct. **Q**: Is that true today as well? **A**: Correct."). Mr. Hein testified that he was not aware of Lang's failed efforts to reduce the invention to practice. *See* Hein Depo. 7/24/2007 at 50:14 – 51:17 ("**Q**: Were you aware that Mr. Lang and his colleagues at Burst and its predecessors worked until sometime in mid to late 1990 before they were able to actually build something that would compress video and send it faster than real time? **A**: I wasn't aware of any of their development efforts. Had no knowledge of it."); 67:2-7 ("**Q**: So let me ask it differently then. Mr. Hein, were you aware that the embodiment in the 995 patent would not work? **A**. I was not."); 127:17 – 128:17 ("**Q**. So Burst never told you that they had

worked for a year and four or five months on finding a compressor to make a VCRET and not been able to find one; right? **A**. I just never had any discussion regarding their development efforts. **Q**. Okay. So they didn't tell you that the fax chip didn't work and they didn't tell you they weren't able to find something else to replace it; right? **A**. As I said I never held discussions with them regarding their development progress."). However, Mr. Lang said he had kept his counsel informed about his progress. *See* Lang Depo. 7/26/07 at 174:20 – 175:1 ("**Q**: Were your patent attorneys aware in the 1988 through 1991 time period, say, of the technical efforts that Burst was making to develop prototypes and commercialize your invention? **A**: I – I believe so. I mean they weren't involved in those efforts day to day. They were aware of what our business activities were in general."). Further, at the time of filing the application that led to the '995 patent, and also at the time of filing the application that led to the '932 patent, Mr. Lang was not aware of any existing technology that was actually capable of performing the compression described in his application, and believed instead that the AMD 7971 fax chip was the best mode of performing video compression in his invention. *See* Lang Depo. 1/8/07 at 225:25-231:2 ("**Q**: So was there a time at which you concluded that the combination of the AMD chip and interframe compression was not the best way to do video compression in your invention? **A**: No. **Q**: So you always believed that? **A**: Correct. **Q**: Okay. And is that still true today, you believe that's the best? **A**: Yes."); *see also* BURSTA 296241-46; BURSTA 297590-600; BURSTA 296224-28; BURSTA 296193-206. At no time did Messrs. Lang and Hein disclose or explain to the PTO that the only disclosed embodiment of the '995 patent was inoperable as described, that the disclosure was not enabling, or that Mr. Lang could not practice the invention.

34.     Further, in the continuation-in-part application that led to the '932, '839, and '705 patents, Messrs. Lang and Leeds removed all reference to the AMD 7971 chip because they knew it did not work. Mr. Lang testified that he kept his counsel informed of technological developments. *See* Lang Depo. 7/26/07 at 174:20 – 175:1 ("**Q**: Were your patent attorneys aware in the 1988 through 1991 time period, say, of the technical efforts that Burst was making to develop prototypes and commercialize your invention? **A**: I – I believe so. I mean they weren't involved in those efforts day to day. They were aware of what our business activities were in

general."). Mr. Lang also testified that he was aware of his obligation to disclose the best mode of his invention. *See* Lang Depo. 7/26/07 at 173:14-19 ("**Q**: Okay. And today do you understand that one of the obligations you have in a patent application is to disclose the best mode of practicing the invention? **A**: Yes. **Q**: Did you have that understanding back in 1988? **A**: Yes."). By stripping out all reference to the AMD 7971 chip, which Mr. Lang believed to be the best mode of the invention, Mr. Lang intentionally withheld the best mode of the invention from the '932, '839, and '705 patents. At no time did Mr. Lang disclose or explain to the PTO that the best mode was not disclosed in the '932, '839, and '705 patents.

35.     A reasonable examiner would have found it important to know that the only disclosed embodiment of the '995 patent was inoperable as described, that the disclosure was not enabling, that Mr. Lang could not practice the invention, and that Mr. Lang's best mode had been removed from the continuation-in-part application that led to the '932, '839, and '705 patents. In withholding this information from the Patent Office, Messrs. Lang, Leeds, and Hein acted with intent to deceive the PTO.

36.     Mr. Lang also committed inequitable conduct by withholding from the PTO statements made by the EPO in rejecting Burst's application on the ground that claims including a "time compressed representation" were not supported by the written description. The EPO rejections on the lack of support for a "time compressed representation" and storing a "time compressed representation" were highly material, particularly in light of the fact that Burst made representations to the PTO to obtain issuance of its applications in the United States that were inconsistent with rejections made by the EPO and Burst's own actions before the EPO.

37.     In an Office Action dated April 22, 1994, the EPO rejected the then-pending claims of Burst's Application No. 90 902 741.9 based on, among other grounds, the fact that the claims "introduce subject matter which extends beyond the content of the application as originally filed." The EPO noted that while the claims required a "time compressed representation" and "storing of time compressed representation," "no such time compression or storing of time compressed information could be identified" in the application. In response, Burst argued on May 5, 1995 that the existing descriptions disclosed that "the video program is

1  communicated or transmitted at an accelerated rate in less time that would be taken to view the
2  program" and thus that no new subject matter had been introduced by "time compressed
3  representation" in the claims. The EPO responded on June 30, 1995, that the passage cited by
4  Burst did not disclose time compression, but disclosed only data compression and faster-than-
5  real-time transmission. The EPO also noted that claims that involved storing a time compressed
6  representation did not make sense: "the subject matter as claimed in claims 1, 40, 50, 66, and 105
7  lacks clarity because it does not make sense to generate a time compressed representation of an
8  information and store this representation in a memory means where the effect of the time
9  compression is lost." In response, Burst dropped "time" from its claims and claimed only
10 compression plus sending the compressed representation faster than real time. Burst also
11 amended the description to match the new claims.

12        38.     Messrs. Lang and Hein were aware of the rejections in the EPO because
13 both were directly involved in the prosecution. *See* Lang Depo. 1/9/07 at 342:23-343:24 ("**Q**:
14 Have you seen the file history for European patent 047561 before? **A**: If I have, it's been, you
15 know, many, many years ago. **Q**: Were you involved in the prosecution of that patent? **A**: I was.
16 **Q**: Did you oversee the responses to Office Actions in that case? **A**: Along with my lawyer, yes.
17 **Q**: Did you read the Office Actions in that case? **A**: I assume I did. **Q**: Were you involved in --
18 did you read the responses to the Office Actions? **A**: I assume that I did."); Hein Depo. 7/24/07 at
19 87:4-7 ("**Q**.  So that suggests that by August of 1992 you had taken over European prosecution
20 for at least some Burst patents; right? **A**.  It would appear that way.") Messrs. Lang and Hein
21 never informed the PTO that Burst's European claims including "time compressed
22 representation" had been rejected by the EPO for lack of support in the written description,
23 despite the fact that its U.S. claims were purportedly based on the same description. *See* Lang
24 Depo. 1/9/07 at 348:24-349:10 ("**Q**: You did not instruct your lawyer to tell the U.S. Patent
25 Office about the European rejection, correct? **A**: Again, I don't recall those discussions at all.
26 It's been 20 years ago, I don't remember the discussions."). The EPO rejections of the "time
27 compressed representation" language would have been important to a reasonable examiner in
28 deciding whether to allow the Burst applications to issue in the U.S. The EPO rejections and

1  Burst's response to them would have been particularly material in light of statements made by
2  Burst to the PTO that contradicted the substance of Burst's dialog with the EPO. For example,
3  Burst stated during prosecution of the '705 patent that "time compression" is "defined in the
4  specification of the Application" when trying to traverse a rejection over the prior art. Burst's
5  withholding from the PTO of EPO rejections based on the fact that "time compression" is <u>not</u>
6  supported by the written description, as well of its actions in response, was intentional and done
7  to deceive the PTO.

8        39.    Messrs. Lang and Hein also committed inequitable conduct during
9  prosecution of the '932, '839, and '705 patents by intentionally misrepresenting the content of
10 U.S. Patent No. 4,506,387 by Howard Walter ("Walter") to the examiner in a manner calculated
11 to conceal the significance of Walter from the examiner. Messrs. Lang and Hein first disclosed
12 Walter to the PTO in an Information Disclosure Statement on May 6, 1991. In that IDS, the
13 applicant stated that Walter had first come to his attention on April 2, 1991, was discussed with
14 his attorney, Mr. Hein, on April 9, 1991, and that they had concluded Walter was material to the
15 examination of the application that led to the '932 patent. The applicant described Walter as
16 being "directed to a programming-on-demand cable TV system in which a video program is
17 divided into a number of segments and stored in a segmented memory in compressed digital
18 form. The stored video segments are then converted from electrical data to optical data and
19 simultaneously transmitted over a plurality of parallel fiber optic transmission lines to a data
20 receiving station, which then reconverts the optical data back to the original electrical data."
21 Applicant's description of Walter was misleading and deceptive because it suppressed the most
22 material facts about the reference, including that Walter teaches data compression that enables
23 significantly faster-than-real-time transmission of compressed full motion video. *See* Hein Depo.
24 7/24/07 at 111:5-22 ("**Q**: Okay. But you did not tell the patent office that the 387 patent to
25 Walter disclosed sending a movie faster than realtime; right? **A**: Where was that tab? **Q**: That
26 was tab 14, the IDS was? **A**: The description doesn't say anything about time. **Q**: Why not? **A**:
27 I don't know. **Q**: You can't explain it? **A**: Like I say, I don't recall -- I can't recall the reference,
28 I can't recall whether I read the reference word for word, what comments I received from

technical comments from Earl and Richard."). A reasonable U.S. patent examiner would have at all times considered the fact that Walter disclosed faster-than-real-time transmission of compressed video important in deciding whether to allow the applications for the Burst patents to issue.

40. Mr. Lang suppressed the material facts about Walter with intent to deceive the PTO. Mr. Lang knew that Walter disclosed faster-than-real-time transmission of data-compressed video. Mr. Lang admitted that he had studied Walter and its file history on several occasions and had concluded that it was material prior art. *See* Lang Depo. 1/9/07 at 355:7-22 ("**Q**: Then it says, the applicant's attorney ordered the file history of this patent from the PTO and reviewed and discussed the subject matter thereof on several occasions with the applicant and his technical associates before concluding on or about May 3rd, 1991, that the reference is material to the examination of the instant application. Do you recall those events? **A**: I don't have a recollection today as I sit here. I have no reason to not believe that, I just don't remember it. **Q**: Do you recall discussing the subject matter of the Walter patent with your attorney at all? **A**: I believe we did discuss it, yes."); *see also generally* Lang Depo. 1/9/07 at 349:25-379:17 (discussing Walter). Despite this extensive review, Messrs. Lang and Hein summarized the disclosure of Walter in a misleading and deceptive way to hide its true importance from the PTO. *See* Lang Depo. 1/9/07 at 359:13-16 ("**Q**: There's no mention there that Walter discloses faster-than-real-time transmission of compressed video, correct? **A**: No, this document doesn't say that."). This suppression of Walter was intentional and done with intent to deceive the PTO. Messrs. Lang and Hein's suppression of material facts about Walter render the '995, '932, '839, and '705 patents unenforceable for inequitable conduct.

41. Additionally, during prosecution of the '932, '839, and '705 patents, Messrs. Lang and Hein withheld from the PTO critical information regarding DVI compression technology. The DVI compression technology was a revolutionary advance in video compression that allowed full motion video to be played and stored at the CD-ROM data rate of 150 KB/second. The DVI compression technology was developed during the mid-1980s at the David Sarnoff Research Center in Princeton, NJ. DVI was demonstrated publicly numerous times

before the filing of the Burst patents, including in March 1987 at the Microsoft CD-ROM conference. DVI and its public demonstrations were also detailed in numerous printed publications before the filing of the Burst patents. *See generally* APBU 159516-836.

42. Mr. Lang learned about DVI no later than September 1990. At that time, Burst was attempting to build a prototype of its system, but had been unable to develop a workable compression technique. Burst learned that DVI, now owned by Intel, had already succeeded in compressing video to a CD-ROM data rate. Burst abandoned its efforts to develop its own compression techniques, and adopted DVI technology for use in Burst prototypes. *See* Lang Depo. 1/8/07 at 225:25-231:2 ("**A**: When we became aware of the DVI product, we determined that that was a better way to go. It was commercially available and it seemed to meet our needs. **Q**: And when did that happen? **A**: That happened sometime in 1990, I believe.").

43. The DVI system could take uncompressed full motion video and dramatically reduce the data rate of the signal so as to allow storage, faster-than-real-time transfer, and real-time playing of the compressed video signal. Mr. Lang knew this because he used DVI to do exactly that in the prototype of his claimed invention exhibited at CES in 1991. DVI was developed and publicized in the United States years before the Burst patents were filed. DVI is material to the patentability of the claims of the '995, '932, '839, and '705 patents, and a reasonable patent examiner would have considered DVI important in deciding whether to allow the claims of the '995, '932, '839, and '705 patents.

44. Despite Burst's intimate knowledge of DVI and its own use of the technology in its attempts to reduce Burst's putative invention to practice, Messrs. Lang and Hein withheld information about DVI from the PTO. Notably, Messrs. Lang and Hein failed to disclose printed publications describing DVI technology that was in development and displayed to the public before the filing of the Burst patents. This omission was intentional and done to deceive the PTO.

45. Messrs. Lang and Hein also withheld from the PTO prior art cited against the European equivalent of the Burst patents during prosecution of the '705 patent. In an Office Action dated April 22, 1994 for Application No. 90 902 741.9, the European Patent Office

("EPO") cited and discussed prior art references including IEEE Transactions on Consumer Electronics, "1988 International Conference on Consumer Electronics, Part 1", 34 (1988) August, No. 3, New York, U.S., pages 838-845; Hildering et al.: "Programmable Compact Disk Picture Memory and Video Processing System" ("Hildering"); EP-A-0 283 727 ("Parker"); and EP-A-0 082 077 ("Gremillet EP"). The Hildering, Parker, and Gremillet EP references disclose subject matter material to the patentability of the asserted claims of the '705 patent. In the EPO Office Action, all of the then-pending claims, which included the phrase "time compressed representation," were deemed not patentable over at least one of the three references. A reasonable examiner would have at all times considered Hildering, Parker, and Gremillet EP important in deciding whether to allow the applications for the Burst patents to issue.

46.   Messrs. Lang and Hein, who had knowledge of these references due to the EPO Office Action rejecting the claims in Burst's European application, withheld Hildering, Parker, and Gremillet EP from the PTO with the intent to deceive the PTO.

47.   Based on Messrs. Lang's, Leeds', and Hein's intentional acts as described above the claims of the '995, '932, '839, and '705 patents are unenforceable for inequitable conduct.

48.   Messrs. Lang's, Leeds', and Hein's inequitable conduct during prosecution of any one of the Burst patents also renders unenforceable the claims of the other Burst patents by the doctrine of infectious unenforceability. The '932, '839, and '705 patents share the same specification. All three descend from the '995 parent patent. Specifically, the '705 patent is the ultimate continuation of the '839 patent, which itself is a division of a continuation-in-part of the '995 patent. That continuation-in-part of the '995 patent led to the '932 patent. Due to the immediate and necessary relationship the '995, '932, '839, and '705 patents have with each other, inequitable conduct during the prosecution of the any one of the Burst patents renders the others unenforceable as well.

## COUNTERCLAIM

49.   Apple hereby restates and realleges the allegations set forth in paragraphs 1 to 48 above and incorporates them by reference.

50. Apple counterclaims against Defendant Burst.com pursuant to the patent laws of the United States, Title 35 of the United States Code, with a specific remedy sought based upon the laws authorizing actions for declaratory judgment in the courts of the United States, 28 U.S.C. §§ 1331, 1338(a), 2201, 2202, and Federal Rule of Civil Procedure 13.

51. Apple has not infringed, and is not infringing, either directly or indirectly, contributorily or other otherwise, any claim of the '932 patent.

52. The claims of the '932 patent are invalid for failure to comply with the requirements of the patent laws of the United States, including but not limited to the provisions of 35 U.S.C. § 101, 102, 103, and 112.

53. The claims of the '995, '932, '839, and '705 patents are unenforceable due to the inequitable conduct alleged in paragraphs 32-48 above.

54. Because of the inequitable conduct alleged in paragraphs 32-48 above, this is an exceptional case warranting an award of attorneys' fees to Apple under 35 U.S.C. § 285.

## **PRAYER FOR RELIEF**

WHEREFORE, Apple prays for judgment as follows:

1. Declaring that Apple has not infringed and is not infringing, directly, indirectly or contributorily, any claims of the '995, '932, '839 and '705 patents ("the patents-in-suit");

2. Declaring that each of the claims of the patents-in-suit is invalid.

3. Declaring that each of the claims of the patents-in-suit is unenforceable.

4. Declaring that Defendant Burst.com and each of its officers, employees, agents, alter egos, attorneys, and any persons in active concert or participation with them be restrained and enjoined from further prosecuting or instituting any action against Apple claiming that any claim of any of the patents-in-suit is valid or infringed, or from representing that any of Apple's products or services, or others' use thereof, infringes any claim of any of the patents-in-suit;

5. Declaring this case exceptional under 35 U.S.C. § 285 and awarding Apple its attorneys' fees and costs in connection with this case;

      6.    Awarding Apple such other and further relief as the Court deems just and proper.

Dated: September 19, 2007                 WEIL, GOTSHAL & MANGES LLP

By:     /s/    
     Nicholas A. Brown
     Attorney for Plaintiff and Counterdefendant
     Apple Computer, Inc.